**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID NYY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TELEFONAKTIEBOLAGET LM ERICSSON, BÖRJE EKHOLM, and CARL MELLANDER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Nyy ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Telefonaktiebolaget LM Ericsson ("Ericsson" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Ericsson securities between April 27, 2017 and February 25, 2022, both dates inclusive (the "Class Period"), seeking

to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Ericsson, together with its subsidiaries, provides communication infrastructure, services, and software solutions to the telecommunications and other sectors.  The Company operates in, among other countries, the Republic of Iraq ("Iraq").

3.     Ericsson has a well-documented history of using bribes to secure business in countries throughout the Middle East and Asia.  For example, in December 2019, Ericsson was the subject of an SEC action alleging, among other things, that the Company used third party consultants and illicit payments from 2011 through early 2017 to access business in Djibouti, Saudi Arabia, and China.  The Company also entered into a Deferred Prosecution Agreement ("DPA") with the U.S. Department of Justice ("DOJ") the same month for its illicit business dealings.

4.     Following the foregoing regulatory enforcement actions—which resulted in Ericsson being fined over $520 million and nearly $540 million by the DOJ and SEC, respectively—Ericsson repeatedly assured investors that the Company had a "zero tolerance" stance for bribery and was making significant investments in related programs.  For example, in a December 2019 press release, the Company asserted that it was "[e]nhancing . . . internal anti-corruption and compliance related awareness campaigns (including the Company's zero tolerance for corruption)."  Likewise, in its 2019 annual report, the Company asserted that it has "zero tolerance for corruption" and "work[s] hard every day to build a culture of compliance, anchored securely within the organization, to ensure that such an event will never happen again."

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ericsson overstated the extent to which it had reformed its business practices to eliminate the use of bribes to secure business in foreign countries; (ii) Ericsson had paid bribes to the terrorist group the Islamic State in Iraq and Syria ("ISIS" or the "Islamic State") to gain access to certain transport routes in Iraq; (iii) accordingly, the Company's revenues derived from its operations in Iraq were, in at least substantial part, derived from unlawful conduct and thus unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     On February 15, 2022, during intraday trading hours, Ericsson issued a press release disclosing media inquiries into its business dealings in Iraq.  That press release assured investors of the Company's "transparency" regarding these inquiries, while vaguely alluding to having undertaken its own investigative and compliance efforts.

7.     Then, on February 16, 2022, Ericsson's Chief Executive Officer ("CEO") told a Swedish newspaper that the Company may have made payments to ISIS to gain access to certain transport routes in Iraq, noting that the Company had identified "unusual expenses dating back to 2018" but had not yet determined the final recipient of the funds for those expenses, although Defendants could "see that it disappeared[,]" and that  Ericsson has spent "considerable resources trying to understand this as best we can."

8.     Following these disclosures, Ericsson's American Depositary Share ("ADS") price fell $1.44 per ADS, or 11.57%, to close at $11.01 per ADS on February 16, 2022.

9.     Finally, on Sunday, February 27, 2022, the International Consortium of Investigative Journalists ("ICIJ") published a report on Ericsson's alleged dealings with ISIS in Iraq, citing a leaked internal investigation that revealed that Ericsson had reportedly made "tens of millions of dollars in suspicious payments" over nearly a decade to keep its business in the country.

The ICIJ report also alleged that "a spreadsheet lists company probes into possible bribery, money laundering and embezzlement by employees in Angola, Azerbaijan, Bahrain, Brazil, China, Croatia, Libya, Morocco, the United States and South Africa[,]" which "have not been previously disclosed."

10.     On this news, Ericsson's ADS price fell $0.84 per ADS, or 8.3%, from its closing price on February 25, 2022, to close at $9.28 per ADS on February 28, 2022, the next trading day.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and subsequent damages took place in this Judicial District.  Pursuant to Ericsson's most recent annual report on Form 20-F, as of December 31, 2020, there were 3,072,395,752 of the Company's B shares outstanding.  Ericsson's ADSs, each representing one B share, trade on the NASDAQ Stock Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Ericsson's ADSs located in the U.S., some of whom undoubtedly reside in this Judicial District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

16.    Plaintiff, as set forth in the attached Certification, acquired Ericsson securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.    Defendant Ericsson is organized under the laws of the Kingdom of Sweden ("Sweden") with principal executive offices located at Torshamnsgatan 21, Kista, SE-164 83, Stockholm, Sweden.  Ericsson ADSs trade on the NASDAQ under the trading symbol "ERIC".

