**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TELEFONAKTIEBOLAGET LM ERICSSON SECURITIES LITIGATION | No. 1:22-cv-1167-WFK-LB |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ........................................................................................... 1

    A.    Company Background ....................................................................................... 2

    B.    Ericsson's $1.9 Billion Business Opportunity ............................................... 2

    C.    The U.S. Government Begins Investigating Defendants' Corrupt Practices .......... 3

    D.    Ericsson Was Engaged in Rampant Corruption in Iraq and Funding ISIS
       Terrorist Attacks on Civilians and American Soldiers ..................................... 4

    E.    Ericsson Concealed Corruption in Iraq While Boasting About the Strength
       of its Business in the Middle East and Anti-Corruption Program ..................... 11

    F.    Ericsson Pleads Guilty to FCPA Violations and is Fined $1 Billion, But
       Continues to Conceal Its Illegal Behavior in Iraq ........................................... 12

    G.    Ericsson Continued to Mislead Investors About Purported Improvements
       to its "Ethics and Compliance Program" While Concealing Its Practices in
       Iraq .................................................................................................................. 15

    H.    Defendants Are Forced to Reveal the Existence of the Iraqi Corruption
       Report Causing Ericsson Shares to Plummet ................................................... 17

    I.    The ICIJ Releases the "Ericsson List" Revealing the Breadth of the Fraud
       and the Details Surrounding Ericsson's Payments to ISIS ............................... 19

    J.    The Full Truth is Revealed When Ericsson Announces its Breach of the
       DPA .................................................................................................................. 20

II.   JURISDICTION AND VENUE ..................................................................................... 21

III.  PARTIES ....................................................................................................................... 22

    A.    Lead Plaintiff .................................................................................................. 22

    B.    Defendants ....................................................................................................... 22

    C.    Relevant Third Parties ..................................................................................... 23

IV.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF
    FRAUD .......................................................................................................................... 24

    A.    Company Background ..................................................................................... 24

    B.    Ericsson's Expansion into Iraq ....................................................................... 26

1.    History of Iraq ................................................................. 26

2.    Ericsson's $1.9 Billion Business Opportunity .......................... 27

C.    Ericsson's Global Growth at All Costs Strategy Relied on Corrupt Practices ........................................................................... 29

1.    Ericsson's Global Strategy to Secure Crucial Projects and Contracts Through Illegal Bribes and Kickbacks .................... 29

2.    Ericsson Hired Subcontractors to Carry Out its Corrupt Conduct ........... 31

D.    The U.S. Government Begins Investigating Ericsson's Corrupt Practices ........... 32

E.    Ericsson Announced an Internal Review of its Anticorruption Program and Increased Oversight Over Corruptive Practices ............................ 33

F.    According to its Own Internal Investigation, Ericsson Was Engaged in the Same Multi-Layered Corruption Scheme in Iraq ................................... 34

1.    Ericsson Performed an Internal Investigation into The Company's Practices in Iraq Uncovering Rampant Corruption, FCPA Violations, and Funding of Terrorist Organizations ............................... 34

2.    Ericsson Bribes Customers and Government Officials to Win Lucrative Contracts in Iraq ............................................... 35

3.    Ericsson Pays Terrorists for Special Access to ISIS's Illegal "Speedway" Transportation System ........................................ 40

4.    Ericsson Engages in Other Corrupt Conduct with ISIS, While Endangering Employees' Lives, to Increase Profits ..................... 42

G.    Ericsson Makes False and Misleading Statements About its Growth in Iraq While Downplaying Any Possible Corruption in Iraq ............................ 45

1.    Ericsson's False and Misleading Statements Mislead Investors About the True Reasons for Growth ..................................... 45

2.    Ericsson Touts Compliance While Downplaying Corruption in Iraq ....... 46

H.    Ericsson Pled Guilty to FCPA Violations, Paid a $1 Billion Criminal Penalty, and Entered Into a Deferred Prosecution Agreement with the DOJ ....... 48

I.    Following the Guilty Plea and DPA, Ericsson Continued to Tout the Company's Ethics and Compliance Program While Failing to Disclose the Company's Known Corrupt Behavior in Iraq ..................................... 51

J.       Facts About Ericsson's Corrupt Practices Are Revealed When Media Outlets Discovered the Company's Illegal Practices in Iraq ............................... 56

K.      Ericsson Shares Continues to Drop as New Details Related to the Company's Illegal Practices Are Revealed............................................................ 59

L.       The Full Truth is Revealed When Ericsson Announced that it Breached the DPA........................................................................................................................ 60

M.      After the Fraud is Revealed, Ericsson Deemed Nearly "Uninvestable"............... 61

V.       DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................. 62

A.      Statements Concerning the Strength of Ericsson's Business in the Middle East........................................................................................................................... 63

B.      Statements Concerning the Company's Purportedly Robust Anti-Corruption Program ......................................................................................... 66

C.      Statements Concerning Ericsson's Entry into the DPA and Failure to Disclose the Existence of the Internal Iraqi Corruption Report........................... 69

VI.      THE TRUTH ABOUT THE FULL IMPACT OF THE FRAUD IS GRADUALLY REVEALED........................................................................................ 75

VII.     ADDITIONAL EVIDENCE OF SCIENTER ................................................. 78

A.      The Importance of Ericsson's Business in Iraq ...................................................... 78

B.      The Severity of Dangers in Operating with ISIS ................................................... 79

C.      Ericsson's First Internal Investigation .................................................................... 80

D.      The DPA Places Ericsson in a Stringent Regulatory Environment ..................... 81

E.      The Importance of Ericsson's Internal Investigation into Illegal Practices in Iraq ......................................................................................................................... 82

VIII.    LOSS CAUSATION.......................................................................................... 83

A.      February 15, 2022 – First Partial Disclosure/Materialization of the Risk ........... 84

B.      February 27, 2022 – Second Partial Disclosure/Materialization of the Risk........ 86

C.      March 2, 2022 – Final Corrective Disclosure/Materialization of the Risk........... 86

IX.      CLASS ACTION ALLEGATIONS ................................................................ 87

X.      PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE............ 89

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 91

XII.    CAUSES OF ACTION ...................................................................................................... 93

        COUNT  I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against
        All Defendants ....................................................................................................................... 93

        COUNT  II For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)
        and (c) Promulgated Thereunder Against All Defendants.................................................. 94

        COUNT  III For Violation of §20(a) of the Exchange Act  Against the Individual
        Defendants ............................................................................................................................. 97

XIII.   PRAYER FOR RELIEF ................................................................................................... 98

XIV.    JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ........................................ 99

Lead Plaintiff Boston Retirement System ("Lead Plaintiff" or "BRS"), individually and together on behalf of all others similarly situated, by its undersigned counsel, hereby brings this Amended Class Action Complaint (the "Complaint") against Defendants Telefonaktiebolaget LM Ericsson ("Ericsson" or the "Company"), Börje Ekholm ("Ekholm"), Carl Mellander ("Mellander"), and Xavier Dedullen ("Dedullen") (the "Individual Defendants" and collectively, "Defendants").  The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Ericsson; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees, independent contractors, and outside sales representatives of Ericsson with knowledge of the matters alleged herein; and consultation with experts in the areas of: (1) accounting; and (2) loss causation and damages.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support exists in the Deferred Prosecution Agreement ("DPA") entered between Defendants and the U.S. Department of Justice ("DOJ"), attached hereto as Exhibit A.  Lead Plaintiff further believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded American Depository Shares

("ADS") of Ericsson during the period from April 27, 2017 to March 1, 2022 inclusive (the "Class Period"), and were damaged thereby.[1]  The action is brought against Ericsson and certain of its former officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

### A.    Company Background

2.    Ericsson is a Swedish multinational telecommunications company that develops, sells, and manages telecommunications infrastructure including software, hardware, and information technology services.  In the late 1990s and early 2000s, mobile broadband infrastructure was a massive opportunity for telecommunications companies like Ericsson because such companies had almost countless opportunities globally to build and expand the infrastructure necessary to support the new mobile networks that were needed by developed and developing countries.  Critically, once Ericsson obtained a contract —implementing its proprietary telecommunications infrastructure—in a country or region, it also effectively assured itself of significant future maintenance, management, and upgrade revenues.  But, as broadband infrastructure was established around the world, the traditional opportunities for construction from the ground up were greatly reduced.

### B.    Ericsson's $1.9 Billion Business Opportunity

3.    However, following the war in Iraq and the United States' subsequent withdrawal in 2011, the country presented itself as a golden opportunity for Ericsson because it was one of

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Ericsson during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Ericsson's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

the few remaining countries in the world without a modern telecommunications infrastructure, making it a massively profitable target for growth and expansion.  Prior to the war, Iraq's dictator, Saddam Hussein, severely limited access to mobile communications thereby stifling the development of modern telecommunications infrastructure.  So, Ericsson moved swiftly to secure government and mobile provider contracts including agreements to construct large scale radio base stations and mobile switch centers—some of the country's largest scale and most profitable projects.[2]

4.      For example, Ericsson was able to secure the following contracts that gave the Company a strong foothold in Iraq: (i) a 2014 contract with Asiacell to complete the highly sought after "Peroza" Project; (ii) a 2016 contract with Zain Iraq to manage mobile network services and IT Operations in the region; (iii) a 2017 contract with Korek to transform Korek's IP core network in Iraq; and (iv) a 2017 contract with Zain Iraq to upgrade the existing network with Ericsson's "Evolved Packed Core" product.[3]

5.      Winning the lucrative Iraqi contracts represented a huge win for Ericsson and its investors.  Indeed, **between 2011 and 2018 Ericsson reaped revenues of over $1.9 Billion in Iraq alone**.

**C.      The U.S. Government Begins Investigating Defendants' Corrupt Practices**

6.      Around the same time, Ericsson's business practices in developing countries came under the scrutiny of the U.S. Government leading to a Securities Exchange Commission ("SEC") investigation beginning in March 2013 and a Department of Justice ("DOJ")

---

[2] Radio base stations and mobile switch centers are examples of large-scale modern telecommunications infrastructure projects.

[3] Asiacell Telecom Company ("Asiacell"), Zain Iraq, and Korek Telecom ("Korek") are three of Iraq's largest mobile telecommunications providers.

investigation beginning in 2015.  Specifically, both agencies began investigating allegations that Ericsson was and had been using corrupt and illegal practices, such as bribes, kickbacks, and slush funds to secure lucrative contracts in developing countries in violation U.S. Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§78dd-1, *et seq*.

7.      On June 17, 2016, Defendants issued a press release disclosing the existence of the U.S. Government investigations while simultaneously downplaying their significance claiming, "we strive to at all times conduct our business in compliance with applicable laws." Later that day, Ericsson held a conference call with investors to discuss the supposed strength of Ericsson's anti-corruption program and the efforts the Company was purportedly taking to ensure that the Company was not engaging in any corruptive practices across the globe.

8.      Investors were understandably concerned about the allegations because of the impact it could have on Ericsson's share price.  For example, one analyst from Nordea Asset Management told Bloomberg in an interview following the announcement: **"We take this very seriously . . . If this is a symptom of a bigger problem, it could cost a lot of money and could affect the share quite a lot, and then we have to decide how to act on this -- if we should keep the share or sell."**

**D.      Ericsson Was Engaged in Rampant Corruption in Iraq and Funding ISIS Terrorist Attacks on Civilians and American Soldiers**

9.      During the pendency of the SEC and DOJ investigations into the Company's corrupt business practices, Defendants engaged in their own internal investigation into the Company's business practices in Iraq.  Specifically, Ericsson retained New York law firm Simpson Thacher & Bartlett LLP ("Simpson Thacher") to determine the existence of any FCPA violations in Iraq.  The internal investigation culminated in December 2019 in a 79-page report

on Ericsson's Iraq business, including summaries of 28 witness interviews and 22.5 million emails (the "Iraqi Corruption Report" or the "Report").[4]

10.     The Report established not only **rampant corruption and FCPA violations related to the use of bribes, sham contracts, and kickbacks to secure lucrative telecommunications contracts in Iraq,** but also **shocking evidence of Ericsson paying a known terrorist organization, the Islamic State of Iraq and Syria ("ISIS"),**[5] **for access to transportation routes through ISIS territory and in ISIS-held cities**—all so Ericsson could avoid the time and expense that came along with using routes sanctioned by the Iraqi and U.S. governments.

### 1. Ericsson Bribed Customers and Government Officials to Secure Important Contracts

11.     The Iraqi Corruption Report contained myriad examples stretching from 2011 through 2018 of Ericsson engaging in corrupt business practices in Iraq in order to secure the massive contracts that generated the billions of dollars of revenues for the Company in Iraq.  For example, Ericsson was able to secure a coveted network expansion, infrastructure construction, and testing contract with Asiacell known as the Peroza Project.  Ericsson executive Tarek Saadi led this project in large part.  Saadi was the Head of Global Customer for the Middle East region and reported directly to the CEO, Defendant Ekholm.  According to the Report, **Saadi requested**

---

[4] Excerpts of the Iraqi Corruption Report were leaked to an international investigative journalist organization known as the International Consortium of Investigative Journalists ("ICIJ") and were subsequently published in a series of articles called "the Ericsson List."  The ICIJ is a Washington D.C. based investigative journalism group with an independent, global network of over 280 investigative journalists.  The ICIJ has a presence in over 100 countries and including the U.S., U.K., France, Australia, Spain, and Egypt, and has reported on some of the largest investigative journalism stories in history including the Pandora Papers, Panama Papers, and Uber Files.

[5] The U.S. Department of State named ISIS a "Designated Foreign Terrorist Organization" on December 17, 2004.

**a $500,000 payment to the CEO of Asiacell in order for "Ericsson to win more business in 2014."** Specifically, Ericsson paid a third-party contractor, Al-Awsat, two payments of $250,000 for "security services" that were never rendered by the contractor. The sham payments were later confirmed to be a "commission payment" requested by Saadi to be paid to the CEO of Asiacell. Unsurprisingly, Ericsson was subsequently awarded the Peroza project. Excerpts from the Report confirm the fraudulent business practices.



> Two PO's[64] for 250K USD each were added to the assembly area contract as "Security Services" which were not included in the original scope of the RFP. These have since been confirmed as a "commission payment" requested by Tarek Saadi to be paid to the CEO of Asiacell.

12.    The Report also contains evidence of Ericsson paying a relative of the majority owner of Korek Telecommunications—another major customer of Ericsson that granted them a lucrative contract in Iraq—over $1.2 million between 2007 and 2017 as part of a "consultancy" contract even though "no clear role" for this relative was ever identified. Ericsson's payments to this individual, Sirwan Barzani, which again were done at the behest of Saadi, were recorded with the vague description, "[b]usiness intelligence and the facilitation to the chairman of Korek" and were not registered with "Group Function Sales" as required by Ericsson's policies and procedures.

6

> The consultant Rasech Barzani, a relative to the Barzani family (majority owner of Korek[138], interests in Darin[139] and strong relation to Kurdistan Army[140]) was engaged by Tarek Saadi, former Head of CU North Middle East, and maintained by ███████████ for five years until 2017. He was paid up to 10.5K USD/month plus 50K USD/year in bonus. (Total: 1.2M USD since 2007).
>
> Email evidence indicates that ███████████ had requested that Rasech Barzani is not paid through ████ since Rasech does not want his name disclosed because of his relation to the ruling family in Kurdistan (Barzani).[141] His sales consultancy agreements have never been registered with Group Function Sales, as per the Ericsson process. As per the contracts available, no clear role has been assigned to Rasech Barzani, rather a more focused Business intelligence and facilitation to the Chairman of Korek, Sirwan Barzani.

13.    A former Director of Business Management for the Middle East at Ericsson confirmed that Saadi regularly engaged in these types of corrupt behaviors.  For example, CW 2, who reported to Saadi, confirmed that Saadi regularly engaged in corrupt practices.  According to CW 2, invoices could be inflated to mask kickback payments to subcontractors and intermediaries.  CW 2 added that payments of this nature were "normal behavior" and that "Ericsson was not blind to it."  When asked about Al-Awsat Telecommunications, CW 2 explained that this was "one of the companies you can put a question mark on," meaning it was unclear what work they provided, but people were questioning "why they are everywhere" and why "everything runs through them."

14.    Ericsson not only bribed private customers to win critical contracts, but bribed Iraqi government officials as well.  For instance, in 2014, Ericsson funded a trip to Spain and Sweden for members of Iraq's Ministry of Defense, while the Ministry of Defense was making a major decision related to projects for Iraq's telecommunications infrastructure.  Ericsson spent

tens of thousands of dollars on this trip and similar entertainment in the lead-up to the award of a major government contract—a clear violation of Ericsson' Anti-Corruption program.

> Pocket money and travel costs for 10 MoD representative's for travel to Spain and Sweden, via Amman. Total amount of approximately 20K USD was paid by Ericsson. Additional costs for gifts and entertainments for MoD representatives during the trip was also confirmed, with a total cost for the travel except the pocket money 97.8K USD. The trip took place 21 October – 3 November 2014. This was during negotiations with MoD, contract was signed 31 October 2014. Offering pocket money and payment of travel costs and gifts to government officials is a breach of the Ericsson Anti-Corruption Group Directive dated December 2012.

15.    As described in further detail below, the Report detailed other examples of Defendants' corrupt and illegal business practices as well as evidence demonstrating how Ericsson facilitated these illegal and corrupt transactions through third parties in order to disguise them or keep them off of the Company's accounting records and prevent them from being discovered by regulators and the market.

### 2. Ericsson Chose to Fund ISIS

16.    In addition to bribing executives and foreign officials to win lucrative contracts Ericsson also resorted to illegal and corrupt practices in carrying out the contracts as well. Following the U.S. withdrawal from Iraq in 2011, terrorist organizations controlled many of Iraq's key transportation routes throughout Iraq as well as its cities such as Mosul.  Al-Qaeda, and later ISIS, developed extensive racketeering operations in Iraq that required all persons or entities seeking to utilize the roads or conduct business in the regions they controlled to pay "taxes" or "protection payments" typically costing between $3,000 and $4,000 per truck and sometimes reaching as high as $22,000 per truck.

17.    This left Ericsson with two options: seek military aid and protection while navigating Iraq legally or use the ISIS "Speedway" – a terrorist-owned route, connecting Iraq's

major cities with surrounding countries.  Use of the route required Ericsson to direct a

"protection payment" to ISIS.  ISIS would then use this illegal money to fund its operations

which included kidnapping and beheading civilians, spearheading terrorist attacks in Europe, and

killing American soldiers who operated in Iraq and Syria.

