## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
         :
         :
         :
         :
         :
         :
         :     Case No. 1:22-cv-01167-WFK-LB

IN RE TELEFONAKTIEBOLAGET LM  :
ERICSSON SECURITIES LITIGATION.  :     **ORAL ARGUMENT REQUESTED**
         :
         :
         :
         :
         :
------------------------------------------------------------x


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS THE AMENDED COMPLAINT

Robert J. Giuffra, Jr.
David M.J. Rein
Jacob G. Singer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  212-558-4000
Fax:  212-558-3558
giuffrar@sullcrom.com
reind@sullcrom.com
singerja@sullcrom.com

*Counsel for Defendants Telefonaktiebolaget
LM Ericsson, Börje Ekholm, Carl Mellander,
and Xavier Dedullen*

December 16, 2022

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...............................................................1

ALLEGATIONS OF THE AMENDED COMPLAINT ...............................4

    A.   Ericsson's Global Business...............................................................4

    B.   Ericsson's Middle East and Africa Region Experiences Declining Sales During 2016 to 2018. ...............................................................5

    C.   Ericsson Warns Investors of FCPA and Compliance Risks. ...............6

    D.   Ericsson Discloses to Investors the DOJ and SEC FCPA Investigations and Their Resolution...............................................................7

    E.   Ericsson Informs Investors of Internal Investigation into Conduct in Iraq. ...........8

    F.   Plaintiff's Claims ...............................................................9

ARGUMENT ...............................................................10

I.    THE COMPLAINT DOES *NOT* PLEAD ANY ACTIONABLE MISREPRESENTATION OR OMISSION. ...............................................................10

    A.   Ericsson's MEA Business Statements Are Not Actionable As a Matter of Law. ...............................................................11

    B.   Ericsson's General Policy Statements Are Not Actionable As a Matter of Law. ...............................................................14

    C.   The FCPA Settlement Statements Were Not False When Made. ...............16

II.    THE COMPLAINT DOES *NOT* PLEAD FACTS SUPPORTING THE REQUIRED STRONG INFERENCE THAT DEFENDANTS ACTED WITH FRAUDULENT INTENT. ...............................................................18

    A.   Plaintiff Does Not Allege That Any Individual Defendant Had Any "Motive and Opportunity" To Commit Fraud. ...............................19

    B.   Plaintiff Does Not Meet Its Burden To Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness. ...............19

III.    PLAINTIFF DOES *NOT* PLEAD LOSS CAUSATION AS A MATTER OF LAW. ...............................................................24

CONCLUSION ...............................................................25

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re Advanced Battery Technologies, Inc.*,
781 F.3d 638 (2d Cir. 2015).................................................................................3

*Africa* v. *Jianpu Technology Inc.*,
No. 21 Civ. 1419 (JMF), 2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) .........................12–13

*Altayyar* v. *Etsy, Inc.*,
731 F. App'x 35 (2d Cir. 2018) .........................................................................14

*Arkansas Public Employees Retirement System* v. *Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .........................................................................3, 19

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).........................................................................10–11

*In re Banco Bradesco S.A. Securities Litigation*,
277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017).........................................................15

*Board of Trustees* v. *Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011).........................................................22

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 F. App'x 32 (2d Cir. 2012) .........................................................................14

*In re Braskem S.A. Securities Litigation*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017).........................................................15

*C.D.T.S.* v. *UBS AG*,
No. 21 Civ. 4924 (KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .........................17–18

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
750 F.3d 227 (2d Cir. 2014).........................................................................14

*In re China Organic Securities Litigation*,
No. 11 Civ. 8623 (JMF), 2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013) .........................24

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014).........................................................................2, 11, 14

*City of Warwick Municipal Employees Pension Fund* v. *Rackspace Hosting, Inc.*,
No. 17 Civ. 3501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019).........................16

*Das* v. *Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018).................................................................20

*In re Diebold Nixdorf, Inc., Securities Litigation*,
    No. 19 Civ. 6180 (LAP), 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...............24

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................18

*Fogel* v. *Vega*,
    759 F. App'x 18 (2d Cir. 2018) .....................................................................14, 15

*Fogel* v. *Wal-Mart de México SAB de CV*,
    No. 13 Civ. 2282 (KPF), 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ...................22

*Fries* v. *Northern Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018).................................................................15

*GE Investors* v. *General Electric Co.*,
    447 F. App'x 229 (2d Cir. 2011) ...................................................................24–25

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................21

*Hensley* v. *IEC Electronics Corp.*,
    No. 13 Civ. 4507 (JMF), 2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ...............20

*Hou Liu* v. *Intercept Pharmaceuticals, Inc.*,
    No. 17 Civ. 7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020)...............21

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund* v. *Royal Bank of
    Scotland Group, PLC*,
    783 F.3d 383 (2d Cir. 2015)..............................................................................12

*Indiana Public Retirement System* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)................................................................................14

*Jackson* v. *Abernathy*,
    960 F.3d 94 (2d Cir. 2020)................................................................................18

*Jiajia Luo* v. *Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020).................................................................14

*Jiehua Huang* v. *AirMedia Group Inc.*,
    No. 15 Civ. 4966 (ALC), 2017 WL 1157134 (S.D.N.Y. Mar. 27, 2017) ...............17

*Jun* v. *500.com Ltd.*,
    No. 20 Civ. 806 (GRB), 2021 WL 4813192 (E.D.N.Y. Aug. 13, 2021) .................12

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)...................................................................................4, 24

*Lopez* v. *Ctpartners Executive Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)..................................................................17

*Malin* v. *XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007).................................................................17

*Marcu* v. *Cheetah Mobile Inc.*,
  No. 18 Civ. 11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..........3, 21

*Menora Mivtachin Insurance Ltd.* v. *International Flavors & Fragrances Inc.*,
  No. 19 Civ. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021)..............13

*Meyer* v. *Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..............................................................................13

*Monroe County Employees' Retirement System.* v. *YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)..................................................................25

*In re Morgan Stanley Information Fund Securities Litigation*,
  592 F.3d 347 (2d Cir. 2010)..............................................................................11

*NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes Inc.*,
  No. 09 Civ. 1740 (VLB), 2013 WL 1188050 (D. Conn. Mar. 23, 2013) ..............22

*In re Nokia Corp. Securities Litigation*,
  No. 19 Civ. 3982 (ALC), 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021).........16–17

*Parkcentral Global Hub Ltd.* v. *Porsche Automobile Holdings SE*,
  763 F.3d 198 (2d Cir. 2014)................................................................................4

*Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2020) ...........................................................................11–12

*In re Qudian Inc. Securities Litigation*,
  No. 17 Civ. 9741 (JMF), 2020 WL 3893294 (S.D.N.Y. July 10, 2020) ...............13

*In re Renewable Energy Group Securities Litigation*,
  No. 22-335, 2022 WL 14206678 (2d Cir. Oct. 25, 2022)................................19–20

*Rice* v. *City of New York*,
  275 F. Supp. 3d 395 (E.D.N.Y. 2017) .................................................................4

*Salim* v. *Mobile Telesystems PJSC*,
  No. 19 Civ. 1589 (AMD), 2021 WL 796088 (E.D.N.Y. Mar. 1, 2021) ............15, 22

