**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TELEFONAKTIEBOLAGET LM ERICSSON SECURITIES LITIGATION | No. 1:22-cv-1167-WFK-LB |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

I.     INTRODUCTION ................................................................................................... 1

II.    STATEMENT OF FACTS ...................................................................................... 4

       A.    Ericsson Used Corrupt Practices to Grow its Business Globally ........................... 5

       B.    Defendants Knowingly Engaged in Rampant Corruption in Iraq and
             Funded ISIS Terrorist Attacks on Civilians and American Soldiers ..................... 5

       C.    Defendants Misled the Market About Rampant Corruption in Iraq ...................... 6

       D.    Defendants Reveal the Corrupt Conduct in Iraq After Facing Media
             Pressure ................................................................................................................ 7

III.   LEAD PLAINTIFF HAS ADEQUATELY STATED A § 10(b) CLAIM ....................... 7

       A.    The Complaint Sufficiently Pleads Materially False and Misleading
             Statements ............................................................................................................ 8

             1.    Ericsson's Statements Touting Growth in the Middle East are
                   Actionable ................................................................................................. 8

             2.    Ericsson's Anti-Corruption Program Statements Are Actionable ................. 11

             3.    Ericsson's Statements Regarding its FCPA Violations are Actionable ......... 14

       B.    The Complaint's Allegations Support a Strong Inference of Scienter ................. 16

             1.    Defendant Ekholm's Admission Supports Scienter ....................................... 17

             2.    Investigations Support a Strong Inference of Scienter .................................. 17

             3.    The Stringent Regulatory Requirements of the DPA Support a Strong
                   Inference of Scienter ................................................................................... 19

             4.    The Confidential Witnesses Lend Further Support to a Strong
                   Inference of Scienter ................................................................................... 20

             5.    The Severity of the Dangers in Operating with ISIS Support Scienter ......... 21

       C.    The Complaint Sufficiently Alleges Loss Causation ........................................... 23

IV.    LEAD PLAINTIFF HAS ADEQUATELY STATED A § 20(a) CLAIM ....................... 25

V.    CONCLUSION ............................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Africa v. Jianpu Technology Inc.*,
    2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)........................................................................10

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................................17

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)..................................................................................12

*In re Barrick Gold Sec. Litig.*,
    2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..........................................................................8

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (D. Conn. 2021)..................................................................................19

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)..................................................................................10

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................................................18

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)...........................................................................20, 22

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006)..................................................................................22

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)...........................................................................19, 20

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)...........................................................................................16, 22

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................................8

*GE Investors v. General Electric Co.*,
    447 F. App'x 229 (2d Cir. 2011) ........................................................................................25

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...............................................................................18

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017)...............................................................8, 10

*Jun v. 500.com Ltd.*,
  2021 WL 4813192 (E.D.N.Y. Aug. 13, 2021).........................................................10

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).................................................................................23

*In re Marsh & McLennan Cos. Sec. Litig*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................................18

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)...............................................................8, 13, 14, 15

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................16, 18, 21

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................................................................17

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
  563 F. Supp. 3d 259 (S.D.N.Y. Sept. 28, 2021) ..................................................23

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).................................................................................13

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019).............................................................................12, 13

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010).................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights., Ltd.*,
  551 U.S. 308 (2007)......................................................................... 16-17, 20, 21

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)...............................................2, 9, 22

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011)..................................................................16

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......................................................................................8

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ...............................................................................................................8

United States Foreign Corrupt Practices Act of 1977 (FCPA),
  15 U.S.C. §§ 78dd-1, *et seq.* ............................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 8 ...............................................................................................................................23

Fed. R. Civ. P. 9(b) ....................................................................................................................8, 20

Lead Plaintiff Boston Retirement System ("Lead Plaintiff") submits this memorandum of law in opposition to Defendants'[1] Motion to Dismiss[2] the Amended Class Action Complaint.[3]

## I. INTRODUCTION

This action presents a simple yet significant case of securities fraud. For years, Defendants covered up known, widespread corruption in Iraq while falsely claiming to investors that it had rooted out any corruption in the Company and leading investors to believe that Ericsson's growth in that highly profitable region was the result of legitimate business practices. In reality, and unbeknownst to investors, Defendants grew the Company's presence in Iraq through corrupt and illegal practices—such as bribes, kickbacks, and slush funds—to secure lucrative telecommunications contracts there. Indeed, Defendants went so far as to knowingly pay the Islamic State of Iraq and Syria ("ISIS"), a terrorist organization responsible for the deaths of innocent civilians, just so Ericsson could continue to implement its growth strategy in the region.

Importantly, investors were focused on Ericsson's corruption at that time because the United States Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC") were actively investigating Ericsson for corrupt practices in *other* developing countries. After a years-long investigation, on December 6, 2019, the DOJ announced that Ericsson had pled guilty to a violation of the United States Foreign Corrupt Practices Act ("FCPA") due to a litany of corrupt conduct in Djibouti, China, Vietnam, Indonesia, and Kuwait, and accordingly entered into a Deferred Prosecution Agreement ("DPA") with the DOJ. As part of the agreement, Ericsson

---

[1] Defendants are Telefonaktiebolaget LM Ericsson ("Ericsson" or the "Company"), Börje Ekholm ("Ekholm"), Carl Mellander ("Mellander"), and Xavier Dedullen ("Dedullen") (the "Individual Defendants" and collectively, "Defendants").

[2] "MTD" refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss.

[3] Lead Plaintiff's pleading is referred to herein as the "Complaint" (cited as "¶__"). ECF No. 39.

paid $1 billion in fines to the government, one of the largest FCPA settlements ever. Critically, the DPA also required Defendants to disclose any corrupt or illegal practices in *other* countries.