18.    Defendant Börje Ekholm ("Ekholm") has served as Ericsson's President and CEO at all relevant times.

19.    Defendant Carl Mellander ("Mellander") has served as Ericsson's Executive Vice President and Chief Financial Officer at all relevant times.

20.    Defendants Ekholm and Mellander are sometimes referred to herein as the "Individual Defendants."

21.    The Individual Defendants possessed the power and authority to control the contents of Ericsson's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Ericsson's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Ericsson, and their access to material information available to them but not to the public, the

Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.     Ericsson and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Ericsson, together with its subsidiaries, provides communication infrastructure, services, and software solutions to the telecommunications and other sectors.  The Company operates in, among other countries, Iraq.

24.     Ericsson has a well-documented history of using bribes to secure business in countries throughout the Middle East and Asia.  For example, in December 2019, Ericsson was the subject of an SEC action alleging, among other things, that the Company used third party consultants and illicit payments from 2011 through early 2017 to access business in Djibouti, Saudi Arabia, and China.  The Company also entered into a DPA with the DOJ the same month for its illicit business dealings.

25.     Following the foregoing regulatory enforcement actions—which resulted in Ericsson being fined over $520 million and nearly $540 million by the DOJ and SEC, respectively—Ericsson repeatedly assured investors that the Company had a "zero tolerance" stance for bribery and was making significant investments in related programs.  For example, in a December 2019 press release, the Company asserted that it was "[e]nhancing . . . internal anti-corruption and compliance related awareness campaigns (including the Company's zero tolerance

for corruption)."  Likewise, in its 2019 annual report, the Company asserted that it has "zero tolerance for corruption" and "work[s] hard every day to build a culture of compliance, anchored securely within the organization, to ensure that such an event will never happen again."

## **Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on April 27, 2017, the day after Ericsson filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 20-F").  In discussing Ericsson's operating results for the years ended December 31, 2014 and 2015, the 2016 20-F reported, *inter alia*: "Global Services sales grew by 11%, with 15% growth in Professional Services, while Network Rollout sales were almost flat. Networks sales grew by 5% and Support Solutions sales by 19%."

27.     With specific respect to Ericsson's Middle Eastern business results, the 2016 20-F reported the following: "Sales increased, primarily in Global Services. In the first half of the year, Network sales growth was mainly driven by some major mobile broadband projects, which were completed in the second half of the year."

28.     With respect to Ericsson's controls and procedures, the 2016 20-F referred investors to the Company's corporate governance report for 2016 (the "2016 Corporate Governance Report"), which stated that, "to ensure compliance with legal and regulatory requirements and the high standards that we set for ourselves, Ericsson has adopted internal rules that include" a "Code of Business Ethics"; "Group Steering Documents, including Group policies and directives, instructions and business processes for approval, control and risk management"; and "[a] Code of Conduct, which applies to product development, production, supply and support of Ericsson products and services worldwide."

29.    The 2016 Corporate Governance Report also stated the following with respect to Ericsson's Code of Business Ethics:

> Ericsson's Code of Business Ethics summarizes fundamental Group policies and directives and contains rules to ensure that business is conducted with a strong sense of integrity. This is critical to maintain trust and credibility with Ericsson's customers, partners, employees, shareholders and other stakeholders.
>
> The Code of Business Ethics contains rules for all individuals performing work for Ericsson under the staff management of Ericsson. The Code of Business Ethics has been translated into more than 30 languages. This ensures that it is accessible to everyone working for Ericsson. Upon recruitment, employees acknowledge that they are aware of the principles of the Code of Business Ethics. This procedure is repeated during the term of employment. Through this process, Ericsson strives to raise awareness throughout its global operations.
>
> Everyone working for Ericsson has an individual responsibility to ensure that business practices adhere to the Code of Business Ethics.