18.     Despite having other legitimate options that would not fund terrorist

organizations, and financially support those killing American soldiers, Ericsson elected to utilize

ISIS-controlled routes, cities, and regions to transport people and materials.  In fact, the Report

confirmed that an Ericsson manager, Roger Antoun, authorized $171,000 in payments to ISIS for

"Speedway" access between 2016 and 2017.



> Roger Antoun[23] stated in interview[24] that Ericsson had paid an illegal "Speedway" option to the transporter Cargo Iraq (see 3.4.5) for faster transportation of equipment in Iraq. According to Roger Antoun, Cargo Iraq were engaged by Ericsson, on instruction by non-government customer Asiacell, for transportation during 2016 and 2017. With the specific purpose to circumvent the official customs. That had been increased to 25% from 10-15% by the government since the ISIS invasion. Cargo Iraq were not registered as an Ericsson supplier and were paid in cash through Security and Logistic Services (SLS), a supplier to Ericsson. The timeframe and geographic areas covered by these transportations[25] indicate that areas controlled by local militias, including ISIS, has been passed.

19.     Working with ISIS became part of Ericsson's playbook for success in Iraq despite

the obvious dangers it posed to its employees and affiliates.  In fact, workers who were asked to

operate in the region confronted Senior Regional Executives pleading to cease operations due to

the tremendous safety risks they faced by working alongside ISIS on a daily basis.  And in fact,

Ericsson's own General Counsel for the region advised that invoking "force majeure" clauses in

the Company's contracts in order to halt work in the region may not only be necessary, but may

be the best option.

20.     However, Ericsson executives refused to cease operations in Iraq because this decision would "destroy [their] business" in the region.  Instead, Ericsson demanded that work continue with ISIS.  In order to avoid the obvious reputational harm that would come with working with ISIS directly, Ericsson hired a third party, Orbitel, to facilitate communication and payments to ISIS for the access it was desperately seeking to complete Asiacell's Peroza Project in the city of Mosul.

21.     One engineer from Orbitel that received Ericsson's directive to seek access from ISIS, Affan Akram, has spoken publicly about his experience.  Akram, who was directed to deliver a letter to ISIS on Ericsson's behalf, explained that he was in communication with Ericsson's Network Program Director along with his superiors at Orbitel in the lead up to the meeting with ISIS to confirm his whereabouts.  When Akram arrived at the ISIS office, he was instructed to speak with a "manager," Haji Saleh.  Akram recalled that once he met with Saleh he was instructed to call his manager, so he called Ericsson's Network Program Director, who spoke with Saleh before hanging up the phone and refusing to answer any further call attempts.  At the conclusion of these calls, Akram was kidnapped by ISIS.  Thereafter, Akram continued to say that he attempted to contact Ericsson, Orbitel, and Asiacell for assistance following his kidnapping and the approximately 10-days of house arrest that followed, but he was not provided any assistance.

22.     As explained in the Iraqi Corruption Report, Defendants' decision to do business with ISIS and fund a known terrorist organization in order to grow the Company's profits in Iraq was also concealed through the use of third-party organizations to protect the Company from the reputational, regulatory, and legal harm that comes with such corrupt practices.

### E.     Ericsson Concealed Corruption in Iraq While Boasting About the Strength of its Business in the Middle East and Anti-Corruption Program

23.     Despite these clear examples of Ericsson's widespread corrupt conduct in Iraq, Defendants misleadingly touted to investors its astonishing growth in the Middle East and the purportedly robust compliance and anti-corruption protocols that it purportedly had in place.  For example, during an October 20, 2017 earnings call, Defendant Ekholm misleadingly touted the growth in the Middle East despite knowing that much of that growth was attributable to the Company's corrupt practices stating: "***we actually see growth in Middle East…which is explained by multiple customers in countries.  So there are many contributing parts***."  On the same day October 20, 2017, in a Form 6-K filing with the SEC, Defendants further misled investors claiming that: "***Sales in the Middle East showed growth despite a continued challenging macroeconomic environment.***"

24.     However, as discussed above, in reality, sales in the Middle East showed growth because of the Company's undisclosed corrupt practices in the region and specifically in Iraq. Moreover, Ericsson failed to disclose that the Company was only able to successfully operate in Iraq's challenging macroeconomic environment because of the Company's illegal and corrupt practices.

25.     Likewise, on March 27, 2018, Defendants filed an annual report on Form 20-F which contained false and misleading statements about the Company's supposed "***zero-tolerance***" for corruption despite the fact that the Company had knowingly engaged in rampant corruption and FCPA violations in Iraq.

26.     Specifically, the 20-F misleadingly stated that "***Ericsson has a zero-tolerance approach to corruption expressed in the Company's Code of Business Ethics***."  Importantly, the same 20-F provided great detail regarding all of the steps Ericsson was allegedly taking to

ensure the successful operation of its anti-corruption program thereby giving investors comfort

over the Company's supposedly robust initiative. Additionally, the Company highlighted the

steps it was taking to improve in the wake of the SEC and DOJ's investigation announcement

stating while completely failing to disclose that the Company was engaged in the same corrupt

behavior in Iraq:

> ***During 2016–2017 we invited external experts to evaluate the robustness of our anti-corruption program. Following the review, we adjusted the anti-corruption program to closer align with the US Foreign Corrupt Practices Act (FCPA). In 2017, the program was strengthened with adding resources on group level and appointing Regional Compliance Officers in all Market Areas. Moreover, one of the elements of the Group targets for sustainability and corporate responsibility is anti-corruption***.
>
> . . .
>
> ***In 2017, Ericsson introduced a vetting process that focuses on ethics and compliance***. So far we have used it for appointments to the Executive Team and for approximately 110 employees in exposed positions. ***All members of the current Executive Team have been vetted, and all future recruitments to these positions will also go through mandatory vetting. Business Partner Review Boards have been established in all Market Areas to over-see mitigation of the corruption risks in relation to onboarding of new business partners***.

27.     Yet, Ericsson's own internal report demonstrates that these processes were being

ignored at every turn in Iraq.  Countless third parties remained unvetted and continued to

facilitate bribes, kickbacks, and slush funds in Iraq without adequate checks on behalf of

Ericsson.  At the same time Ericsson was engaging in its corrupt scheme to bribe customers and

pay terrorists to sustain its business, Defendants were touting the Company's growth in the

Middle East and attributing successes to securing contracts.

### F.     Ericsson Pleads Guilty to FCPA Violations and is Fined $1 Billion, But Continues to Conceal Its Illegal Behavior in Iraq

28.     On December 6, 2019, the DOJ issued a bombshell press release regarding the

results of the U.S. Government's investigation into Ericsson's corrupt practices. The press

release revealed that Ericsson had pled guilty to a litany of FCPA violations – admitting to

crimes, illegal business practices, bribes, and corruption in the countries of Djibouti, China,

Vietnam, Indonesia, and Kuwait – and accordingly was entering into a Deferred Prosecution

Agreement ("DPA") with the DOJ.[6]  Notably, while the illegal practices Ericsson admitted to in

the five countries were nearly the exact same as those that they had committed in Iraq (as

confirmed by the internal investigation that Defendants were days from completing) there was no

mention of Iraq or Defendants' illegal payments to ISIS.

29.     In pleading guilty, Ericsson admitted to widespread illegal activities in Djibouti,

China, Vietnam, Indonesia, and Kuwait in violation of the FCPA.  The DOJ and SEC found that

Ericsson **made millions of dollars of improper payments** to government officials and other

organizations– in direct violation of the FCPA.  U.S. officials confirmed that these illegal

practices were inherent to Ericsson's growth at all costs business strategy and intended to "to

solidify its grip on telecommunications business."  U.S. Attorney Geoffrey S. Berman said:

"Through slush funds, bribes, gifts, and graft, **Ericsson conducted telecom business with the

guiding principle that 'money talks.'"**  Similarly, Assistant Attorney General Brian A.

Benczkowski said: "Ericsson's corrupt conduct **involved high-level executives** and spanned 17

years and at least five countries, **all in a misguided effort to increase profits**."

30.     As a result, Ericsson entered into a binding Deferred Prosecution Agreement

("DPA") with the DOJ thereby admitting to its corrupt conduct and agreeing to abide by DOJ

oversight going forward.

---

[6] According to the DOJ press release announcing the DPA, Ericsson Egypt pled guilty as
part of the Company's settlement with the U.S. Government.

31.    As part of the DPA, Ericsson, "admit[ted], accept[ed], and acknowledge[d] that it [was] responsible under United States law for the acts of its officers, directors, employees, and agents," for these FCPA violations.  The DOJ imposed over $500 million in criminal penalties and the SEC imposed over $500 million in civil penalties requiring Ericsson to pay $1 billion in fines to the U.S. government – one of the largest foreign corruption settlements ever.

32.    Ericsson's punishment did not end with these exorbitant fines.  The DPA further required Ericsson to take certain remedial steps or risk further prosecution.  Critically, the DPA included **a strict future disclosure requirement that mandated that the Company disclose any potential FCPA violations in other countries**.  Specifically, the DPA stated:

> **The Company shall truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire.**
>
> …
>
> In addition to the obligations in Paragraph 5, during the Term, **should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA antibribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.**

33.    The DPA further prohibited Ericsson from "mak[ing] any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendants set forth above or the facts described in the Information and the Statement of Facts."  If Ericsson failed to satisfy any of these ongoing requirements or were to engage in a felony or subsequent FCPA violation, Ericsson would "be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge."

34.     Ericsson had been looking into its corrupt practices in Iraq since at least 2018 and the final internal Iraqi Corruption Report was issued on December 11, 2019, *just days after Ericsson's entry into the DPA*.  Yet, it would not be until the end of the Class Period in February 2022 that Defendants would even acknowledge to the market that the Ericsson was aware of and had investigated its corrupt business practices in Iraq and undisclosed payments to ISIS at the exact time it was negotiating a settlement with the DOJ.

**G.     Ericsson Continued to Mislead Investors About Purported Improvements to its "Ethics and Compliance Program" While Concealing Its Practices in Iraq**

35.     On December 6, 2019, Ericsson issued a press release that misleadingly reassured investors that "*[t]he resolution marks the end of the FCPA-related investigations into Ericsson and its subsidiaries undertaken by the DOJ and the SEC.*"  When, in reality, the DOJ and SEC investigations were not at an end because the Company was knowingly concealing other egregious FCPA violations in Iraq from the DOJ, SEC, and investors at that time placing the Company at significant regulatory risk.

36.     The next day, on December 7, 2019, Defendants held an earnings call with analysts and doubled down on their statements regarding the completeness of the DOJ investigation assuring investors that the results of the DOJ were complete and that they were not aware of any other investigations into other countries despite knowing the opposite to be true. For example, during the call with investors, Defendant Ekholm stated:

> *This settlement puts an end to a long and wide-ranging process. And while the events described in the settlement are totally unacceptable, I'm actually glad that we finally reached this day. We're now able to move forward and fully focus on our business and build a stronger company*, supporting our customers in their journey into the 5G era.

37.     Later during the call, analyst David Terence Mulholland from UBS asked if there were any other investigations investors should be aware of or "if you could give us an update on

15

whether anything else has or you've had any kind of discussions with the regulators." Xavier Dedullen, Chief Legal Officer, blatantly misled investors stating: "*we are not aware of any other follow-on investigations in any of the other countries.* But of course, *we continue to closely monitor the situation*."

38.     Defendants' statements touting the end of the DOJ investigation and denying the existence of any other investigations were false and misleading because Defendants knew that the Company had been investigating its corrupt practices in Iraq and payments to ISIS since at least 2018.

39.     The DPA also required Ericsson to strengthen its compliance program in specific ways and to engage an external monitoring group to assess the effectiveness of the program for three years. In its December 6, 2019 press release, Ericsson touted these eight overarching changes as part of its "Improved Ethics and Compliance Program."

40.     Notably, Ericsson assured investors that it would "*[e]nhanc[e] the due diligence process of third-parties, including the overall monitoring of third-party engagements*." Similarly, Ericsson announced the implementation of "*more sophisticated analytic tools to better identify and prevent high-risk transactions and engagements*."

41.     Defendants' statements regarding the supposedly enhanced anti-corruption practices were false and misleading when made because they failed to disclose that at that time Defendants were aware of the risk that regulators would uncover that Ericsson had engaged in the exact type of "*high risk transactions and engagements*" in Iraq that the Defendants now assured investors there was no chance of occurring given the purportedly "*enhanced due diligence*" process.

42.     As the Class Period continued, Defendants continued to mislead investors about the existence of Ericsson's corrupt practices and funding of ISIS in Iraq.  For example, on March 26, 2021, following the announcement of an investigation in Sweden, Defendant Ekholm continued to omit the existence of the Iraq corruption and ISIS payments, stating to investors: "I think that compliance is, therefore, an area which the executive team spends a lot of time, and *we can simply never allow what happened previously to happen again*"  Moreover, Ekholm went on to misleadingly tout the Company's zero tolerance for corruption, stating "*we have a culture where we have zero tolerance when it comes to corruption and that we comply with all rules fully. And that takes a bit of work, and this is something that the entire management team is working with. We're working with this on a continuous basis to have full commitment*."

**H.     Defendants Are Forced to Reveal the Existence of the Iraqi Corruption Report Causing Ericsson Shares to Plummet**

43.     Ericsson continued to fraudulently conceal its illegal business practices in Iraq through early 2022 and would have continued to do so except that a group of journalists at the ICIJ obtained a leaked copy of the Iraqi Corruption Report and began investigating the egregious corruption and FCPA violations Defendants had engaged in Iraq and subsequently concealed.

44.     After conducting their own investigation and confirming the validity of the leaked Report, the journalists approached Ericsson seeking answers.  Specifically, the ICIJ sent a list of questions to Defendant Ekholm inquiring about the Company's illegal payments made to ISIS in order to conduct its business in Iraq.  Ericsson had successfully concealed its illegal practices in Iraq for years, until this moment, when the ICIJ asked for more information on the Company's illegal business practices, bankrolling of ISIS, and concealment of the internal investigation.  But now Defendants no longer had control in concealing their corrupt conduct as it was clear that the

ICIJ would soon reveal the truth to the public. Accordingly, Ericsson had no choice but to issue a press release addressing the issues in order to get out ahead of it.

45.     Specifically, on February 15, 2022, Ericsson issued a press release partially disclosing conduct in Iraq, stating:

> Unusual expense claims in Iraq, dating back to 2018, **triggered a review** that uncovered compliance concerns about breaches of the company's Code of Business Ethics. Investigations of these concerns led to a subsequent and detailed internal investigation that was undertaken by Ericsson in 2019, supported by external legal counsel.

> The investigation included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. **It found serious breaches of compliance rules and the Code of Business Ethics**. It identified evidence of corruption-related misconduct, including: **Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation**.

> The investigating team also identified **payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes**. . .

46.     The next day, on February 16, 2022, various news outlets began amplifying the bad news about Ericsson's corrupt business practices in Iraq and bankrolling ISIS. For example, *Bloomberg First Word* issued a report entitled "Ericsson Plummets; Analysts Say Report on ISIS Erodes Trust" in which Bloomberg reported that Ericsson had a 15% drop in the wake of statements about potential ISIS ties by Defendant Ekholm in Sweden.

47.     Ericsson's February 16, 2022 disclosure and the resulting negative news coverage **caused Ericsson's ADS price to fall $1.44, or 11.57%, closing at $11.01 on February 16, 2022.**

48.     Despite this shocking revelation, **Ericsson continued to assure investors of its purported "transparency"** regarding these issues and its ability to manage compliance risks due to its "processes in place to manage security risks, covering both employees and subcontractors."  However, investors were still unaware of the full truth regarding Defendants' corrupt practices and the extent of the Company's bankrolling of ISIS.

**I.      The ICIJ Releases the "Ericsson List" Revealing the Breadth of the Fraud and the Details Surrounding Ericsson's Payments to ISIS**

49.     Approximately two weeks later, on February 27, 2022, the ICIJ published a thorough report on Ericsson's corruption and FCPA violations in Iraq based upon the information contained in the Iraqi Corruption Report conducted by Simpson Thacher at the direction of Ericsson following Ericsson's identification of "suspicious payments" in Iraq in 2018.  The article revealed that Ericsson allegedly made "**tens of millions of dollars in suspicious payments**" over nearly a decade to keep its business in the country.  These suspicious payments were allegedly made in connection with "**slush funds, trips abroad for defense officials and payoffs through middlemen to corporate executives and possibly terrorists**."  Further, according to the February 27, 2022 article, Ericsson went as far as seeking "**permission from the terrorist organization known as the Islamic State to work in an ISIS-controlled city and paid to smuggle equipment into ISIS areas on a route known as known as the 'Speedway.'**"

50.     Notably, the article revealed that Defendant Ekholm admitted that he knew of the illegal conduct in Iraq at least as early as 2018 and affirmatively elected to conceal this material information from investors based on **Ericsson's unilateral materiality analysis**, stating: "**the materiality of our findings did not pass our threshold to make a disclosure.**"

51.     Following the ICIJ's bombshell report, which significantly undermined all of the Defendants' assurances to the contrary, **Ericsson's ADS price fell $0.84, or 8.3%, from its closing price on February 25, 2022.**

**J.      The Full Truth is Revealed When Ericsson Announces its Breach of the DPA**

52.     On March 2, 2022, in a Form 6-K filed with the SEC prior to the market opening, Ericsson announced that the DOJ determined that the Company's prior disclosures in connection with the DPA were "**insufficient**" and "that the company **breached the DPA by failing to make subsequent disclosure** related to the investigation post-DPA."  Ericsson continued to stand on its February 15, 2022 press release stating, "[t]he investigation could not identify that any Ericsson employee was directly involved in financing terrorist organizations. Based on our current assessment of the media reports, we do not believe they change this conclusion."

53.     **In response to this news, Ericsson's ADS price fell $0.74, or 8.35%. to close at $8.12 per ADS on March 2, 2022**, further injuring investors.

54.     In the days following the revelation of Ericsson's fraud, shareholders demanded answers, specifically from Defendant Ekholm.  In one instance, "Swedbank AB's Robur unit, asked Ericsson's board to justify **why Ekholm received almost $20 million in bonuses for the years 2019-2021, while Ericsson kept quiet about misconduct in Iraq, including possible payments to the Islamic State terror group**."  Likewise, Glass, Lewis & Co., took steps to publicly criticize Defendant Ekholm for "'**misleading communication' that led to the stock losses.**"  Finally, an analyst issued a report telling investors that **given the news, the Company risked becoming "uninvestable."**

55.     As the media and markets continued to heighten pressure, on March 16, 2022, Ericsson replaced Defendant Dedullen with a new Chief Legal Officer, Scott Dresser.  In addition to the DOJ's renewed investigation, the Swedish Stock Exchange Nasdaq Stockholm

AB announced its own initiation of an investigation into Ericsson's illegal practices which are currently underway.