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)........................................12, 15, 22

*Schiro* v. *Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)..............................................12, 15

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).............................................3, 14–15, 17

*In re Skechers USA, Inc. Securities Litigation*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020)...................................................23

*Slayton* v. *American Express Co.*,
    604 F.3d 758 (2d Cir. 2010)...............................................................18

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................3, 10, 18

*Thomas* v. *Shiloh Industries, Inc.*,
    2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018)..........................................23

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)................................................................4

*Venkataraman* v. *Kandi Technologies Group, Inc.*,
    No. 20 Civ. 8082 (LGS), 2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ................18

*Villare* v. *Abiomed, Inc.*,
    No. 19 Civ. 7319 (ER), 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ................21

*In re Weight Watchers International Inc. Securities Litigation*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020)...................................................19

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................................................4

*Woodley* v. *Wood*,
    No. 20 Civ. 2357 (ER), 2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) ...................19

**Statutes**

15 U.S.C. § 77o(a) ............................................................................25

15 U.S.C. § 78t(a) ............................................................................25

15 U.S.C. § 78u-4(b)(1) .......................................................................11

15 U.S.C. § 78u-5 ............................................................................17

## PRELIMINARY STATEMENT

In this putative securities class action, Plaintiff seeks to represent a class of purchasers of American Depositary Shares ("ADS") of the Swedish communications technology company, Telefonaktiebolaget LM Ericsson ("Ericsson" or the "Company"). In accusing Ericsson and three of its most senior officers of securities fraud, Plaintiff conflates Defendants' disclosure duties to Ericsson's shareholders with a company's disclosure obligations to the U.S. Department of Justice ("DOJ") in connection with a deferred prosecution agreement ("DPA").

In December 2019, the DOJ announced that it had entered into a DPA with Ericsson in relation to improper payments by Ericsson and certain of its subsidiaries' employees or agents "in at least five countries" to obtain contracts in violation of the Foreign Corrupt Practices Act ("FCPA"). (AC, Ex. A; Ex. 50 at 2.)[1] On March 1, 2022, shortly after the International Consortium of Investigative Journalists ("ICIJ") leaked portions of the report of an Ericsson internal investigation completed after the DPA about conduct in Iraq, the DOJ informed Ericsson it had determined that Ericsson had made "insufficient" disclosures to the DOJ in connection with the DPA about conduct in Iraq, and that "the company breached the DPA by failing to make subsequent disclosure" about that conduct to the DOJ. (Ex. 47 at 1.)

In seeking to allege securities fraud claims based on allegations of insufficient disclosure to the DOJ, Plaintiff runs up against a basic problem: a public company's obligations to its shareholders are different from its obligations to the DOJ under the terms of a DPA. This Court should dismiss Plaintiff's Amended Complaint because it does not plead three fundamental—and independent—elements of a securities fraud claim as a matter of law.

*First*, in challenging three categories of Defendants' statements, Plaintiff has not

---

[1] "Ex. _" refers to the exhibits to the Declaration of David M.J. Rein, dated December 16, 2022.

adequately pled that those statements were false or material when made. Plaintiff asserts that the Company's statements made in 2017 and 2018 describing the "strength and basis for Ericsson's growing business" in the Middle East and Africa (the "MEA Business Statements") were misleading, because those statements did not disclose possible FCPA violations in Iraq as an element of the Company's growth. (AC ¶ 193.) But Plaintiff misconstrues Ericsson's public statements, which actually reported that its regional sales in the Middle East and Africa ("MEA") *declined* from 2016 through 2018. (*See* Section I.A.) And, in any event, it is black letter law in this Circuit that allegations of improper payments uncovered in an investigation, and which were not the subject of any enforcement action, need not have been disclosed at that time, because "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

Plaintiff also asserts that Ericsson's general policy statements in 2017 and 2018 about the Company's anti-corruption controls (the "Policy Statements") were false, because those statements also did not disclose alleged improper payments in Iraq (AC ¶ 207), even though Ericsson expressly cautioned that "we cannot provide any assurances that violations will not occur" (Ex. 17 at 100). In this Circuit, "general statements about reputation, integrity, and compliance with ethical norms" are "too general to cause a reasonable investor to rely upon them," *UBS*, 752 F.3d at 183, and courts have repeatedly held that nearly indistinguishable aspirational statements to those challenged here are immaterial as a matter of law. (*See* Section I.B.)

Finally, Plaintiff challenges Ericsson's statements about its resolution of DOJ and SEC investigations and consequent "[i]mprovements to Ericsson's Ethics and Compliance Program" (the "FCPA Settlement Statements"), because those statements did not disclose Ericsson's alleged conduct in Iraq or the risk of future enforcement actions. (AC ¶¶ 215, 220,

222.)  But Ericsson had no obligation to disclose uncharged, unadjudicated allegations of misconduct, and the Company's descriptions of its enhanced compliance program contained no "assurances of actual compliance."  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63–64 (2d Cir. 2019).  Instead, Ericsson agreed to retain "an independent compliance monitor to reduce the risk of misconduct," "because [Ericsson] ha[d] not yet fully implemented or tested its compliance program" (AC, Ex. A § 4(e)).  Critically, Plaintiff does not allege that Defendants were aware of any on-going enforcement actions involving conduct in Iraq at the time that Ericsson disclosed the conclusion of the investigations.  (*See* Section I.C.)

*Second*, Plaintiff does not come close to meeting the "[e]xacting" requirements for pleading scienter with the particularity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  (*See* Section II.)  Plaintiff does not even try to allege that any of the individual Defendants had the motive or opportunity to defraud, and, as a result, Plaintiff's obligation to allege recklessness or conscious misbehavior is "correspondingly greater."  *Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022).  Instead, Plaintiff raises a grab bag of theories, none of which infer the "extreme departure from the standards of ordinary care" necessary to meet its exacting pleading burden.  *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015).  For example, Plaintiff's lead allegation is that the Court should infer scienter from the supposed "importance" of Iraq to Ericsson's business.  (AC ¶ 248.)  But Iraq represented just a small fraction of Ericsson's overall revenues.  In pointing to two supposed "confidential witnesses," Plaintiff does not meet the threshold requirement for "confidential source allegations" of "show[ing] that individual defendants actually possessed the knowledge highlighting the falsity of public statements."  *Marcu* v. *Cheetah Mobile Inc.*, 2020 WL 4016645, at *7 (S.D.N.Y. July 16, 2020).

*Third*, Plaintiff does not plead loss causation, including because nothing in any of three supposed "corrective disclosures" revealed that any of the challenged statements were false. (*See* Section III.) Plaintiff concedes that Ericsson's ADS price did not decline until the day *after* the first "corrective disclosure" (AC ¶¶ 277–281), which is inconsistent with pleading of loss causation. Plaintiff also claims that the second "corrective disclosure," the release of portions of Ericsson's internal investigation report, reflected a "partial[]" materialization of undisclosed risks of misconduct. (AC ¶ 284.) But Ericsson provided no assurances of compliance and repeatedly warned that misconduct could occur. As to the third "corrective disclosure," "the DOJ's response" to reports of the Iraq investigation (AC ¶ 286), Ericsson disclosed that response immediately after it was provided to Ericsson and so it plainly was not "concealed . . . from the market." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

In short, Plaintiff has not met its burden to plead securities fraud with particularity.