Despite this clear and unequivocal disclosure requirement, Defendants did not disclose their corruption in Iraq even though they knew of an ongoing internal investigation confirming that rampant illegal misconduct had occurred in Iraq. Specifically, in 2018, Defendants hired the law firm Simpson Thacher & Bartlett LLP ("Simpson Thacher") to perform an internal investigation into any FCPA violations in Iraq. Simpson Thacher produced a 79-page report, which contained detailed information from 28 witness interviews and a review of 22.5 million emails, confirming that Defendants had been engaging in egregious corrupt and illegal business practices in Iraq since at least 2013 (the "Iraqi Corruption Report"). But, far from disclosing this information during the Class Period, Defendants misleadingly told investors that entering into the DPA "***marks the end of the FCPA-related investigations into Ericsson***" and falsely claimed "***we are not aware of any other follow-on investigations in any of the other countries.***"

Now, faced with a detailed complaint describing how Defendants misled investors about their corrupt business practices and funding of ISIS, Defendants try to escape liability through a myriad of hyper-technical arguments, each of which miss the point. Defendants argue that they had no duty to disclose "unadjudicated wrongdoing" to investors. While that may be the case in certain narrow circumstances, when a company puts the source of its financial success at issue, they "must disclose information concerning the source of its success, including illegal sources." *In re VEON Ltd. Sec. Litig*., 2017 WL 4162342, at *5 (S.D.N.Y. Sept. 19, 2017). Here, Defendants misled investors because they touted their growth in Iraq and the Middle East without disclosing that much of that growth was the result of corrupt business practices.

Next, Defendants claim the challenged misstatements touting Ericsson's supposedly robust protections over corrupt and illegal practices are not actionable because they are too general, i.e., immaterial puffery. However, this argument improperly ignores all relevant context. Specifically, at that time, investors cared deeply about the Company's positive statements regarding the supposed protections the Company had in place to protect from corruption in light of ongoing and highly publicized DOJ and SEC investigations into corruption in other countries that led to a $1 billion fine. To be sure, after being misled numerous times about the Company's supposedly robust anti-corruption measures, investors pointed to Ericsson's failure to follow its own anti-corruption policies as the dispositive reason for investing (or not) in the Company. For example, one analyst from Citi stated the "persistent uncertainty and claims of further wrong-doing and insufficient disclosure to authorities likely **makes Ericsson uninvestable** for many."

Finally, while Defendants knew from the Iraqi Corruption Report that Ericsson in fact had engaged in rampant corruption and funded ISIS in Iraq, Defendants argue that statements such as "*we are not aware of any other follow-on investigations in any of the other countries*" and the DPA "*marks the end of the FCPA-related investigations into Ericsson*" were not false and misleading. But it strains credulity to claim that such statements were not knowingly false and misleading given the fact that the Company knew of its corrupt and illegal practices in Iraq and failed to disclose such information to investors.

With respect to scienter, Defendants isolate the Complaint's allegations of scienter and claim Defendants did not know about the rampant corruption in Iraq. However, this runs afoul of the Supreme Court's clear instructions that allegations of scienter must be considered holistically. When viewed holistically, the Complaint's allegations—including that Defendant Ekholm's admitted that he knew about Ericsson's illegal conduct in Iraq as early as 2018, the critical and

highly publicized nature of the DOJ and SEC investigations, the importance of the Company's business in Iraq, and corroborative CW allegations detailing the flow of information regarding Ericsson's corruption—all support a strong inference of scienter that is at least as plausible as any other inference that can be drawn.

Finally, Defendants' challenge to loss causation also fails. The truth regarding Ericsson's corruption in Iraq was revealed through three partial corrective disclosures, each of which revealed new information to the market that caused the Company's American Depository Shares ("ADS") to plummet. First, on February 15, 2022, Ericsson was forced to issue a press release after a group of journalists obtained a copy of the Iraqi Corruption Report. On that day, Defendants revealed that the Company identified "[u]nusual expense claims in Iraq" which resulted in the internal investigation. Defendants claim this disclosure cannot be a corrective because the stock price did not drop until the following day. However, the Complaint alleges that investors attributed the stock drop to the disclosure about Iraq and reacted within 24 hours as they absorbed the information, causing Ericsson's ADS price to drop by over 13%. Such facts are more than sufficient to establish loss causation at this stage.

Defendants' attacks on the February 27, 2022 and March 2, 2022 disclosure dates fare no better. Defendants argue that these final two disclosures were not corrective because they previously warned investors of corruption-related risks and risks of violating their DPA. However, this argument ignores the fact that the disclosures revealed new information and details regarding previously undisclosed corruptive practices that the Company never once warned investors about.

For all these reasons, the Court should reject Defendants' motion to dismiss in its entirety.

## II.    STATEMENT OF FACTS

Ericsson is a Swedish multinational telecommunications company that develops, sells, and manages telecommunications infrastructure, including hardware, software, and information

technology services.  ¶¶69-71.  As the world's telecommunications infrastructure developed, opportunities to obtain a mobile broadband infrastructure contract greatly decreased.  *Id*. However, a new opportunity presented itself after the war in Iraq.  ¶¶72, 79.  Once the U.S. exited the country, Iraq presented itself as one of the last countries lacking a mobile broadband infrastructure and therefore a massive opportunity for Ericsson.  *Id*.  Indeed, experts projected that there were approximately $2 billion worth of telecommunications projects available in Iraq. *Id.*

A.    **Ericsson Used Corrupt Practices to Grow its Business Globally**

Ericsson had significant experience competing for, obtaining, and fulfilling global contracts of this kind because Ericsson's business was dependent on growth.  ¶83.  Unbeknownst to investors and the general public, Ericsson employed a multi-layered illegal scheme to secure contracts and generate revenues.  *Id*.  In 2019, the DOJ confirmed the existence of Ericsson's multi-layered illegal scheme to secure contracts and generate revenues in countries like Djibouti, Kuwait, China, Indonesia, and Vietnam.  ¶¶83-84.  After a years-long investigation into Ericsson's illegal business practices, the DOJ published its findings, including that Ericsson: (i) engaged subsidiaries through sham contracts to deliver millions of dollars in bribes to government officials in exchange for telecommunications contracts; (ii) hired third parties with multi-million dollar payments to act as "consultants" really responsible for managing illegal slush funds; and (iii) utilized illegal slush funds to illegally fix project bidding in Ericsson's favor.  ¶¶85-91.  Ericsson pled guilty to this rampant corruption and ultimately paid a $1 billion fine—the largest FCPA settlement in history.  ¶¶85-145.