30.    Appended as exhibits to the 2016 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "the [2016 20-F] fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the [Exchange Act], as amended[,]" and that "the information contained in the [2016 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

31.    On March 27, 2018, Ericsson filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 20-F").   In discussing Ericsson's operating results for the years ended December 31, 2015 and 2016, the 2017 20-F reported, *inter alia*: "Global Services represented 45.7% of net sales in 2016 (43.7% in 2015). The segment delivers network rollout services and professional services (i.e., managed services, consulting and systems integration (CSI), customer support as well as network design and optimization services)."

32.     The 2017 20-F also made various representations concerning Ericsson's compliance efforts, particularly with respect to anticorruption and bribery, stating, *inter alia*, that "[s]ustainability and corporate responsibility are integrated into Ericsson's business processes"; that "Ericsson is committed to creating business value while reducing risk related to . . . employee, human rights, corruption and bribery matters"; that "[g]roup policies and directives have been implemented to ensure consistency across global operations"; that "Ericsson has a zero-tolerance approach to corruption expressed in the Company's Code of Business Ethics"; that "[t]he Company has embedded this guiding principle at its highest levels and implemented it throughout its global organization with a set of policies and processes"; and that "[t]his includes an anti-corruption directive with more detailed guidelines, for example about appropriate levels of gifts and entertainment."

33.     Additionally, the 2017 20-F assured investors that "[d]uring 2016–2017 we invited external experts to evaluate the robustness of our anti-corruption program"; that "[f]ollowing the review, we adjusted the anti-corruption program to closer align with the US Foreign Corrupt Practices Act (FCPA)"; that "[i]n 2017, the program was strengthened with adding resources on group level and appointing Regional Compliance Officers in all Market Areas"; and that "[i]n 2017 the Company continued to roll out an automated anti-corruption screening tool for supplier and third party due diligence, which was launched in 2016."

34.     Appended as exhibits to the 2017 20-F were substantively the same SOX certifications as referenced in ¶ 30, *supra*, signed by the Individual Defendants.

35.     On March 29, 2019, Ericsson filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December

31, 2018 (the "2018 20-F").  That filing reported total 2017 sales for the Middle East and Africa of 25 million SEK.[1]

36.      With respect to Ericsson's controls and procedures, the 2018 20-F referred investors to the Company's corporate governance report for 2018, which contained substantively the same statements as referenced in ¶¶ 28-29, *supra*, regarding the Company's internal rules and Code of Business Ethics.

37.      Appended as exhibits to the 2018 20-F were substantively the same SOX certifications as referenced in ¶ 30, *supra*, signed by the Individual Defendants.

38.      On December 6, 2019, Ericsson issued a press release announcing that it had reached a resolution regarding U.S. Foreign Corrupt Practices Act ("FCPA") investigations by the DOJ and SEC (the "December 2019 Press Release").  That press release stated, *inter alia*, that "[t]he resolution relates to historical FCPA breaches ending Q1 2017"; that "[w]hile the Company had a compliance program and a supporting control framework, they were not adequately implemented"; that, "[s]pecifically, certain employees in some markets, some of whom were executives in those markets, acted in bad faith and knowingly failed to implement sufficient controls"; and that "[t]hey were able to enter into transactions for illegitimate purposes and, together with people under their influence, used sophisticated schemes in order to hide their wrongdoing."

39.      With respect to Ericsson's purported remediation efforts following resolution of the FCPA investigations, the December 2019 Press Release stated, in relevant part:

Improvements to Ericsson's Ethics and Compliance program include:

- Additional resources for the Compliance and Investigations functions.

---

[1] "SEK" is the code for the krona, which is the official currency of Sweden.  In Ericsson's annual reports filed with the SEC, the Company presents certain of its financial figures in terms of SEK.

- Reorganizing the allegation management process to ensure a centralized, professional intake of allegations, conduct of investigations and remediation.

- Refining the risk assessment process to consist of a tiered approach and systematic risk mitigation methodology.

- Enhancing the due diligence process of third-parties, including the overall monitoring of third-party engagements.

- Introducing more sophisticated analytic tools to better identify and prevent high-risk transactions and engagements.

- Enhancing the ethics and compliance vetting process for senior leaders.

- Refreshing compliance training modules for employees, including workshops and face-to-face training for employees in exposed roles.