## II.    JURISDICTION AND VENUE

56.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

57.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

58.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as the alleged misstatements entered and subsequent damages took place in this Judicial District. Pursuant to Ericsson's most recent annual report on Form 20-F, as of December 31, 2021, there were 3,072,395,752 of the Company's B shares outstanding. Ericsson's ADSs, each representing one B share, trade on the NASDAQ Stock Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Ericsson's ADSs located in the U.S., some of whom undoubtedly reside in this Judicial District.

59.    Defendants, through their offerings and contacts with investors in New York, have purposefully availed themselves of the benefits of the American securities market.  Defendants sold the subject securities to investors in New York.  Defendants' ADSs, each representing one underlying Class B share, are traded on the NASDAQ New York, where there are approximately 3.3 billion outstanding shares. Defendants have an office and conduct business in New York. By publishing their annual report in English and listing their ADSs on the NASDAQ stock exchange in New York, Defendants have targeted American investors with their securities offerings. Defendants' ADSs are sponsored by Deutsche Bank, which has an office located at 60 Wall

Street, New York, New York.  Defendant also does business related to its ADRs with American Stock Transfer & Trust Company, located at 6201 15th Ave, Brooklyn, New York.

60.  Individual Defendants Ekholm, Mellander, and Dedullen, through control person liability of §20(a) of the Exchange Act, have also purposefully availed themselves of the benefits of the American securities market.  Some of the Individual Defendants signed annual reports, translated to English, that targeted American investors.

## III.   PARTIES

### A.   Lead Plaintiff

61.  On June 8, 2022, the Court appointed Boston Retirement System to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). BRS is a governmental defined benefit pension plan that administers retirement benefits to all employees of the City of Boston, as well as its autonomous agencies, including:  the City of Boston, the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission.  BRS oversees the pensions of more than 34,000 retired and active members.  The current value of Boston Retirement System's assets under management is $5.4 billion.  As set forth in the certification attached to Lead Plaintiff's motion for appointment as Lead Plaintiff (*see* ECF No. 15-3), BRS purchased or otherwise acquired Ericsson ADSs at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.

### B.   Defendants

62.  Ericsson is incorporated in Sweden and maintains a U.S. Headquarters in Plano, Texas.  Ericsson's ADS trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "ERIC."

63.     Defendant Börje Ekholm ("Ekholm") was, at all relevant times, the Chief Executive Officer ("CEO") of Ericsson and a member of its Board of Directors.  Defendant Ekholm made false and misleading statements during earnings calls with investors.  During the Class Period, Ekholm spoke publicly and extensively about Ericsson's corrupt conduct in Iraq and other countries and its impact on Ericsson's business.

64.     Defendant Carl Mellander ("Mellander") was, at all relevant times, the Senior Vice President and Chief Financial Officer ("CFO") of Ericsson.  Mellander was tasked with managing Ericsson's financial operations.  Defendant Mellander signed SEC Form 6-Ks and Form 20-Fs that contained false and misleading statements and made false and misleading statements during earnings calls with investors.  In his role as CFO, Defendant Mellander spoke publicly and extensively about Ericsson's corrupt conduct in Iraq and other countries and its impact on Ericsson's financial performance.

65.     Defendant Xavier Dedullen ("Dedullen") was, at all relevant times, the Senior Vice President and Chief Legal Officer ("CLO") of Ericsson.  Dedullen was tasked with managing Ericsson's legal obligations.  Defendant Dedullen signed the DPA with the DOJ that contained false and misleading statements and made false and misleading statements during earnings calls with investors.  Additionally, Dedullen signed the DPA, entered with the DOJ, on behalf of Ericsson.  In his role as CLO, Defendant Dedullen spoke publicly and extensively about Ericsson's corrupt conduct in Iraq and other countries and its impact on Ericsson's financial performance.

### C.     Relevant Third Parties[7]

66.     Affan Akram worked for Orbitel Communications, a subcontractor of Ericsson. Affan Akram was employed by Orbitel Telecommunication from June 2011 until September 2014.

---

[7] CWs are identified herein by number (*e.g.* CW-1). All CWs are described in the masculine to protect their identities.

Akram was initially an RF Drive Test Engineer from June 2011 until August 2013 and then was the RF DT team leader and Coordinator with Ericsson from August 2013 to September 2014. Akram's employer, Orbitel, was hired by Ericsson as a third-party subcontractor in connection with the Peroza Project (Asiacell contracted Ericsson for the project). Affan Akram had regular communications with Ericsson's current Network Program Director, Rabah Dannawi, and former Senior Network Engineer, Lewaa Hamadeh. Ericsson directed Akram and his Orbitel team to deliver a letter to ISIS requesting permission to work in Mosul. When Akram executed this task on Ericsson's behalf, in July 2014, he was kidnapped by ISIS.

67.    CW 1 was employed by Ericsson for over 10 years through 2021. In his role, he was responsible for selecting suppliers, negotiating contracts and handling payments and renewals. CW 1 worked in the Middle East and Africa region in Procurement Department.

68.    CW 2 was employed by Ericsson from before 2000 and left after 2015 and held several positions during his tenure. CW 2 was most recently employed as a Director in the Middle East and reported to Tarek Saadi at times during his tenure. CW 2 explained that he was stationed in the Middle East and had experience with the market in Iraq while occupying roles in charge of the Middle East and North Middle East.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD

### A.    Company Background

69.    Ericsson is a Swedish multinational telecommunications company that develops, sells, and manages telecommunications infrastructure including software, hardware, and information technology services. Described as "one of the leading providers of Information and Communication Technology," Ericsson's core business entails implementing telecommunications infrastructure to support mobile broadband across the globe. Ericsson was and is one of largest telecommunications companies that implemented the current mobile communication infrastructure

used in the world today beginning with 2G in about 1991, then 3G in 2000, 4G around 2011, and now, the current expansion of 5G technology globally.[8]

70.    Mobile broadband infrastructure was a massive opportunity for telecommunications companies, like Ericsson, in the late 1990s and early 2000s.  At that time, telecommunications companies had essentially countless opportunities globally to build and expand the infrastructure necessary to support the new mobile networks that were needed by developed and developing countries internationally.  Critically, once a telecommunications company such as Ericsson established itself—and its proprietary telecommunications infrastructure—in a country or region, it also effectively assured itself of significant future maintenance, management, and upgrade revenues because the infrastructure was built on Ericsson hardware and software.

71.    As broadband infrastructure was established around the world, the traditional opportunities for construction from the ground up were greatly reduced.  Indeed, by the early 2000s, modern telecommunication infrastructure had been implemented in almost every developed and developing region of the world.  Accordingly, Ericsson and its competitors turned to other areas of expansion including increasing telecommunication speed and other alternative sources of revenue.

72.    However, a unique and hugely profitable opportunity arose following the war in Iraq.  Due to its political history, Iraq was one of the few remaining countries in the world without a modern telecommunications infrastructure, making it a massively profitable target for growth and expansion.  Indeed, according to a 2003 *Los Angeles Times* article there were nearly "$2 billion

---

[8] While telecommunication infrastructure products and services are Ericsson's primary revenue generators, the Company also recently began providing cloud software and services and automated communications services.  Ericsson also invests in emerging business opportunities such as artificial intelligence.

worth of projects to build a cellular telecommunications system for Iraq," and Ericsson was one of the primary companies positioning itself to compete for these incredibly large contracts.

### B.    Ericsson's Expansion into Iraq

#### 1.    History of Iraq

73.    Saddam Hussein ascended to power in 1979 and ruled Iraq for almost 30 years. Under Hussein's regime, telecommunications products such as satellite televisions and cell phones were banned for the majority of Iraqi residents. For these reasons, Iraq lacked telecommunications infrastructure as compared to the rest of the world.

74.    On March 20, 2003, the United States declared war against Iraq in response to reports that Iraq was harboring weapons of mass destruction. Throughout the war, Iraq experienced severe instability resulting, in part, in the formation of a faction of the terrorist organization, Al-Qaeda.

75.    During the war, Al-Qaeda in Iraq (and later ISIS) took control over critical Iraqi transportation routes including key shipping and transportation routes to Jordan, Syria, Turkey, and the Persian Gulf – all imperative routes for any company conducting business in Iraq. The terrorist organization also took control of important internal roads such as those connecting major cities like Baghdad and Mosul. As part of their control over these critical transportation routes, ISIS, charged companies seeking to use the roads exorbitant tolls as high as $22,000 for safe passage. The money raised was then used to fund terrorist attacks, including attacks against American soldiers and journalists in the region and abroad.

76.    Saddam Hussein's trial, and ultimate execution for crimes against humanity, took place in 2006. And during the period from 2008 through 2011, the U.S. military began withdrawing from Iraq with the final contingent of troops withdrawn in December 2011, marking

the conclusion of the Iraq war.  While the war was officially over, the U.S. was still in close communication with Iraq's government and continued to provide aid to Iraq going forward.

77.    However, in 2011, with the U.S. military largely gone from the country, the remnants of the Al-Qaeda in Iraq quickly established a foothold in the country by renaming themselves as ISIS with the objective of establishing an Islamic Caliphate.  This reemerging terrorist organization took advantage of Iraq's political instability to gain power and continued to carry out brutal attacks including attacks against American civilians and soldiers.  By 2014, under the leadership of  Abu Bakr al Baghdadi, ISIS had strengthened to a point where it began engaging in strategic attacks to gain control over key Iraqi cities including, Mosul and Tikrit.

78.    During the Class Period, ISIS continued to control certain regions in Iraq and Syria. In the years that followed, Iraq regained control of certain cities, thereby reducing ISIS's control in Iraq.

### 2.    Ericsson's $1.9 Billion Business Opportunity

79.    Recognizing the business opportunity that Iraq presented, Ericsson moved swiftly to compete for and win several large government and mobile provider contracts at least as early as 2011.  These included agreements to construct large scale radio base stations and mobile switch centers—some of the country's largest scale and most profitable projects.

80.    For example, Ericsson was able to secure the following contracts that gave the Company a strong foothold in Iraq: (i) a 2014 contract with Asiacell to complete the highly sought after "Peroza" Project; (ii) a 2016 contract with Zain Iraq to manage mobile network services and IT Operations in the region; (iii) a 2017 contract with Korek to transform Korek's IP core network in Iraq; and (iv) a 2017 contract with Zain Iraq to upgrade the existing network with Ericsson's

"Evolved Packed Core" product.  Performing these contracts, however, required Ericsson to work in and transport significant materials through Iraq, Syria, and Turkey.[9]

81.    Defendants recognized the importance of these growth opportunities as well as their challenges.  This was especially important around 2016 when reports surfaced that Ericsson was "struggling" to obtain growth opportunities globally, with the exception of Iraq.[10]  For example, in a 2017 Form 6-K filing with the SEC, Ericsson stated "*[s]ales in the Middle East showed growth despite a continued challenging macroeconomic environment*."  Likewise, Defendant Mellander stated in a 2018 earnings call.  "*[W]e, of course, see the investments in R&D paying off here when it comes to the gross margin improvement there…strong performance, a good momentum in…Middle East*."

82.    Growth in Iraq exploded as intended and the contracts Ericsson won provided massive amounts of revenue to the Company.  Indeed, Ericsson reaped **$1.9 billion in revenues between 2011 and 2018 in Iraq alone**.  This came after telecommunications construction for the whole country was projected to be valued at $2 billion, according to a 2003 *Los Angeles Times* article.

83.    Throughout the Class Period, growth in the Middle East, including Iraq, continued to be a critical source of revenue and profit for Ericsson.  For example, in an April 21, 2021 earnings call, Defendant Ekholm touted Ericsson's business in the Middle East, stating, "**one of the cornerstones of our strategy has been to grow gross margin**. And it's a fundamental indicator of

---

[9] Ericsson's expansion into Iraq and the winning of the coveted telecommunications contracts there was primarily led by two individuals.  First, by former President and Head of Ericsson Region Middle East and Africa, Rafiah Ibrahim, and later by Tarek Saadi, former Ericsson Head of Global Customer.  In their role, each individual reported directly to Defendant Ekholm.

[10] "U.S. corruption probe puts renewed pressure on Ericsson," *Reuters* (June 16, 2016), https://www.reuters.com/article/us-lm-ericsson-probe/u-s-corruption-probe-puts-renewed-pressure-on-ericsson-idUSKCN0Z22WM.

success or progress on the focused strategy. So[,] it is encouraging that we continue to see our gross margin strengthen in the business, and we are able to see that strengthening."

### C.   Ericsson's Global Growth at All Costs Strategy Relied on Corrupt Practices

84.    In order to continually grow and generate revenues from 2010 through the end of the Class Period, Ericsson employed a growth at all costs strategy across the globe.  However, unbeknownst to investors and the Company's regulators, Ericsson's strategy to generate revenues internationally was rooted in a multi-layered illegal scheme that violated both Ericsson's internal anticorruption program and numerous anticorruption laws and regulations including the FCPA. Ericsson would later plead guilty to and pay a $1 billion fine for violations of the FCPA in 2019 when U.S. regulators uncovered Defendants' rampant use of bribes, sham contracts, inflated invoices, slush funds, and kickbacks in order to win telecommunications contracts in a number of countries such as Djibouti, Kuwait, China, Indonesia, and Vietnam.  Notably, as discussed in detail below, Defendants failed to disclose that they were simultaneously performing an internal investigation that uncovered the existence of Ericsson engaging in some of the same, and at times, dramatically worse, practices in Iraq, including the bankrolling of ISIS.

### 1.   Ericsson's Global Strategy to Secure Crucial Projects and Contracts Through Illegal Bribes and Kickbacks

85.    From the early 2000s through the present, Ericsson sought to advance Defendants' growth strategy and "grow gross margins."  Accomplishing these goals required employees to obtain major telecommunications projects and contracts on an international scale.  At Ericsson, however, submitting competitive bids on projects was not enough.  Instead, Ericsson engaged third party "sales agents" to execute bribes and illegal payments through slush funds, in direct contravention of Ericsson's own anti-corruption policies, to illegally fix project bidding in its favor. Specifically, according to the DOJ, "the Company conspired with [third parties] to violate the

FCPA by engaging in a longstanding scheme to pay bribes, to falsify books and records and to fail to implement reasonable internal accounting controls."

86.    For example, Ericsson admitted to hiring a subsidiary through a sham contract to deliver a bribe of approximately $2.1 million to a Djibouti government official in order to secure a €20.3 million state telecommunications contract.  Ericsson employees then approved fake invoices in order to execute the $2.1 million payment and conceal the bribe.  Similarly, Defendants obtained a $182 million contract in Kuwait through this same practice – paying a "sales agent" $450,000 for bid-rigging.

87.    Likewise, Ericsson applied this same corrupt playbook in China between 2000 and 2016, paying consultants over ten million dollars to bribe officials related to telecommunications contracts.  The DOJ reported that there:

> Ericsson subsidiaries **made payments of approximately $31.5 million to third party service providers pursuant to sham contracts for services that were never performed**.  The purpose of these payments was to allow Ericsson's subsidiaries in China to continue to use and pay third party agents in China **in contravention of Ericsson's policies and procedures**.  Ericsson knowingly mischaracterized these payments and improperly recorded them in its books and records.

88.    Ericsson's corrupt business practices were well-known within the Company as evidenced by emails discussing the illegal payments.  For example, Ericsson's Head of the Customer Unit in Northeast Africa explained the existence of repeated phone calls that he was receiving from Foreign Officials to wire money in order to secure lucrative government contracts.  This management-level employee said: "[w]e need to wire the payment within the current week," and "[e]verybody in the management of [Telecom Company] & in the ministry **are waiting their part of the cake**."

## 2.    Ericsson Hired Subcontractors to Carry Out its Corrupt Conduct

89.    Ericsson's multi-layered corruption scheme also involved hiring third party subcontractors to act as intermediaries between Ericsson and other organizations. This sham third-party arrangement created a buffer between Ericsson and the corrupt practices while allowing the Company to do business with organizations that Ericsson could otherwise not interact without serious criminal, regulatory and reputational harm.[11] By laundering the money through third party organizations Ericsson was able to avoid triggering the Company's purportedly robust anti-corruption program and keep the slush funds and sham agreements from appearing on its accounting books and records.

90.    For example, from 2012 to 2015, in Vietnam Ericsson paid $4.8 million to a "consulting company" for the creation of "off-the-books slush funds." Ericsson funded the Vietnam slush fund by creating bogus and inflated services contracts through which the "consultants" could be paid. Not only did this result in employees blatantly disregarding Ericsson's compliance protocols, but also caused fraudulent books and records entries which mischaracterized the true nature of the transaction.

91.    Similarly, Ericsson employed "consultants" for the creation of noncompliant slush funds on multiple occasions in Indonesia from 2012 through 2015. There, Ericsson paid a "consultant" **$45 million to create slush funds**, all of which, according to the DOJ, was hidden from disclosure in Ericsson's books and records. Ericsson's own internal emails demonstrated the Company's end-run around its anti-corruption and compliance protocols. For instance, an Ericsson

---

[11] The second layer in Ericsson's scheme is an example of a well-known, illegal corporate corruption tactic known as "offloading." At the most basic level, large multinational corporations pay third parties to carry out illegal directives in exchange for executive tasks, like facilitating bribes or creating slush funds. This agency relationship allows the large corporation to "offload" the legal, political, and public relations risk of engaging in illegal conduct.

"consultant" emailed Ericsson employees to discuss the balance of a "Fridge" account which Ericsson admitted, and the DOJ has confirmed, to be a "cash account used for 'off the book' expenses" that "employees of the Company did not want to record on the Company's books."

**D.    The U.S. Government Begins Investigating Ericsson's Corrupt Practices**

92.    Ericsson's rampant corruptive practices started coming under increased scrutiny in March of 2013.  In March 2013, the SEC began investigating Ericsson related to the Company's purported "anticorruption program" and violations of the FCPA.  Then, in 2015, the DOJ launched its own investigation into Ericsson's FCPA violations because of allegations related to the Company's systematic bribery, bid-rigging, use of slush funds, and illegal payments practices to grow its business.

93.    In response to the flurry of investigations, on June 17, 2016, Defendants issued a press release disclosing the existence of the U.S. Government investigations and claiming, "we strive to at all times conduct our business in compliance with applicable laws."  Later that day, Ericsson held a conference call to reassure investors about the supposed strength of Ericsson's anti-corruption program and the efforts the Company was purportedly taking to ensure that the Company was not engaging in any corruptive practices across the globe.

94.    Investors were concerned about the Company's revelation of the corruption investigation.   For example, Sasja Beslik, head of responsible investment at Nordea Asset Management, told Bloomberg in an interview following the call: "**We take this very seriously . . . If this is a symptom of a bigger problem, it could cost a lot of money and could affect the share quite a lot, and then we have to decide how to act on this -- if we should keep the share or sell**." Beslik continued: "**[a]ll in all, it was informative, but let[']s hope there won't be more closet cases we're not aware about**."