## ALLEGATIONS OF THE AMENDED COMPLAINT[2]

### A.    Ericsson's Global Business

Headquartered in Stockholm, Ericsson is a Swedish communications technology company providing hardware, software, and services around the world. (AC ¶ 2, Ex. A at A-1.) With approximately 100,000 employees and customers, the Company operates in more than 180 countries, including war-torn countries in the Middle East. (Ex. 48 at 1.) Ericsson's shares trade

---

[2] For purposes of this motion, the Court should consider only the Complaint's well-pleaded allegations. *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014). The Court also may consider "documents incorporated into the complaint by reference," and "public disclosure documents filed with the SEC," *Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016), "any document not specifically incorporated by reference but on which the Complaint relies and which is integral to it," and "any matter of which the court can take judicial notice," *Rice* v. *City of New York*, 275 F. Supp. 3d 395, 402 (E.D.N.Y. 2017) (Kuntz, J.), including "documents filed with governmental entities and available on their official website," *Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

on Nasdaq Stockholm and its sponsored ADS trade on Nasdaq in New York. (*Id.*)

Börje Ekholm has served as Ericsson's CEO since 2017 and has been a member of Ericsson's Board of Directors since 2006. (AC ¶ 63; Ex. 48 at 13.) Carl Mellander is the Company's CFO, having served in that role since 2017. (AC ¶ 64; Ex. 48 at 22.) From 2018 until March 2022, Xavier Dedullen was Ericsson's Chief Legal Officer and Secretary to the Board of Directors. (AC ¶¶ 65, 188; Ex. 48 at 21.)

### B. Ericsson's Middle East and Africa Region Experiences Declining Sales During 2016 to 2018.

In 2016, Ericsson's business was divided into ten geographical market areas, including the Middle East, which comprised approximately 3,100 employees, or 2.7% of the Company's global workforce. (Ex. 17 at 35, 88.) In 2017, Ericsson consolidated its ten geographic segments into five, including combining its Middle East and Africa segments. (Ex. 15 at 11.) The combined MEA region comprised 70 countries with more than 4,500 employees, roughly 4.5% of Ericsson's global workforce. (Ex. 25 at 75; Ex. 33 at 20.)

Ericsson's financial reporting provided updates on each geographic segment. In its 2016 Annual Report, Ericsson reported that its 2016 Middle East "[s]ales declined, primarily in Networks due to lower broadband investments." (Ex. 17 at 18.) Ericsson also provided, for context, the reporting it had issued in 2015, where its Middle East "[s]ales increased, primarily in Global Services," and "[i]n the first half of the year [*i.e.*, 2015], Network sales growth was mainly driven by some major mobile broadband projects." (Ex. 6 at 36; Ex. 16 at 14.) Ericsson reported continued sales declines in 2017 and 2018 in its MEA region. (Ex. 25 at 24; Ex. 33 at 31.)

Ericsson's public disclosures also included information about its quarterly performance in the MEA region. Even though its overall MEA sales decreased in each of 2016, 2017 and 2018, Ericsson experienced growth or encouraging performance in particular business

lines during some time periods.  Thus, CEO Ekholm reported in an investor call that, for the third quarter 2017, "we actually see growth in the Middle East and Africa, which is explained by multiple customers in multiple countries."  (Ex. 20 at 3.)  And, in the first quarter of 2018, CFO Mellander reported that "investments in R&D [were] paying off" in the Networks business, and that sales showed "a good momentum" in the Middle East.  (Ex. 26 at 4.)

### C.    Ericsson Warns Investors of FCPA and Compliance Risks.

Like other global companies, including those operating in the Middle East, Ericsson faced corruption-related risks.  Ericsson repeatedly disclosed those risks to investors, explaining that "[i]n some of the countries where we operate, corruption risks are high, therefore there is a higher focus on anticorruption."  (*E.g.*, Ex. 17 at 100.)[3]  At the same time, Ericsson expected a "zero tolerance approach to corruption" (*id.* at 23), and like many public companies, disclosed to investors some of its anti-corruption policies and controls.  Under its "Code of Business Ethics," for example, Ericsson issued "rules to ensure that business is conducted with a strong sense of integrity."  (*Id.* at 104.)  Ericsson encouraged employees to "report any conduct that they believe[d]" violated the law or its Code of Business Ethics, including conduct involving "corruption or fraud."  (*E.g.*, Ex. 24 at 8.)  Ericsson disclosed that it received 412 reports through its compliance hotline and other channels in 2017, and 445 reports in 2018.  (*Id.*; Ex. 41 at 152.)

In generally describing its controls, Ericsson warned investors of the risks of these anti-corruption procedures failing.  For example, the Company emphasized that it "cannot fully prevent . . . violation of our Code of Business Ethics, corruption or violations of our Code of Conduct."  (Ex. 17 at 100.)  It also cautioned investors that Ericsson "cannot provide any

---

[3] A chart summarizing Ericsson's repeated warnings to investors about the risks of non-compliance with anti-corruption laws or its policies is appended as Exhibit 1 hereto.

assurances that violations" of its anti-corruption policies "will not occur." (*Id.*)  Thus, Ericsson highlighted as a specifically-identified "risk factor" for investors that "[w]e may fail to comply with our corporate governance standards, which could negatively affect our business, operating results, financial condition, reputation and brand." (*Id.*)

**D.    Ericsson Discloses to Investors the DOJ and SEC FCPA Investigations and Their Resolution.**

Prior to the alleged class period of April 27, 2017 to March 1, 2022, Ericsson disclosed that it faced FCPA investigations (the "FCPA Investigations"), and subsequently kept investors apprised of their progress. (*E.g.*, Ex. 7 at 1; *see* Ex. 1.)  In its 2016 and 2017 Annual Reports, Ericsson disclosed that it was "voluntarily cooperating with inquiries from the [SEC] and the [DOJ] regarding its compliance with the [FCPA]" and that the "inquiries concern a period from January 1, 2007 and onwards." (Ex. 17 at 23, 100; Ex. 25 at 3, 85.)  Ericsson expressly warned that "the outcome of these questions is currently not determinable." (Ex. 17 at 100; Ex. 25 at 85.)

In its 2018 Annual Report, Ericsson disclosed that it was "engaged in discussions with [the SEC and the DOJ] to find a resolution" and warned investors that "Ericsson believes that the resolution of these matters will likely result in monetary and other measures," which "may be material." (Ex. 33 at 33; *see* Ex. 34 at 2, 13, 14.)  On October 17, 2019, Ericsson informed investors that "[i]n the course of the investigations, the Company identified breaches of its Code of Business Ethics and the FCPA," which were "the result of several deficiencies." (Ex. 37 at 17.)