B.    **Defendants Knowingly Engaged in Rampant Corruption in Iraq and Funded ISIS Terrorist Attacks on Civilians and American Soldiers**

Unbeknownst to investors, Ericsson employed the same multi-layered illegal scheme to secure growth opportunities in Iraq.  ¶98.  According the Iraqi Corruption Report, the Company

was engaged in egregious corrupt and illegal business practices in Iraq since at least 2013. *Id.* The 79-page report, commissioned by Ericsson executives, included information from a review of 22.5 million emails and 28 witness interviews. ¶99. The Iraqi Corruption Report confirmed that Ericsson won several major contracts with Iraq's main mobile carriers through the use of slush funds, inflated invoices, sham contracts, bogus settlement agreements, fraudulent financial statements, kickbacks, and bribes. ¶99-101. Worse, in addition to these corrupt practices, Ericsson also chose to pay ISIS to gain access to favorable transportation routes and cities throughout Iraq in order to facilitate its growth in the region. ¶112.

**C.    Defendants Misled the Market About Rampant Corruption in Iraq**

Even though many of the Company's most important contracts in Iraq were won through corrupt practices, including bribery and kickbacks, Defendants made repeated statements misleading investors about the driving forces behind Ericsson's growth in the Middle East. ¶¶127-132. For example, Defendants told investors that "***Sales in the Middle East showed growth despite a continued challenging macroeconomic environment***" and explained that they "***see growth in [the] Middle East,***" due to "***many contributing parts.***" ¶¶201, 205.

Similarly, Defendants misleadingly touted to investors Ericsson's purportedly robust compliance and anti-corruption protocols. ¶¶207-14. For example, Defendants told investors that "***Ericsson has a zero tolerance approach to corruption expressed in the Company's Code of Business Ethics.***" ¶211. Moreover, even after Ericsson pled guilty to FCPA violations in Djibouti, Kuwait, China, Indonesia, and Vietnam, Defendants continued making misleading statements claiming that there were no other corruption investigations ongoing despite knowing the opposite was true. ¶¶215-234. For example, on December 6, 2019, Defendants issued a press release reassuring investors that "***[t]he resolution marks the end of the FCPA-related investigations into Ericsson.***" ¶216. Then, on December 7, 2019, Ekholm falsely reassured investors that "[t]his

settlement ***puts an end*** to a long and wide-ranging process," and Dedullen falsely represented that "***we are not aware of any other follow-on investigations in any of the other countries***." ¶¶222, 224.

### D. Defendants Reveal the Corrupt Conduct in Iraq After Facing Media Pressure

Defendants concealed their fraud in Iraq from the market until a group of journalists at the ICIJ obtained a leaked copy of the Iraqi Corruption Report. ¶165. After confirming the veracity of the report's findings, ICIJ sent Defendant Ekholm a list of questions concerning the Company's corrupt practices in Iraq. ¶166. Realizing that the truth about the rampant corruption in Iraq was about to be revealed, Defendants issued a press release to get ahead of the news.

As a result, on February 15, 2022, Defendants issued a press release revealing that "[u]nusual expense claims in Iraq, dating back to 2018," had been identified which resulted in Ericsson's internal investigation into its business practices in Iraq. ¶168. As investors began absorbing this shocking information, the price of Ericsson's ADS over 11.57%, or $1.44, to close at $11.01 per ADS on February 16, 2022. ¶237.

The truth was further revealed in part on February 27, 2022, when ICIJ published an article revealing further details about the breadth and severity of Ericsson's misconduct in Iraq, including excerpts from the Iraqi Corruption Report. ¶¶284-287. As a result of this news, Ericsson's ADS fell another 8.3%, or $0.84, to close at $9.28 on February 28, 2022 (the next trading day). *Id*.

The full truth was finally revealed on March 2, 2022. ¶244. On that day, Ericsson informed investors that the DOJ determined Ericsson was in breach of its DPA due to its failure to fully disclose information about the Company's corrupt practices in Iraq. ¶290. On this news, Ericsson's ADS price fell an additional 8.35%, or $0.74, to close at $8.12 on March 2, 2022. ¶292.

## III. LEAD PLAINTIFF HAS ADEQUATELY STATED A § 10(b) CLAIM

To state a claim for securities fraud under Section 10(b), plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *5 (S.D.N.Y. Apr. 1, 2015). On a motion to dismiss, a Court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003) (citation omitted). The Complaint's allegations surpass these standards.

### A. The Complaint Sufficiently Pleads Materially False and Misleading Statements

Under the PSLRA and Rule 9(b), falsity is alleged if the plaintiff "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). To assess whether falsity is adequately alleged, the court must review defendants' statements in context and taken together. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014). It is inappropriate to resolve such disputes on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that ***reasonable minds could not differ*** on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).

### 1. Ericsson's Statements Touting Growth in the Middle East are Actionable

Defendants misled investors about the Company's growth in the Middle East. ¶¶195, 201, 203, 205. For example, Defendants misleadingly told investors that "***[s]ales in the Middle East showed growth despite a continued challenging macroeconomic environment***." ¶205. Similarly, Ekholm explained that the Company "***s[aw] growth in [the] Middle East,***" due to "***many***

***contributing parts***." ¶201.  These statements were false and misleading because they led investors to believe that Ericsson's operations in the Middle East were legitimate when, in reality, the Company's growth was attributable to its corrupt business practices in Iraq.