- Enhancing the internal anti-corruption and compliance related awareness campaigns (including the Company's zero tolerance for corruption).

40.     The December 2019 Press Release also quoted Defendant Ekholm, who assured investors that "[r]eaching a resolution with the US authorities allows us to close this legacy chapter" and "[w]e can now move forward and build a stronger company."

41.     On March 19, 2020, Ericsson filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 20-F").  That filing reported total 2018 sales for the Middle East and Africa of approximately 24.34 million SEK.

42.     With respect to Ericsson's controls and procedures, the 2018 20-F referred investors to the Company's corporate governance report for 2019, which contained substantively the same statements as referenced in ¶¶ 28-29, *supra*, regarding the Company's internal rules and Code of Business Ethics.

43.     Appended as exhibits to the 2019 20-F were substantively the same SOX certifications as referenced in ¶ 30, *supra*, signed by the Individual Defendants.

44.    On March 25, 2021, Ericsson filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 20-F").  The 2020 20-F itself contained almost no substantive information regarding the Company's global operations, particularly in the Middle East, or its controls and procedures.  Rather, the 2020 20-F referred investors to the Company's English version of its Swedish Annual Report for 2020, which was attached to the 2020 20-F as Exhibit 15.1 (the "2020 Annual Report").  The 2020 Annual Report reported total 2020 sales for the Middle East and Africa of approximately 23.3 million SEK, and total 2019 sales for the Middle East and Africa of approximately 25.53 million SEK.

45.    The 2020 Annual Report also assured investors that Ericsson's Audit and Compliance Committee "monitored the continued compliance with [SOX] as well as the internal control and risk management process and monitored and evaluated the effectiveness and appropriateness of Ericsson's anti-bribery and corruption program"; that "[t]he management of operational risks in Ericsson is embedded in various business processes and controls, such as decision tollgates and approvals"; and that "[c]ertain cross-process risks are centrally coordinated, such as risks relating to [*inter alia*] . . . anti-bribery and corruption."

46.    Additionally, the 2020 Annual Report contained substantively the same statements as referenced in ¶¶ 28-29, *supra*, regarding Ericsson's internal rules and Code of Business Ethics.

47.    Moreover, the 2020 Annual Report stated the following regarding Ericsson's "FCPA Compliance Monitor":

> In 2019, Ericsson announced the resolution of investigations by the [DOJ] and the [SEC] regarding the Company's compliance with the [FCPA]. As part of the settlement, Ericsson has agreed to engage an independent compliance monitor for a period of three years while the Company continues to undertake significant reforms to strengthen its Ethics & Compliance program. In 2020, the three-year period for the monitorship commenced by the appointment of Dr. Andreas

Pohlmann of the firm Pohlmann & Company – Compliance and Governance Advisory LLP as Ericsson's monitor. The monitor's main responsibilities include reviewing Ericsson's compliance with the terms of the settlement and evaluating the Company's progress in implementing and operating its enhanced compliance program and accompanying controls as well as providing recommendations for improvements.

48.     Appended as exhibits to the 2020 20-F were substantively the same SOX certifications as referenced in ¶ 30, *supra*, signed by the Individual Defendants.

49.     The statements referenced in ¶¶ 26-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) Ericsson overstated the extent to which it had reformed its business practices to eliminate the use of bribes to secure business in foreign countries; (ii) Ericsson had paid bribes to the terrorist group ISIS to gain access to certain transport routes in Iraq; (iii) accordingly, the Company's revenues derived from its operations in Iraq were, in at least substantial part, derived from unlawful conduct and thus unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

50.     On February 15, 2022, during intraday trading hours, Ericsson issued a press release disclosing media inquiries into its business dealings in Iraq (the "February 15, 2022 Press Release").   That press release assured investors of the Company's "transparency" regarding these inquiries, while vaguely alluding to having undertaken its own investigative and compliance efforts, stating, *inter alia*:

> In the past week, Ericsson . . . has continued to receive detailed media inquiries from Swedish and international news outlets. Their interest pertains to information detailed in a 2019 internal investigation by the company, on conduct in Iraq.

We are committed to transparency and continuously improving our compliance performance. Therefore, we are updating our earlier statement on this matter.