95.    Yet, as the investigations continued, Ericsson defended its supposedly above-board business practices stating in a December 17, 2016 press release published in response to yet another allegation of corruption: "We take any allegations about corruption in relation to our business seriously, and **we do not agree with the allegations of widespread briberies**."

### E.    Ericsson Announced an Internal Review of its Anticorruption Program and Increased Oversight Over Corruptive Practices

96.    Facing immense pressure from regulators and investors, Ericsson sprang into action to reassure the market that it was taking the allegations of corruption very seriously. Specifically, Defendants announced that it would be performing an internal review of its anti-corruption program and would be strengthening the Company's anti-corruption program to the point where Ericsson could identify and eliminate illegal activities, claiming that the Company "***has a zero-tolerance approach to corruption expressed in the Company's Code of Business Ethics***."

97.    Indeed, beginning in 2016, the Defendants employed "***external experts to evaluate the robustness of [its] anti-corruption program***."  This review spanned one full year and flagged areas of weakness to Defendants.  At the conclusion of the internal review in October 2017, the Company came to vague and ambiguous conclusions such as that the anti-corruption program should be "closer align[ed] with the US Foreign Corrupt Practices Act (FCPA)."  However, the Company did implement certain new policies and procedures to ensure that the individuals at the highest levels of the Company were monitoring the anti-corruption program.  For example, the Company announced that "Business Partner Review Boards have been established in all Market Areas to over-see mitigation of the corruption risks in relation to onboarding of new business partners" and implemented a process where the Chief Compliance Officer "report[ed] directly to the Audit Committee of the Board of Directors. The Audit Committee also review[ed] and evaluate[ed] the program at least annually."

**F.      According to its Own Internal Investigation, Ericsson Was Engaged in the Same Multi-Layered Corruption Scheme in Iraq**

98.      While the SEC and DOJ were investigating Ericsson for rampant corruption in Djibouti, China, Vietnam, Indonesia, and Kuwait, the Company, unbeknownst to investors and the Company's regulators, was engaging in the same illegal practices in Iraq.  According to a leaked internal Ericsson investigation that was published in 2019 by Simpson Thacher, Ericsson was and had been engaging in even more egregious corrupt and illegal business practices in Iraq since at least 2013. Worse, in addition to the rampant use of bribery, kickbacks, and slush funds to win contracts, Ericsson also chose to engage in the unconscionable act of paying off ISIS in order to have access to favorable transportation routes and cities in Iraq.  In doing so, **Ericsson chose to fund a known terrorist organization that was actively killing civilians, journalists and American soldiers at that time**.

**1.      Ericsson Performed an Internal Investigation into The Company's Practices in Iraq Uncovering Rampant Corruption, FCPA Violations, and Funding of Terrorist Organizations**

99.      Unbeknownst to investors, and the U.S. Government (who was then investigating Ericsson for corrupt practices elsewhere), Ericsson initiated its own *broader* internal investigation in its corrupt business dealings in Iraq which culminated with the issuance of a December 11, 2019 report by Simpson Thacher. [12]  The Report was "79-page[s]" in length and included "summaries of 28 witness interviews and 22.5 million emails" (the "Iraqi Corruption Report" or the "Report"). [13]

---

[12] Ericsson hired prominent New York law firm Simpson Thacher to conduct an independent internal investigation into the company's widespread fraudulent practices around the globe. Simpson Thacher was the same law firm handling Ericsson's defense in the DOJ's FCPA investigation.

[13] Excerpts of the Iraqi Corruption Report were published as part of a multi-part series called the "Ericsson List" by a popular investigative journalist site called the ICIJ.

100.    The Iraqi Corruption Report confirmed that Ericsson had been engaging in the nefarious multi-level corruption scheme since at least 2011 and found numerous examples of illegal and corrupt practices including the use of slush funds, inflated invoices, sham contracts, bogus settlement agreements, fraudulent financial statements, kickbacks, and bribes.

101.    The Iraqi Corruption Report confirmed that Ericsson won many major contracts with Iraq's main mobile carriers, Asiacell, Zain Iraq, and Korek through these unlawful practices. Bribes to obtain these contracts **ranged from $500,000 to over $20 Million.**  The results of the investigation went as far as to say that the corrupt practices were significant to Ericsson's ongoing business in the Country and was, in fact, "***sustain[ing] [Ericsson's] business in Iraq***."

102.    The Iraqi Corruption Report also summarized the investigation into Ericsson's affirmative decision to use the "Speedway," thereby funding ISIS–a known terrorist organization that was responsible for killing civilians and American Soldiers–instead of legal Iraqi government routes or U.S. assistance.  The report cited the exact dollar amounts paid to ISIS in order to make use of the "Speedway"– ranging from $3,000 per vehicle to, in some cases, as much as $22,000 per vehicle.  The Report further corroborated that these were not one-time payments, but instead, systematic components of Ericsson's ability to transport equipment and materials to and within Iraq.

### 2.    Ericsson Bribes Customers and Government Officials to Win Lucrative Contracts in Iraq

103.    According to the Iraqi Corruption Report, as in the other countries, Ericsson relied on corrupt and illegal business practices to sustain its business in Iraq.  In some cases, illegally paying **as much as $500,000 to fix project bidding** for Iraq's largest mobile providers – Asiacell and Korek.

104.     For example, Ericsson was able to secure a coveted network expansion, infrastructure construction, and testing contract with Asiacell known as the Peroza Project. According to the Report, Ericsson executive Tarek Saadi requested a $500,000 payment to the CEO of Asiacell in order for "Ericsson to win more business in 2014."  Specifically, Ericsson paid a third party contractor, Al-Awsat, two payments of $250,000 for "security services" that were never rendered by the contractor.  The sham payments were later confirmed to be "commission payment" requested by Ericsson's Tarek Saadi to be paid to the CEO of Asiacell.  Unsurprisingly, Ericsson was eventually awarded the Peroza project.



105.     Former Ericsson employees confirmed that Saadi engaged in these types of corrupt behaviors.  For example, CW 2, who reported to Saadi, confirmed that Saadi regularly engaged in corrupt practices.  According to CW 2, invoices could be inflated to mask kickback payments to

subcontractors and intermediaries. CW 2 added that payments of this nature were "normal behavior" and that "Ericsson was not blind to it." When asked about Al-Awsat Telecommunications, CW 2 explained that this was "one of the companies you can put a question mark on," meaning it was unclear what work they provided, but people were questioning "why they are everywhere" and why "everything runs through them."

106.    The Iraqi Corruption Report set forth other examples of Ericsson bribing customers for lucrative contracts. On August 12, 2014, an Ericsson employee directed a $50,000 payment to be made to Kurdistan's Peshmerga forces with the description "for fighting ISIS." However, one of major mobile provider, Korek's, main shareholders, Sirwan Barzani, was the de facto head of the Kurdistan militia. In reality, by making this payment, Ericsson sought to secure contracts with Barzani and Korek. Indeed, the Report confirmed that the purpose of the donation was to "try to get mileage from Korek chairman for supporting this."

A donation request of 50K USD was initiated by ████████████ on 12 August 2014[38], according to Manual Payment documentation from SAP. The donation requests came from the majority shareholder (56%[39]) and Chairman of the Board in customer Korek: Sirwan Barzani as in email[40] review: Sirwan Barzani is also the de-facto head of the Kurdish army[41]. According to a mail from Rafiah Ibrahim, at point of time Head of RMEA, the donation should be used to *"try to get mileage from Korek Chairman for supporting this"*.[42]

Approval of the donation was granted[43] on 14 August 2014 according to the sponsorship & donations process to "Falakadin Kakei Foundation" to *"Buy the displaced people [of Northern Iraq] Food, secure shelter, and provide medical assistance"*.

107.    Sirwan Barzani, the Chairman of a major telecommunications customer, Korek, was a repeat contact in Ericsson's corruption scheme. Between 2007 and 2017, Ericsson paid Rasech Barzani, a relative of the Chairman, $1.2 million as a "consultant" even though "no clear role" for him was ever identified. Ericsson's payments to Barzani, which again were done at the behest of

Saadi, were recorded with the vague description, "business intelligence and the facilitation to the chairman of Korek" and were not registered with "Group Function Sales" as per the Ericsson process.



The consultant Rasech Barzani, a relative to the Barzani family (majority owner of Korek[138], interests in Darin[139] and strong relation to Kurdistan Army[140]) was engaged by Tarek Saadi, former Head of CU North Middle East, and maintained by ████████████ for five years until 2017. He was paid up to 10.5K USD/month plus 50K USD/year in bonus. (Total: 1.2M USD since 2007).

Email evidence indicates that ████████████ had requested that Rasech Barzani is not paid through ██████ since Rasech does not want his name disclosed because of his relation to the ruling family in Kurdistan (Barzani).[141] His sales consultancy agreements have never been registered with Group Function Sales, as per the Ericsson process. As per the contracts available, no clear role has been assigned to Rasech Barzani, rather a more focused Business intelligence and facilitation to the Chairman of Korek, Sirwan Barzani.

108.    Ericsson not only bribed private customers to win critical contracts but Iraqi government officials as well.  For instance, in 2014, Ericsson funded a trip to Spain and Sweden for members of Iraq's Ministry of Defense, while the Ministry of Defense was making a major decision related to projects for Iraq's telecommunications infrastructure.  Ericsson spent tens of thousands of dollars on this trip and similar entertainment in the lead-up to the award of a major government contract—a clear violation of Ericsson's Anti-Corruption program.

Pocket money and travel costs for 10 MoD representative's for travel to Spain and Sweden, via Amman. Total amount of approximately 20K USD was paid by Ericsson. Additional costs for gifts and entertainments for MoD representatives during the trip was also confirmed, with a total cost for the travel except the pocket money 97.8K USD. The trip took place 21 October – 3 November 2014. This was during negotiations with MoD, contract was signed 31 October 2014.  Offering pocket money and payment of travel costs and gifts to government officials is a breach of the Ericsson Anti-Corruption Group Directive dated December 2012.

109.   Like they did in other countries, Ericsson illegally retained third parties, to engage in conduct prohibited under Ericsson's anti-corruption program to prevent the payments from being traced back to Ericsson.  According to the Report, Ericsson hired third-party sales agents and consultants, such as Al-Awsat, to execute sham contracts, create slush funds, facilitate kickbacks, and deliver bribes in order to secure contracts all to guarantee growth and increase profits.  For example, according to the Iraqi Corruption Report, in direct violation of Ericsson's anti-corruption program principles, Ericsson paid Al-Awsat $10.5 million that could not be traced or properly accounted for and another $1.2 million for purposes that remain unclear.  However, the Report revealed that this large sum ended up in the hands of a powerful family with ties to one of Iraq's largest mobile phone operating companies.

110.   Each of Ericsson's payments to Al-Awsat in Iraq were accompanied by the same type of vague, mischaracterizations that were recorded in the Company's books and records in other countries employing similar corrupt practices.  For example, when Ericsson paid Al-Awsat, Ericsson employees recorded the payment as "consultancy services," when in fact, it is unclear whether any such consulting services were ever provided at all.

111.   Further, Ericsson's $10.5 million payment was made and approved **without** any indication of a clear beneficiary.  Later investigation revealed that Ericsson "manipulated" internal documents to ensure this payment to Al-Awsat for illegal purposes.

> During the supplier selection process in 2015, when preparing for the governmental customer Ministry of Defense (MoD) opportunity ▮▮▮▮▮▮▮▮▮▮ Al-Awsat were provided with favorable scoring (10/10). The pattern of the scoring for the other suppliers shows that this document was manipulated to provide biased scoring to Al-Awsat[68].

The 10.5M USD paid to Alawsatiya into Al-Awsat's accounts was not reflected in their accounts at all, and therefore we are unable to ascertain who the ultimate beneficiary owner was for this money.

### 3.    Ericsson Pays Terrorists for Special Access to ISIS's Illegal "Speedway" Transportation System

112.    In addition to bribing executives and foreign officials to win lucrative contracts, Ericsson also resorted to illegal and corrupt practices in carrying out the contracts as well.  As described in Section B *supra*, ISIS controlled many of Iraq's key transportation routes throughout the Class Period.  Despite having other options, Ericsson elected to utilize terrorist-controlled routes, cities, and regions to transport people and materials.  The terrorist organizations developed extensive racketeering operations which required all persons or entities seeking to utilize the roads or conduct business in the regions they controlled to pay "taxes" or "protection payments" on a regular basis.

113.    By 2014, ISIS had taken control of several major Iraqi cities and transportation routes.  For example, according to Affan Akram, everyone who attempted to do business in Mosul knew that payment was necessary.  Akram explained that following ISIS taking Mosul in May 2014, they became the group to receive access payments.

114.    Critically, working with ISIS was not the only option.  Ericsson had numerous legal options to avoid making payments to terrorists.  First, the U.S. government had established processes for companies to seek U.S. military aid in order to gain legitimate protection, and gain access to the necessary transportation routes.  However, seeking the legitimate aid of the U.S. government would take more time and come at a greater expense to Ericsson, thereby cutting into profits.  Second, companies could independently operate, without U.S. military aid, and choose to

travel via unrestricted routes, instead of terrorist-controlled roads.  Yet, this option involved Iraqi customs checkpoints which could result in the payment of higher tariffs to the Iraqi government.

115.   When presented with these options, Defendants knowingly chose to avoid the time and expense of seeking U.S. aid or using sanctioned Iraqi government routes and instead decided to fund ISIS for access to the "Speedway."  The "Speedway" was an ISIS-controlled transportation route allowing businesses to circumvent Iraqi customs checkpoints when transporting goods and cargo into and out of the country if organizations made payments to ISIS for access.

116.   According to the Iraqi Corruption Report, Ericsson affirmatively chose to use the "Speedway" to transport the materials necessary to complete the lucrative Peroza Project (secured by bribes) for Asiacell.  Ericsson transported project equipment and materials via the "Speedway" in at least 30 large vehicles typically costing between $3,000 and $4,000 per truck and sometimes reaching as high as $22,000 per truck.[14]

117.   In keeping with its international multi-layered corruption scheme, Ericsson made payments to ISIS by hiring and directing third parties to engage in this illegal and corrupt conduct. Specifically, the Report found that Ericsson repeatedly hired a third party, Cargo Iraq, to make these payments to ISIS and transport the materials through the "Speedway."

118.   An excerpt from these internal documents, reprinted below, confirmed that Ericsson manager, Roger Antoun, authorized $171,000 in payments for "Speedway" access between 2016 and 2017 – at the same period the SEC and DOJ were investigating the same corrupt practices in

---

[14] On August 5, 2022, a complaint was filed against Ericsson for violations of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333, on behalf of American service members and civilians who were killed or wounded while serving their country in Iraq, Afghanistan, and Syria between 2005 and 2021, as well as their families.  The complaint alleges that Ericsson helped finance and logistically aid Al Qaeda and ISIS through its corrupt practices which directly led to the death of civilians and American Service members through no less than 75 terrorist attacks in the region.  *See Schmitz v. Ericsson, Inc. et al.*, No. 1:22-cv-02317-CKK (D.D.C).

other countries.  This access payment, and others like it, resulted in Ericsson's direct funding of the ISIS in Iraq.



Roger Antoun[25] stated in interview[24] that Ericsson had paid an illegal "Speedway" option to the transporter Cargo Iraq (see 3.4.5) for faster transportation of equipment in Iraq. According to Roger Antoun, Cargo Iraq were engaged by Ericsson, on instruction by non-government customer Asiacell, for transportation during 2016 and 2017. With the specific purpose to circumvent the official customs. That had been increased to 25% from 10-15% by the government since the ISIS invasion. Cargo Iraq were not registered as an Ericsson supplier and were paid in cash through Security and Logistic Services (SLS), a supplier to Ericsson. The timeframe and geographic areas covered by these transportations[25] indicate that areas controlled by local militias, including ISIS, has been passed.

119.    Former Ericsson employees corroborated the findings of the Report.  For example, CW 2 stated that if someone needed money in Iraq, to pay subcontractors, for supplies, etc. that they could get money from these companies and then Ericsson would reimburse the companies and provide an approximately 10% commission payment.  CW 2 continued to say that payments to facilitate transportation or for use of the airports in the region were common examples.

**4.    Ericsson Engages in Other Corrupt Conduct with ISIS, While Endangering Employees' Lives, to Increase Profits**

120.    By 2014, ISIS had taken over Mosul, a city that was key to Ericsson's business dealings.  ISIS substantially increased the risks of conducting business in the area because ISIS was actively kidnapping, taking hostage, and beheading employees working in the region.  This was especially common when their employers did not make "protection payments."

121.    For these reasons, Ericsson employees approached Senior Regional Executives asking to cease operations due to the tremendous safety risks they faced by working alongside ISIS on a daily basis.  In fact, the Report revealed that "Tom Nygren, then vice president and general counsel for Ericsson in the Middle East, made a 'strong recommendation' to his supervisors to invoke force majeure" in order to cease operations in Iraq due to major safety concerns.  These requests and proposals were raised to Ericsson's executive offices and rejected.



*Excerpt from the leaked Ericsson report.*

122.    Senior Ericsson executives, including Tarek Saadi, refused to cease operations in Iraq because such a decision would "destroy [their] business."  Instead, Ericsson chose to seek access to Mosul from ISIS – a process that required payments to ISIS.  According to CW 2, Tarek Saadi, and his team were viewed as "kind of heroes" by Ericsson because they were able to get business in Iraq and Afghanistan, dangerous areas where others did not want to work.  CW 2 added that payments of this nature were "normal behavior" and that "Ericsson was not blind to it."

123.    Understanding the reputational risks associated with funding an international terrorist organization, Ericsson hired a third-party subcontractor, Orbitel, to do the dirty work for

them. But in reality, Ericsson was affirmatively directing Orbitel employees to secure access to Mosul from ISIS through letter correspondence and payment.

124.    In July 2014, Ericsson directed a team of Orbitel engineers to hand deliver a letter to ISIS requesting permission to continue the Peroza project in Mosul.  Not only did Ericsson clearly violate the FCPA for materially supporting a terrorist organization with payments, but also demonstrated a blatant disregard for human life by placing these employees in front of a group that was actively killing, kidnapping, and beheading employees without "protection payment" in the city.