On December 6, 2019, Ericsson, the DOJ and the SEC announced settlements related to FCPA violations in "at least five countries," including two Middle East countries (Djibouti and Kuwait). (Ex. 50 at 1.)  As part of the settlements, Ericsson entered into a DPA with the DOJ, and Ericsson's Egyptian subsidiary agreed to a guilty plea for conspiracy to violate the FCPA's anti-bribery provisions. (*Id.* at 1; Ex. 39 at 1.)  The DOJ found that the subsidiary made

improper payments to secure contracts with a state-owned telecommunications company in Djibouti, and that other Ericsson subsidiaries had made improper "off-the-books" payments in Vietnam, Kuwait, and Indonesia to secure business.  (Ex. 50 at 2–3.)  Under the DPA, "because [Ericsson] ha[d] not yet fully implemented or tested its compliance program," Ericsson accepted "an independent compliance monitor to reduce the risk of misconduct."  (AC, Ex. A § 4(e).)  Ericsson agreed that the monitorship would last for three years, "while the Company continues to undertake significant reforms to strengthen its Ethics & Compliance program."  (Ex. 39 at 1.)

In its December 6, 2019 press release announcing the DPA, Ericsson cautioned: "While the Company had a compliance program and a supporting control framework, they were not adequately implemented."  (*Id.* at 2.)  Ericsson also stated that "[t]he resolution marks the end of the FCPA-related investigations into Ericsson and its subsidiaries undertaken by the DOJ and the SEC," and described "[i]mprovements" the Company would make to its "Ethics and Compliance program."  (*Id.* at 2–4.)  The next day, CEO Ekholm stated during an investor call that "[w]e're now able to move forward and fully focus on our business and build a stronger company." (Ex. 40 at 3.)  In response to a question concerning "other investigations in other regions" or "any kind of discussions with [] regulators," Mr. Dedullen explained that "we are not aware of any other follow-on investigations," and "we continue to closely monitor the situation."  (*Id.* at 6.)

In its 2019 Annual Report, Ericsson then warned investors that "[i]f the DOJ determines that we have violated the terms of the DPA, the DOJ may in its sole discretion commence prosecution . . . or extend the term of the DPA for up to one year."  (Ex. 41 at 103.)

### E.     Ericsson Informs Investors of Internal Investigation into Conduct in Iraq.

On February 15, 2022, in response to media inquiries, Ericsson issued a press release stating that, in 2019, it had initiated an internal investigation supported by external legal counsel in response to "[u]nusual expense claims in Iraq."  (Ex. 46 at 2.)  This internal investigation

covered the period of 2011 through 2019 (*id.*) and, according to Plaintiff, involved "nearly the exact same" conduct as that at issue in the FCPA Investigations and the DPA (AC ¶ 28). In its press release, Ericsson reported that the investigation "found serious breaches of compliance rules and the Code of Business Ethics," including "payments to intermediaries" where "[i]nvestigators could not determine the ultimate recipients of these payments," but did not "identify that any Ericsson employee was directly involved in financing terrorist organizations." (Ex. 46 at 2.)

On February 27, 2022, the International Consortium of Investigative Journalists leaked excerpts of the Company's investigation report concerning "Ericsson's Iraq business." (Ex. 52.) The ICIJ reported that Ericsson's internal investigation "covers the years 2011 to 2019" and included "28 witness interviews and 22.5 million emails," but "couldn't identify any Ericsson employee as 'directly involved'" in "financ[ing] terrorism through its subcontractors." (*Id.* at 2–3, 5.) The ICIJ report included a statement that CEO Ekholm had given to another media outlet, explaining that "the company chose not to disclose the Iraq probe, because 'the materiality of our findings did not pass our threshold to make a disclosure.'" (*Id.*)

On March 1, 2022, the DOJ informed Ericsson it had determined that Ericsson's prior disclosures to the DOJ in connection with the DPA were "insufficient" and that the Company had breached the DPA "by failing to make subsequent disclosure related to [its Iraq] investigation post-DPA." (Ex. 47.) Ericsson disclosed the DOJ's notification to investors the next day. (*Id.*)

F. **Plaintiff's Claims**

The Complaint asserts claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") against all Defendants and Section 20(a) of the Exchange Act against Messrs. Ekholm, Mellander and Dedullen (the "Individual Defendants"). Plaintiff seeks to bring claims on behalf of investors who acquired Ericsson's ADS between April 27, 2017 and March 1, 2022. (AC ¶ 293.)

Plaintiff challenges three categories of Defendants' statements:

1. the Company's MEA Business Statements about its business in the Middle East and Africa during 2016 to 2018, including the 3Q 2017 statement that "[s]ales in the Middle East showed growth despite a continued challenging macroeconomic environment" (AC ¶ 205);

2. Ericsson's aspirational Policy Statements, discussing its anti-corruption programs during 2017 to 2018, such as "Ericsson's Code of Business Ethics summarizes fundamental Group policies and directives and contains rules to ensure that business is conducted with a strong sense of integrity" (AC ¶ 209); and

3. the Company's FCPA Settlement Statements, regarding its DOJ and SEC FCPA settlements, including the DPA in December 2019, such as "[w]e're now able to move forward and fully focus on our business" (AC ¶ 222).[4]

Plaintiff claims that each of these statements were misleading because they did not disclose possible FCPA violations in Iraq. (AC ¶¶ 193, 207, 215.) Plaintiff asserts that the challenged statements were shown to be false based on three purported "corrective disclosures":

1. *February 15, 2022*: Ericsson press release stating that the Company had undertaken an internal investigation concerning conduct in Iraq (AC ¶¶ 277);[5]

2. *February 27, 2022*: ICIJ's leak of excerpts of Ericsson's internal investigation report on Iraq conduct (AC ¶ 284); and

3. *March 2, 2022*: Ericsson press release reporting that DOJ had determined that the Company's DPA disclosures to DOJ were insufficient (AC ¶ 290).

## ARGUMENT

## I. THE COMPLAINT DOES *NOT* PLEAD ANY ACTIONABLE MISREPRESENTATION OR OMISSION.

Plaintiff's claims face "[e]xacting pleading requirements." *Tellabs*, 551 U.S. at 313. Federal Rule of Civil Procedure 9(b) requires Plaintiff to "state[] with particularity" "the

---

[4] For the Court's convenience, Exhibit 2 hereto is a chart summarizing the challenged statements.

[5] Although the press release was released during trading hours on February 15, Plaintiff alleges the release caused Ericsson's ADS price to fall only the following day. (AC ¶ 237; Ex. 46 at 1.)

circumstances constituting fraud." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). And, under the PSLRA, Plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Although this Court must accept the Complaint's well-pled allegations, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99. Plaintiff does not satisfy these heightened pleading standards for *any* of the challenged statements here.

## A.  Ericsson's MEA Business Statements Are Not Actionable As a Matter of Law.

Plaintiff claims that Ericsson's 2017 and 2018 statements purportedly describing the "strength and basis for Ericsson's growing business" in MEA were misleading, because Ericsson failed to disclose possible FCPA violations in Iraq as a source of the Company's growth. (AC ¶¶ 193, 205; *see* Ex. 2.) Plaintiff's allegations do not state a claim for multiple reasons.