Defendants argue that their statements about the strength of Ericsson's business in the Middle East are not actionable because the existence of "unadjudicated wrongdoing" does not trigger a duty to disclose.  MTD at 11-12.  Defendants' argument misconstrues the Complaint's allegations.  The Complaint does not allege that Defendants had a duty to disclose their wrongdoing in a vacuum.  Rather, Defendants had a duty to disclose the misconduct because their statements put the source of their supposed success, or growth, in the Middle East at issue when that success was attributable to illegal and corrupt practices.

It is well-settled that companies must "disclose uncharged criminal conduct" where, like here, "the failure to do so would make other disclosures materially misleading."[4]  *VEON*, 2017 WL 4162342, at *5.  Indeed, courts routinely hold that defendants "must disclose information concerning the source of its success, including illegal sources" regardless of whether the wrongdoing was adjudicated.  *Id.*

*Veon* and *Braskem* are instructive.  In *Veon*, the defendants' statements attributed increases in "mobile subscribers and revenues" to "sales and marketing efforts in Uzbekistan."  *Id*. at 6.  The court found these statements actionable because they omitted the fact that this growth was, in part, caused by the company's political bribes.  *Id*.  Similarly, the court in *Braskem* found a duty to disclose wrongdoing where defendants' statements concerning its pricing "omitted the fact that these prices had been set as a result of a side agreement enabled by Braskem's payment of

---

[4] Internal quotations omitted throughout.

substantial bribes to Petrobas and to Brazilian political leaders." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017).

This case is no different. For example, on October 20, 2017, Defendants falsely attributed Ericsson's business "***growth in the Middle East and Africa***" to "***multiple customers***" without mentioning the bribery or corrupt practices employed to establish relationships with those customers. ¶¶196-99, 201, 205. Likewise, Defendant Ekholm stated that growth or "***momentum***" in the Middle East stemmed, in part, from "***investments in R&D***" while omitting the bribery and corruption occurring in Iraq. ¶¶196-99, 203. As a result, investors were left completely in the dark about the fact that Ericsson's growth in the Middle East was the result of corrupt practices.

Contrary to Defendants' arguments, such statements were material to investors.[5] Ericsson's ongoing success was known to be directly tied to the Company's ability to grow and expand mobile broadband infrastructure in the Middle East, and specifically in Iraq where there was still ample expansion opportunity. ¶¶71-72, 80-83. In any event, Defendants' materiality arguments are reserved for the trier of fact. *Inv. Tech.*, 251 F. Supp. 3d at 609 (determining whether statement is materially false and misleading "is generally a question reserved for the trier of fact").

Defendants' other arguments similarly fail. First, Defendants' purported risk disclosures do not shield them from liability. MTD at 13-14. In the Second Circuit, "[v]ague disclosures of general risks will not protect defendants from liability. Instead, the relevant cautionary language

---

[5] The cases cited by Defendants in support of their materiality argument are inapposite. MTD at 11-13. In *Africa v. Jianpu Technology Inc.*, the complaint failed to demonstrate that "a material source of [the company's] success is the use of improper or illegal business practices." 2022 WL 4537973, at *7 (S.D.N.Y. Sept. 28, 2022). Here, the Complaint alleges particularized facts that Ericsson obtained critical broadband contracts with Iraq's largest mobile providers Asiacell, Korek, and Zain Iraq. ¶¶79-83. Likewise, *Jun v. 500.com Ltd.*, does not apply because there, the plaintiffs "d[id] not allege nor argue that Defendants made any false or misleading statements . . . relating to the bribery scheme." 2021 WL 4813192, at *19 (E.D.N.Y. Aug. 13, 2021).

must be prominent and specific, and must directly address exactly the risk that plaintiffs claim was not disclosed." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013). Here, not even one of Defendants' cited risk disclosures makes any mention of Iraq or ISIS. *See* MTD Exs. 1-52. Further, these disclosures fail to set forth any information revealing the extent of Ericsson's corrupt conduct. Simply put, these limited, vague disclosures were insufficient to put investors on notice that Ericsson's growth in Iraq was attributable to Ericsson's illegal bribes and payments to ISIS.[6] *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) ("Cautionary language must be extensive and specific . . . [t]o suffice, the cautionary statements must be substantive and tailored").[7]

### 2. Ericsson's Anti-Corruption Program Statements Are Actionable

Defendants also misled investors about Ericsson's purportedly robust anti-corruption program. ¶¶208-09, 211, 213. For example, on March 27, 2018, Defendants told investors that "***Ericsson has a zero tolerance approach to corruption expressed in the Company's Code of Business Ethics.***" ¶211. Critically, Defendants' statements about its anti-corruption program included significant detail about "***internal rules***" "***steering documents***" "***policies and directives***" and "***instructions***" in order assuage investors' concerns and "***to ensure compliance with legal and regulatory requirements.***" ¶208.

Defendants challenge these misstatements concerning Ericsson's robust anti-corruption

---

[6] Indeed, investors were clearly unaware of Defendants' illegal conduct, as they expressed shock when the truth was revealed. ¶¶175, 180, 185.