We continue to invest significantly to understand these matters fully. As in all investigations we cannot exclude the possibility that we may not have found all the underlying facts.

Ericsson takes any allegation of impropriety extremely seriously and welcomes any new facts brought to light as a result. This allows us to sharpen our processes further and target any wrongdoing.

We reiterate our commitment to investigate and take action as appropriate to address any new information, in line with our Code of Business Ethics and under the terms of our 2019 [DPA], with US authorities.

With customers in more than 180 countries around the world, our products and services address critical communication needs for people and societies alike. We are committed to conducting business in a responsible manner, applying ethical standards in anti-corruption, humanitarian and human rights terms. We adhere to the United Nations' guiding principles on business and human rights - as well as all relevant international laws.

51.     The February 15, 2022 Press Release also acknowledged that "Ericsson has been active in Iraq since the lifting of a UN embargo led to the reopening of the telecoms equipment market" and that "[s]ince then, Ericsson has continued its work in the country, including during periods of civil unrest[,]" while assuring investors that the Company "has processes in place to manage security risks, covering both employees and subcontractors."

52.     With specific respect to Ericsson's investigation into its business dealings in Iraq, the February 15, 2022 Press Release stated the following:

Unusual expense claims in Iraq, dating back to 2018, triggered a review that uncovered compliance concerns about breaches of the company's Code of Business Ethics. Investigations of these concerns led to a subsequent and detailed internal investigation that was undertaken by Ericsson in 2019, supported by external legal counsel.

The investigation included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. It found serious breaches of compliance rules and the Code of Business Ethics. It identified evidence of corruption-related misconduct, including: Making a monetary donation without a

clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation.

The investigating team also identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. Investigators could not determine the ultimate recipients of these payments. Payment schemes and cash transactions that potentially created the risk of money laundering were also identified.

Ericsson invested significant time and resources to understand these matters. The investigation could not identify that any Ericsson employee was directly involved in financing terrorist organizations.

As a result of the investigation, several employees were exited from the company and multiple other disciplinary and other remedial actions were taken. This included closing gaps in our internal processes in the region and incorporating lessons from the investigation into our ethics and compliance program.

Furthermore, Ericsson terminated a number of third-party relationships and prioritized the Iraq country business for enhanced training and awareness activities, policies and procedures, and third-party management processes.

Ericsson is continuing to work with external counsel to review the findings and remediation resulting from the 2019 investigation to identify any additional measures that the company should take.

53.     The February 15, 2022 Press Release also assured investors that "Ericsson promotes a speak up culture and routinely undertakes internal investigations covering a broad range of ethics and compliance considerations, when such matters are raised"; that "[t]he Government and Corporate Investigations team is responsible for conducting such investigations, with the support and guidance of external counsel, where necessary"; and that "[t]he company acts upon the findings of any misconduct, through disciplinary actions, process improvements and internal learning."

54.     Then, on February 16, 2022, news outlets reported that Ericsson may have made payments to the ISIS terrorist organization to gain access to certain transport routes in Iraq.  For example, a *Bloomberg* article, entitled "Ericsson CEO Concedes Company May Have Paid Off ISIS in Iraq", stated, in relevant part:

> Ericsson may have made payments to the ISIS terror organization to gain access to certain transport routes in Iraq, the company's chief executive officer [Defendant] Ekholm told newspaper Dagens Industri.
>
> Speaking in an interview with the business daily, the CEO admitted that Ericsson had identified "unusual expenses dating back to 2018" but the company hasn't yet determined who the final recipient of the money was. "But we can see that it disappeared," he said.
>
> * * *
>
> His comments follow a statement by the telecommunications equipment manufacturer late on Tuesday, in which the company said that it continues to "invest significantly" into a probe regarding compliance concerns in its Iraq-based operations.
>
> A spokesperson for Ericsson declined to comment when contacted by Bloomberg News.
>
> The suspect payments likely formed part of a corruption probe by the [DOJ] that was concluded in 2019, according to analysts at Handelsbanken. And while the analysts don't expect the revelations to trigger further investigations, "it is likely to harm the stock price" when trading starts, they wrote in a client note.
>
> Ekholm told the newspaper that Ericsson has spent "considerable resources trying to understand this as best we can. Financing terrorism is completely unacceptable and something we do not allow at all."