125.    One engineer from the Orbitel team that received Ericsson's directive to seek access from ISIS has spoken publicly about his experience.[15]  Affan Akram was directed to deliver a letter to ISIS, on Ericsson's behalf.  Akram explained that he was in communication with Ericsson's Network Program Director along with his superiors at Orbitel in the lead up to the meeting with ISIS to confirm his whereabouts.  According to Akram, when he arrived at the ISIS office, he was instructed to speak with a "manager," Haji Saleh.  Akram recalled that once he met with Saleh he was instructed to call his manager, so he called Ericsson's Network Program Director, who spoke with Saleh before hanging up the phone and refusing to answer any further call attempts.

126.    At the conclusion of these calls, Akram was kidnapped by ISIS.  Thereafter, Affan Akram continued to say that he attempted to contact Ericsson, Orbitel, and Asiacell for assistance following his kidnapping and the approximately 10 days of house arrest that followed, but he was not provided any assistance.

---

[15] Amir Musawy and Maggie Michael, "Held hostage on the job ," *ICIJ* (Feb. 26, 2022), https://www.icij.org/investigations/ericsson-list/iraq-isis-hostage-telecom-engineer/.

44

G.    **Ericsson Makes False and Misleading Statements About its Growth in Iraq While Downplaying Any Possible Corruption in Iraq**

1.    **Ericsson's False and Misleading Statements Mislead Investors About the True Reasons for Growth**

127.    Despite the fact that many of the Company's most important contracts in Iraq were won through corrupt practices including bribery and kickbacks, Defendants made repeated statements misleading investors about the driving forces behind Ericsson's growth in the Middle East.  For example, on April 27, 2017, the first day of the Class Period, the day after Ericsson filed an annual report on Form 20-F with the SEC, Ericsson reported: "***Sales increased, primarily in Global Services. In the first half of the year, Network sales growth was mainly driven by some major mobile broadband projects, which were completed in the second half of the year***."  Here, Defendants misled investors that growth in the Middle East was organic and concealed the true fact that the growth was actually based on the Company's ability to obtain key contracts through bribes and illegal bid rigging.

128.    Defendants continued to make similarly misleading statements during an October 20, 2017 earnings call.  Defendant Ekholm misleadingly touted the growth in Middle East despite knowing that much of that growth was attributable to the Company's corrupt practices stating: "***we actually see growth in Middle East and Africa which is explained by multiple customers in multiple countries. So there are many contributing parts***."

129.    On the same day, October 20, 2017, in a Form 6-K filing with the SEC, Defendants further misled investors claiming that: "***Sales in the Middle East showed growth despite a continued challenging macroeconomic environment.***"

130.    However, as discussed above, in reality, sales in the Middle East showed growth because of the Company's undisclosed corrupt practices.  Moreover, Ericsson failed to disclose that the Company was able to successfully operate in a challenging macroeconomic environment

45

specifically because of the Company's illegal and corrupt practices that allowed them to profitably operate in Iraq despite the "*challenging macroeconomic environment*" there.

131.    Defendants' misleading statements concerning Ericsson's growth in the Middle East continued well into 2018.  For example, during an April 20, 2018 earnings call, Defendant Mellander stated: "*[W]e, of course, see the investments in R&D paying off here when it comes to the gross margin improvement there…strong performance, a good momentum in…Middle East.*"

132.    Contrary to Defendant Mellander's statement, growth in the Middle East was attributable to Ericsson's bribery and bid rigging scheme, not investments in research and development as he led investors to believe.

### 2.    Ericsson Touts Compliance While Downplaying Corruption in Iraq

133.    Despite the clear examples of Ericsson's widespread corrupt conduct in Iraq, Defendants misleadingly touted to investors its purportedly robust compliance and anti-corruption protocols.

134.    For example, in the 2016 20-F filed with the SEC on April 27, 2017, Ericsson referred investors to the Company's corporate governance report for 2016 (the "2016 Corporate Governance Report"), which stated that:

> *to ensure compliance with legal and regulatory requirements and the high standards that we set for ourselves, Ericsson has adopted internal rules that include: [a] Code of Business Ethics[;] Group Steering Documents, including Group policies and directives, instructions and business processes for approval, control and risk management[; and a] Code of Conduct, which applies to product development, production, supply and support of Ericsson products and services worldwide*.

135.    In the same 2016 Corporate Governance Report, Ericsson further misled investors by touting a purported culture of "integrity:" *Ericsson's Code of Business Ethics summarizes fundamental Group policies and directives and contains rules to ensure that business is conducted with a strong sense of integrity*.

136.     Likewise, on March 27, 2018, Defendants filed an annual report on Form 20-F which contained false and misleading statements about the Company's supposed "zero-tolerance" for corruption, despite the fact that the Company had knowingly engaged in rampant corruption and FCPA violations in Iraq.

137.     Specifically, the 20-F misleadingly stated that "***Ericsson has a zero-tolerance approach to corruption expressed in the Company's Code of Business Ethics***."  Importantly, the same 20-F provided great detail regarding all of the steps Ericsson was allegedly taking to promote its anti-corruption program, thereby giving investors comfort over the Company's supposedly robust anti-corruption protections.  Specifically, Ericsson highlighted that "[t]he Company's anti-corruption program, focusing on prevention and accountability, is headed by a Chief Compliance Officer, who since October 2017 reports directly to the Audit Committee of the Board of Directors."

138.     Additionally, the Company highlighted the steps it was taking to improve in the wake of the SEC's and DOJ's investigation announcements stating while completely failing to disclose that the Company was engaged in similar, if not worse, corruptive behavior in Iraq:

> During 2016–2017 ***we invited external experts to evaluate the robustness of our anti-corruption program***. Following the review, we adjusted the anti-corruption program to closer align with the US Foreign Corrupt Practices Act (FCPA). In 2017, the program was strengthened with adding resources on group level and appointing Regional Compliance Officers in all Market Areas. Moreover, one of the elements of the Group targets for sustainability and corporate responsibility is anti-corruption.
>
> ***In 2017 the Company continued to roll out an automated anti-corruption screening tool for supplier and third party due diligence, which was launched in 2016. By the end of 2017, close to 93% of active employees had completed the Company's anti-corruption e-learning course since the training was launched in 2013***. A customized online anti-corruption training is also available for Ericsson's suppliers on the Company website.

> *In 2017, Ericsson introduced a vetting process that focuses on ethics and compliance*. So far we have used it for appointments to the Executive Team and for approximately 110 employees in exposed positions. *All members of the current Executive Team have been vetted, and all future recruitments to these positions will also go through mandatory vetting. Business Partner Review Boards have been established in all Market Areas to over-see mitigation of the corruption risks in relation to onboarding of new business partners*.

139.    Yet, Ericsson's own internal report demonstrates that these processes were being ignored at every turn, rendering them false and misleading when made.  Countless third parties remained unvetted and continued to facilitate bribes, kickbacks, and slush funds in Iraq.  At the same time Ericsson was engaging in its corrupt scheme to bribe customers and pay terrorists to sustain its business, Defendants were touting the Company's growth in the Middle East and attributing successes to securing contracts.

### H.    Ericsson Pled Guilty to FCPA Violations, Paid a $1 Billion Criminal Penalty, and Entered Into a Deferred Prosecution Agreement with the DOJ

140.    On December 6, 2019, the DOJ announced that Ericsson "agreed to pay total penalties of more than $1 billion to resolve the government's investigation into violations of the Foreign Corrupt Practices Act (FCPA) arising out of the Company's scheme to make and improperly record tens of millions of dollars in improper payments around the world."  The announcement continued to explain that in connection with the settlement, "[a]n Ericsson subsidiary pleaded guilty today for its role in the scheme."

141.    In pleading guilty, Ericsson admitted to widespread illegal activities in Djibouti, China, Vietnam, Indonesia, and Kuwait in violation of the FCPA.  The DOJ and SEC found that Ericsson made millions of dollars of improper payments to government officials and terrorists organizations in five countries – a direct violation of the FCPA.  Ericsson had concealed these practices for years prior.  As a result, Ericsson entered into a binding DPA with the DOJ thereby

admitting to its corrupt conduct and agreeing to abide by DOJ oversight into the future as well as stringent disclosure obligations related to corrupt practices in other countries.

142.    The government investigation revealed Ericsson's egregious conduct in these five countries.  For example, the Statement of Facts to the DPA revealed that an Ericsson employee intentionally omitted a conflict disclosure from the due diligence report intended to vet the $2.1 million consultant payment deemed illegal by the DOJ.  Shortly after making this unvetted payment, Ericsson was informed that it had been selected for a telecommunications modernization contract.  This same type of corrupt conduct was identified on at least two other occasions in Djibouti alone.

143.    The DOJ determined that Ericsson, through its corrupt conduct, violated the anti-bribery provisions of the FCPA, the books and records and internal controls provisions of the FCPA, and engaged in a conspiracy to commit an offense against the United States.  Further, the DOJ made the determination that Ericsson "**had inadequate anti-corruption controls and an inadequate anti-corruption compliance program.**"

144.    U.S. officials confirmed that these illegal practices were inherent to Ericsson's growth at all costs business strategy and intended to "to solidify its grip on telecommunications business."  U.S. Attorney Geoffrey S. Berman said: "Through slush funds, bribes, gifts, and graft, **Ericsson conducted telecom business with the guiding principle that 'money talks.'**"  Similarly, Assistant Attorney General Brian A. Benczkowski said: "Ericsson's corrupt conduct **involved high-level executives** and spanned 17 years and at least five countries, **all in a misguided effort to increase profits**."

145.    Ultimately, as part of the DPA, Ericsson, "admit[ted], accept[ed], and acknowledge[d] that it [was] responsible under United States law for the acts of its officers,

directors, employees, and agents," for these FCPA violations.  The DOJ imposed over $500 million in criminal penalties and the SEC imposed over $500 million in civil penalties requiring Ericsson to pay over $1 billion in fines to the U.S. government – one of the largest foreign corruption settlements ever.

146.    Ericsson's punishment did not end with these exorbitant fines.  The DPA further required Ericsson to take certain remedial steps or risk further prosecution**.**  For this reason, Ericsson and the Defendants were expected to implement stringent compliance measures to avoid running afoul of this provision.

147.    The DPA was conditioned on Ericsson retaining an independent compliance consultant with which the Company would have no attorney client relationship with to monitor the Company for a three-year period.  The Company was also required to answer all of the consultant's questions and disclose any relevant information related to corrupt practices to the consultant.  This consultant would monitor the Company's practices and provide updates to the Defendants and, in some instances, members of the board of directors to ensure that Ericsson's actions would not run afoul of the FCPA again.

148.    Critically, the DPA included **a strict future disclosure requirement that mandated that the Company disclose any potential FCPA violations in other countries**. Specifically, the DPA stated:

> **The Company shall truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire.**
>
> …

> In addition to the obligations in Paragraph 5, during the Term, **should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA antibribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.**

149.    Accordingly, following the entry of the DPA Ericsson was under an affirmative

obligation to tell the government about its known corrupt and illegal conduct in Iraq.  Yet, the

Company failed to do so.  Instead, the Company conducted an internal investigation as a way to

cover up the conduct in Iraq.

150.    The DPA further prohibited Ericsson from "mak[ing] any public statement, in

litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth

above or the facts described in the Information and the Statement of Facts."  If Ericsson failed to

satisfy any of these ongoing requirements or were to engage in a felony or subsequent FCPA

violation, Ericsson would "be subject to prosecution for any federal criminal violation of which the

Fraud Section and the Office have knowledge."

**I.      Following the Guilty Plea and DPA, Ericsson Continued to Tout the Company's Ethics and Compliance Program While Failing to Disclose the Company's Known Corrupt Behavior in Iraq**

151.    Likewise, the Company's December 6, 2019 press release, misleadingly reassured

investors that Ericsson's ***"[t]he resolution marks the end of the FCPA-related investigations

into Ericsson and its subsidiaries undertaken by the DOJ and the SEC."***   When in reality, the

DOJ and SEC investigation were not at an end because the Company was knowingly concealing

additional FCPA violations that occurred in Iraq.

152.    In a December 7, 2019 earnings call, Defendant Ekholm in discussing conduct

related to the DPA, explained that "**employees in some markets, some of whom were executives**

in those markets, acted in bad faith and knowingly failed to implement sufficient controls . . . [and] were able to enter into transactions for illegitimate purposes.**"**

153.    Defendant Ekholm further explained the full details of Ericsson's 2016 internal review stating that the Board was aware of this misconduct including the use of "**sham contracts or contracts that inflated prices, including the creation of cash pools outside of the company's control,**" and "**excessive travel and entertainment of customer representatives without a demonstrable business purpose.**"

154.    The Individual Defendants employed a "focus on the future" tone in an attempt to assuage investor concerns and regain the market's confidence in the Company.  Defendant Ekholm stated:

> This settlement ***puts an end*** to a long and wide-ranging process. And while the events described in the settlement are totally unacceptable, I'm actually glad that we finally reached this day. ***We're now able to move forward and fully focus on our business and build a stronger company***, supporting our customers in their journey into the 5G era.

155.    The misstatements during this call continued during the Q&A session.  Analyst David Terence Mulholland from UBS asked if there were any other investigations investors should be aware of or "if you could give us an update on whether anything else has or you've had any kind of discussions with the regulators."  Xavier Dedullen, Chief Legal Officer, answered "***we are not aware of any other follow-on investigations in any of the other countries.*** But of course, ***we continue to closely monitor the situation***."  This statement misled investors to believe that the Defendants were doing their due diligence and would keep the market abreast of related updates and discoveries.

156.    On the same call, J.P. Morgan analyst Sandeep Sudhir Deshpande asked if the compliance monitoring requirements imposed by the DPA would negatively impact Ericsson's

ability to conduct business and execute contracts quickly.  Defendant Ekholm replied "*that we can continue to do business in the countries we are in, but of course, we need to be compliant.* And that's the way I would conduct the business anyway." Yet, Ericsson had chosen to cut corners in Iraq, circumventing the legal practice of seeking U.S. military aid and instead negotiating with terrorists to expedite the Company's ability to fulfill contracts.

157.    As part of the DPA and settlement with the U.S. government, Ericsson was required to strengthen its compliance program in specific ways and to engage an external monitoring group to assess the effectiveness of the program for three years.  In its December 6, 2019 press release, Ericsson touted these eight overarching changes as part of its "Improved Ethics and Compliance Program" while failing to disclose that Defendants knew they were aware of further FCPA violations in Iraq according to an internal investigation that had been ongoing for over a year.

158.    Specifically, contrary to what it knew had happened in Iraq, Ericsson represented that it would "*[e]nhanc[e] the due diligence process of third-parties, including the overall monitoring of third-party engagements*."  Similarly, Ericsson announced the implementation of "*more sophisticated analytic tools to better identify and prevent high-risk transactions and engagements*."  In this press release, Ericsson also provided great detail on its remediation efforts, stating that "[i]mprovements to Ericsson's Ethics and Compliance program include[d]" some "[a]dditional resources for the Compliance and Investigations functions," "*[e]nhanc[ing] the due diligence process of third-parties, including the overall monitoring of third-party engagements*," and "*[e]nhancing the internal anti-corruption and compliance related awareness campaigns (including the Company's zero tolerance for corruption)*."

159.    As the Class Period continued, Defendant continued to make false and misleading statements regarding their purported compliance with the DPA and its anti-corruption program

while omitting that the Company had investigated and knew that the Company had engaged in undisclosed illegal and corruptive practices in Iraq.

160. For example, Ericsson's 2020 Annual Report filed with the SEC assured investors that Ericsson's Audit and Compliance Committee "monitored the continued compliance with [SOX] as well as the internal control and risk management process and monitored and *evaluated the effectiveness and appropriateness of Ericsson's anti-bribery and corruption program*"; that "[t]he management of operational risks in Ericsson is embedded in various business processes and controls, such as decision tollgates and approvals"; and that "*[c]ertain cross-process risks are centrally coordinated, such as risks relating to [inter alia] . . . anti-bribery and corruption*."

161. Moreover, the 2020 Annual Report misled investors about Ericsson's "FCPA Compliance Monitor" making the following misleading statements:

> In 2019, Ericsson announced the resolution of investigations by the [DOJ] and the [SEC] regarding the Company's compliance with the [FCPA]. As part of the settlement, Ericsson has agreed to engage an independent compliance monitor for a period of three years while *the Company continues to undertake significant reforms to strengthen its Ethics & Compliance program*. In 2020, the three-year period for the monitorship commenced by the appointment of Dr. Andreas Pohlmann of the firm Pohlmann & Company – Compliance and Governance Advisory LLP as Ericsson's monitor. *The monitor's main responsibilities include reviewing Ericsson's compliance with the terms of the settlement and evaluating the Company's progress in implementing and operating its enhanced compliance program and accompanying controls as well as providing recommendations for improvements*.

162. Then, during a March 26, 2021 earnings call, Defendant Ekholm referenced the independent monitor requirement imposed by the DPA stating:

> I see this as an opportunity to truly ensure that we can achieve our highly set targets. In this context, it's also worth mentioning the preliminary investigations ongoing currently in Sweden and which are really investigating events, which the U.S. authorities have had a look at Ericsson, are cooperating fully with the investigations. I think that compliance is, therefore, an area which the executive team spends a lot of time, and *we can simply never allow what happened previously to happen again.*

54

*And to start at the end, how we collaborate with government agencies involved. Well, we cooperate fully*. We have preliminary investigations ongoing in Sweden. *We work together with Swedish authorities, just as we have in the past, worked together with U.S. government agencies, and we really do want to be fully transparent in what we do, what we have, and we think that is the best possible way because it is about building a stronger company for the future, and that is what – why we have decided to do this*.

And if we look at what we do, well, I have to say that there are some different components. *The most important one, and that has to do with culture, that we have a culture where we have zero tolerance when it comes to corruption and that we comply with all rules fully. And that takes a bit of work, and this is something that the entire management team is working with. We're working with this on a continuous basis to have full commitment*.

163.    Defendant Ekholm's statements were highly misleading because Ericsson was mischaracterized as a transparent company with repaired compliance systems and strong anti-corruption culture.  These assertions were untrue given that Ericsson was actively concealing the same corrupt practices in Iraq for which the Company had an obligation to disclose.

164.    Defendant Ekholm continued to mislead investors and mischaracterize Ericsson's true practices even weeks before the truth was revealed.  During a January 25, 2022 earnings call, just three weeks before the truth would partially be disclosed, Defendant Ekholm stated:

We expect Vonage to close here during Q1 or possibly into Q2, depending on regulatory approvals and shareholder votes. *I would also just touch upon the correspondence that we received from the DOJ during the fourth quarter, where there is a breach in the deferred prosecution agreement, as Ericsson basically failed to provide certain documents and factual information. I'm sorry to say, but at this point in time, we will have no further information to share. But I will say that we will update the market as soon as we have additional information about the matter and then we will share it, of course*. But in the meantime, I would also say that we continue to invest very heavily in building a world-class compliance program and basically a culture of integrity at the company. And we're taking significant investments. We took them already last year, and we will continue to do that during 2022.