As a threshold matter, Plaintiff mischaracterizes Defendants' statements. For example, Plaintiff challenges a statement that "[s]ales increased" in the Middle East and claims that this shows Defendants "tout[ed] Ericsson's growth in the Middle East" for the "quarter and year ended December 31, 2016." (AC ¶¶ 194, 195, 200.) But this statement describes growth in *2015*, before the alleged class period. (Ex. 16 at 11 ("Business in 2015").) Ericsson actually informed investors that its "[s]ales *declined*" in the Middle East or MEA in each of *2016*, *2017*, and *2018*. (Ex. 17 at 18; Ex. 25 at 24; Ex. 33 at 31 (emphasis added).)

Further, nothing about the Company's 2019 internal investigation makes the MEA Business Statements actionable. In this Circuit, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *UBS*, 752 F.3d at 184; *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010) ("Disclosure is not a rite of confession . . . ."). "Otherwise, every company whose [] financial reports include revenue from transactions that violated [] regulations could be sued for securities fraud," which "would bring within the sweep

of federal securities laws many routine representations made by companies." *Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2020). Thus, "courts have not required defendants in cases" involving an alleged "bribery scheme" to "disclose uncharged criminal wrongdoing even *after* the defendants became subject to scrutiny by regulatory agencies or other proceedings related to the conduct at issue." *Jun* v. *500.com Ltd.*, 2021 WL 4813192, at *19 (E.D.N.Y. Aug. 13, 2021), *report and recommendation adopted*, 2021 WL 4260644 (E.D.N.Y. Sept. 20, 2021) (Brown, J.).

Plaintiff cannot turn general descriptions of performance or growth into securities fraud by citing potential violations of anti-corruption laws. To be actionable, a plaintiff must allege that a defendant "reported income that it did not actually receive or sales growth that did not actually occur." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016). The Complaint alleges no inaccuracy in Ericsson's financial results for 2016 or 2017 requiring a restatement. Instead, Plaintiff challenges general statements discussing the reasons for Ericsson's performance, such as that "growth in the [MEA]" "has many contributing parts," or that "we [] see investments in R&D paying off." (AC ¶¶ 201, 203.) But courts have repeatedly held that statements attributing growth to factors such as "expansion projects" and a "solid asset base" are "far too generic" to "giv[e] rise to a duty to disclose that th[e] growth was actually attributable to [an] alleged bribery scheme." *Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019).[6]

Judge Furman's decision in *Africa* v. *Jianpu Technology Inc.*, 2022 WL 4537973

---

[6] In alleging that Ericsson had "$1.9 billion" of "contracts and projects" in Iraq "between 2011 and 2019," Plaintiff does not assert what portion of these alleged revenues was improper. (AC ¶¶ 249, 250.) And, in any event, this total amount would comprise just 0.7% of Ericsson's global revenues of approximately $265 billion during that period. (*See* Ex. 3.) In this Circuit, "a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015).

(S.D.N.Y. Sept. 28, 2022), is directly on point. There, the Court held that there was "nothing misleading" about statements that "identif[ied] the reason for the growth" of a company's credit card business as "an increase in both credit card volume and average fee per credit card," without disclosing that the company was "engaged in [improper] related-party transactions." *Id.* at *8. As Judge Furman explained, "an allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained, is insufficient to impose Section 10(b) liability." *Id.*; *see Menora Mivtachin Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *17–18 (S.D.N.Y. Mar. 30, 2021) (attributing financial performance to "organic growth and acquisitions" was "far too generalized and attenuated to implicate defendants' duty to disclose" allegedly improper payments), *aff'd sub nom. Menora Mivtachin Ins. Ltd.* v. *Fruatrom Indus. Ltd.*, 2022 WL 17332303 (2d Cir. Nov. 30, 2022).[7]

In any event, Ericsson *did* repeatedly disclose the risk that its employees might "fail to comply with [its] corporate governance standards," before or contemporaneously with making each of the MEA Business Statements. (*E.g.*, Ex. 6 at 98; Ex. 17 at 100; Ex. 25 at 85.) Ericsson also disclosed the investigations "regarding its compliance with the [FCPA]" at the same time or prior to making all of the MEA Business Statements. (*E.g.*, Ex. 17 at 100.) Ericsson likewise disclosed its December 2019 settlements with the DOJ and SEC, which involved allegations of FCPA violations in two MEA countries (Djibouti and Kuwait) and a guilty plea by Ericsson's

---

[7] Plaintiff asserts that, under *Meyer* v. *Jinkosolar Holdings Co.*, Ericsson was required to disclose any misconduct in Iraq because it "chose to speak in detail about its business" there. (Dkt. 41 at 2.) But in *Jinkosolar*, the company had a duty to disclose "ongoing, serious pollution problems" because it published specific descriptions of its "pollution-preventing equipment and 24-hour monitoring teams," thereby giving "comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations." 761 F.3d 245, 247, 251 (2d Cir. 2014). By contrast, the MEA Business Statements contained no "specific, confident assurances of compliance" and, to the contrary, Ericsson "explicitly cautioned investors" of FCPA risks. *In re Qudian Inc. Sec. Litig.*, 2020 WL 3893294, at *2–3 (S.D.N.Y. July 10, 2020); *see* Ex. 1.

Egyptian subsidiary. (Ex. 39.) Ericsson thus "warned investors of exactly the risk [Plaintiff] claim[s] was not disclosed." *Jiajia Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 411 (S.D.N.Y. 2020).

**B.    Ericsson's General Policy Statements Are Not Actionable As a Matter of Law.**

Plaintiff also challenges statements made by Ericsson in 2017 and 2018 about its Code of Business Ethics and other policies or controls. For example, Plaintiff challenges statements such as "to ensure compliance with legal and regulatory requirements and the high standards that we set for ourselves, Ericsson has adopted internal rules that include a 'Code of Business Ethics.'" (AC ¶ 208.) Plaintiff claims these Policy Statements were false because they did not disclose the Company's alleged misconduct in Iraq. (AC ¶ 207.) But, under settled Second Circuit law, the Policy Statements cannot form the basis of a securities fraud claim, and, in any case, Plaintiff alleges no inaccuracy in the Policy Statements.

Even more fundamentally, Ericsson's Policy Statements were no different from analogous statements that the Second Circuit has repeatedly held are not actionable. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms" are "too general to cause a reasonable investor to rely upon them." *UBS*, 752 F.3d at 183.[8] For example, in *Singh*, the challenged statements concerned "Cigna's commitment to regulatory compliance," such as that Cigna "established policies and procedures to comply with applicable requirements" and, in its "Code of Ethics and Principles of Conduct," "affirm[ed] the importance

---

[8] *See also*, *e.g.*, *Fogel* v. *Vega*, 759 F. App'x 18, 23–24 (2d Cir. 2018) ("[g]eneral statements about honesty and integrity, including those about general compliance with the law," and "statements regarding [] 'internal controls'" inactionable); *Altayyar* v. *Etsy, Inc.*, 731 F. App'x 35, 37–38 (2d Cir. 2018) ("statements of policy and values" inactionable); *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (statements regarding "culture of high ethical standards" inactionable); *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (statements "concerning the company's minimum control requirements" inactionable); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012) ("generalizations about a company's business practices and integrity" inactionable).

of compliance and integrity." 918 F.3d at 60–61. Judge Cabranes rightly described plaintiff's claim there as based on a "simple equation": "first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and *voila*, you have alleged a prima facie case of securities fraud!" *Id.* at 59–60. The court explained that "[t]he problem with this equation" is that "such generic statements do not invite reasonable reliance," and "are not, therefore, *materially* misleading, and so cannot form the basis of a fraud case." *Id.* at 60. Plaintiff trots out the same flawed equation here.