[7] Defendants' reference to allegedly declining sales in the Middle East between 2016 and 2018 is a red herring. MTD at 11. The falsity of the misstatements here does not turn on the Company's positive or negative rate of growth. Rather, their statements were misleading because Defendants attributed their success in the Middle East and Iraq to legitimate business reasons while omitting the true reason was corruption and illegal practices.

program as "too general" to be actionable.  MTD at 14-16.  But this argument overlooks the context and detailed substance of the alleged misstatements.  *See* ¶¶207-215.  Defendants' detailed statements regarding its supposedly robust "***zero tolerance***" anti-corruption program came at a time when the Company was undergoing a highly publicized DOJ and SEC investigation into the Company's corruption in other countries.  As a result, investors cared deeply about the Company's exposure to corruption throughout the world.   Indeed, Defendants' repeated failure to adhere to its supposedly robust anti-corruption formed the basis of some investors' decision to invest in the company at all—the very definition of materiality.[8]   *See* ¶185 (Citi Analyst: "the persistent uncertainty and claims of further wrong-doing and insufficient disclosure to authorities likely **makes Ericsson uninvestable** for many").  Given this context, Defendants' statements about their purportedly robust anti-corruption program were material.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) ("while challenged statements are mere puffery when viewed in isolation, the context in which they were made could lead a reasonable investor to rely on them as reflective of the true state of affairs at the [c]ompany.").

Nonetheless, Defendants assert that the Complaint's allegations are no different than the allegations in *Singh v. Cigna Corp.*, 918 F.3d 57, 60-61 (2d Cir. 2019).  However, the compliance statements in *Cigna* merely referred to general "policies and procedures" intended to "comply with applicable requirements."  *Id.*  Here, the alleged statements were far more detailed and served as confident assurances that investors relied on.  Indeed, while facing intense regulatory scrutiny, from both the DOJ and SEC, Defendants explicitly laid out the components of the purportedly enhanced Code of Business Ethics, including: (i) the purpose of the Code; (ii) the format of the

---

[8] This does not even address the fact that investors would not have invested in a company that was funding ISIS, a terrorist organization that has killed innocent people, including women and children.

Code; (iii) the process used to train employees about its terms; and (iv) the processes used for carrying out the terms of the Code. Defendants' own disclosures admit they contained "detailed guidelines, for example about appropriate levels of gifts and entertainment," that went beyond the mere statements of compliance at issue in *Cigna*. ¶211; *see JinkoSolar*, 761 F.3d at 251 (detailed descriptions of compliance efforts "gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations . . . investors would be misled by a statement . . . if in fact [they] . . . were then failing to prevent substantial violations" of applicable regulations).

Defendants argue that their compliance statements are not actionable because they warned of the risk that Ericsson might not follow their own anti-corruption program and that they "did not promise perfect compliance." MTD at 15-16.[9] However, "[c]autionary words about future risk cannot insulate from liability" where, like here, "the risk has [already] transpired." *Rombach*, 355 F.3d at 173. Here, Defendants' "failure to disclose then-ongoing and serious" risks of violation "would cause a reasonable investor to make an overly optimistic assessment of the risk." *Jinkosolar*, 761 F.3d at 251. Likewise, such omissions are material where "a reasonable investor could conclude that a substantial non-compliance would constitute a substantial threat to earnings, if not to the entire venture." *Id*. at 252.

Finally, a finding of wrongdoing is not required to establish that defendants had a duty to disclose for this category of statements. "Even when there is no existing independent duty to

---

[9] The fact that Defendants disclosed their receipt of "hundreds of employee reports of possible misconduct through its compliance hotline" actually bolsters the misleading nature of Defendants' misstatements and misrepresentations. MTD at 16. This statement would lead reasonable investors to believe that the compliance enhancements were functioning properly and would lead to resolution. In truth, pervasive corruption continued despite the fact that "hundreds of employee reports" were made.

disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *JinkoSolar*, 761 F.3d at 250. Because Ericsson elected to "speak" on the issue of anti-corruption and FCPA compliance, the Defendants had a duty to disclose the full, known truth.

### 3. Ericsson's Statements Regarding its FCPA Violations are Actionable

Defendants made a series of false and misleading statements after Ericsson pled guilty to FCPA violations and entered into the DPA with the DOJ. ¶¶151-164; 215-234. For example, on December 6, 2019, Defendants issued a press release reassuring investors that "*[t]he resolution marks the end of the FCPA-related investigations into Ericsson*." ¶216. Then, during the Company's earnings call the next day, Ekholm falsely reassured investors that "this settlement *puts an end* to a long and wide-ranging process," and Dedullen falsely represented that "*we are not aware of any other follow-on investigations into any of the other countries*." ¶¶222, 224. These statements were false and misleading because they led investors to believe that Ericsson was not at risk of any further DOJ investigations. However, Defendants had already hired Simpson Thacher to investigate similar corruption in Iraq. Indeed, Simpson Thacher provided its **final** 79-page report to Defendants on December 11, 2019, **just four days** after Defendants' false and misleading statements reassuring investors that there were no similar investigations. Even if "literally true," affirmative statements may be rendered false by what they fail to disclose. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016).

Defendants argue that Dedullen's statement was not false or misleading because it was in response to an analyst question about investigations by *regulators*. This hyper-technical argument is misguided and overlooks the fact that Dedullen's statements created the misleading impression that the Company was not aware of **any** investigations into similar misconduct, when in reality, Dedullen knew of an extremely similar investigation that found the same type of corrupt practices and even worse, the funding of ISIS. This investigation was requested by Ericsson—and likely

Dedullen in particular, as he was the Chief Legal Officer—after the Company discovered "suspicious payments" in Iraq in 2018. Moreover, Defendant Ekholm admitted that they were looking into Ericsson's corrupt business practices as early as 2018. ¶240. Thus, Dedullen and Ekholm would have been aware of illegal activity as early as 2018, if not earlier. It strains credulity to claim that Ekholm and Dedullen had no idea about an internal investigation which Ericsson commissioned and that included information from 28 witness interviews and 22.5 million emails.