55.     As the market continued to digest the implications of the February 15, 2022 Press Release, and Defendant Ekholm's subsequent disclosures the following day, Ericsson's ADS price fell $1.44 per ADS, or 11.57%, to close at $11.01 per ADS on February 16, 2022.  Despite this decline in the Company's ADS price, Ericsson securities continued to trade at artificially inflated prices throughout the remainder of the Class Period, particularly because of Defendants' continued

misrepresentations and omissions regarding the true scope and severity of Ericsson's illicit business dealings abroad.

56.    For example, Defendants' statements referenced in ¶¶ 50-54 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) Ericsson overstated the extent to which it had reformed its business practices to eliminate the use of bribes to secure business in foreign countries; (ii) Ericsson had paid bribes to the terrorist group ISIS to gain access to certain transport routes in Iraq; (iii) accordingly, the Company's revenues derived from its operations in Iraq were, in at least substantial part, derived from unlawful conduct and thus unsustainable; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

57.    On Sunday, February 27, 2022, the ICIJ published a report on Ericsson's alleged dealings with ISIS in Iraq, citing a leaked internal investigation that revealed that Ericsson had reportedly made "tens of millions of dollars in suspicious payments" over nearly a decade to keep its business in the country.  Specially, that report stated, *inter alia*:

> Telecom giant Ericsson sought permission from the terrorist group known as the Islamic State to work in an ISIS-controlled city and paid to smuggle equipment into ISIS areas on a route known as the "Speedway," according to a leaked internal investigation report obtained by the [ICIJ].

> The report reveals that the Swedish-based firm made tens of millions of dollars in suspicious payments over nearly a decade to sustain its business in Iraq, financing slush funds, trips abroad for defense officials and payoffs through middlemen to corporate executives and possibly terrorists.

> The internal investigation describes a pattern of bribery and corruption so widespread, and company oversight so weak, that millions of dollars in payments

couldn't be accounted for – all while Ericsson worked to maintain and expand vital cellular networks in one of the most corrupt countries in the world. The review, which has not been made public, covers the years 2011 to 2019.

Ericsson's business in Iraq relied on politically connected fixers and unvetted subcontractors. It was marked by sham contracts, inflated invoices, falsified financial statements and payments to "consultants" with nebulous job descriptions. In one instance, a member of a powerful Kurdish family, the Barzanis, collected $1.2 million for "facilitation to the chairman" of a mobile phone operator — also a Barzani, the report says.

Most of the corrupt conduct came after Ericsson, a key actor in the West's battle with China over the future of global communications, acknowledged in 2013 that it was cooperating with U.S. authorities investigating bribery allegations elsewhere. The U.S. probe resulted in a $1 billion bribery settlement in 2019 with the [DOJ] and the [SEC].  The settlement does not mention Iraq.

58.    The ICIJ report cited numerous leaked documents, witness interviews, and millions of emails to support its allegations, noting that it had shared this information with major news outlets around the world, even as Defendant Ekholm purported to provide a transparent account of the scandal.  Specifically, in this regard, the ICIJ report stated, in relevant part:

ICIJ shared the leaked records with The Washington Post, SVT in Sweden and 28 other media partners in 22 countries as part of a project known as the Ericsson List. ICIJ and its partners verified the records' authenticity and spent months examining other documents and interviewing ex-employees, government officials, contractors and other industry insiders in Iraq, London, Washington, Jordan, Lebanon and elsewhere.

The leaked documents include 73 pages of a 79-page report on Ericsson's Iraq business, including summaries of 28 witness interviews and 22.5 million emails.

ICIJ and partnering news organizations sent detailed questions to Ericsson about the secret internal review. Instead of answering, Ericsson issued a public statement on Feb. 15 acknowledging "corruption-related misconduct" in Iraq and possible payments to ISIS.

Ericsson CEO [Defendant] Ekholm also granted interviews to news outlets not in possession of the leaked documents. He said that Ericsson may have made illicit payments, but that the company had often struggled to identify the final beneficiary.

"We can't determine where money sometimes really goes, but we can see that it has disappeared," Ekholm told a Swedish newspaper.