**J.    Facts About Ericsson's Corrupt Practices Are Revealed When Media Outlets Discovered the Company's Illegal Practices in Iraq**

165.    As described above, Ericsson continued to fraudulently conceal its illegal business practices in Iraq through early 2022.  However, unbeknownst to investors, a group of journalists at the ICIJ obtained a leaked copy of the Iraqi Corruption Report which detailed the Company's corrupt and illegal activities in Iraq.

166.    After engaging in its own investigation and confirming the validity of the leaked report, the journalists approached Ericsson seeking answers.  Specifically, the ICIJ sent a list of questions to Defendant Ekholm inquiring about the illegal payments made to ISIS in order to conduct its business in Iraq.  According to ICIJ, in response "Ekholm said the company **had identified in 2018 suspicious payments for the use of transport routes controlled by terrorist organizations, 'including ISIS**.' He said the ultimate recipient of those payments had yet to be identified." Shockingly, **in his reply, Defendant Ekholm further stated that Ericsson did not believe that this information rose to the level of materiality warranting a disclosure.**

167.    Defendants recognized that the ICIJ was about to disclose Ericsson's nearly two decades' worth of illegal conduct, corruption, and racketeering in Iraq, and during trading hours, issued a press release disclosing media inquiries into its business dealings in Iraq.

168.    Notwithstanding their efforts to keep this information from becoming public and faced with the impending ICIJ publication, Ericsson, in a February 15, 2022 press release, addressed its conduct in Iraq, disclosing the following information:

> Unusual expense claims in Iraq, dating back to 2018, **triggered a review** that uncovered compliance concerns about breaches of the company's Code of Business Ethics.  Investigations of these concerns led to a subsequent and detailed internal investigation that was undertaken by Ericsson in 2019, supported by external legal counsel.

> The investigation included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. **It found serious breaches of**

**compliance rules and the Code of Business Ethics**. It identified evidence of corruption-related misconduct, including: **Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation**.

The investigating team also identified **payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes**. Investigators could not determine the ultimate recipients of these payments. Payment schemes and cash transactions that potentially created the risk of money laundering were also identified.

Ericsson invested significant time and resources to understand these matters. The investigation could not identify that any Ericsson employee was directly involved in financing terrorist organizations.

As a result of the investigation, several employees were exited from the company and multiple other disciplinary and other remedial actions were taken. This included closing gaps in our internal processes in the region and incorporating lessons from the investigation into our ethics and compliance program.

Furthermore, Ericsson terminated a number of third-party relationships and prioritized the Iraq country business for enhanced training and awareness activities, policies and procedures, and third-party management processes.

Ericsson is continuing to work with external counsel to review the findings and remediation resulting from the 2019 investigation to identify any additional measures that the company should take.

169. Despite this shocking revelation, **Ericsson continued to assure investors of its purported "*transparency*"** regarding these issues and its ability to manage compliance risks due to its "***processes in place to manage security risks, covering both employees and subcontractors***."

170. Ericsson went on to tout its company culture to investors explaining that Ericsson encourages employees to raise compliance issues and that the Company routinely engages in internal investigations into ethics and compliance issues, stating: "***[t]he company acts upon the***

*findings of any misconduct, through disciplinary actions, process improvements and internal learning*."

171.    Defendants' reassurances contained in the February 15, 2022 press release were false and misleading because they continued to conceal the fact that Ericsson officials knew that the business in Iraq was built upon a corrupt foundation, especially because it was revealed in connection with the DPA.

172.    On February 16, 2022, various news outlets began amplifying the bad news about Ericsson's business in Iraq.  For example, on February 16, 2022, *Bloomberg First Word* issued a report entitled "Ericsson Plummets; Analysts Say Report on ISIS Erodes Trust" in which Bloomberg reported that Ericsson had a 15% drop in the wake of statements about potential ISIS ties by Defendant Ekholm in Sweden.  Additionally, *Dow Jones Institutional News Feed* issued a report entitled "Ericsson Shares Slump After Acknowledging Past Compliance Breaches in Iraq" stating that Ericsson shares were trading lower because "the company said late Tuesday that a 2019 internal probe found 'serious breaches of compliance rules' in Iraq."

173.    Defendant Ekholm's disclosures, in combination with Ericsson's February 15, 2022 press release, Ericsson's ADS price fell $1.44 per ADS, or 11.57%, closing at $11.01 on February 16, 2022.

174.    One day later, on February 16, 2022, a *Bloomberg* article echoed that Ericsson confirmed the possibility that the Company made payments to ISIS as part of its business dealings in Iraq stating, "Ericsson may have made payments to the ISIS terror organization to gain access to certain transport routes in Iraq, the company's chief executive officer [Defendant] Ekholm told newspaper Dagens Industri."

175.    Analysts attributed the drop in Ericsson ADSs to this new information.  For example, a February 16, 2022 Citi analyst report stated:

> **Allegations of corrupt practices in Iraq are concerning** — Following an unusual expense claim, Ericsson conducted a detailed investigation into the behaviour of its employees, vendors and suppliers in Iraq covering the years 2011-2019 and found serious breaches of compliance rules and Ericsson's Code of Business Ethics. The key concern being discussed in the media today is Ericsson's admission that it identified payments and the use of "alternate transport routes in connection with circumventing Iraqi Customs," when ISIS controlled certain routes.
> **What happens next / things to consider — The situation clearly heightens the uncertainty around Ericsson shares**.
>
> **All of the above leads to heightened uncertainty, which we acknowledge has an impact on Ericsson's multiple more so than its fundamentals**. We think the 11-12% impact on shares today (at time of writing) represents significant multiple compression, more than factoring in a potential further financial penalty. At SEK103, -11% vs. last night's close, Ericsson trades on 2023E EV/EBITDA of 6x and P/E of 13x, multiples that we argue capture a material level of downside and uncertainty associated with the current conduct allegations and investigation.

**K.    Ericsson Shares Continues to Drop as New Details Related to the Company's Illegal Practices Are Revealed**

176.    Approximately two weeks later, on February 27, 2022, the ICIJ published a fulsome report on Ericsson's corruption and FCPA violations in Iraq.  This Report was based largely upon the information contained in the Iraqi Corruption Report (an internal investigation), conducted by Simpson Thacher at the direction of Ericsson.  The article revealed that Ericsson allegedly made "tens of millions of dollars in suspicious payments" over nearly a decade to keep its business in the country.  These suspicious payments were allegedly made in connection with "slush funds, trips abroad for defense officials and payoffs through middlemen to corporate executives and possibly terrorists."

177.    Further, according to the February 27, 2022 article, Ericsson went as far as seeking "permission from the terrorist organization known as the Islamic State to work in an ISIS-controlled city and paid to smuggle equipment into ISIS areas on a route known as known as the 'Speedway.'"

59

178.    Notably, the article revealed that Defendant Ekholm admitted that he knew of the illegal conduct in Iraq at least as early as 2018 and affirmatively elected to conceal this material information from investors based on **Ericsson's unilateral materiality analysis**, stating: "**the materiality of our findings did not pass our threshold to make a disclosure.**"

179.    Following the ICIJ's bombshell report, which significantly undermined all of the Defendants' recent assurances, Ericsson's ADS price fell $0.84, or 8.3%, from its closing price on February 25, 2022.

180.    Once again analysts were surprised by the disclosure and attributed the drop in share price to the announcement.  In fact, Citi analysts downgraded Ericsson shares from "Buy" to "Neutral" on this "disturbing" news stating:

> We think the detailed reporting and track record of the journalists (ICIJ broke the Panama and Paradise Papers) means investors will take The Ericsson List seriously. Rightly or wrongly, we expect this becomes a case of "guilty until proven innocent." **If corroborated and shown to be true, we anticipate further penalties and potentially management change**; if proven untrue (or at least already sufficiently disclosed to authorities), we think such an event too far in the future to matter for shares today and see limited valuation support despite strong fundamentals.

181.    Additionally, Jeffries analyst, Janardan Menon, rated Ericsson's shares "Hold" and stated that a fine from the DOJ for Ericsson's concealed conduct in Iraq was "almost definite."

**L.    The Full Truth is Revealed When Ericsson Announced that it Breached the DPA**

182.    On March 2, 2022, in a Form 6-K filed with the SEC prior to the market opening, the ICIJ findings were corroborated when Ericsson announced that the DOJ determined that the Company's prior disclosures in connection with the DPA were "**insufficient**" and "that the company **breached the DPA by failing to make subsequent disclosure** related to the investigation post-DPA."  Ericsson continued to stand on its February 15, 2022, press release stating, "[t]he investigation could not identify that any Ericsson employee was directly involved in

financing terrorist organizations. Based on our current assessment of the media reports, we do not believe they change this conclusion."

183.    The DOJ's determination that Ericsson breached the DPA is significant for various reasons. Specifically, for the reason that Ericsson may face criminal prosecution.

184.    Following this new development, Ericsson's ADS price fell $0.74 per ADS, or 8.35%. to close at $8.12 per ADS on March 2, 2022.

185.    Analysts were shocked. On March 2, 2022, Citi published the following in its analyst report:

> Ericsson's announcement that the U.S. Department of Justice determined its disclosure prior and subsequent to its 2019 settlement to be insufficient **heightens the uncertainty pertaining to the allegations of wrong-doing by Ericsson in Iraq during the last decade**.
>
> [T]he fact that the DOJ has determined that disclosure to be insufficient and **Ericsson to be in breach of its agreement is of real concern**. This breach is in addition to the DOJ's earlier determination of a breach under the deferred prosecution agreement (DPA), which Ericsson announced in Oct-21.
>
> [T]he persistent uncertainty and claims of further wrong-doing and **insufficient disclosure to authorities likely makes Ericsson uninvestable for many**.

### M.    After the Fraud is Revealed, Ericsson Deemed Nearly "Uninvestable"

186.    In the days following the revelation of Ericsson's fraud, shareholders demanded answers, specifically from Defendant Ekholm. In one instance, "Swedbank AB's Robur unit, asked Ericsson's board to justify why Ekholm received almost $20 million in bonuses for the years 2019-2021, while Ericsson kept quiet about misconduct in Iraq, including possible payments to the Islamic State terror group." Likewise, Glass, Lewis & Co., took steps to publicly criticize Defendant Ekholm for "'misleading communication' that led to the stock losses."

61

187.    Shareholders questioned Defendants, "[o]n what basis [had] you decided not to inform the stock market?"16  According to the ICIJ, Defendant Ekholm had previously stated that "the materiality of our findings did not pass our threshold to make a disclosure."  Frustrated investors continued to seek answers, stating: "Who is responsible for the decision not to share the Iraq information with the market. Was this a question you discussed in board meetings?" But, Defendants continued to evade these tough questions.

188.    As the media and markets continued to heighten pressure, on March 16, 2022, Ericsson replaced Defendant Dedullen with a new Chief Legal Officer, Scott Dresser.

189.    In addition to the DOJ's renewed investigation, the Swedish Stock Exchange Nasdaq Stockholm AB announced its own initiation of an investigation into Ericsson's illegal practices.17

190.    As a result of these bombshell revelations and Ericsson's clear disregard for transparency with investors, in a March 2, 2022 analyst report, **Citi reported that the Company risked becoming "uninvestable."**

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

191.    Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of Ericsson's publicly traded ADS and

---

16 Fredrik Sandburg, "Key analysts urge Ericsson investors to hold CEO accountable for oversight failures," *ICIJ* (Mar. 28, 2022), https://www.icij.org/investigations/ericsson-list/key-analysts-urge-ericsson-investors-to-hold-ceo-accountable-for-oversight-failures/.

17 Trealor, Stephen, "Ericsson (ERICB) Faces Swedish Probe Into Suspected Bribery in Iraq, TT Reports," *Bloomberg* (Apr. 20, 2022), https://www.bloomberg.com/news/articles/2022-04-20/ericsson-facing-swedish-probe-into-actions-in-iraq-tt-reports (last visited September 6, 2022).

operated as a fraud or deceit on all persons and entities that purchased ADSs during the Class Period.

192.    Throughout the Class Period, Defendants made a series of misrepresentations concerning growth in Iraq and the legality and compliance of its operations in Iraq, which created the misleading impression that Ericsson was growing organically and taking steps to strengthen compliance efforts and eliminate corrupt practices upon identification to investors, when in truth, Ericsson was carrying out an elaborate scheme to grow its business by making bribes and protection payments to corrupt officials and terrorist organizations in Iraq.

### A.    Statements Concerning the Strength of Ericsson's Business in the Middle East

193.    Statements demonstrating the strength and basis for Ericsson's growing business in the Middle East were false and created a misleading impression for the reasons stated in Section F, *supra*, and for the following reasons, both together and individually: (a) Ericsson attributed growth to major mobile broadband projects in the Middle East when, in reality, Ericsson's ability to obtain these contracts depended upon its illegal conduct including, bid rigging, bribery, and slush fund payments; and (b) Ericsson's ability to profitably execute projects in Iraq depended upon transporting equipment and materials into the country which was made possible, in part, by making illegal "protection payments" to ISIS.

### Misstatement 1

194.    The Class Period begins on April 27, 2017, the day after Ericsson filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 20-F").  The 2016 20-F reported: "Global Services sales grew by 11%, with 15% growth in Professional Services, while Network Rollout sales were almost flat. Networks sales grew by 5% and Support Solutions sales by 19%."

63

195. Ericsson specifically reported the following with respect to its Middle Eastern business results: "*Sales increased, primarily in Global Services. In the first half of the year, Network sales growth was mainly driven by some major mobile broadband projects, which were completed in the second half of the year*."

196. The statement(s) in the prior paragraph, that Ericsson's "*sales increase[ ]*" was "*mainly driven*" by "*major mobile broadband projects*,"  was false and misleading because, as set forth in Section F, *supra*, Ericsson: (i) procured lucrative contracts in Iraq by illegally bribing customers, making payments from slush funds, and fixing bids in its favor; (ii) accessed terrorist-controlled transportation routes and cities by making protection payments to ISIS; (iii) intentionally bypassed compliance systems to employ questionable third parties to engage in corrupt behavior; and (iv) concealed the illegal conduct from regulators and investors.

197. Specifically, beginning as early as 2011, Ericsson paid bribes, slush fund payments, and kickbacks to secure contracts from major customers.  For example, Ericsson executive Tarek Saadi requested a $500,000 payment to the CEO of Asiacell in order for "Ericsson to win more business."  These sham payments were later confirmed to be a "commission payment" requested by Saadi to be paid to the CEO of Asiacell and resulted in Ericsson's award of the Peroza Project.  Similarly, executive Saadi directed Ericsson to pay Sirwan Barzani, a relative of the majority owner of Korek Telecommunications, over $1.2 million between 2007 and 2017 as part of a "consultancy" contract even though "no clear role" was ever identified.  Notably, CW 2, who reported to Saadi, confirmed that Saadi regularly engaged in corrupt practices.  CW 2 added that payments of this nature were "normal behavior" and that "Ericsson was not blind to it."

198. To execute these illegally obtained projects, Ericsson paid ISIS to access terrorist-controlled transportation routes and cities.  Unbeknownst to investors, Ericsson chose to fund ISIS

in order to evade the time and expense associated with utilizing legal means or Iraqi government routes.  For instance, according to the Iraqi Corruption Report, an Ericsson manager, Roger Antoun, authorized $171,000 in payments to ISIS for access to the terrorist-controlled "Speedway" route between 2016 and 2017.  Ericsson also hired third party, Cargo Iraq, to pay ISIS to transport its equipment and materials typically costing between $3,000 and $4,000 per truck, and sometimes reaching as high as $22,000 per truck.  Similarly, Ericsson paid ISIS to access Mosul, a city key to its ability to conduct business, despite strong recommendations to the contrary from employees and Tom Nygren, then vice president and general counsel for Ericsson in the Middle East.  Indeed, Defendants refused to cease operations with ISIS because this decision would "destroy [their] business" in the region.

199.    Ericsson engaged in much of this illegal conduct by hiring third party subcontractors to engage in corrupt behavior for them.  Further, Ericsson intentionally bypassed established compliance and anti-corruption protocols to push through questionable subcontractors.  For example, Ericsson hired Al-Awsat to pay countless bribes to customers in order to secure contracts.

200.    Accordingly, Defendants' statements touting Ericsson's growth in the Middle East based on mobile communications projects and a variety of other contributing factors were materially false and misleading when made.

**Misstatement 2**

201.    In 2017, Defendants continued to make similar statements attributing growth in the Middle East to a variety of factors, other than illegal practices.  During an October 20, 2017 earnings call, Defendant Ekholm stated: "***And we actually see growth in Middle East and Africa which is explained by multiple customers in multiple countries. So there are many contributing parts***."

202.    The above statement(s) was false and misleading for the same reasons set forth in paragraphs 196-99, above.

**Misstatement 3**

203.    Defendants' statements about growth in the Middle East continued well into 2018. For example, during an April 20, 2018 earnings call, Defendant Mellander stated:

> *If we look into Networks then. We -- as Börje said, we, of course, see the investments in R&D paying off here when it comes to the gross margin improvement there.* So hardware margins as well as service margins are up in the quarter. Certain sales declined there. The mix, Börje already alluded to, between China is coming down; but also strong performance, a good momentum in North America *but also Latin America and Middle East.*

204.    The above statement(s) was false and misleading for the same reasons set forth in paragraphs 196-99, above.

**Misstatement 4**

205.    In a Form 6-K filing with the SEC on the same day (October 20, 2017), Ericsson disclosed: "*Sales in the Middle East showed growth despite a continued challenging macroeconomic environment*."

206.    The above statement(s) was false and misleading for the same reasons set forth in paragraphs 196-99, above.

**B.    Statements Concerning the Company's Purportedly Robust Anti-Corruption Program**

207.    Defendants' statements touting the purported robustness of the enhanced anti-corruption program were false and created a misleading impression for the reasons stated in Section F, *supra*,  and the following reasons, both together and individually because Defendants knew that: (a) Ericsson's purportedly strong compliance and anti-corruption programs, designed to weed out illegal conduct, failed to identify that Ericsson's business in Iraq was sustained by obtaining contracts through illegal bribes, kickbacks, and bid rigging practices; (b) Ericsson's allegedly robust

compliance and anti-corruption programs, failed to identify that its ability to complete projects depended upon the paid assistance of ISIS for access to key transportation routes and cities; (c) Ericsson failed to ensure that the steps taken to align its anti-corruption program closer to the FCPA were implemented at the business level; and (d) Ericsson's new third party vetting process did not identify the Company's illegal relationships with ISIS, and questionable third party "sales agents" like Al-Awsat.