Indeed, applying this settled law, courts in this Circuit have repeatedly dismissed claims based on statements no different from Ericsson's Policy Statements, including in the face of allegations of employee misconduct.[9] Here, unlike in cases such as *Singh*, Plaintiff cannot even "point to significant regulatory violations," because no court made any finding that Ericsson had violated the FCPA in Iraq when the Policy Statements were made. For the reasons explained above (at Section I.A.), Defendants had no obligation to disclose unadjudicated wrongdoing.[10]

Moreover, the Policy Statements did not promise perfect compliance by Ericsson's

---

[9] *E.g.*, *Fogel*, 759 F. App'x at 21 ("We do not tolerate, permit, or engage in bribery, corruption or unethical practices of any kind."); *Salim* v. *Mobile Telesys. PJSC*, 2021 WL 796088, at *11 (E.D.N.Y. Mar. 1, 2021) (Donnelly, J.) (statements "tout[ing] the Company's corporate compliance system, including the Company's commitment to compliance with the FCPA and its zero-tolerance policy towards corruption"); *Fries* v. *N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 713–14, 718 (S.D.N.Y. 2018) ("[A]ll employees and directors comply strictly with all laws."); *Schiro*, 396 F. Supp. 3d at 298 (company "rejects all form of corruption" and "does not tolerate bribery in any form"); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017) ("[N]o waivers of the provisions of the code of ethics are permitted."); *Sanofi*, 155 F. Supp. 3d at 401 (company has "zero tolerance for any unethical conduct").

[10] This case bears no resemblance to *In re Banco Bradesco S.A. Securities Litigation*, on which Plaintiff relies. (Dkt. 41 at 3.) There, unlike here, "the highest levels of management [were] alleged to have been involved in bribery and corruption at the very same time" that they stated they had an "'effective' anti-corruption policy, which would subject violators to discipline 'regardless of hierarchical level.'" 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017). More relevant here, *Bradesco* recognized that "codes of conduct and [] aspirational statements concerning compliance with the law do not guarantee that compliance will occur in every instance." *Id.* at 658.

more than 100,000 employees operating in more than 180 countries, including in countries in the Middle East. By their terms, the Policy Statements were aspirational, explaining, for example, that "Ericsson strives to raise awareness" of its Code of Business Ethics. (AC ¶ 209.) And, when making the Statements, Defendants expressly cautioned that "[w]e may fail to comply with our corporate governance standards" and that "we cannot provide any assurances that violations will not occur." (Ex. 17 at 100; *see* Ex. 1.) In any event, because Ericsson disclosed that the Company had received hundreds of employee reports of possible misconduct through its "compliance hotline" and other channels (Ex. 24 at 8), no reasonable investor could have understood the Policy Statements as promising that all of its more than 100,000 employees always would comply with Ericsson's requirements. Just as in *Cigna*, Defendants provided no "detailed" "assurances of actual compliance" and their statements "suggest[ed] caution (rather than confidence) regarding the extent of [] compliance." 918 F.3d at 63–64. This Court should dismiss for the same reason.

### C. The FCPA Settlement Statements Were Not False When Made.

Plaintiff claims that statements about the resolution of FCPA Investigations, such as "[w]e're now able to move on and fully focus on our business" and describing "[i]mprovements to Ericsson's Ethics and Compliance Program," were false, because Defendants did not disclose alleged misconduct in Iraq, or that Ericsson's "risks of future government enforcement action" were "not mitigated or reduced." (AC ¶¶ 215, 220, 222.) Applying settled law, the Court should dismiss Plaintiff's claims based on the FCPA Settlement Statements.

*First*, statements of general corporate optimism, such as "[w]e're now able to move forward" (AC ¶ 222), are "generally positive and of the type that other courts in this circuit have found constitute puffery." *City of Warwick Mun. Emps. Pension Fund* v. *Rackspace Hosting, Inc.*, 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (statement that "the distractions that we had to overcome earlier this year are now behind us" not actionable); *see In re Nokia Corp. Sec. Litig.*,

2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021) ("statements touting the progress of []
integration as 'complete' and 'successful' . . . are 'too general to cause a reasonable investor to
rely upon them.'" (citation omitted)); *Malin* v. *XL Cap. Ltd.*, 499 F. Supp. 2d 117, 145 (D. Conn.
2007) (statement that company had put "problems . . . behind us" "not actionable as a general
statement of optimism"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).[11]

    *Second*, no reasonable investor could have understood Defendants' descriptions of
"[i]mprovements to Ericsson's Ethics and Compliance program" implemented in connection with
the DPA (AC ¶ 220) to contain "assurances of actual compliance." *Singh*, 918 F.3d at 63–64. This
is plainly so where the DPA required the Company to have "an independent compliance monitor
to reduce the risk of misconduct" "because [Ericsson] ha[d] not yet fully implemented or tested its
compliance program." (AC, Ex. A § 4(e).)

    *Third*, Plaintiff does *not* allege that Mr. Dedullen's statement that "[w]e are not
aware of any other follow-on investigations in any of the other countries" was false when made in
response to an analyst asking "it wasn't clear [in Q3] whether other investigations in other regions
around the same topics might kick off. I just wondered if you could give us an update on whether
anything else has or you've had any kind of discussions with the regulators." (AC ¶ 224; Ex. 40
at 6.) "A violation of Rule 10b-5 cannot occur unless an alleged material misstatement or omission
was false at the time it was made." *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec.

---

[11] These statements also are forward-looking within the PSLRA's statutory safe harbor. 15 U.S.C.
§ 78u-5. Absent "actual knowledge" of falsity, which Plaintiff does not allege, forward-looking
statements are not actionable if "identified and accompanied by meaningful cautionary language."
*Lopez* v. *Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016). Here, the
statements were accompanied by warnings, such as that they "were based on [] current
expectations" and "subject to risks and uncertainties." Ex. 40 at 2; *see Jiehua Huang* v. *AirMedia
Grp. Inc.*, 2017 WL 1157134, at *8 (S.D.N.Y. Mar. 27, 2017) (statements accompanied by
cautions that they reflected the company's "beliefs and expectations" involving "inherent risks and
uncertainties" protected).

13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund* v. *UBS AG*, 604 F. App'x 5 (2d Cir. 2015). Fatally for the Complaint, Plaintiff does not allege that, when Mr. Dedullen made this statement, any regulator had notified Ericsson that it was investigating its conduct in Iraq. Plaintiff's presumption that Defendants knew that regulators would someday investigate or determine that Ericsson's conduct was unlawful is impermissible "[f]raud by hindsight." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

## II. THE COMPLAINT DOES *NOT* PLEAD FACTS SUPPORTING THE REQUIRED STRONG INFERENCE THAT DEFENDANTS ACTED WITH FRAUDULENT INTENT.