Defendants also continued to mislead investors about purported improvements to Ericsson's Ethics and Compliance program following the FCPA investigations. ¶220. Defendants argue that "no reasonable investor could have understood Defendants' descriptions of [i]mprovements to Ericsson's Ethics and Compliance program . . . [as] assurances of actual compliance." MTD at 17. Not so. The Complaint sets forth specific allegations indicating that investors did understand Defendants' statements, touting its anti-corruption program enhancements, as "assurances of adequate transparency and compliance monitoring," given the context. ¶¶48, 169, 235, 238, 241. Specifically, Defendants touted certain of Ericsson's anti-corruption enhancements *after* announcing the DPA and thus gave investors the misleading impression that Defendants were in compliance with their purportedly improved anti-corruption program and the DPA, and that no further risk of DOJ penalties existed. *Jinkosolar*, 761 F.3d at 251 (finding compliance statements actionable where they caused "reasonable investor[s] to make an overly optimistic assessment of the risk.").

Defendants then argue that their misstatement in ¶222 that "***[w]e're now finally able to move forward***" is puffery or forward-looking. MTD at 16-17. The Court should reject this argument because "comforting [oral] statements" about "compliance" can be actionable given their context. *Jinkosolar*, 761 F.3d at 251. Specifically, where a company represents in detail that it is

compliant with applicable regulations when it is in fact ***not*** compliant, such statements are actionable. *See id.*; *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 573 (S.D.N.Y. 2011) (rejecting puffery argument because statement that company was on "sound financial footing" was false when paired with "specific statements of fact regarding Vivendi's resources and financial condition" such as "zero net debt" and "free cash flow"). Here, Defendants led investors to believe all investigations were behind them when in fact, an internal investigation finding corrupt practices in Iraq including the funding of ISIS was nearly completed—information that, if disclosed, would not allow Ericsson to "move forward."

Finally, Defendants argue, in a footnote, that these misstatements are shielded from liability under the PSLRA's safe harbor for forward looking statements. Contrary to Defendants' arguments, Lead Plaintiff does allege actual knowledge of the falsity of the statements when made. As discussed in detail below, Defendants made these statements as Simpson Thacher finalized the Iraqi Corruption Report concerning the investigation into business corruption in Iraq which was published only four days later. *See* Section III(B).

### B. The Complaint's Allegations Support a Strong Inference of Scienter

Scienter may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). To demonstrate recklessness, Lead Plaintiff must demonstrate that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

In assessing scienter, the Court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights., Ltd.*, 551

U.S. 308, 323 (2007). Lead Plaintiff need not present "irrefutable" or "smoking gun" evidence in order to meet this pleading standard. *Id.* at 323-24. Instead, Lead Plaintiff is only required to present allegations of scienter that are at least as compelling as any competing inference. *Id.* Thus, a "tie . . . goes to the plaintiff." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019). Here, the Complaint successfully sets forth strong evidence of conscious misbehavior and recklessness sufficient to establish each defendant's scienter. [10]

### 1. Defendant Ekholm's Admission Supports Scienter

The ICIJ article, published on February 27, 2022, reported that Ekholm was aware of the internal investigation as early as 2018 and quoted him stating that: "the materiality of our findings did not pass our threshold to make a disclosure." ¶¶177-178; *see also* MTD Ex. 51 (February 15, 2022 article quoting Defendant Ekholm stating that Ericsson "completed the investigation two years ago."). Thus, Ekholm **knew** of illegal conduct as early as 2018 but made the **conscious decision** to not disclose this information to investors. Defendants try to walk back this unequivocal statement by muddying the waters with references to a other statements and caveats. MTD at 23. This attempt is unpersuasive. Simply put, Defendant Ekholm's statement admitting knowledge of the underlying conduct establishes Ekholm's scienter on its own, as early as 2018, if not earlier. A similar inference can be made for Dedullen, who was Ericsson's Chief Legal Officer.

### 2. Investigations Support a Strong Inference of Scienter

Contrary to Defendants' argument and cited cases, MTD at 22-23, courts in the Second Circuit make clear that government investigations can contribute to an inference of scienter. *See*

---

[10] Motive is not required to establish scienter. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *Tellabs*, 551 U.S. at 325 ("absence of a motive . . . is not fatal."). The circumstantial evidence of conscious misbehavior or recklessness alleged here are independently sufficient to demonstrate scienter. *See ATSI*, 493 F.3d at 99.

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y.2008) (DOJ investigation added to inference of scienter).

The initiation of the DOJ and SEC investigations in 2016 are also strong indicia of scienter. After the launch of these investigations into Ericsson's corrupt practices and knowing their results Defendants touted compliance reforms and anti-corruption enhancements. *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y 2006) (holding that after a government investigation, an executive's statements promoting company's business practices which were followed by discovery of misconduct constituted strong circumstantial evidence of the executive's scienter).

Similarly, Ericsson's own internal investigation, conducted by Simpson Thacher, lends further support to finding a strong inference of scienter. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F. 3d at 309. The 79-page Iraqi Corruption Report, completed on December 11, 2019,[11] confirmed countless instances of fraud, corruption, and illegal conduct that had been committed by Ericsson for years. ¶270. The Complaint clearly sets forth the several reasons for which Defendants would have been aware of the Iraqi Corruption Report's contents, including the fact that Defendants commissioned the Iraqi Corruption Report and that the Chief

---

[11] While Lead Plaintiff does not know the precise date on which the Iraqi Corruption Report was commissioned, it is reasonable to assume that a 79-page report (detailing 28 witness interviews and 22.5 million emails) took significant time to prepare. Therefore, the investigation and report would have been in progress long before the December 7, 2019 earnings call, and an inference can be drawn that Dedullen, as Chief Legal Officer, would have known much earlier based on the volume and size of the investigation.

Compliance Officer reported directly to the Board of Directors and was responsible for providing updates. ¶271. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 134 (D. Conn. 2021) (finding strong inference of scienter where plaintiffs "identified the [internal investigation] report," and specified who prepared it and when it was prepared, outside counsel's conclusion concerning unethical conduct, and "facts sufficient to support an inference that the information in the confidential report submitted by outside counsel was reasonably available to [defendants]").