Ericsson cited its "commitment to transparency" in its recent disclosures. But the company made no mention of other internal probes described in the leaked documents.

59.     Additionally, the ICIJ report noted that "records show that besides Iraq, the company examined alleged misconduct in Lebanon, Spain, Portugal and Egypt" and that "a spreadsheet lists company probes into possible bribery, money laundering and embezzlement by employees in Angola, Azerbaijan, Bahrain, Brazil, China, Croatia, Libya, Morocco, the United States and South Africa[,]" which "have not been previously disclosed."

60.     Following publication of the ICIJ report, Ericsson's ADS price fell $0.84 per ADS, or 8.3%, from its closing price on February 25, 2022, to close at $9.28 per ADS on February 28, 2022, the next trading day.

61.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Developments**

62.     On March 2, 2022, Ericsson filed a report of foreign issuer on Form 6-K with the SEC, disclosing that the DOJ had determined that the Company had breached its 2019 DPA, and found that the Company's prior disclosures about its business dealings in Iraq had been insufficient.  Specifically, that filing stated, in relevant part:

> On March 1, 2022, the DOJ informed Ericsson that the disclosure made by the company prior to the DPA about its internal investigation into conduct in Iraq in the period 2011 until 2019 was insufficient. Furthermore, it determined that the company breached the DPA by failing to make subsequent disclosure related to the investigation post-DPA. The company is in communication with the DOJ regarding the facts and circumstances of the breach determination and is committed to co-operating with the DOJ to resolve the matter.

> At this stage it is premature to predict the outcome of this matter.

63. Following these disclosures, Ericsson's ADS price fell $0.74 per ADS, or 8.35%, to close at $8.12 per ADS on March 2, 2022.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

64. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ericsson securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ericsson securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ericsson or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ericsson;

- whether the Individual Defendants caused Ericsson to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ericsson securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

70.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ericsson securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ericsson securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ericsson securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ericsson securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ericsson securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ericsson's finances and business prospects.

77.     By virtue of their positions at Ericsson, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Ericsson, the Individual Defendants had knowledge of the details of Ericsson's internal affairs.

79.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ericsson.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ericsson's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ericsson securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Ericsson's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ericsson securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

80.     During the Class Period, Ericsson securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ericsson securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ericsson securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Ericsson securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

81.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

83.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     During the Class Period, the Individual Defendants participated in the operation and management of Ericsson, and conducted and participated, directly and indirectly, in the conduct of Ericsson's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ericsson's misstatement of income and expenses and false financial statements.

85.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ericsson's financial condition and results of operations, and to correct promptly any public statements issued by Ericsson which had become materially false or misleading.

86.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ericsson disseminated in the marketplace during the Class Period concerning Ericsson's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ericsson to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Ericsson within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ericsson securities.

87.     Each of the Individual Defendants, therefore, acted as a controlling person of Ericsson.  By reason of their senior management positions and/or being directors of Ericsson, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ericsson to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ericsson and possessed the

power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ericsson.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 3, 2022                          Respectfully submitted,

                                               POMERANTZ LLP

                                               */s/ Jeremy A. Lieberman*
                                               Jeremy A. Lieberman
                                               J. Alexander Hood II
                                               James M. LoPiano
                                               600 Third Avenue, 20th Floor
                                               New York, New York 10016
                                               Telephone: (212) 661-1100
                                               Facsimile: (212) 661-8665
                                               jalieberman@pomlaw.com
                                               ahood@pomlaw.com
                                               jlopiano@pomlaw.com

WOHL & FRUCHTER LLP
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, David Nyy, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Telefonaktiebolaget LM Ericsson (publ) ("Ericsson" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Ericsson securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Ericsson securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Ericsson securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

DocuSign Envelope ID: C8FB3694-0318-4BA7-B5A5-80C7EC988C5A

8.   I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** 3/1/2022
_____
   **(Date)**



_____
         **(Signature)**


David Nyy
**(Type or Print Name)**

**Telefonaktiebolaget LM Ericsson (publ) (ERIC)**                                    **Nyy, David**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 6/30/2021 | 500 | $12.6000 |
| Purchase | 7/27/2021 | 500 | $11.4900 |