### Misstatement 5

208.    With respect to Ericsson's controls and procedures, the 2016 20-F referred investors to the Company's corporate governance report for 2016 (the "2016 Corporate Governance Report"), which stated that:

> *to ensure compliance with legal and regulatory requirements and the high standards that we set for ourselves, Ericsson has adopted internal rules that include*" a "*Code of Business Ethics*"; "*Group Steering Documents, including Group policies and directives, instructions and business processes for approval, control and risk management*"; and "*[a] Code of Conduct, which applies to product development, production, supply and support of Ericsson products and services worldwide*.

209.    The 2016 Corporate Governance Report also stated the following with respect to Ericsson's Code of Business Ethics:

> *Ericsson's Code of Business Ethics summarizes fundamental Group policies and directives and contains rules to ensure that business is conducted with a strong sense of integrity*. This is critical to maintain trust and credibility with Ericsson's customers, partners, employees, shareholders and other stakeholders.
>
> The Code of Business Ethics contains rules for all individuals performing work for Ericsson under the staff management of Ericsson. The Code of Business Ethics has been translated into more than 30 languages. This ensures that it is accessible to everyone working for Ericsson. Upon recruitment, employees acknowledge that they are aware of the principles of the Code of Business Ethics. This procedure is repeated during the term of employment. *Through this process, Ericsson strives to raise awareness throughout its global operations*.
>
> Everyone working for Ericsson has an individual responsibility to ensure that business practices adhere to the Code of Business Ethics.

210.    The statement(s) in paragraphs 208 and 209, above that Ericsson had "***internal rules***" to "***ensure compliance with legal and regulatory requirements,***" was false and misleading because, as stated in Section F and in addition to the reasons set forth in paragraphs 196-99, above Ericsson misleadingly touted the strength of its anti-corruption and compliance programs despite knowledge of the widespread corrupt and illegal practices that were taking place in Iraq. Specifically, that Ericsson had paid, and was paying, millions of dollars in bribes to government officials and key customer contacts to rig the bidding process and secure contracts and was bankrolling ISIS by facilitating payment to them for access to ISIS controlled transportation routes, regions and cities.  Also, that Ericsson employees were knowingly circumventing the compliance and anti-corruption systems in place to vet business partners by entering vague descriptions about the third parties hired and their work, even when such work was never completed.

**Misstatement 6**

211.    On March 27, 2018, Defendants filed a 20-F/A foreign issuer annual report (the "2017 20-F") for the Fiscal Year ended December 31, 2017 with the SEC.  The 20-F contained the following false and misleading statement: "[s]ustainability and corporate responsibility are integrated into Ericsson's business processes"; that "Ericsson is committed to creating business value while reducing risk related to . . . employee, human rights, corruption and bribery matters"; that "[g]roup policies and directives have been implemented to ensure consistency across global operations"; that "***Ericsson has a zero tolerance approach to corruption expressed in the Company's Code of Business Ethics***";  that "***[t]he Company has embedded this guiding principle at its highest levels and implemented it throughout its global organization with a set of policies and processes***"; and that "***[t]his includes an anticorruption directive with more detailed guidelines, for example about appropriate levels of gifts and entertainment***."

68

212.     The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99 and 210.

**Misstatement 7**

213.     The 2017 20-F filing contained the following false and misleading statements:

> **In 2017, Ericsson introduced a vetting process that focuses on ethics and compliance**. So far we have used it for appointments to the Executive Team and for approximately 110 employees in exposed positions. **All members of the current Executive Team have been vetted, and all future recruitments to these positions will also go through mandatory vetting. Business Partner Review Boards have been established in all Market Areas to over-see mitigation of the corruption risks in relation to onboarding of new business partners**.

214.     The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99 and 210.

### C.     Statements Concerning Ericsson's Entry into the DPA and Failure to Disclose the Existence of the Internal Iraqi Corruption Report

215.     Statements regarding Ericsson's entry into the DPA and subsequent failure to disclose the existence of the Iraqi Corruption Report were false and created a misleading impression for the reasons stated in Sections F and H, *supra*, and the following reasons, both together and individually: (a) Ericsson knowingly violated the DPA's ongoing disclosure requirements by concealing the known illegal conduct in Iraq; (b) the strength of Ericsson's compliance systems were unchanged because the illegal conduct in Iraq continued to be concealed; and (c) the risks of future government enforcement action for the same misconduct were not mitigated or reduced in any way.

**Misstatement 8**

216.     On December 6, 2019, Ericsson issued a press release announcing that it had reached a resolution regarding the FCPA investigations by the DOJ and SEC.  The press release stated, *inter alia*, that "[w]hile the Company had a compliance program and a supporting control framework,

they were not adequately implemented"; that, "[s]pecifically, certain employees in some markets, some of whom were executives in those markets, acted in bad faith and knowingly failed to implement sufficient controls"; that "[t]hey were able to enter into transactions for illegitimate purposes and, together with people under their influence, used sophisticated schemes in order to hide their wrongdoing;" and that ***"[t]he resolution marks the end of the FCPA-related investigations into Ericsson and its subsidiaries undertaken by the DOJ and the SEC.***"

217.    The statement(s) in the prior paragraph that "***[t]he resolution marks the end of the FCPA-related investigations into Ericsson***" was false and misleading because, as stated in Section F and H, and in addition to the reasons set forth in paragraphs 196-99 and 210, above, Ericsson failed to disclose the known illegal conduct in Iraq.  At the time these statements were made, Ericsson had retained Simpson Thatcher to conduct an independent internal investigation into its corrupt practices in Iraq.  The Iraqi Corruption Report, based on 28 witness interviews and 22.5 million emails, was near final at the time Ericsson entered into the DPA.  The DPA with the DOJ imposed stringent continuing disclosure requirements on Ericsson calling for disclosure of any felonies or FCPA violations.  The December 11 Iraqi Corruption Report revealed that Ericsson was engaged in making illegal payments to ISIS (thereby funding ISIS) and bribing customer officials to secure contracts.  Further, the Report highlighted serious compliance breaches.  For example, Ericsson engaged questionable third party subcontractors to engage with individuals or do work that was otherwise prohibited under Ericsson's compliance and anticorruption laws.  Despite the definitive information in this Report, Ericsson failed to alert the DOJ in violation of the DPA's disclosure requirements.

218.    Ericsson understood that any breach of the DPA, especially a breach of the continued disclosure requirement, risked further DOJ and SEC penalties on top of the already

enormous $1 billion fine.  Worse, breach of the DPA would give rise to potential criminal prosecution of the Defendants.  Additionally, Ericsson understood that the DPA imposed ongoing regulations governing any public statements made by Defendants about the DPA or the related criminal conduct.  Defendants were required to only make truthful representations when discussing the DPA and the related conduct.

219.    However, Ericsson failed to comply with the DPA on all fronts.  First, Defendants concealed illegal conduct in Iraq known at least as of December 11, 2019.  Second, Defendants touted the end of DOJ and SEC investigations when these statements were false when made.  The risk of additional investigation and penalty had accrued and remained an enormous risk each day Ericsson continued to conceal this fraudulent and illegal conduct.  Also, Defendants were misleading investors, who had expressed grave concern over follow-on investigations, by framing the DPA as a turning point at which the illegal conduct had been eliminated and no such risk of further fines or prosecution existed and that no such conduct had occurred outside of the countries identified in the DPA or since 2016.  Thus, the press release was misleading because it created the impression that Ericsson's anti-corruption program was strengthened to a point where it would identify and remediate all illegal corrupt practices.  In truth, Ericsson was actively concealing worse corrupt and illegal conduct in Iraq and there was a very real possibility that if the DOJ found out about the conduct in Iraq it would result in further prosecution and fines by the DOJ.

**Misstatement 9**

220.    With respect to Ericsson's purported remediation efforts following resolution of the FCPA investigations, the December 2019 Press Release stated, in relevant part:

> ***Improvements to Ericsson's Ethics and Compliance program include:***
>
> - ***Additional resources for the Compliance and Investigations functions.***
> - ***Reorganizing the allegation management process to ensure a centralized,***

- ***professional intake of allegations, conduct of investigations and remediation.***
- ***Refining the risk assessment process to consist of a tiered approach and systematic risk mitigation methodology.***
- ***Enhancing the due diligence process of third-parties, including the overall monitoring of third-party engagements.***
- ***Introducing more sophisticated analytic tools to better identify and prevent high-risk transactions and engagements.***
- ***Enhancing the ethics and compliance vetting process for senior leaders.***
- ***Refreshing compliance training modules for employees, including workshops and face-to-face training for employees in exposed roles.***
- ***Enhancing the internal anti-corruption and compliance related awareness campaigns (including the Company's zero tolerance for corruption)***

221.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

**Misstatement 10**

222.    On December 7, 2019, Defendants Ekholm and Mellander participated in an earnings call to address the DPA that Ericsson entered with the DOJ and SEC the day before. During the call, Defendant Ekholm made the following false and misleading statements:

> This settlement ***puts an end*** to a long and wide-ranging process. And while the events described in the settlement are totally unacceptable, ***I'm actually glad that we finally reached this day. We're now able to move forward and fully focus on our business and build a stronger company***, supporting our customers in their journey into the 5G era.

223.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

**Misstatement 11**

224.    During the December 7, 2019 earnings call, David Terence Mulholland from UBS asked if there were any other investigations investors should be aware of or "if you could give us an update on whether anything else has or you've had any kind of discussions with the regulators." Xavier Dedullen, Chief Legal Officer, provided the following false and misleading response: "***we***

*are not aware of any other follow-on investigations in any of the other countries*. But of course, *we continue to closely monitor the situation*."

225.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

**Misstatement 12**

226.    On the same call, J.P. Morgan analyst Sandeep Sudhir Deshpande asked if the compliance monitoring requirements imposed by the DPA would negatively impact Ericsson's ability to conduct business and execute contracts quickly.  Defendant Ekholm replied by making the following false and misleading statement: "*we can continue to do business in the countries we are in, but of course, we need to be compliant. And that's the way I would conduct the business anyway*."

227.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

**Misstatement 13**

228.    Ericsson's 2020 Form 20-F (the "2020 20-F") filed with the SEC assured investors that Ericsson's Audit and Compliance Committee "monitored the continued compliance with [SOX] as well as the internal control and risk management process and monitored and *evaluated the effectiveness and appropriateness of Ericsson's anti-bribery and corruption program*"; that "[t]he management of operational risks in Ericsson is embedded in various business processes and controls, such as decision tollgates and approvals"; and that "*[c]ertain cross-process risks are centrally coordinated, such as risks relating to [inter alia] . . . anti-bribery and corruption*."

229.    Moreover, the 2020 20-F stated the following regarding Ericsson's "FCPA Compliance Monitor:"

In 2019, Ericsson announced the resolution of investigations by the [DOJ] and the [SEC] regarding the Company's compliance with the [FCPA]. As part of the settlement, Ericsson has agreed to engage an independent compliance monitor for a period of three years while ***the Company continues to undertake significant reforms to strengthen its Ethics & Compliance program***. In 2020, the three-year period for the monitorship commenced by the appointment of Dr. Andreas Pohlmann of the firm Pohlmann & Company – Compliance and Governance Advisory LLP as Ericsson's monitor. ***The monitor's main responsibilities include reviewing Ericsson's compliance with the terms of the settlement and evaluating the Company's progress in implementing and operating its enhanced compliance program and accompanying controls as well as providing recommendations for improvements***.

230.    The statement(s) in the prior paragraph(s) was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

**Misstatement 14**

231.    During a March 26, 2021 earnings call, Defendant Ekholm further misled investors when he referenced the independent monitor requirement imposed by the DPA stating:

I see this as an opportunity to truly ensure that we can achieve our highly set targets. In this context, it's also worth mentioning the preliminary investigations ongoing currently in Sweden and which are really investigating events, which the U.S. authorities have had a look at Ericsson, are cooperating fully with the investigations. I think that compliance is, therefore, an area which the executive team spends a lot of time, and ***we can simply never allow what happened previously to happen again.***

***And to start at the end, how we collaborate with government agencies involved. Well, we cooperate fully***. We have preliminary investigations ongoing in Sweden. ***We work together with Swedish authorities, just as we have in the past, worked together with U.S. government agencies, and we really do want to be fully transparent in what we do, what we have, and we think that is the best possible way because it is about building a stronger company for the future, and that is what – why we have decided to do this***.

And if we look at what we do, well, I have to say that there are some different components. ***The most important one, and that has to do with culture, that we have a culture where we have zero tolerance when it comes to corruption and that we comply with all rules fully. And that takes a bit of work, and this is something that the entire management team is working with. We're working with this on a continuous basis to have full commitment***.

232.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

**Misstatement 15**

233.    During a January 25, 2022 earnings call, just three weeks before the truth would partially be disclosed, Defendant Ekholm stated:

> We expect Vonage to close here during Q1 or possibly into Q2, depending on regulatory approvals and shareholder votes. ***I would also just touch upon the correspondence that we received from the DOJ during the fourth quarter, where there is a breach in the deferred prosecution agreement, as Ericsson basically failed to provide certain documents and factual information. I'm sorry to say, but at this point in time, we will have no further information to share. But I will say that we will update the market as soon as we have additional information about the matter and then we will share it, of course***. But in the meantime, I would also say that we continue to invest very heavily in building a world-class compliance program and basically a culture of integrity at the company. And we're taking significant investments. We took them already last year, and we will continue to do that during 2022.

234.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19.

## VI.    THE TRUTH ABOUT THE FULL IMPACT OF THE FRAUD IS GRADUALLY REVEALED

**Misstatement 16**

235.    After the truth was partially revealed for the first time on February 15, 2022, Ericsson continued to assure investors of its "***transparency***" regarding the allegations of corruption in Iraq and its ability to manage compliance risks due to its "***processes in place to manage security risks, covering both employees and subcontractors***" and the purported fact that "***[t]he company acts upon the findings of any misconduct, through disciplinary actions, process improvements and internal learning***."

236.    The statement(s) in the prior paragraph was false and misleading for the reasons stated in paragraphs 196-99, 210 and 217-19, and because Defendants continued to conceal the fact

that Ericsson officials knew that the business in Iraq was built upon a corrupt foundation and had stated that such conduct had ceased upon entry into the DPA and was limited to the countries identified therein.

237.    As set forth in Sections J-M, *supra*, the full extent of Defendants' fraudulent misrepresentations and omissions was gradually revealed through the disclosure of new information about Ericsson's illegal business dealings in Iraq and the incredible profits derived from that corruption.  On February 15, 2022, for the first time, Defendants partially revealed that "[u]nusual expense claims in Iraq, dating back to 2018," had been identified which resulted in Ericsson's internal investigation into its business practices in Iraq.  On February 16, 2022, the next trading day, media reports of Defendant Ekholm's subsequent disclosures further partially revealed that the corrupt practices investigated may have resulted in payments being made to terrorist organization, ISIS.  In response, the price of Ericsson's ADS fell 11.57%, or $1.44, to close at $11.01 per ADS on February 16, 2022.

238.    Even after these partial disclosures, Ericsson's ADS price remained artificially inflated because Defendants knew and failed to disclose or deliberately disregarded Ericsson's corruption-based business model in Iraq which the Defendants had investigated and found involved illegal practices including bribes, slush funds, and sham contracts.  Instead, Defendants reassured investors that Ericsson was committed to "transparency" with respect to these allegations.  Further, Defendants minimized the severity of the allegations by stating that it had "processes in place to manage security risks, covering both employees and subcontractors," and a company culture that encouraged employees to "speak up" about misconduct.

239.   Citi analysts expressed the market's serious concerns in an analyst report stating: "What happens next / things to consider — The situation clearly heightens the uncertainty around Ericsson shares."

240.   The second partial disclosure was communicated to the market on Sunday, February 27, 2022, in an ICIJ article.  The article, based on a leaked Ericsson internal investigation report, brought Ericsson's corrupt business model, as discussed *supra*, to light.  Critically, Defendant Ekholm **admitted** to knowing of the fraud and making his own determination regarding the materiality of the information to investors.  As a result of this news, Ericsson's ADS fell 8.3%, or $0.84, to close at $9.28 on February 28, 2022 (the next trading day).

241.   However, Ericsson's ADS price remained inflated because, while the ICIJ article revealed a plethora of damning information, and the Defendants had not yet commented on the news.  As a result, investors were left to rely on Defendant Ekholm's February 16, 2022 assurances of adequate "transparency" and compliance monitoring.

242.   Again, analysts were surprised by the disclosure and attributed the drop in share price to the announcement.  Citi analysts downgraded Ericsson shares from "Buy" to "Neutral" on this "disturbing" news.

243.   Jeffries analyst, Janardan Menon, rated Ericsson's shares "Hold" and stated that a fine from the DOJ for Ericsson's concealed conduct in Iraq was "almost definite."

244.   On March 2, 2022, the full truth was revealed to the market when Ericsson issued a press release publicizing the DOJ's March 1, 2022, correspondence indicating that Ericsson was in breach of its DPA and had not made sufficient disclosures prior to entering into the DPA.  On this news, Ericsson's ADS price tumbled, falling 8.35%, or $0.74, to close at $8.12 on March 2, 2022.

245.    Andrew M. Gardiner, an analyst at Citi, downgraded Ericsson's rating from "Buy" to "Neutral" in the wake of these revelations and published that Ericsson shares were nearly "uninvestable."

## VII.    ADDITIONAL EVIDENCE OF SCIENTER

246.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Ericsson's and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter as they knew or recklessly disregarded that the public statements more specifically set forth in Section V were materially false and misleading when made, and knowingly or recklessly participated in or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts:

### A.    The Importance of Ericsson's Business in Iraq

247.    *First*, Defendants' knowledge of the use of corrupt business practices to win contracts in Iraq and illegal "protection payments" to ISIS and can be inferred because these facts were critical to Ericsson's operations in Iraq and success there.

248.    As described above, Growth in the Middle East was of particular importance to Defendants as evidenced by their statements about growth in the Middle East.  Iraq represented one of Ericsson's largest growth opportunities in the Middle East.  Ericsson's Iraq operations represented critical growth opportunities given that Iraq was one of the few remaining countries wholly lacking telecommunications infrastructure.

249.    The opportunity in Iraq was also worth billions of dollars to the Company. Indeed, a 2003 *Los Angeles Times* article projected telecommunications infrastructure for the entire country to cost $2 billion and Ericsson reaped $1.9 billion of this opportunity between 2011 and 2019.

250.    The $1.9 billion worth of contracts and projects were imperative to Ericsson's growth at a time when the number of opportunities for establishing telecommunications infrastructure in a developed or developing nation were drying up.  To achieve these revenues, Ericsson paid bribes and illegally fixed bids to secure lucrative contracts.  Then, Ericsson executed these critically important contracts, in large part, by paying "protection payments" to ISIS for access to the "Speedway" and cities, like Mosul.