Plaintiff must "plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with' . . . an intent 'to deceive, manipulate, or defraud.'" *ECA*, *Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). Under the PSLRA, the inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiff must allege particularized facts alleging *either* (1) "motive and opportunity to commit fraud," *or* (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Venkataraman* v. *Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021). In so doing, Plaintiff must plead "a factual basis for scienter for each defendant; guilt by association is impermissible." *Id.*

Here, Plaintiff must plead facts giving rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). The "most straightforward" way to raise such a strong inference of corporate scienter is to "impute it from an individual who made the challenged misstatement." *Id.* But Plaintiff does not come close to meeting the PSLRA's "[e]xacting" pleading requirements with respect to any Individual Defendant. *Tellabs*, 551 U.S. at 313.

**A.  Plaintiff Does Not Allege That Any Individual Defendant Had Any "Motive and Opportunity" To Commit Fraud.**

To allege "motive and opportunity" to commit fraud, Plaintiff must allege "a concrete and personal benefit to the individual defendants resulting from the fraud." *Woodley* v. *Wood*, 2022 WL 103563, at *5 (S.D.N.Y. Jan. 11, 2022), *aff'd sub nom. Rotunno* v. *Wood*, 2022 WL 14997930 (2d Cir. Oct. 27, 2022).  Plaintiff makes no attempt to plead scienter on that basis.

**B.  Plaintiff Does Not Meet Its Burden To Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.**

Because Plaintiff does not allege that the Individual Defendants had any motive and opportunity to commit fraud, "the circumstantial evidence of conscious misbehavior must be correspondingly greater." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355.  Allegations of conscious misbehavior "generally consist[] of deliberate, illegal behavior," while recklessness requires conduct that was "highly unreasonable" and constituted "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 258 (S.D.N.Y. 2020) (citations omitted).  "In other words, the recklessness required to plead scienter is 'conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *Id.* (citation omitted).  Rather than allege that any Individual Defendant knew that any of Defendants' statements were false, Plaintiff offers a scattershot series of theories.  (*See* AC ¶¶ 246–271.)  None comes close to pleading that any Individual Defendant acted with the required "strong inference" of scienter.

**1.  Plaintiff Overstates the Supposed "Importance" of Ericsson's Iraq Business.**  The Complaint's allegation that Iraq was a "critical growth opportunit[y]" for Ericsson (AC ¶¶ 248–50) does not support the required strong inference that any Individual Defendant knew any statement's supposed falsity.  In citing the "importance" of Ericsson's Iraq business, Plaintiff

relies on a variant of the "core operations doctrine," which is sometimes invoked to "infer that a company and its senior executives have knowledge of information concerning the core operations of a business." *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *3 n.4 (2d Cir. Oct. 25, 2022). Following the PSLRA's passage, the validity of this doctrine is unsettled. *Id.* At most, it "constitutes supplemental support for alleging scienter but does not independently establish scienter," and "typically applies only where the operation in question constitutes nearly all of a company's business." *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).

Here, Plaintiff does not allege that Iraq, or even the Middle East region, constituted "nearly all" of Ericsson's business. Plaintiff claims that Ericsson obtained "$1.9 billion worth of contracts and projects" in Iraq during 2011 to 2019. (AC ¶¶ 249, 250.) But Ericsson's global revenues in the same period were approximately $265 billion (Ex. 3), and its Middle East region (of which Iraq was just one of multiple countries) accounted for less than 10 percent of its 2016 sales. (Ex. 17 at 35.) Courts have held that similar figures fall well short of the amount of a company's business needed to constitute "core operations." *See Hensley* v. *IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (subsidiary not "core operation" of parent where it "contributed only about fifteen percent" of parent's total revenue).

**2. Generalized Risks of Doing Business in Iraq Do Not Support a Strong Inference of Scienter.** The Complaint asserts that scienter can be inferred based on "terrorism risks" in Iraq. (AC ¶¶ 254–258.) But knowledge that it was dangerous to operate in Iraq—a fact known to the public at large—does not suggest that any Individual Defendant was reckless in making any of the challenged statements.[12] Similarly, that an employee of an Ericsson contractor

---

[12] This theory also could not apply to statements made after December 9, 2017, when Iraq's Prime Minister declared victory over ISIS. (Ex. 49.)

was kidnapped (AC ¶¶ 256–257) simply confirms the dangers of Iraq during that period, but does not sufficiently plead that any Individual Defendant recklessly made the challenged statements.

### 3. Purported "Confidential Witnesses" Allege Nothing That Infers Scienter.

Confidential witness allegations must "show that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Marcu*, 2020 WL 4016645, at *7. Thus, such statements are "insufficient absent some allegation that the witness communicated with the individual defendants . . . or else that the witness was privy to the individual defendants' knowledge." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 589–90 (S.D.N.Y. 2011).[13]

None of Plaintiff's "confidential witness" allegations support the required strong inference that Defendants were informed of facts rendering the challenged statements false. "CW 1" alleges that "Ericsson had a database for contracts, payments, and renewals" which "rolled up to the Central Procurement Team." (AC ¶ 253.) But CW 1 does not allege that this database showed any unlawful payments, nor even that any Individual Defendant was on the "Central Procurement Team" or reviewed the database. Moreover, "simply asserting that executives had access to extensive raw data that reflected problems . . . is insufficient to raise an inference of scienter." *Villare* v. *Abiomed, Inc.*, 2021 WL 4311749, at *23 (S.D.N.Y. Sept. 21, 2021).

Nor do the claims of "CW 2," a former Ericsson employee who allegedly reported to Ericsson's former "Head of Global Customer for the Middle East," Tarek Saadi, support the required strong inference of scienter. (AC ¶¶ 11, 68.) Plaintiff conclusorily asserts that Saadi reported to CEO Ekholm, and that Saadi "regularly engaged in corrupt practices." (AC ¶¶ 11, 105.) But Plaintiff makes no allegation that Saadi informed CEO Ekholm (or any other Individual

---

[13] *See Hou Liu* v. *Intercept Pharms., Inc.*, 2020 WL 1489831, at *17 (S.D.N.Y. Mar. 26, 2020) (confidential witnesses failed to claim that "'management level' Intercept employees knew both of the adverse event reports and approved or were aware of the allegedly misleading statements").

Defendant) of these practices or of any other information rendering their statements false. Plaintiff's failure to "describe any communications with the Defendants or provide grounds to believe they were aware of the alleged scheme" is fatal to CW 2's allegations of scienter. *Bd. of Trustees* v. *Mechel OAO*, 811 F. Supp. 2d 853, 880 (S.D.N.Y. 2011), *aff'd sub nom. Frederick* v. *Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). And Plaintiff cannot rely on a reporting arrangement alone to allege scienter. *See Fogel* v. *Wal-Mart de México SAB de CV*, 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (declining "invitation" to infer scienter based on allegation that individual defendant "supervis[ed] a culpable individual"), *aff'd*, 759 F. App'x at 18; *NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes Inc.*, 2013 WL 1188050, at *36 (D. Conn. Mar. 23, 2013) (reporting line alone insufficient to allege scienter).