### 3. The Stringent Regulatory Requirements of the DPA Support a Strong Inference of Scienter

Ericsson's entry into the DPA with the DOJ, on December 6, 2019, was tied to stringent, ongoing reporting obligations which, if not followed, could result in further criminal penalties for Defendants. ¶264. Thus, it is reasonable to infer that Defendants knew of conduct that ran afoul of their agreement.

With respect to the obligations imposed on Defendants by the DPA, Defendants rely on the same flawed arguments addressed in Section III(B)(2). MTD at 22. Their arguments ignore the fact that affirmative findings of misconduct support an inference of scienter in similar contexts. For example, *In re Eletrobras Sec. Litig.*, the court found that defendants' "positions within the Company . . . bolster[ed] the circumstantial evidence supporting an inference of scienter" where an officer of the company had been found to have committed crimes "and participation in a criminal organization, with other former officers [also] formally charged." 245 F. Supp. 3d 450, 468-69 (S.D.N.Y. 2017). Similarly, here, the Individual Defendants held senior executive positions when Ericsson entered into the DPA, pled guilty to corruption, and paid a **one billion dollar** fine—one of the largest FCPA settlements in history—for their corrupt practices in other countries. As in *Electrobas*, the Individual Defendants "were allegedly aware of material weaknesses in internal controls" that supported "a strong inference" that the Defendants "knew

facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor." *Id.*

### 4. The Confidential Witnesses Lend Further Support to a Strong Inference of Scienter

In direct contravention of the Supreme Court's instruction in *Tellabs*, 551 U.S. at 323, Defendants' Motion isolates the CW allegations and argues that, standing alone, the CW allegations are insufficient to support a strong inference of scienter. "As a general matter, courts consider and take as true the statements of [confidential] witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405 (S.D.N.Y. 2020) (citing *Novak*, 216 F.3d at 314). To rely on confidential witness allegations, plaintiffs need only describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 405-406.

Here, the Complaint described the CWs with sufficient particularity. CW 1 worked in the Middle East and Africa region in the Procurement Department. ¶67. His allegations explain that Ericsson's contracts in Iraq made their way to Ericsson's headquarters in Sweden, and that Ericsson had a database for contracts, payments, and renewals, which Defendants had access to. ¶253. These facts, *paired with* the significant danger of doing business in Iraq and the highly lucrative business opportunities there, support an inference that the Defendants were monitoring Iraq's contracts, payments, and renewals or were reckless in failing to know this information. Defendants question whether the databases contained unlawful payments, but that is an inference that must be drawn in Lead Plaintiff's favor at this stage. ¶323 ("Ericsson fraudulently recorded its expenses in Ericsson's books and records as part of is illegal, multi-layered scheme").

The Complaint also describes CW 2 with sufficient particularity. CW 2, a former Director of Business Management for the Middle East at Ericsson who reported directly to Tarek Saadi, provides several examples of Saadi's corrupt practices. ¶105 ("CW 2, who reported to Saadi, confirmed that Saadi regularly engaged in corrupt practices. According to CW 2, invoices could be inflated to mask kickback payments to subcontractors and intermediaries. CW 2 added that payments were normal behavior and that Ericsson was not blind to it."). Taken in context, these allegations support a strong inference of scienter and bolster the Complaint's allegations that: (i) Ericsson knowingly employed third party subcontractors for illegal purposes; and (ii) Defendants knew or were reckless in not knowing that Saadi was engaging in illegal conduct in Iraq.

At bottom, Defendants seek to impose more stringent pleading requirements by requiring the CWs to provide proof of Defendants' actual knowledge of falsity. This requirement goes far beyond the actual standard for crediting CWs and would run afoul of the Supreme Court's holding that Lead Plaintiff need not present a "smoking gun" to establish scienter. *Tellabs*, 551 U.S. at 324; *Novak*, 216 F.3d at 314 (plaintiffs may rely on CWs "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

### 5. The Severity of the Dangers in Operating with ISIS Support Scienter

Because the dangers of operating in ISIS-controlled regions were so severe, Defendants knew or were reckless in not knowing that continued operations in ISIS-controlled Iraq resulted in corrupt practices and the funding of terrorists. ¶¶254-258. Defendants' argument that the severe risks of conducting business in Iraq are too "generalized" to support an inference of scienter misses the forest for the trees. MTD at 20-21.

As Defendants admit, it was well-known that ISIS presence made it dangerous to operate in Iraq. MTD at 20.[12] Indeed, employees in Iraq even pled with project leader, Roger Antoun, to cease all operations in Iraq because of the severe and life-threatening dangers they faced. Antoun elevated these concerns to senior management, including Tom Nygren. In or about 2014, Nygren, then vice president and general counsel for Ericsson in the Middle East, recommended to his supervisors that Ericsson cease its operations in Mosul because of the terrorist threat, which was a severe macroeconomic risk. ¶120-21, 256. Despite these clear warnings and Defendants' admission that they were aware of the "challenging macroeconomic environment" in Iraq, Defendants chose to continue operating in the ISIS-controlled regions. Moreover, while there were legitimate ways for Ericsson to travel through and operate in these areas, unbeknownst to investors, Defendants instead chose to make payments to ISIS. ¶256. At a minimum, Defendants were on notice that their operation in Iraq was dangerous and susceptible to involvement with ISIS. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) ("'[a]n egregious refusal to see the obvious, or to investigate the doubtful" may also give rise to an inference of recklessness.); *VEON*, 2017 WL 4162342, at *11 (finding cogent inference of scienter where "time and again, board members, executives, and employees" were made aware of significant corruption, but no action was taken).