251.    Defendants' knowledge of Ericsson's business practices in Iraq are further evidenced by the frequency with which Defendants touted performance and growth metrics about their business in the Middle East.  Defendants supported each qualitative statement with alleged bases for the growth, *i.e.*, "major mobile broadband projects."  Defendants were tracking growth in Iraq, a component of growth in the Middle East, and all related factors.

252.    Because Defendants were tracking the "***many contributing parts***" influencing Ericsson's growth in the Middle East, and further, because Ericsson's corrupt practices were sustaining its business in Iraq, it can be inferred that Defendants knew, or were reckless in not knowing, of the corrupt practices taking place in Iraq.

253.    Moreover, former Ericsson employees confirmed that information related to Ericsson's contracts in Iraq made their way to Sweden where Ericsson is headquartered. For example, as CW 1 confirmed, Ericsson had a database for contracts, payments, and renewals. According to CW 1, the database he utilized to include these payments and relationships rolled up to the Central Procurement Team located in Sweden.

**B.    The Severity of Dangers in Operating with ISIS**

254.    Defendants expressly acknowledge their awareness of the "***challenging macroeconomic environment***" in the Middle East.  While Ericsson was operating in Iraq, the country was in turmoil – destroyed by war and overrun by terrorists.

255.   As discussed in detail previously, the key routes and cities in which Ericsson needed to conduct business were under ISIS control.  ISIS was a globally known, terrorist organization. The risks of conducting business alongside ISIS, such as in Mosul, were directly communicated to the highest level officials at Ericsson.

256.   Employees operating on the ground elevated their concerns, about the dangers of working with or near ISIS, to project leader Roger Antoun who thereby raised the issue with others in Ericsson management.  Tom Nygren, then vice president and general counsel for Ericsson in the Middle East, recommended to his supervisors that Ericsson cease its operations in Mosul because of the terrorist threat, a severe macroeconomic risk.

257.   Additionally, these same terrorism risks were elevated to Ericsson management in connection with ISIS's kidnapping of Affan Akram, an Orbitel employee, while he was carrying out an Ericsson directive.  Not only did Ericsson managers direct Akram to interact with ISIS, but Akram contacted Ericsson seeking assistance after he was kidnapped.

258.   Ericsson's false and materially misleading statement that Defendants were aware of the "***challenging macroeconomic environment***," paired with the repeated occasions on which employees elevated dire situations concerning terrorism to Ericsson officials, raise an inference that Defendants knew that the Company was interacting with ISIS or was reckless in not knowing.

### C.   Ericsson's First Internal Investigation

259.   After the DOJ and SEC initiated investigations, in 2013 and 2015 respectively, into Ericsson's corrupt practices in other countries, Ericsson disclosed in its 20-F filing for fiscal year end 2017 that it had conducted a year-long internal investigation into the allegations of corruption.

260.   Having seen the results of the investigation, and not disclosing any illegal conduct in Iraq, Ericsson announced the steps it would be taking to enhance its anti-corruption program "to align more closely with the FCPA" and demonstrate its "zero tolerance" for corruption.

261. With these enhancements, Ericsson disclosed a development in its reporting structure that called for the Chief of Compliance to report directly to the Audit Committee to the Board. In this structure, the Chief of Compliance would provide the Audit Committee with at least one update per year.

262. This structure, in which the Chief of Compliance directly reported to the Board of Directors, supports the inference that Defendants knew or were reckless of not knowing of the widespread corrupt and illegal conduct taking place in Iraq.

263. Additionally, it can be inferred that Ericsson had knowledge of similar conduct occurring globally as early as 2016 because the internal and external government investigations into corrupt practices put Defendants on notice that such practices could, and indeed were, occurring elsewhere.

**D.   The DPA Places Ericsson in a Stringent Regulatory Environment**

264. Ericsson's entry into the DPA with the DOJ on December 6, 2019, was tied to stringent, ongoing obligations to the DOJ. Defendants were required to be aware of these requirements in order to avoid the risk of future prosecution.

265. The DPA obligations included: (i) a requirement that Ericsson to retain a third party independent compliance monitor for a three year period; and (ii) a prohibition on Ericsson and Defendants from "mak[ing] any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts." Failure to comply with the obligations set forth in the DPA would "subject [Ericsson] to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge."

266.    Given the fact that failure to comply with the DPA could result in criminal penalties for Defendants, it can be inferred that they were aware of the obligations and any related conduct that could be determined to run afoul of the agreement.

267.    Moreover, it can be inferred that Defendants knew the gravity of making statements contradictory to the DPA (*i.e.*, publicly stating that all of the corruption was in the past) given that the DPA imposed rigorous obligations on public statements.  This is especially true because the Defendants, in their role at Ericsson, frequently made public statements related to the very issues covered by the DPA.

268.    Thus, Defendants knew or were reckless in not knowing that their statements related to Ericsson's entry into the DPA with the DOJ were false because they materially misrepresented the full scope of corruption simultaneously taking place in Iraq.

### E.    The Importance of Ericsson's Internal Investigation into Illegal Practices in Iraq

269.    In response to media allegations of corruption and the DOJ and SEC's investigation into Ericsson's corrupt practices abroad, Ericsson launched its own internal investigation into corruption practices globally.  Defendants retained Simpson Thacher as an independent third party to conduct the review.

270.    The results of the investigation, reported on December 11, 2019, confirmed countless allegations of fraud, corruption, and illegal conduct that had been made about Ericsson for years prior.  Specifically, Ericsson's use of third party contractors to offload liability in connection with bribes and illegal payments to terrorists was confirmed.

271.    Defendants commissioned this independent internal investigation and therefore knew of or were reckless in not knowing its contents.  As part of the 2016-2017 reorganization, the Chief of Compliance reported directly to the Audit Committee of the Board, with the ability to elevate

important situations, such as a bombshell internal investigation confirming corrupt conduct in at least 20 countries.  Accordingly, it can be inferred that because of Ericsson's internal investigation into illegal practices in Iraq that Defendants were aware of its contents when they made false and misleading statements to the market.

## VIII.   LOSS CAUSATION

272.    During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated or artificially maintained the price of Ericsson's ADS and operated as a fraud or deceit on Class Period purchasers of Ericsson ADS by failing to disclose and misrepresenting Ericsson's progress in strengthening compliance systems and weeding out international corruption, despite assuring investors that all had been resolved, as detailed herein.

273.    Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Ericsson ADS at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Ericsson ADS at the artificially inflated prices at which it traded during the Class Period.

274.    The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between February 15, 2022 and March 2, 2022.  During this corrective disclosure period, Ericsson's ADS fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Ericsson's ADS price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on March 2, 2022, that the full truth was known to the market, such that there was no longer any artificial inflation in Ericsson's ADS price attributable to the fraud.

275.    As a result of their purchases of Ericsson ADS during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (i.e., damages) under the federal

securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Ericsson ADS to trade at artificially inflated levels throughout the Class Period, reaching as high as $15.32 per share on January 27, 2021.

276.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Ericsson's business and prospects.  As the truth about the Company and the extent of the fraud were revealed to the market, the price of Ericsson ADS fell significantly.  These declines removed the inflation from the price of Ericsson ADS, causing real economic loss to investors who had purchased ADS during the Class period.

### A.    February 15, 2022 – First Partial Disclosure/Materialization of the Risk

277.    On February 15, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized, in connection with Ericsson's press release.  On that date, Defendants partially revealed that Ericsson had identified "[u]nusual expense claims in Iraq, dating back to 2018," that "triggered a review that uncovered compliance concerns about breaches of the company's Code of Business Ethics."  Further, Defendants disclosed that as a result of the investigation, Ericsson "identified evidence of corruption-related misconduct, including:"

> Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants.  In addition, it found violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation.

278.    The February 15, 2022 press release stating that Ericsson had been involved in egregious corrupt practices, in violation of their DPA and consent decree, and news related thereto, was a foreseeable consequence of, and within the zone of risk concealed by, Defendants'

representations and omissions concerning the widespread, multi-layered bribery scheme in which Ericsson was involved.

279.    The February 15, 2022 news was then picked up and amplified by public media reports about Ericsson's conduct in Iraq the following day on February 16, 2022.  Further, on that day Defendant Ekholm confirmed to the market that "Ericsson may have made payments to the ISIS terror organization to gain access to certain transport routes in Iraq."

280.    The February 15 and 16, 2022 disclosures were a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the widespread, multi-layered bribery scheme in which Ericsson was involved.

281.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risk concealed by Defendants' fraud, on February 16, 2022, Ericsson's ADS price fell approximately 11.57%, or $1.44, to close at $11.01 per ADS on February 16, 2022.

282.    However, the shares of Ericsson ADSs remained inflated because the full truth regarding the details of Ericsson's corrupt practices and the DOJ's response to these bombshell allegations remained undisclosed.

283.    Moreover, Defendants reassured the market by making further false and misleading statements.  Specifically, after the truth was partially revealed for the first time on February 15, 2022, Ericsson continued to assure investors of its "***transparency***" regarding the allegations of corruption in Iraq and its ability to manage compliance risks due to its "***processes in place to manage security risks, covering both employees and subcontractors***" and the purported fact that "***[t]he company acts upon the findings of any misconduct, through disciplinary actions, process***

***improvements and internal learning.***" By making such false and misleading statements Defendants concealed the full truth about the Company's corrupt practices in Iraq.

**B.    February 27, 2022 – Second Partial Disclosure/Materialization of the Risk**

284.    On Sunday, February 27, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized, in connection with an ICIJ article revealing Ericsson's leaked internal investigation.  On that date, the results of Ericsson's internal investigation into its misconduct in Iraq was partially revealed, including Ericsson's dealings with third party subcontractors for the purpose of exchanging bribes with government officials and terrorist organizations.

285.    The February 27, 2022 article was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the widespread, multi-layered bribery scheme in which Ericsson was involved.

286.    However, the shares of Ericsson ADSs remained inflated because the full truth regarding the details the DOJ's response to these bombshell allegations remained undisclosed.

287.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, on February 28, 2022 (the next trading day) Ericsson's ADS fell 8.3%, or $0.84, to close at $9.28 on February 28, 2022.

**C.    March 2, 2022 – Final Corrective Disclosure/Materialization of the Risk**

288.    On March 1, 2022, the DOJ privately informed Ericsson that its prior disclosures in connection with the DPA were insufficient due to Ericsson's failure to inform the DOJ of the results of its internal investigation into its business practices in Iraq.

289.    The March 1, 2022 correspondence with the DOJ was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representations and omissions concerning the fraudulent and corrupt business practices, which served as the basis for Ericsson's business, in Iraq.

290.    On March 2, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized, in connection with Ericsson's press release.  On that date, Defendants publicly revealed that the DOJ determined Ericsson to be in breach of its DPA due to its failure to disclose the internal investigation into its business practices in Iraq and failure to fully disclose information about these practices prior to entering the DPA.

291.    The March 2, 2022 press release revealing Ericsson's breach of the DPA with the DOJ was a foreseeable consequence of, and within the zone of risk, concealed by, Defendants'' representations and omissions concerning the fraudulent and corrupt business practices, which served as the basis for Ericsson's business, in Iraq.

292.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, on March 2, 2022, Ericsson's ADS price fell 8.35%, or $0.74, to close at $8.12 on March 2, 2022.

## IX.    CLASS ACTION ALLEGATIONS

293.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased the publicly traded American Depository Shares ("ADS") of Ericsson during the period from April 27, 2017 through March 1, 2022, both dates inclusive, and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Ericsson during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v)

Ericsson's employee retirement and benefits plan(s), if any, and their participants or beneficiaries to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

294. The members of the Class are so numerous that joinder of all members is impracticable. According to its quarterly and annual reports filed with the SEC, during the Class Period, Ericsson had approximately 300 million shares of ADS outstanding and was actively traded on NASDAQ under the ticker symbol ERIC. While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Ericsson and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

295. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

296. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

297. Common questions of law and fact exist as to all members of the Class, and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)     Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)     Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)     Whether, and to what extent, the market price of Ericsson ADS was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)     Whether Defendants acted with the requisite level of scienter;

(e)     Whether Defendants Börje Ekholm, Carl Mellander, and Xavier Dedullen were controlling persons of Ericsson; and

(f)     Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

298.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.     PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

299.    To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)     Lead Plaintiff and other members of the Class purchased Ericsson's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)     Ericsson ADS met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)     As a regulated issuer, Ericsson filed periodic public reports with the SEC and the NASDAQ;

(h)     Ericsson regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(i)     Ericsson was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, RBC, UBS, J.P. Morgan, Goldman, Deutsche Bank, Craig-Hallum, Raymond James, Argus, Macquarie, Bank of America, Cross Research LLC, Citigroup, and Needham & Company, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(j)     There were market makers for Ericsson's ADSs during the Class Period, including but not limited to, Morgan Stanley, Barclays and UBS.

300.    As a result of the foregoing, the market for Ericsson's securities promptly digested current information regarding Ericsson from publicly available sources and reflected such information in Ericsson's securities price(s). Under these circumstances, all persons and entities who purchased Ericsson's ADSs during the Class Period suffered similar injuries through their purchase of Ericsson at artificially inflated prices and thus, the presumption of reliance applies.

301.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Ericsson's ADSs.

302.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Ericsson's ADS between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

303.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Ericsson's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

304.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

305.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection – at least with respect to the part of the statement that refers to the present.

306.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

307.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual disclosures to differ materially from omitted information. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Ericsson was engaged in a complex illegal corruption scheme to facilitate growth and increase profits while telling investors the Company had a "***zero-tolerance***" for corruption and was moving forward towards a more compliant future.

308.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, or the forward-looking statement was authorized or approved by an executive officer of Ericsson who knew that the statement was false when made.

## XII.   CAUSES OF ACTION

### COUNT  I

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

309.    Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

310.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

311.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, and carried out a plan, scheme and course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Ericsson ADS; and (iii) cause Lead Plaintiff and members of the Class to purchase Ericsson ADS at artificially inflated prices.

312.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated

documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

313.    As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Ericsson ADS during the Class Period.

314.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Ericsson ADS, Lead Plaintiff and other members of the Class purchased Ericsson ADS at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Ericsson ADS at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Ericsson ADS declined precipitously and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Ericsson ADS at artificially inflated prices and the subsequent decline in the price of that ADS when the truth was disclosed.

315.    By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT  II

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

316.    Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

317.    This Count is brought under Section 10(b) of the Exchange Act and the provisions of SEC Rule 10b-5(a) and (c) promulgated thereunder against all Defendants.  Accordingly, Plaintiff need not allege in this Count, nor prove in this case, that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

318.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate and artificially maintain the market price of Ericsson's ADS price; and (iii) cause Plaintiff and Class members to purchase Ericsson ADS at artificially inflated prices.

319.    Defendants' manipulative conduct included, but was not limited to, selling ADS under the false pretense that Ericsson had a strong anti-corruption program and robust policies for vetting third party contractors and subcontractors internationally, when in reality, Ericsson was actively carrying out a complex, multi-layered corruption scheme to promote rapid growth and increased profits for its own business.

320.    In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud and manipulate, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a manipulation, fraud, and deceit upon Lead Plaintiff and the Class in connection with their purchases of Ericsson's ADS, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

321.    Specifically, Ericsson engaged in an unlawful plan to hire third party subcontractors to pay illegal bribes to secure contracts.  Ericsson knew that bribing customers was an illegal

practice and violation of its compliance and anti-corruption systems, so Ericsson developed a systematic plan to evade its internal controls and to continue engaging in a complex bribery scheme by hiring and directing third party subcontractors to pay the illegal bribes for Ericsson.

322.    Ericsson engaged in a similar illegal scheme in order to pay ISIS for access to illegal routes, such as the "Speedway," and terrorist-controlled cities, like Mosul.  By hiring third party subcontractors like Cargo Iraq and Orbitel, Ericsson was able to engage in its unlawful plan to develop financial relationships with ISIS in order to accomplish its own illegal business practices.

323.    Additionally, Ericsson fraudulently recorded its expenses in Ericsson's books and records as part of its illegal, multi-layered scheme.  Ericsson recorded payments, totaling millions of dollars, with vague descriptions for "sales agents" and "consultants" even when no clear work or role was established to explain the payment.

324.    Ericsson and Defendants' unlawful course of conduct culminated with their concealment of Ericsson's December 11, 2021 Internal Report - which confirmed the full scope of the illegal conduct (funding ISIS, paying bribes, abandoning kidnapped subcontractors) in Iraq – from the SEC, DOJ, and investors.  Specifically, Ericsson entered into a DPA with the DOJ which imposed a number of reporting and disclosure obligations on the Company.  For instance, *inter alia*, the DPA required the Company to hire a monitor without an attorney client relationship and to disclose any relevant information related to corruption to that monitor.  Moreover, the DPA required Ericsson to affirmatively disclose any corrupt practices or FCPA violations to the government.  By knowingly engaging in the internal investigation in Iraq, obtaining a report that evidenced numerous corrupt practices including facilitating payments to ISIS, and then entering into the DPA while concealing the information from the DOJ and investors, Defendants engaged in this scheme.

325.    Lead Plaintiff and the Class reasonably relied upon the integrity of the market in which Ericsson's ADS traded.

326.    During the Class Period, Lead Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme.  Had Plaintiff and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Ericsson's ADS or if they had, would not have done so at the artificially inflated prices paid for such securities.

327.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Ericsson's ADS during the Class Period.

328.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiff and the Class for damages suffered in connection with their purchases of Ericsson's ADS during the Class Period.

### COUNT  III

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

329.    Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

330.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Börje Ekholm, Carl Mellander, and Xavier Dedullen.  Defendants Börje Ekholm, Carl Mellander and Xavier Dedullen had control over Ericsson and made the material false and misleading statements and omissions on behalf of Ericsson within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions, as alleged above, Defendants Börje Ekholm, Carl Mellander and Xavier Dedullen had had the power to influence and

control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading.  Defendants Börje Ekholm, Carl Mellander and Xavier Dedullen were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

331.    In particular, Defendants Börje Ekholm, Carl Mellander and Xavier Dedullen had had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

332.    By reason of such wrongful conduct, Defendants Börje Ekholm, Carl Mellander and Xavier Dedullen are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants Börje Ekholm, Carl Mellander and Xavier Dedullen's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Lead Plaintiff demands a trial by jury.


Dated:  September 9, 2022                 **LABATON SUCHAROW LLP**

By: */s/ Michael P. Canty*
Michael P. Canty
James T. Christie
Danielle Izzo
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:   mcanty@labaton.com
         jchristie@labaton.com
         dizzo@labaton.com

*Lead Counsel for Lead Plaintiff Boston Retirement System and the Proposed Class*