**4. Ericsson's Internal Investigations and the DPA Undermine Any Inference of Scienter.** Plaintiff claims enhancements to Ericsson's "anti-corruption program" in connection with internal investigations into "corrupt practices," as well as its "obligations" under the DPA, support the required strong inference of scienter. (AC ¶¶ 260, 263, 265.) Plaintiff has it backwards: Ericsson's efforts to investigate and remediate noncompliance with laws or policies "tends to undermine any inference of scienter," *Salim*, 2021 WL 796088, at *14, because "clutching the results of [the] investigation . . . directly contradicts the rationale behind engaging in an internal investigation in the first place: the desire to uncover any improper conduct by" the Company's employees. *Sanofi*, 155 F. Supp. 3d at 406–07. Indeed, Plaintiff does not allege any specific information that any Individual Defendants learned from the internal investigations or the DPA that rendered any of their statements false.[14]

---

[14] For example, that Ericsson responded to an internal investigation by establishing an annual reporting obligation from its Chief of Compliance to its board's Audit Committee (AC ¶¶ 261–

In any event, the *2019* internal investigation plainly can have no bearing on scienter for the MEA Business Statements and Policy Statements, which were made in *2017* and *2018*. *See* Ex. 2; *Thomas* v. *Shiloh Indus., Inc.*, 2018 WL 4500867, at *6 (S.D.N.Y. Sept. 19, 2018) (scienter pleading "must identify specific contradictory information . . . available to the defendant *at the time*" of challenged statements (emphasis added)).

**5. Plaintiff Cannot Allege Scienter by Mischaracterizing CEO Ekholm's Statements.** Referring to snippets of a statement given to the press by CEO Ekholm on February 15, 2022, Plaintiff alleges that "Defendant Ekholm *admitted* to knowing of the fraud and making his own determination regarding the materiality of" the results of the Company's internal investigation into conduct in Iraq. (AC ¶ 240; *see* Dkt. 41 at 3.) Not true. In its press release, the Company reported that its internal investigation in 2019 found "serious breaches of compliance rules and the Code of Business Ethics," but that "[t]he investigation could not identify that any Ericsson employee was directly involved in financing terrorist organizations." (Ex. 46 at 2.) On the same date, CEO Ekholm reported that "[t]he materiality of our findings did not pass our threshold to make a disclosure," and "[t]hat was our judgment when we completed the investigation two years ago." (Ex. 51 at 1.)

CEO Ekholm's statement was not an "admission" of "fraud." Rather, CEO Ekholm referred to the inconclusive and imprecise findings of the internal investigation in 2019, and the Company's policies for making disclosure under the applicable Swedish laws and rules.

---

262) does not infer that CEO Ekholm, the only Individual Defendant who served on the board, acted recklessly. The Complaint alleges no well-pled facts that CEO Ekholm supposedly learned from this reporting that rendered any challenged statement false when made. *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020) ("[S]cienter cannot be inferred solely from the fact that, due to defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.").

\*     \*     \*

When all is said and done, Plaintiff relies on a series of legally insufficient allegations about misconduct in Iraq to try to meet its exacting burden of pleading particularized facts supporting the required strong inference of conscious misbehavior or recklessness. To try to obfuscate its clear-cut pleading failure, Plaintiffs' response to Defendants' pre-motion letter claimed that "taken collectively" (Dkt. 41 at 3) the Complaint's allegations strongly infer scienter. They do not. As Judge Preska reaffirmed when dismissing a complaint that similarly tried to plead scienter by bundling legally insufficient allegations, Plaintiff cannot escape the "elementary arithmetic" that "'zero plus zero' (plus zero plus zero plus zero) 'cannot equal one.'" *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at \*15 (S.D.N.Y. Mar. 30, 2021) (citation omitted).

## III.    PLAINTIFF DOES *NOT* PLEAD LOSS CAUSATION AS A MATTER OF LAW.

To plead loss causation, Plaintiff must allege that the alleged misrepresentations "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. The Court must dismiss a complaint that does "not adequately [plead] facts which, if proven, would show that [the] loss was caused by the alleged misstatements as opposed to intervening events." *Id.* at 174. As shown above (Section I), nothing alleged to have been disclosed on the Complaint's three purported corrective disclosure dates revealed that any challenged statement was false. That is fatal to loss causation. *See In re China Organic Sec. Litig.*, 2013 WL 5434637, at \*7 (S.D.N.Y. Sept. 30, 2013).

As to the first purported "corrective disclosure"—Ericsson's press release issued during trading hours on February 15, 2022 concerning its internal investigation into conduct in Iraq—the Complaint does not allege loss causation because it concedes that Ericsson's ADS price did not decline **until the following day**. AC ¶ 281; *see GE Invs.* v. *Gen. Elec. Co.*, 447 F. App'x 229, 231–32 (2d Cir. 2011) (complaint "failed to plead loss causation" where "[t]he loss allegedly

suffered did not occur until the following day" after the alleged corrective disclosure).

Plaintiff also claims that its second purported "corrective disclosure," the ICIJ's February 27, 2022 leak of excerpts of Ericsson's internal investigation report, reflected a "partial[] materializ[ation]" of the undisclosed "foreseeable risks" of corruption-related misconduct. (AC ¶ 284.) But Defendants never promised perfect compliance by its more than 100,000 employees and repeatedly cautioned investors that it "cannot fully prevent . . . violation of our Code of Business Ethics, corruption or violations of our Code of Conduct." Ex. 17 at 100; *see* Ex. 1; *Monroe Cnty. Emps. Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 357–58 (S.D.N.Y. 2014) (plaintiffs did not "plausibly allege loss causation" where purported corrective disclosure "likely represented the materialization of a known risk").

Finally, Plaintiff does not plead loss causation with respect to the third purported "corrective disclosure," Ericsson's March 2, 2022 press release stating that the DOJ had determined that Ericsson's "disclosures [to the DOJ] in connection with the DPA were insufficient." (AC ¶ 288.) Ericsson previously warned investors that "the DOJ [may] determine[] that we have violated the terms of the DPA." (Ex. 48 at 105.) Plaintiff concedes that the DOJ did not inform Ericsson of its determination until ***March 1, 2022***, and that Ericsson promptly informed investors of the DOJ's position the next day. (AC ¶¶ 280–90.) Defendants could not have disclosed "the DOJ's response" earlier because that response had not yet occurred.[15]

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice. There is no basis for yet a third complaint here.

---

[15] Because Plaintiff does not plead any primary Exchange Act violations, its Section 20(a) control person liability claim also must be dismissed. *See* 15 U.S.C. §§ 77o(a), 78t(a).

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*

Robert J. Giuffra, Jr.
David M.J. Rein
Jacob G. Singer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: 212-558-4000
Fax: 212-558-3558
giuffrar@sullcrom.com
reind@sullcrom.com
singerja@sullcrom.com

*Counsel for Defendants Telefonaktiebolaget*
*LM Ericsson, Börje Ekholm, Carl Mellander,*
*and Xavier Dedullen*

December 16, 2022