Defendants' one sentence argument concerning ISIS's kidnapping of Affan Akram similarly glosses over the obvious point. MTD at 20-21. Akram was kidnapped when he carried

---

[12] Defendants attempt to combat Lead Plaintiff's well-pled scienter allegations with outside facts—that on December 9, 2017 "Iraq's Prime Minister declared victory over ISIS." MTD at 20 n. 12. The Prime Minister's presumably politically motivated statement is of no moment. The Complaint expressly states that "[d]uring the Class Period, ISIS continued to control certain regions in Iraq and Syria." ¶78. At this early stage, the Court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Blanford*, 794 F.3d at 307.

out Ericsson's directive to deliver correspondence to ISIS officials. This supports a strong inference of scienter for at least two reasons: (i) it is direct evidence of Ericsson's decisions to engage with terrorists—a violation of the FCPA; and (ii) any kidnapping by ISIS would undoubtedly have been reported to the highest levels of the company, as kidnappings of employees are not common occurrences for companies like Ericsson. *See* ¶257. [13]

When viewed holistically, the Complaint pleads a strong inference of scienter.

### C. The Complaint Sufficiently Alleges Loss Causation

Lead Plaintiff's burden of pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). "The complaint must simply give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id*. At the motion to dismiss stage, plaintiffs "need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are issues of proof reserved for the merits stage of the case." *In re Omega Healthcare Invs., Inc. Sec. Litig*., 563 F. Supp. 3d 259, 266 (S.D.N.Y. Sept. 28, 2021) (citing *Loreley*, 797 F.3d at 187, 189). Lead Plaintiff's loss causation allegations are subject to the less stringent Rule 8 pleading requirements. *Id*. at 266 n.7.

The Complaint's allegations meet, and surpass, the applicable Rule 8 pleading standard. Lead Plaintiff alleges that Defendants' statements touting Ericsson's growth in the Middle East,

---

[13] The Complaint's core operations allegations also support an inference of scienter. Iraq presented Ericsson with a unique growth opportunity unavailable elsewhere in the world. Moreover, considering the Company was just fined one billion dollars, Defendants knew, or should have known, of corruption in Iraq given the risk of additional large fines.

its Anti-Corruption Program, and reassurances in the wake of the DPA, caused investor losses when they revealed: (i) on February 15, 2022 that Ericsson's business in Iraq was founded upon rampant corruption; (ii) on February 27, 2022, when details about the breadth and extent of Ericsson's corrupt practices and multi-layered illegal scheme; and (iii) the full fraud on March 2, 2022, when Defendants announced that the DOJ determined Ericsson breached the DPA. As a result, Ericsson's ADSs lost 28.17% of their value.

Defendants first argue that the Complaint does not allege loss causation as to the February 15, 2022 partial corrective disclosure because Ericsson's ADS price did not decline until the following day. MTD at 24. However, this argument fails for multiple reasons. *First*, while the press release was released during the afternoon on February 15, 2022, the market still absorbed the partially corrective information over the course of the next 24 hours, which saw the price of Ericsson shares declined from $12.42 at the time of the disclosure to $10.81 at the same time on February 16, 2022—a statistically significant decline of approximately 13%. *Second*, the Complaint sufficiently alleges that analysts attributed the information released on February 15, 2022 (and the subsequent articles released thereafter) as the *cause* for the stock decline that occurred on February 16, 2022. *See* ¶172 (Bloomberg First Word: "Ericsson Plummets; Analysts Say Report on ISIS Erodes Trust" in which Bloomberg reported that Ericsson had a 15% drop in the wake of statements about potential ISIS ties, and *Dow Jones Institutional News Feed:* "Ericsson Shares Slump After Acknowledging Past Compliance Breaches in Iraq"). Notably, Defendants do not point to any other possible cause for the stock drop on February 16, 2022. Nor

could they because no unrelated, intervening news about the Company was released during that time frame.[14]

Defendants next argue that the February 27, 2022 disclosure cannot be "corrective" because they "never promised perfect compliance" and warned of the risks of corruption-related misconduct. MTD at 25. However, this argument misses the mark. Ericsson's purported warnings failed to put investors on notice of the specific new facts revealed on that date—namely the facts regarding the extent and breadth of the corruption in Iraq and the other shocking details revealed in the ICIJ article. The disclosure of such information adequately establishes loss causation.

Finally, Defendants misconstrue Lead Plaintiff's allegations regarding the March 2, 2022 corrective disclosure. The Complaint does not allege that investors experienced losses because they were unaware of DOJ action sooner. Instead, the Complaint clearly states that investors' losses stemmed from Defendants' decision to conceal rampant corruption in Iraq for decades. Defendants should have anticipated that the DOJ action would be inevitable if the illegal conduct in Iraq came to light. This failure is the central cause of the March 2, 2022 losses.

## IV.     LEAD PLAINTIFF HAS ADEQUATELY STATED A § 20(a) CLAIM

Because Lead Plaintiff states a § 10(b) claim, the Court should sustain the § 20(a) claim.

## V.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety. If the Court grants the Motion, Lead Plaintiff respectfully requests the opportunity to amend the Complaint to cure any deficiency.

---

[14] For this reason, *GE Investors v. General Electric Co.*, 447 F. App'x 229, 232 (2d Cir. 2011) is distinguishable. There, the court found that loss causation was not alleged because new and intervening information was released the very next day that caused the stock price to drop. *Id.*

Dated: February 10, 2023

**LABATON SUCHAROW LLP**

*/s/ Michael P. Canty*
Michael P. Canty
Thomas G. Hoffman, Jr.
James T. Christie
Danielle Izzo
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:  mcanty@labaton.com
         thoffman@labaton.com
         jchristie@labaton.com
         dizzo@labaton.com

*Lead Counsel for Lead Plaintiff Boston Retirement
System and the Proposed Class*