# Exhibit 53



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 2, 2023

**BY ECF**

The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   <u>United States</u> v. <u>Telefonaktiebolaget LM Ericsson</u>,
      **19 Cr. 884 (LTS)**

Dear Chief Judge Swain:

On behalf of the parties, the Government respectfully requests that the Court schedule a proceeding at which Telefonaktiebolaget LM Ericsson ("Ericsson") will plead guilty, pursuant to the plea agreement attached as Exhibit A (the "Plea Agreement"), to Counts One and Two of the above-cited Information. As discussed in Exhibit A, the Plea Agreement follows the Government's determination that Ericsson has breached its cooperation and disclosure obligations under the deferred prosecution agreement between the parties entered into on December 6, 2019 (the "DPA").

During the proceeding, the Government expects that a representative of Stockholm, Sweden-based Ericsson, an issuer of publicly traded securities in the United States, will enter a guilty plea to the Information, pursuant to the Plea Agreement. The parties are prepared to proceed directly to sentencing without the need for a presentence report. The Plea Agreement is subject to judicial approval, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. In accordance with Rule 11(c)(5)(B), Ericsson may withdraw its plea of guilty in the event that the Court declines to impose the stipulated penalties set forth in the Plea Agreement.

The Government respectfully proposes that the Court conduct the proceeding as follows:

1.   Allocute Ericsson on the Certificate of Corporation Resolution of its Board of Directors, which is attached as Attachment B to the Plea Agreement, such as by asking the

following questions:

    a. [To the Government] I understand that there is a plea agreement between the Government and Ericsson. Is that correct?

    b. [To the defendant] Do you have before you the plea agreement?

    c. Who signed the plea agreement on behalf of the defendant?

    d. Exhibit B to the plea agreement is a signed Certificate of Corporate Resolution regarding the Board resolution approving the execution of the plea agreement. Does this certificate accurately reflect the relevant excerpt of that Board resolution, as duly adopted by Ericsson's Board of Directors?

    e. Does the plea agreement contain all the terms and understandings between the parties in this case?

2.   Allocute Ericsson on the entry of its guilty pleas to Counts One and Two of the Information, pursuant to Federal Rule of Criminal Procedure 11, as follows:

    a. Ensure that (i) Ericsson's duly authorized corporate officer (the "Corporate Officer"), namely Matthew Matule, Group Head of Litigation and Disputes of Ericsson, is sworn in for the purposes of conducting an allocution; (ii) the Corporate Officer has, in fact, been authorized by Ericsson's Board of Directors to speak and act on Ericsson's behalf throughout the proceeding; (iii) the Corporate Officer understands what is happening in the proceeding; and (iv) counsel for Ericsson has explained to the Corporate Officer the consequences that may flow from the proceeding.

    b. Conduct a full allocution pursuant to Rule 11(b), including advising Ericsson of the rights it is giving up by pleading guilty and establishing a factual basis for the plea by permitting the Corporate Officer, and if appropriate the Government, to address how Ericsson's conduct satisfies the elements of the count charged in Counts One and Two of the Information.

3.   If the Court is prepared to do so, proceed to sentencing of Ericsson. Under the Plea Agreement and Federal Rule of Criminal Procedure 11(c)(1)(C), the parties recommend that the Court impose the following sentence:

    a. a term of probation until June 2, 2024, during which Ericsson will be subject to conditions that include fulfilling its obligations under Paragraphs 8(a)-(g), 12, and 13 of the Plea Agreement;

    b. extension of the term of the independent compliance monitor until June 2, 2024;

    c.   an additional criminal fine of $206,728,848, which, together with the $520,650,432 criminal penalty Ericsson paid under the DPA, brings Ericsson's total criminal penalty to $727,379,280; and

    d.   the mandatory special assessment of $400 per count, or $800 total.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
David Abramowicz / Juliana Murray
Assistant United States Attorneys
Tel:  (212) 637-6525 / 2314

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice

Courtney A. Howard
Assistant Chief, FCPA Unit

Michael Culhane Harper
Trial Attorney

Encl.

cc:     Counsel to Ericsson (by ECF)

# Attachment A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA                                              19 Cr. 884 (LTS)

v.

TELEFONAKTIEBOLAGET LM ERICSSON

**PLEA AGREEMENT**

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the Office of the United States Attorney for the Southern District of New York (the "Office") and the Defendant, Telefonaktiebolaget LM Ericsson (the "Defendant"), by and through its undersigned attorneys, and through its authorized representatives, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

**Term of the Defendant's Obligations Under the Agreement**

1.      Except as otherwise provided in Paragraph 12 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall be effective for a period beginning on the date on which this Agreement is entered and ending June 2, 2024 (the "Term"). The Defendant agrees, however, that in the event the Fraud Section and the Office determine, in their sole discretion, that the Defendant has knowingly failed to completely perform or fulfill its obligations under paragraphs 7(c)-(d), 8(h)-(i), 9-10, 23(d), and any other paragraphs relating to the Defendant's compliance program and the independent compliance monitor, the Fraud Section and the Office, in their sole discretion, may impose an extension of the

compliance and Monitor terms for up to a total additional time period of one year, without prejudice to the Fraud Section and the Office's right to proceed as provided in Paragraphs 23-26 below.  Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the Monitor described in Attachment D, and that the other provisions of this Agreement have been satisfied, the  Monitor may be terminated early.

### The Defendant's Agreement

2.       Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to plead guilty to Counts One and Two of Information 19 Cr. 884 (the "Information").  Count One of the Information charges the Defendant with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, *see* Title 15 United States Code, Section 78dd-1.  Count Two of the Information charges the Defendant with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the books and records and internal controls provisions of the FCPA, *see* Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(2)(B), and 78m(b)(5).  The Defendant is subject to prosecution for this conduct (which occurred from 2000 to 2016) following the determination of the Fraud Section and the Office that the Defendant breached the Deferred Prosecution Agreement, which the Defendant entered into with the Fraud Section and the Office on December 6, 2019.  *See* 19 Cr. 884, Dkt. 6 (the "DPA").  In light of the Defendant's breach of the terms of the DPA based on inadequate document production and reporting and entry of a guilty plea, the DPA has been vitiated by this Agreement.  The Defendant further agrees to persist in that

plea through sentencing and to cooperate fully with the Fraud Section and the Office, as set forth in Paragraph 12.

3.     The Defendant understands that, to be guilty of these offenses, the following essential elements of each offense must be satisfied and were satisfied here through the acts of former employees:

Count One

    a.     The agreement specified in the Information—namely, the agreement to violate the anti-bribery provisions of the FCPA—existed between two or more persons;

    b.     the Defendant knowingly and willfully joined in that conspiracy; and

    c.     one of the conspirators committed an overt act in furtherance of the conspiracy.

Count Two

    a.     The agreement specified in the Information—namely, the agreement to violate the books-and-records and internal-controls provisions of the FCPA—existed between two or more persons;

    b.     the Defendant knowingly and willfully joined in that conspiracy; and

    c.     one of the conspirators committed an overt act in furtherance of the conspiracy.

4.     The Defendant understands and agrees that this Agreement is between the Fraud Section and the Office and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority.  Nevertheless, the Fraud Section and the Office will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant and its direct or indirect

3

affiliates, subsidiaries, and joint ventures to the attention of other law enforcement, regulatory, and debarment authorities, as well as Multilateral Development Banks ("MDBs"), if requested by the Defendant.

5.      The Defendant agrees that this Agreement will be executed by authorized corporate representatives.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions") authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

6.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

7.      In addition to the relevant considerations articulated in the DPA, the Fraud Section and the Office enter into this Agreement based on their determination of the individual facts and circumstances presented by the Defendant's breach of the DPA, including the following:

        a.      the Defendant failed to comply with the obligations set forth in paragraphs 5 and 6 of the DPA, as determined by the Department of Justice and as described in the Factual Basis for Breach attached to this Agreement as Attachment A-1;

        b.      as part of the DPA, the Defendant received partial credit for its cooperation with the Fraud Section and the Office's investigation; however, in light of the Defendant's failure to disclose key factual evidence and information to the Department as described in the Factual Basis for Breach attached to this Agreement as Attachment A-1, the Defendant's prior cooperation

credit has been eliminated both under U.S.S.G. § 8C2.5(g)(2) and pursuant to the FCPA Corporate Enforcement Policy, JM § 9-47.120, in connection with this Agreement;

      c.     although the Defendant had inadequate anti-corruption controls and an inadequate anti-corruption compliance program during the period of conduct described in the Statement of Facts attached to this Agreement as Attachment A-2, prior to and since entering into the DPA the Defendant has significantly enhanced its compliance program and internal accounting controls through structural and leadership changes, including but not limited to the hiring of a new Chief Legal Officer and new Head of Corporate and Government Investigations and the establishment of a multi-disciplinary Business Risk Committee comprised of Group-level senior executives who oversee and apply a heightened scrutiny approach to group material risks, to ensure that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program"), and has committed to continuing to implement and test further enhancements;

      d.     the Defendant has agreed to extend the engagement of the independent compliance monitor (the "Monitor") retained under the DPA (as set forth in Paragraphs 11-14 and Attachment D to the DPA) until the end of the term of this Agreement;

      e.     the Defendant has no prior criminal history, other than the DPA and the related guilty plea by its majority-owned subsidiary Ericsson Egypt Ltd.; and

      f.     the Defendant has significantly enhanced its cooperation and information sharing efforts since the Fraud Section and Office notified the Defendant of the breach and continues to agree to cooperate with the Fraud Section and the Office in any ongoing investigation as described in Paragraph 12 below.

       g.      Accordingly, after considering (a) through (f) above, and pursuant to Paragraph 17 of the DPA, the Fraud Section and the Office believe that the appropriate resolution of the Defendant's breach of the DPA is for the Defendant to plead guilty to Counts One and Two of the Information; to extend the Monitor for the duration of the term of this Agreement; and to pay an overall criminal monetary fine of $727,379,280, which reflects a fine at the midpoint between the low end and the high end (which in this case is the statutory maximum fine) of the applicable Sentencing Guidelines fine range.  The Fraud Section and the Office will credit $520,650,432 previously paid by the Defendant pursuant to the DPA, resulting in a remaining criminal penalty of $206,728,848.

       8.      The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

       a.      to plead guilty as set forth in this Agreement;

       b.      to abide by all sentencing stipulations contained in this Agreement;

       c.      to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

       d.      to commit no further crimes;

       e.      to be truthful at all times with the Court;

       f.      to pay the applicable fine and special assessment;

       g.      to cooperate fully with the Fraud Section and the Office as described in Paragraph 12;

       h.      to continue to implement a compliance and ethics program, as described in Paragraphs 9-10 and Attachment C of this Agreement; and

i.      to extend the term of the Monitor engaged in accordance with Attachment D of the DPA by one year, i.e., through the end of the term of this Agreement.

9.      The Defendant represents that it has implemented and will continue to implement a compliance and ethics program that meets, at a minimum, the elements set forth in Attachment C.  Such program shall be designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption, including, but not limited to, the minimum elements set forth in Attachment C. Thirty days prior to the expiration of the Term, the Defendant, by its Chief Executive Officer and Chief Compliance Officer, will certify to the Fraud Section and the Office, in the form of executing the document attached as Attachment E to this Agreement, that the Defendant has met its compliance obligations pursuant to this Agreement. This certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

10.     In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under the Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws.  Where necessary and appropriate, the Defendant will adopt new or modify existing internal controls, compliance policies, and procedures in order to ensure that the Defendant maintains: (a) an effective system of internal accounting controls

7

designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws.  The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.  The Offices, in their sole discretion, will consider the Monitor's certification decision in assessing the Defendant's compliance program and the state of its internal accounting controls.

11.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any direct or indirect affiliates, subsidiaries, and joint ventures involved in the conduct described in Attachment A-2 of the Agreement, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section and the Office's ability to assert a breach under this Agreement is applicable in full force to that entity.  The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Defendant shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  If the Fraud Section and the Office notify the Defendant prior to such transaction (or series of

8

transactions) that they have determined that the transaction or transactions have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section and the Office, the Defendant agrees that such transaction or transactions will not be consummated.  In addition, if at any time during the Term the Defendant engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to Paragraphs 23-26.  Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

12.     The Defendant shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and Attachment A-2 and any individual or entity referred to therein, as well as any other conduct under investigation by the Fraud Section and the Office at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud Section and the Office, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the MDBs, in any investigation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and Attachment A-2. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, including data privacy and national security laws, as well as

valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such assertion. The Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

      a.    The Defendant represents that it has truthfully disclosed all relevant factual information as of the date of the initial breach notification on October 21, 2021 about which the Defendant has any knowledge with respect to its activities, those of its direct or indirect affiliates, subsidiaries, and joint ventures, and those of its present and former directors, officers, employees, agents, and consultants, relating to the conduct described in this Agreement and the Statement of Facts attached as Attachment A-2 and other conduct under investigation by the Fraud Section and the Office. The Defendant further represents that it will truthfully disclose all factual information about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and the Office, upon request, any document, record, or other tangible evidence about which the Fraud Section and the Office may inquire of the Defendant, including evidence that is responsive to any requests made prior to the execution of this Agreement.

      b.    Upon request of the Fraud Section and the Office, the Defendant shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 12(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

c.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents, and consultants of the Defendant.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Defendant consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government, as well as to the MDBs, of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

e.     The Defendant has ongoing obligations under the National Security Agreement (NSA) entered into by the Defendant, Ericsson Global Network Platform Holding Inc., Vonage Holdings Corporation ("Vonage"), and the U.S. Department of Justice and the U.S. Department of the Treasury as the Committee on Foreign Investment in the United States (CFIUS) Monitoring Agencies in CFIUS Case No. 22-120, regarding the Defendant's acquisition of Vonage. The NSA obligations include, among other things, Vonage's obligation under NSA Article VI.D.12 to ensure that the Vonage Security Officer communicates with the Defendant's independent compliance monitor regarding any information that the Vonage Security Officer deems relevant to compliance with the NSA, in accordance with the Security Plan established under the NSA. The Defendant's independent compliance monitor will provide the Vonage Security Officer with the requisite information, reports, and documents, as well as quarterly (or if

11

necessary, more frequent) briefings, to ensure that the Vonage Security Officer can meet its obligations under NSA Article VI.D.12.

13.     During the Term, should the Defendant learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegation to the Fraud Section and the Office.  Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Fraud Section and the Office in the form of executing the document attached as Attachment F to this Agreement that the Defendant has met its disclosure obligations pursuant to this Paragraph.  Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

14.     The Defendant agrees that any fine or mandatory special assessment imposed by the Court will be due and payable as specified in Paragraph 22 below.

### The United States' Agreement

15.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of the Defendant's obligations under this Agreement, the Fraud Section and the Office agree they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures (a) relating to any of the conduct described in the Statement of Facts attached hereto as Attachment A-2 or the Factual Basis for Breach attached hereto as Attachment A-1, or (b) based on information provided to the Fraud Section and the Office prior to the DPA, as well as pursuant to the Defendant's cooperation and disclosure obligations

under paragraphs 5 and 6 of the DPA prior to the date of this Agreement, other than the information related to certain historical conduct in Iraq described in a 2019 internal investigation report, which Ericsson referred to as case number 2019-0044 in its disclosures to the Fraud Section and the Office.  Nothing in this Agreement precludes the Fraud Section and the Office from investigating and filing criminal charges relating to the matters described in (b) above, in the event the Fraud Section and the Office learn material information concerning such matters that was not disclosed by the Defendant prior to the date of this Agreement.  The Fraud Section and the Office, however, may use any information related to the conduct described in the Statement of Facts attached hereto as Attachment A-2 against the Defendant: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.  This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures.  In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant.  The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any of the Defendant's tax liabilities and reporting obligations.

## **Factual Basis**

16.    The Defendant is pleading guilty because it is guilty of the charges contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment A-2 are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Attachment A-2.  The Defendant stipulates to the admissibility of the Statement of Facts in Attachment A-2 in any

proceeding by the Fraud Section and the Office, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts in Attachment A-2 at any such proceeding.

## The Defendant's Waiver of Rights, Including the Right to Appeal

17.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  The Defendant expressly warrants that it has discussed these rules with its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in Attachment A-2 to this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving the Fraud Section and the Office and the Defendant, as: (a) substantive evidence offered by the Government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the Government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, the Defendant agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United States Sentencing Guidelines (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts set forth in Attachment A-2 to this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form).  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal

14

criminal proceeding if, even though the Fraud Section and the Office have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

18.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance.  The Defendant understands that by entering into the Agreement, the Defendant surrenders certain rights as provided in the Agreement.  The Defendant understands that the rights of criminal defendants include the following:

(a)     the right to plead not guilty and to persist in that plea;

(b)     the right to a jury trial;

(c)     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

(d)     the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

(e)     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack its convictions or any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant also knowingly waives the right to collaterally challenge

either the convictions or the sentence imposed in this case.  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.  The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment A-2 or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed, in the event that: (a) either or both convictions are later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea, plus the remaining time period of the statute of limitations as of the date that this Agreement is signed.  The Fraud Section and the Office are free to take any position on appeal or any other post-judgment matter.  The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.  Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

In connection with the Defendant's plea of guilty, the Defendant, in consultation with counsel, has chosen not to request discovery materials pursuant to Fed. R. Crim. P. 16 ("Rule 16 Material").  The Defendant understands that if not for Defendant's plea of guilty, the Government would be required to produce Rule 16 Material, and would further be required to produce material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and Fed R. Crim. P. 5(f), and, if the Defendant

16

proceeded to trial, impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), and *Jencks* Act material.  The Defendant acknowledges that the Defendant has not and will not receive such information because the Defendant has decided to plead guilty, waives the right to this information, and agrees not to withdraw the Defendant's plea or to attack the Defendant's conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce any such information, apart from any information establishing the factual innocence of the Defendant.

### Penalty

19.     The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 is: a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (Title 18, United States Code, Section 371 and Title 18, United States Code, Section 3571(c), (d)); five years' probation (Title 18, United States Code, Section 3561(c)(1)); and a mandatory special assessment of $400 per count (Title 18, United States Code, Section 3013(a)(2)(B)).  In this case, the parties agree that the gross pecuniary gain resulting from the offenses is $382,831,200. Therefore, pursuant to 18 U.S.C. § 3571(d), the maximum fine that may be imposed is $765,662,400.

### Sentencing Recommendation

20.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory Sentencing Guidelines range.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory Sentencing Guidelines range and the factors listed in Title 18, United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors

sufficient to satisfy the applicable burden of proof.  The Defendant understands that if the Court

accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 19.

21.     The Fraud Section and the Office and the Defendant agree that a faithful application

of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") to determine the

applicable fine range yields the following analysis:

a.      The November 1, 2021 Guidelines manual applies to this matter.

b.      <u>Offense Level</u>.  Based upon U.S.S.G. § 2C1.1, the total offense level is 46,
        calculated as follows:

| (a)(2) | Base Offense Level | 12 |
|--------|--------------------|----|
| (b)(1) | Multiple bribes | +2 |
| (b)(2) | Value of Benefit Received ($382,831,200) | +28 |
| (b)(3) | Involvement of High-level Official | +4 |
| **TOTAL** | | 46 |

c.      <u>Base Fine</u>.  Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is
        $382,831,200 (the pecuniary gain to the Defendant from the offense).

d.      <u>Culpability Score</u>.  Based upon U.S.S.G. § 8C2.5, the culpability score is
        9, calculated as follows:

| (a) | Base Culpability Score | 5 |
|-----|------------------------|---|
| (b)(1) | the unit of the organization within which the offense was committed had 5,000 or more employees and an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(3) | The organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 1 |
| **TOTAL** | | 9 |

18

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $382,831,200 |
| Multipliers | 1.80(min)/2.00 (max)[1] |
| Fine Range | $689,096,160 (min)/<br>$765,662,400 (max) |
| Fine Range Mid-Point: | $727,379,280 |
| Previously paid penalty | $520,650,432 |
| Remaining penalty | $206,728,848 |

22.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section and the Office and the Defendant agree that the following represents the appropriate disposition of the case and recommend jointly that the Court impose the following sentence:

a.      Disposition.  The appropriate criminal fine is $727,379,280.  This penalty reflects a fine at the midpoint between the low end of the applicable Sentencing Guidelines fine range and the high end of the applicable Sentencing Guidelines fine range, which in this case is the statutory maximum fine.  The Fraud Section and the Office will credit $520,650,432 previously paid by the Defendant pursuant to the DPA, resulting in a remaining total criminal monetary

---

[1] Under U.S.S.G. § 8C2.6, a culpability score of 9 results in a minimum multiplier of 1.80 and a maximum multiplier of 3.60.  As set forth in Paragraph 18, however, the statutory maximum fine here is twice the gross pecuniary gain resulting from the offense, *see* 18 U.S.C. § 3571(c)(3) & (d), or twice the base fine of $382,831,200.  Under U.S.S.G. § 8C3.1(a), the maximum Guideline fine cannot exceed the statutory maximum fine.  Accordingly, the maximum multiplier here is 2.00, not 3.60.

penalty of $206,728,848 (the "Total Criminal Fine"), payable in full at the time of the entry of judgment.

b. <u>Mandatory Special Assessment</u>. The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of New York the mandatory special assessment of $400 per count. The mandatory special assessments shall be payable in full at the time of the entry of judgment.

c. The Defendant and the Fraud Section and the Office waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to seek sentencing by the Court immediately following the Rule 11 hearing. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. In the event the Court directs the preparation of a PSR, the Fraud Section and the Office will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

d. <u>Probation.</u> In light of the Defendant's breach of the DPA, the Fraud Section and the Office and the Defendant agree that a term of organizational probation for a period lasting until the end of the Term on June 2, 2024, shall be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 8(a)-(g), 12, and 13 above, as well as the payment of a fine, as set forth in Paragraph 22(a).

## **Breach of Agreement**

23. If, during the Term, the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 12 and 13 of this Agreement; (d) fails

to implement a compliance program as set forth in Paragraphs 9 and 10 of this Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails specifically to perform or to fulfill completely any of its obligations under the Agreement, and is found to have breached the Agreement by the Court pursuant to paragraph 24 or by the Fraud Section and the Office pursuant to paragraph 25, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including additional charges arising out of the conduct described in the Statement of Facts attached hereto as Attachment A-2, distinct from the charges in the Information described in Paragraph 2, as well as charges related to any additional criminal conduct, if appropriate. Such charges may be pursued by the Fraud Section and the Office in the U.S. District Court for the Southern District of New York or any other appropriate venue. Any such prosecution may be premised on information provided by the Defendant or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts attached hereto as Attachment A-2 or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution

21

or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraphs 11 and 12 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

24.     If the Fraud Section and the Office determine that the Defendant has breached any obligations that are also conditions of probation—specifically Paragraphs 8(a)-(g), 11, 12, 13, or 22(a)—the Fraud Section and the Office will notify the Defendant, and the Defendant will have the ability to respond as described in paragraph 26. If, after review of the Defendant's response, the Fraud Section and the Office maintain that the Defendant has breached, they will notify the Probation Office and the Court. If the Court finds that such a breach and corresponding probation violation occurred, the Fraud Section and the Office may pursue prosecution of the Defendant as discussed in Paragraph 23.

25.     Determination of whether the Defendant has breached any other obligations—that are not also conditions of probation—shall be in the sole discretion of the Fraud Section and the Office.

26.     In the event the Fraud Section and the Office determine that the Defendant has breached this Agreement—whether the breach is a condition of probation or not—the Fraud Section and the Office agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section and the Office in writing

to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining next steps pursuant to paragraphs 23-25.

27.     In the event that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section and the Office or to the Court, including the Statement of Facts attached hereto as Attachment A-2, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.

28.     The Defendant acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and is subsequently prosecuted for any crime, or the breach constitutes a violation of the Defendant's probation.  The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

29.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the

23

Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment A-2.  Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to sanction or prosecution as set forth in Paragraphs 23-26 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or Attachment A-2 will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Attachment A-2, the Fraud Section and the Office shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Attachment A-2 provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Attachment A-2.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

30.     The Defendant agrees that if it or any of its direct or indirect affiliates, subsidiaries, or joint ventures over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and the Office to determine: (a) whether the text of the release or proposed statements at

the press conference are true and accurate with respect to matters between the Fraud Section and

the Office and the Defendant; and (b) whether the Fraud Section and the Office have any objection

to the release or statement.

## **Complete Agreement**

31.     This document states the full extent of the Agreement between the parties.  There

are no other promises or agreements, express or implied.  Any modification of this Agreement

shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all

parties.

DocuSign Envelope ID: 4A9F4E0E-DAF5-4CAA-8058-7EF52F746C12

AGREED:

**FOR TELEFONAKTIEBOLAGET LM ERICSSON:**

Date: 02 March 2023 | 19:20:47 CET     By: _Carl Mellander_
                                           Authorized Representative of
                                           Telefonaktiebolaget LM Ericsson

Date: 02 March 2023 | 19:26:27 CET     By: _____
                                           Authorized Representative of
                                           Telefonaktiebolaget LM Ericsson

Date: March 2, 2023                    By: _F. Joseph Warin_
                                           F. Joseph Warin
                                           Courtney M. Brown
                                           Gibson, Dunn & Crutcher LLP
                                           William P. Barry
                                           Miller & Chevalier Chartered
                                           Outside counsel for Telefonaktiebolaget
                                           LM Ericsson

**FOR THE DEPARTMENT OF JUSTICE:**

                                           Glenn S. Leon
                                           Chief, Fraud Section
                                           Criminal Division
                                           U.S. Department of Justice

Date: March 2, 2023                    By: _Michael Culhane Harper_
                                           Michael Culhane Harper
                                           Trial Attorney

                                           Damian Williams
                                           United States Attorney
                                           Southern District of New York
                                           U.S. Department of Justice

Date: March 2. 2023                    By: _Juliana Murray_
                                           David Abramowicz
                                           Juliana Murray
                                           Assistant United States Attorneys

**ATTACHMENT A-1**

**<u>FACTUAL BASIS FOR BREACH</u>**

The Factual Basis for Breach of the November 26, 2019 Deferred Prosecution Agreement ("DPA"), between the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and the Office of the United States Attorney for the Southern District of New York (the "Office," and together with the Fraud Section, the "United States"), and the Defendant, Telefonaktiebolaget LM Ericsson ("LM Ericsson" or the "Company") is incorporated by reference as part of the plea agreement, dated March 2, 2023, between the United States and LM Ericsson.

On December 6, 2019, the United States filed a two-count criminal Information (the "Information") in the United States District Court for the Southern District of New York charging LM Ericsson with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, *see* Title 15, United States Code, Section 78dd-1, and one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the books and records and internal controls provisions of the FCPA, *see* Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(2)(B), and 78m(b)(5).  *See United States v. Telefonaktiebolaget LM Ericsson*, 19 Cr. 884, Dkt. 3.

The same day, the United States also filed the DPA between the United States and LM Ericsson.  *See United States v. Telefonaktiebolaget LM Ericsson*, 19 Cr. 884, Dkt. 6.  In exchange for LM Ericsson agreeing, among other things, "to continue to cooperate with the Fraud Section and the Office in any investigation as described in Paragraph 5[,]" the United States agreed not to prosecute LM Ericsson for any crimes described in the Statement of Facts, including the bribery

scheme in Djibouti, as well as books and records and internal control violations in Djibouti, China, Vietnam, Indonesia, and Kuwait that occurred over a period of years. *Id.* ¶ 16. As part of the DPA, the Company also agreed, among other things, to pay a penalty of $520,650,432. As part of responding to the United States' FCPA investigation which led to the DPA, LM Ericsson hired two separate law firms as outside counsel ("prior outside counsel"). The Company interacted with the Fraud Section and the Office through its prior outside counsel in connection with its cooperation with the United States.

Relevant to the United States' breach determination, Paragraph 5 of the DPA stated, in part:

> The Company shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section and the Office at any time during the Term, subject to applicable laws and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.

> a.    The Company shall truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and the Office, upon request, any document, record, or other tangible evidence about which the Fraud Section and the Office may inquire of the Company.

Additionally, Paragraph 6 of the DPA stated, in part:

> In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.

The United States, in an exercise of the discretion conferred upon it by the agreed upon terms of the DPA (namely, Paragraph 17 of the DPA), has determined that LM Ericsson violated

Paragraphs 5 and 6 of the DPA and declared a breach of the DPA.  Relevant considerations in arriving at that determination and making that declaration include the following:

- LM Ericsson's failure to truthfully disclose all factual information and evidence regarding the Djibouti scheme, the China scheme, and other potential violations of the FCPA anti-bribery or accounting provisions; and

- LM Ericsson's failure to promptly report and disclose evidence and allegations of conduct related to its historical business activities in Iraq that may constitute a violation of the FCPA.

## I.   Substantially Delayed Disclosures of Key Factual Information and Evidence – China, Djibouti Investigations

LM Ericsson failed to disclose to the United States certain evidence, factual information, and documents that were required to be disclosed pursuant to Paragraphs 5 and 6 of the DPA.  The substantially delayed disclosures hindered the United States' investigations and possible prosecutions of certain individuals and criminal conduct.  Based upon the totality of the conduct described below, the United States, which can declare a breach of its own discretion, has determined that the Company is in breach of the DPA.

### A.   May 2011 Email Between Employee 1 and Employee 3 Regarding the Djibouti Bribery Scheme

The Statement of Facts included in the DPA described the Djibouti bribery scheme, explaining, in part, that "[i]n or about and between 2010 and 2014, LM Ericsson, through certain of its agents, including Ericsson Egypt, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others knowingly and willfully conspired and agreed with others to corruptly provide approximately $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti, including Foreign Official 1, Foreign Official 2, and Foreign Official 3, in order to secure an improper advantage in order to obtain and retain business with Telecom Company A and to win a contract valued at approximately €20,300,000 with Telecom Company A (the 'Telecom Company A Contract')."  DPA, Attachment A-2, at ¶ 34.  Although the United States anonymized

Employee 1, Employee 3 (now former employees), and the relevant foreign officials in the Statement of Facts, the Company knew the true identities of those individuals and their roles in the Djibouti bribery scheme.

The Company failed to disclose to the United States until May 2021 a significant May 2011 email between two of the principal Ericsson executives who orchestrated the Djibouti bribery scheme (the "May 2011 Email"). In the May 2011 Email (which was in Italian), now former Employee 1, the Head of the Customer Unit in North East Africa, informed now former Employee 3, a high-level executive, that the Company had just won a contract and had been assisted in that effort by its agent, "who is [Foreign Official 2] in person!" Employee 3 replied, "Ok, Understood." Employee 1 and Employee 3 frequently communicated by email in Italian, and the Company produced to the United States a number of other emails between Employee 1 and Employee 3 that were written in Italian. The May 2011 Email was responsive to search terms agreed upon between the United States and LM Ericsson had the Company run those terms in Italian. In addition, the May 2011 Email was part of a broader email chain about the Djibouti Telecom contract. Prior to entering into the the DPA, the Company produced other branches of the same email chain. However, the Company failed to produce to the United States this key piece of evidence—which confirmed that its executives had knowingly paid a foreign official in order to obtain the telecommunications contract for the Company—until May 2021, more than one year after the Company entered into the DPA and one month after the same email was provided to a foreign authority. That disclosure failure prevented the United States from bringing certain charges against certain individuals.

    **B.**    **The February 2018 Email Between Ericsson Manager and LM Executives Regarding the China Scheme**

As part of the DPA, the Statement of Facts described the criminal conduct relating to China, explaining, in part, that "[i]n or about and between at least 2000 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, EHK, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, caused tens of millions of dollars to be paid to various agents, consultants, and service providers in China, at least a portion of which was used to provide things of value, including leisure travel and entertainment, to foreign officials, including employees of Telecom Company B." DPA, Attachment A-2, at ¶ 65. Although the United States anonymized Employee 5, Employee 6, and Employee 8 (now former employees) in the Statement of Facts, LM Ericsson knew the true identities of these individuals and their roles in the China books and records and internal controls scheme.

Nonetheless, the Company failed to disclose a significant email that an LM Ericsson manager (the "Ericsson Manager") for the North East Asia Market, which included China, sent to a senior officer at LM Ericsson in February 2018 (the "February 2018 Email"). In the February 2018 Email, the Ericsson Manager raised several allegations against former senior executives of LM Ericsson and its subsidiary in Asia—including Employees 5, 6, and 8—who played central roles in the China criminal scheme. The Ericsson Manager alleged how the senior executives in China had engaged in improper relationships with third-party agents who were at the heart of the China criminal scheme and had known of and approved very large payments from LM Ericsson to the agents without much, if any, work being performed by the agents. In the February 2018 Email, the Ericsson Manager also alleged a "conspiracy by certain of the top management in the company to withhold information" and noted that the "conspiracy may also be criminal if it was to withhold information from the Board or the US authorities."

Upon receipt of the February 2018 Email, senior leadership of LM Ericsson recognized its significance to the United States' investigation and immediately asked the Company's prior outside counsel to investigate the allegations.  For more than three years, the Company failed to produce the February 2018 Email to the United States or disclose all of the facts gathered during its independent investigation into the February 2018 Email's allegations as part of its cooperation with the United States.  The Company did not disclose the February 2018 Email to the United States until April 2021.  That late disclosure harmed the United States' ongoing criminal investigation, including by preventing the United States from taking key investigative steps that were foreclosed by the time the Company finally produced the February 2018 Email.

### C.  Thousands of Responsive Documents Stored at Ericsson's Headquarters

For many years, including prior to and during the United States' investigation, LM Ericsson maintained certain hard copy records—such as agreements with third parties, third-party invoices, and due diligence files—in safes and locked filing cabinets in secured storage areas in basements of various buildings at the Company's headquarters in Sweden.  In addition, LM Ericsson personnel maintained two USB drives that contained records regarding third-party payments and agreements, including records regarding who approved and signed those agreements and who approved the payments.  Those materials contained information relevant to the United States' investigation into bribery, books and records, and internal control schemes—including significant evidence concerning the China criminal conduct charged in the Information.  LM Ericsson failed to produce those materials to the United States until April 2021, even though some Company employees knew about their existence as early as 2015.

Specifically, certain LM Ericsson employees and now former executives, as well as prior outside counsel, were aware of these records and understood that they were required to produce

them to the United States.  For example, as early as 2015, certain LM Ericsson employees knew of documents in a secure storage area at the Company's headquarters that contained information relating to third parties, including significant evidence related to the China criminal conduct— such as invoices for payments to third parties known to be involved in the China scheme.  These disclosure failures, including at least hundreds of documents containing key evidence of the bribery, books and records, and internal controls schemes, impaired the United States' ongoing criminal investigation.

II.     **Failure to Disclose Evidence or Allegations of Conduct that May Violate the FCPA -
        Iraq Investigation**

On November 22, 2019, two weeks prior to entering into the DPA and at the direction of senior corporate leadership, LM Ericsson's prior outside counsel disclosed generalized information to the United States relating to a new internal investigation it was conducting concerning the Company's operations in Iraq (the "2019 Iraq Disclosure").  Prior outside counsel's disclosure omitted key details related to the Company's investigative findings to that date that were known to the Company and its prior outside counsel at the time.  LM Ericsson finalized the Iraq investigation report on December 11, 2019—five days after its entry into the DPA—LM Ericsson's prior outside counsel did not update the United States on the findings and conclusions of the investigation despite being required to do so by the terms of the DPA.  More than two years later, in February 2022, both the United States and LM Ericsson received requests for information from an investigative journalist consortium regarding the Company's business in Iraq.  Following the requests to the Company, it contacted the United States and conducted a review of the 2019 Iraq Disclosure.  After reviewing the 2019 Iraq Disclosure, LM Ericsson, through new outside counsel, provided an updated disclosure to the United States regarding the Company's 2019 internal investigation into the Iraq business (the "2022 Iraq Disclosure").  The 2022 Iraq Disclosure

included information and evidence of possible FCPA violations and other serious misconduct that had not previously been provided to the United States as part of the 2019 Iraq Disclosure and as required by the DPA.  Although LM Ericsson leadership had directed prior outside counsel to disclose the Iraq investigation to the United States in late 2019, the 2019 Iraq Disclosure provided during a telephone call by the Company's prior outside counsel omitted material facts and information, as well as evidence of possible misconduct, known to the Company and its prior outside counsel.  The full details of the Iraq investigation were not disclosed to the United States until after LM Ericsson became aware of the potential news report in 2022.

ATTACHMENT A-2

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Southern District of New York (the "Office") (collectively, the "United States"), and the defendant Telefonaktiebolaget LM Ericsson ("LM Ericsson" or the "Company"). LM Ericsson admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, LM Ericsson agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the Criminal Information attached to this agreement.

**LM Ericsson and Other Relevant Entities and Individuals**

1.      From in or about and between 2000 and 2016 (the "relevant time period"), LM Ericsson was a multinational telecommunications equipment and service company headquartered in Stockholm, Sweden. LM Ericsson maintained a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 and was required to file periodic reports with the SEC. Accordingly, during the relevant time period, LM Ericsson was an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-1. LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated entities. The subsidiaries acted as divisions of the parent, rather than

separate and independent entities. LM Ericsson and its subsidiaries, combined, have approximately 100,000 employees.

2.     During the relevant time period, Ericsson Egypt Ltd. ("Ericsson Egypt") was a majority-owned subsidiary and operating entity of LM Ericsson. Individual employees of Ericsson Egypt oversaw Ericsson's operations in North East Africa, a region that included the country of Djibouti. Ericsson Egypt's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

3.     During the relevant time period, Ericsson AB was a wholly-owned subsidiary of LM Ericsson that served as one of LM Ericsson's largest operating companies. Ericsson AB's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

4.     During the relevant time period, LM Ericsson operated in China through its direct and indirect wholly owned subsidiaries, including Ericsson (China) Company Ltd. ("ETC"), Ericsson (China) Communications Co., Ltd. ("CBC"), and Ericsson Hong Kong ("EHK"), as well as LM Ericsson's indirect majority-owned joint venture, Nanjing Ericsson Panda Communications Company Ltd. ("ENC") (ETC, CBC, EHK, and ENC are hereinafter collectively referred to as "Ericsson China"). Ericsson China's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

5.     During the relevant time period, Ericsson Vietnam Company Ltd. ("Ericsson Vietnam"), was a wholly-owned subsidiary of LM Ericsson that operated in Vietnam. Ericsson Vietnam's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

6.      During the relevant time period, PT Ericsson Indonesia ("Ericsson Indonesia"), was a majority-owned subsidiary of LM Ericsson that operated in Indonesia.  Ericsson Indonesia's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

7.      During the relevant time period, Ericsson Resource & Competence Center Sdn. Bhd. ("Ericsson Malaysia"), was a wholly-owned subsidiary of LM Ericsson that operated in Malaysia.  Ericsson Malaysia's books, records, and accounts were included in the consolidated financial statements of LM Ericsson filed with the SEC.

8.      "Employee 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between May 2010 and June 2012, Employee 1 was the Head of the Customer Unit in North East Africa ("CU NEA"), a region that included Djibouti.  Employee 1 left the Company in 2013.  Employee 1 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

9.      "Employee 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson Egypt and acted as an agent of LM Ericsson.  In or about and between November 2010 and October 2012, Employee 2 served as the VP of New Business Development for the Horn of Africa, a region that included Djibouti. Employee 2 reported to Employee 1.  Employee 2 left the Company in 2015.  Employee 2 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

10.     "Employee 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between April 2010 and June 2014, Employee 3 was a high-level executive in the Middle East and Africa region, a region which included Djibouti and Kuwait.  Employee 1 reported to Employee 3.  Employee 3 left the Company in 2017. Employee 3 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

11.     "Employee 4," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of a wholly-owned indirect subsidiary of LM Ericsson and acted as an agent of LM Ericsson.  In or about and between July 2011 and December 2012, while on a long term assignment with Ericsson Egypt, Employee 4 served as the Customer Unit Controller for North East Africa, including Djibouti.  Employee 4 reported to Employee 3. Employee 4 left the Company in 2015.  Employee 4 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

12.     "Employee 5," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee and agent of LM Ericsson.  In or about and between 2004 and 2016, Employee 5 was a high-level executive in the Asia Pacific Region, a region which included China, Indonesia, and Vietnam.  Employee 5 left the Company in 2016.  Employee 5 was an employee and agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

13.     "Employee 6," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM

Ericsson.  In or about and between 2008 and 2014, Employee 6 was a high-level executive in China.  Employee 6 reported to Employee 5.  Employee 6 left the Company in 2016.  Employee 6 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

14.    "Employee 7," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee and agent of LM Ericsson.  In or about and between 2012 and 2016, Employee 7 was a high-level executive in China and Hong Kong.  Employee 7 reported to Employee 5.  Employee 7 left the Company in 2018.  Employee 7 was an employee and an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

15.    "Employee 8," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2010 and 2016, Employee 8 was a high-level executive in China.  Employee 8 reported to Employee 5.  Employee 8 left the Company in 2018.  Employee 8 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

16.    "Employee 9," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2004 and 2013, Employee 9 was a high-level executive in China and Hong Kong.  Employee 9 reported to Employee 5.  Employee 9 left the Company in 2016.  Employee 9 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

17.     "Employee 10," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB and acted as an agent of LM Ericsson.  In or about and between 2010 and 2017, Employee 10 served as a Customer Unit Head of Vietnam.  Employee 10 left the Company in 2018.  Employee 10 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

18.     "Employee 11," an individual whose identity is known to the Fraud Section, the Office, and the Company, was an employee of Ericsson AB.  In or about and between 2011 and 2014, Employee 11 was the Customer Unit Head for Telecom Company C, which is defined below.  Employee 11 reported to Employee 3.  Employee 11 left the Company in 2018.  Employee 11 was an agent of an "issuer," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

## Foreign Entities and Officials

19.     During the relevant time period, "Telecom Company A," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in Djibouti.  Telecom Company A was controlled by the Djibouti government and performed a function that the Djibouti government treated as its own.  Telecom Company A was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

20.     During the relevant time period, "Telecom Company B," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in China.  Telecom Company B was controlled by the China government and performed a function that the China government treated as its own.  Telecom

Company B was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

21.    During the relevant time period, "Telecom Company C," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a state-owned telecommunications company in Kuwait.  Telecom Company C was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

22.    During the relevant time period, "Foreign Official 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a high-ranking government official in the executive branch of the government of Djibouti.  Foreign Official 1 had influence over decisions made by Telecom Company A.  Foreign Official 1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

23.    During the relevant time period, "Foreign Official 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a high-ranking government official in the executive branch of the government of Djibouti.  Foreign Official 2 used his influence with the government of Djibouti to affect and influence the acts and decisions of Telecom Company A.  Foreign Official 2 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

24.    During the relevant time period, "Foreign Official 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was the CEO of Telecom Company A.  Foreign Official 3 had influence over decisions made by Telecom Company A.

Foreign Official 3 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

### Third Party Agents and Consultants

25.     During the relevant time period, "Consulting Company A," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company that was formed in Djibouti.  Consulting Company A was registered to the spouse of Foreign Official 2, and Foreign Official 2 acted as a representative of Consulting Company A.

26.     During the relevant time period, "Consulting Company B," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company formed in Thailand.  Consulting Company B entered into consultancy agreements with Ericsson Malaysia and Ericsson Vietnam.  Consulting Company B was retained to assist Ericsson Vietnam in obtaining business in Vietnam.

27.     During the relevant time period, "Consulting Company C," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company formed in Indonesia and Singapore.  Consulting Company C entered into consultancy agreements with Ericsson Malaysia and Ericsson Indonesia.  Consulting Company C was retained to assist Ericsson Indonesia in obtaining business in Indonesia.

28.     During the relevant time period, "Consulting Company D," an entity whose identity is known to the Fraud Section, the Office, and the Company, was a private consulting company formed in Qatar.  Consulting Company D entered into a consultancy contract with Ericsson AB's branch office in Qatar.  Consulting Company D was hired to help Ericsson AB's branch office in Qatar obtain business with Telecom Company C in Kuwait.

29.     During the relevant time period, "Sales Agent 1," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson China.  Sales Agent 1 had consulting companies that entered into service provider agreements with Ericsson China.  Sales Agent 1 helped Ericsson China obtain business from state-owned customers in China, including from Telecom Company B.

30.     During the relevant time period, "Sales Agent 2," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson China.  Sales Agent 2 helped Ericsson China obtain business from state-owned customers in China, including with Telecom Company B.

31.      During the relevant time period, "Sales Agent 3," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson China.  Sales Agent 3 had multiple consulting companies that entered into service provider agreements with Ericsson China.  Sales Agent 3 helped Ericsson China obtain business from state-owned customers in China, including from Telecom Company B.

32.     During the relevant time period, "Sales Agent 4," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a sales agent for Ericsson Vietnam.  Sales Agent 4 owned Consulting Company B.  Sales Agent 4 was retained to help Ericsson Vietnam obtain business in Vietnam.

33.     During the relevant time period, "Sales Agent 5," an individual whose identity is known to the Fraud Section, the Office, and the Company, was a consultant to Ericsson AB's branch office in Qatar.  Sales Agent 5 was a director of Consulting Company D.  Sales Agent

5 helped Ericsson AB's branch office in Qatar obtain business with a state-owned customer in Kuwait.

## The Unlawful Schemes

### Overview of the Djibouti Bribery Scheme

34.     In or about and between 2010 and 2014, LM Ericsson, through certain of its agents, including Ericsson Egypt, Ericsson AB, Employee 1, Employee 2, Employee 3, Employee 4, and others knowingly and willfully conspired and agreed with others to corruptly provide approximately $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti, including Foreign Official 1, Foreign Official 2, and Foreign Official 3, in order to secure an improper advantage in order to obtain and retain business with Telecom Company A and to win a contract valued at approximately €20,300,000 with Telecom Company A (the "Telecom Company A Contract").

35.     In order to conceal the true nature of the approximately $2,100,000 in bribe payments, Employee 2 completed a draft due diligence report that failed to disclose the spousal relationship between the owner of Consulting Company A and Foreign Official 2.  Further, certain agents of LM Ericsson caused Ericsson AB's branch office in Ethiopia to enter into a sham contract with Consulting Company A and to approve fake invoices in order to further conceal the bribe payments.

36.     LM Ericsson, through certain of its agents, caused the bribe payments to be improperly recorded in its consolidated books and records.

37.     In furtherance of the scheme, conspirators, including Employee 2 and Foreign Official 2, used U.S.-based email accounts to communicate with each other and other individuals about the scheme.

38.     In addition, the $2,100,000 in bribe payments that LM Ericsson, through certain of its agents, including Ericsson AB, Ericsson Egypt, and an employee of Ericsson Egypt, made and caused to be made to Consulting Company A were routed into and out of correspondent bank accounts at financial institutions in New York, New York.

## Details of the Djibouti Bribery Scheme

39.     Specifically, in or about May 2010, Telecom Company A informed Ericsson AB that Telecom Company A was planning to modernize the mobile networks system in Djibouti, and that Ericsson AB was selected to participate in a tender for the business.

40.     Subsequently, in or about 2010, Employee 2 informed Employee 1 that Ericsson AB could win the Telecom Company A Contract if Ericsson AB paid bribes to government officials in Djibouti.

41.     Subsequently, in or about 2010, Employee 1 and Employee 2 travelled to Djibouti to meet with Foreign Official 2 and Foreign Official 3.  During this trip, Foreign Official 2 informed Employee 1 that Foreign Official 1 needed to be paid a bribe of €1,000,000, a portion of which would be passed along to Foreign Official 3.  In return, Ericsson AB could win the Telecom Company A Contract.

42.     After the trip to Djibouti, in or about July 2010, Employee 1 informed Employee 3 that Ericsson AB could win the Telecom Company A Contract if it paid bribes to

Djibouti government officials.   Employee 3 instructed Employee 1 to ensure that the bribe payments were tied to other costs associated with the Telecom Company A Contract.

43.     On or about October 25, 2010, Ericsson AB responded to the tender and submitted its bid to Telecom Company A.

44.     On or about May 11, 2011, Telecom Company A awarded the Telecom Company A Contract to Ericsson AB, a contract valued at approximately €20,300,000.

45.     On or about June 16, 2011, Ericsson AB's branch office in Ethiopia and Consulting Company A signed a consulting agreement.  The services contemplated in the contract were never intended to be performed.

46.      On or about June 26, 2011, Foreign Official 2 sent Employee 2 an invoice from Consulting Company A requesting payment of €1,000,000 for 5,000 hours of purported work that was never performed.

47.     On July 24, 2011, Employee 2 sent Employee 1 an email stating, "[Foreign Official 3] is on vacation until the 28th of July so not much will happen before he gets back… Maybe it will be better to pay the 1 M to [Foreign Official 1] and [another foreign official] so things can be pushed from them. What do you think?"  Employee 1 responded on or about July 26, 2011, "We need to book the contract before doing any $."

48.     Following additional delays in getting the bribe payment of €1,000,000 approved, Employee 1 sent a series of emails detailing the pressure Employee 1 was receiving from Djibouti government officials for the bribe payments to be made.

49.     On or about August 14, 2011, Employee 1 emailed Employee 4, "I got a call from [Foreign Official 2] and he wants to know when we will wire…"

50.     On August 14, 2011, Employee 1 emailed Employee 2 and Employee 4, and others, "Gents I just got another call from [Foreign Official 2]. We need to wire the payment within the current week."

51.     On or about August 17, 2011, Employee 1 emailed Employee 4 and others, "I just got now a call from the cabinet of [Foreign Official 1]. I really need we to wire the $."

52.     On or about August 18, 2011, Employee 1 emailed Employee 4 and others, attaching an invoice from Consulting Company A requesting the payment of €1,000,000, writing, "Hi, please find attached the invoice signed by me. Tell me what can I do to make this happen fast. I am getting strong pressures from [Foreign Official 1]. This is not nice."

53.     On or about August 18, 2011, Employee 2 emailed Employee 1 and Employee 4, and others, "As you said on your email below we have to pay the invoice ASAP . . . Everybody in the management of [Telecom Company A] & in the ministry are waiting their part of the cake."

54.     On or about August 22, 2011, Employee 2 emailed Employee 1, Employee 4, and others, attaching a draft due diligence report on Consulting Company A.  The draft due diligence report failed to disclose the spousal relationship between the owner of Consulting Company A and Foreign Official 2.

55.     On or about August 24, 2011, Ericsson AB's branch office in Dubai transferred approximately $1,441,050 – the approximate equivalent at the time of €1,000,000 – to Consulting Company A.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

56.     On or about August 29, 2011, Employee 2 emailed Employee 4 a second invoice from Consulting Company A, requesting a payment of €122,000 for 610 hours of purported work that was never performed.

57.     On or about October 27, 2011, Ericsson AB's branch office in Dubai transferred approximately $171,703 – the approximate equivalent at the time of €122,000 – to Consulting Company A.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

58.     On or about January 27, 2012, Employee 2 sent Employee 4 a third invoice from Consulting Company A, requesting a payment of €414,000 for 2,070 hours of purported work that was never performed.

59.     On or about March 9, 2012, Ericsson AB's branch office in Dubai transferred approximately $545,230 – the approximate equivalent at the time of €414,000 – to Consulting Company A.  Bank records show that the funds were through correspondent bank accounts in New York, New York, to Consulting Company A's bank account at a bank in Djibouti.

60.     On or about June 30, 2012, LM Ericsson, through certain of its agents, caused a portion of the $2,100,000 bribe that was paid to Consulting Company A, for the benefit of foreign officials in Djibouti, to be improperly recorded in LM Ericsson's consolidated books and records.

61.     On or about December 28, 2012, LM Ericsson, through certain of its agents, caused a portion of the $2,100,000 bribe that was paid to Consulting Company A, for the benefit

of foreign officials in Djibouti, to be improperly recorded in LM Ericsson's consolidated books and records.

62.     Ericsson AB continued to perform on the Telecom Company A contract through 2014.

63.     In or about January 2014, Ericsson AB sent an invoice to Telecom Company A in order to receive the final payment under the Telecom Company A contract.

64.     On or about January 31, 2014, Ericsson AB received its last payment for its performance on the Telecom Company A contract.  LM Ericsson, through Ericsson AB, earned approximately $7,000,000 in profits from the Telecom Company A Contract.

### Overview of the Scheme in China

65.     In or about and between at least 2000 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, EHK, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, caused tens of millions of dollars to be paid to various agents, consultants, and service providers in China, at least a portion of which was used to provide things of value, including leisure travel and entertainment, to foreign officials, including employees of Telecom Company B.

66.     Additionally, in or about and between 2013 and 2016, LM Ericsson, through certain of its employees and agents, including CBC, ENC, Employee 5, Employee 6, Employee 7, Employee 8, and Employee 9, made payments to third party service providers pursuant to sham contracts for services that were never performed. The purpose of these payments was to allow Ericsson China to continue to use and pay third party agents in China in contravention of Ericsson's policies and procedures.  LM Ericsson, through certain of its employees and agents, knowingly

mischaracterized these payments and improperly recorded them in LM Ericsson's consolidated books and records.

**Details of the Payments in China Pursuant to Sham Service Provider Agreements**

67.     In or about and between 2013 and 2016, LM Ericsson, through certain of its employees and agents, including Ericsson China, made approximately $31,500,000 in payments pursuant to sham service provider agreements under which no legitimate services were rendered. These payments were made so as to continue to use and pay third party agents in China in contravention of LM Ericsson's policies and procedures.

68.     Specifically, in or about 2011, LM Ericsson instructed senior executives, including Employee 5, that all sales agent agreements needed to be terminated.  In or about 2013, LM Ericsson formalized this policy change to prohibit the use of third party agents, except in cases where legally required or necessary for a specific business reason (the "New Agent Policy").

69.     In spite of this, Employee 5 determined that it was important for LM Ericsson's business in China to continue to engage third party agents that had strong connections to LM Ericsson's state-owned customers.

70.     Employee 5 instructed Employee 6 to work with others, including Employee 7, to create a structure that would allow Ericsson China to continue to work with and pay third party agents despite the New Agent Policy.

71.     Employee 6 and Employee 7, with the knowledge, assistance, and direction of Employee 5, caused ENC to enter into False Service Agreements (the "False Service Agreements") and to sign purchase requests and approve invoices with pre-existing approved service providers, including consulting companies associated with Sales Agent 1 and Sales Agent

3.   The services contemplated in the False Service Agreements, purchase requests, and invoices were never intended to be provided. Further, the False Service Agreements were entered into for the purpose of continuing to make payments to third party agents in violation of the New Agent Policy.  For example,

        a.      On or about January 1, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 3.

        b.      On or about July 31, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 1.

72.     In or around 2015, Employee 5 instructed Employee 8 to work with others to create a new and more complicated structure of agreements with third party providers to enable Ericsson China to continue working with and paying third party agents in violation of the New Agent Policy.

73.     In or around 2015, Employee 8, and others, with the knowledge, assistance, and direction of Employee 5, caused CBC to enter into False Service Development Agreements (the "False Service Development Agreements") and to sign purchase requests and approve invoices with newly established third party service provider companies, all of which were associated with pre-existing agents, specifically Sales Agent 1 and Sales Agent 3.  The services contemplated in the False Service Development Agreements, purchase requests, and invoices were

never intended to be provided.  Further, the False Service Development Agreements, were entered into for the purpose of continuing to make payments to third party agents in violation of the New Agent Policy.

74.    Certain employees and agents of LM Ericsson knowingly caused the payments related to False Service Agreements and the False Service Development Agreements to be mischaracterized in LM Ericsson's consolidated books and records.  For example,

a.    On or about July 11, 2014, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $879,955.22 to a consulting company associated with Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

b.    On or about July 27, 2013, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,059,999.98 to a consulting company associated with Sales Agent 3 to be improperly recorded in LM Ericsson's consolidated books and records.

c.    On or about July 31, 2013, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, Employee 6, and Employee 7, caused ENC to enter into a False Service Agreement with a consulting company associated with Sales Agent 1.

d.    On or about January 14, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $427,902.46 to a consulting company associated Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

e.      On or about April 20, 2015, LM Ericsson, through certain of its employees and agents, including Ericsson China, Employee 5, and Employee 8 caused CBC to enter into a False Service Development Agreement with a consulting company associated with Sales Agent 3.

f.      On or about September 1, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,301,765.16 to a consulting company associated Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

g.      On or about September 3, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,135,700.06 to a consulting company associated with Sales Agent 1 to be improperly recorded in LM Ericsson's consolidated books and records.

h.      On or about September 12, 2015, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $764,419.45 to a consulting company associated Sales Agent 3 to be improperly recorded in LM Ericsson's consolidated books and records.

**Details of the Agent Payments in China to Cover Expenditures for Gifts, Travel, and Entertainment**

75.    Since at least in or about the early 1990s, LM Ericsson, through certain of its employees and agents, including ENC, CBC, and EHK, had an expense account (the "Travel Expense Account") that covered expenses on behalf of agents and customers in China, including gifts, travel, and entertainment for customers from state-owned telecommunications companies, that had no legitimate business purpose.  The Travel Expense Account was largely associated with Sales Agent 2 and was used to pay for gifts, travel, and entertainment for Ericsson's state-owned customers in China, including Telecom Company B, as well as to cover Sales Agent 2's own travel expenses.   Certain employees of LM Ericsson and Ericsson China used the Travel Expense Account to win business with state-owned customers, including Telecom Company B.  The total historical spend through the Travel Expense Account was tens of millions of dollars.

76.    The Travel Expense Account covered travel for delegations of Chinese government officials and sales and procurement managers of state-owned customers, including Telecom Company B, on trips to international destinations, including to the United States, which had little to no apparent business purpose.  The trips include, among others:

a.    In or around and between April 2007 and May 2007, Ericsson China paid for a delegation of Chinese government officials and high-level employees of Telecom Company B to go on a 16-day trip to Canada, the United States, and the Caribbean, including a week-long luxury cruise that included ports of call in Barbados, St. Lucia, Antigua, and St. Martin. Only two hours of the 16-day trip were reserved for meetings at Ericsson's offices in Canada.

b.    In or around May 2013, Ericsson China paid for a delegation of Chinese government officials to go on a trip to the United States and the United Kingdom, with

stops in Palo Alto, CA (with accommodations at the Four Seasons Hotel), Las Vegas, NV, Phoenix, AZ, Chicago, IL, and London, England.

77.     In or around 2008, in an effort to conceal the continued existence of the Travel Expense Account from LM Ericsson's headquarters, Employee 5, Employee 6, and others, came to an arrangement with a consulting company of Sales Agent 1 for Sales Agent 1 to cover the expenses associated with the Travel Expense Account, and then to seek reimbursement for the associated expenses from EHK.  EHK also provided Letters of Guarantee to certain vendors, including a luxury hotel and a travel agency, associated with the Travel Expense Account in order to guarantee that EHK would be responsible for any expenses that Sales Agent 1 failed to cover.

78.     In or around 2013, in light of the New Agent Policy, and to further conceal the Travel Expense Account, Employee 5 instructed Employee 6 and Employee 7 to continue to have Sales Agent 1 cover the expenses associated with the Travel Expense Account, but to reimburse Sales Agent 1 through the False Service Agreements and the False Service Development Agreements.

79.     In or about and between 2013 and 2015, LM Ericsson, through certain of its employees and agents, including ENC, CBC, EHK, Employee 5, Employee 6, Employee 7, Employee 8, and others paid approximately $19,500,000 to cover the expenses associated with the Travel Expense Account.  Most of these expenditures related to travel for Chinese government officials and employees of state-owned customers, including Telecom Company B, which had no apparent business purpose, including the previously described customer trip to the United States in 2013.

80.     Employee 5, Employee 6, Employee 7, Employee 8, and others knowingly caused CBC to sign purchase requests and approve invoices submitted by third party service providers pursuant to the False Service Agreements and False Service Development Agreements for services that were never provided.  The true purpose of the false purchase requests was to cover the expenses associated with the Travel Expense Account.  These fake purchase requests and false invoices were used to justify making the payments to third party service providers.

81.     Certain employees and agents of LM Ericsson knowingly caused payments related to the False Service Agreements and the False Service Development Agreements to be mischaracterized in LM Ericsson's consolidated books and records.

## The Scheme in Vietnam

82.     In or about and between 2012 and 2015, LM Ericsson, through certain of its employees and agents, including Ericsson Malaysia, Ericsson Vietnam, Employee 9, and Employee 10, made approximately $4,800,000 in payments, sometimes in cash, to Consulting Company B in order to create off-the-books slush funds to be managed by Sales Agent 4 (a representative of Consulting Company B) and Consulting Company B, with oversight and direction from employees and agents of LM Ericsson's subsidiaries Ericsson Malaysia and Ericsson Vietnam, and Employee 9.

83.     The slush fund accounts were sometimes used to make payments to other third parties who Ericsson employees knew would not be able to pass Ericsson's due diligence processes.

84. The payments to Consulting Company B were made pursuant to sham contracts between Ericsson Malaysia, Ericsson Vietnam, and Consulting Company B for services that were never performed.  For example,

a.    In or about July 2013, LM Ericsson, through certain of its employees and agents, including Ericsson Vietnam, Employee 9, and Employee 10, caused Ericsson Vietnam to enter into a sham consultancy agreement with Consulting Company B.

85. Sales Agent 4 also set up a means by which Sales Agent 4 could quickly transfer cash to third parties.

86. For example, in January 2014 Employee 9 and Sales Agent 4 discussed via email the need to urgently transfer $25,000 to provide to an individual in Hanoi.  On or about January 21, 2014, an employee of LM Ericsson, known to the Fraud Section, the Office, and the Company, sent Employee 9 and Employee 10 an email with the subject "Update summary [Employee 10]" and the following content: "Hi [Employee 9], Please find a summary of the transfers, Q 64,953 . . . F&S 108,600 . . . Dr 108,600 . . . Taiwan 154,000 . .  Thao 208,700." "DR", "Thao", and "F&S" were identified as sub-agents associated with LM Ericsson's customers in Vietnam, all of which were state-owned.

87. Employee 10 understood that the slush funds managed by Sales Agent 4 were associated with LM Ericsson's customers in Vietnam.  A portion of the slush funds managed by Sales Agent 4 were given to customers as cash gifts.

88. LM Ericsson, through certain of its employees and agents, knowingly mischaracterized these payments and improperly recorded them in LM Ericsson's consolidated

books and records.  Some of these payments were improperly recorded as "[Consulting Company B] Supply Cost HQM" to an "External HW, Material Consumption" account.  For example,

a.     On or about December 19, 2012, LM Ericsson, through certain of its agents, caused LM Ericsson to improperly record the payment of approximately $433,604 to Consulting Company B in LM Ericsson's consolidated books and records.

### The Scheme in Indonesia

89.     In or about and between 2012 and 2015, LM Ericsson, through certain of its employees and agents, including Ericsson Indonesia, Employee 5, and Employee 9, made approximately $45,000,000 in payments to Consulting Company C in order to create off-the-books slush funds to be managed by Consulting Company C, with oversight and direction from employees and agents of LM Ericsson and its subsidiaries, including Ericsson Indonesia, Employee 5, and Employee 9.  LM Ericsson, through its agents and employees, took active steps to conceal these payments on Ericsson's books and records.

90.     The payments to Consulting Company C were made pursuant to sham contracts between Ericsson Malaysia, Ericsson Indonesia, and Consulting Company C for services that were never performed.  For example,

a.     In or about January 2013, LM Ericsson, through certain of its employees and agents, including Ericsson Indonesia, Employee 5, and Employee 9, caused Ericsson Indonesia to enter into a sham consulting agreement with Consulting Company C.

91.     Toward the end of the scheme, Ericsson made termination payments to Consulting Company C but improperly recorded these payments in a "Customer Service" account connected with a "Cost of Sales" account.

92.     For example, on or about August 7, 2014, a representative of Consulting Company C, whose identity is known to the Fraud Section, the Office, and the Company, sent an email to Employee 9: "[Employee 9], Please see my updated files, attached, which show the current net balance as follows: Entitlements vs. Settlements = $3,625,734 . . Fridge = ($2,374,259) . . . [Other] = ($1,270,899) . . . Operational = ($634,783) . . . Net total = ($654,207)."  Ericsson Indonesia, Employee 9, and others, knew that the "Fridge" account was a cash account that was used for "off the book" expenses, such as pleasure travel to Bali, that certain employees of the Company did not want to record on the Company's books.

93.     LM Ericsson, through certain of its employees and agents, knowingly mischaracterized the above-described payments and improperly recorded them in LM Ericsson's consolidated books and records.  For example,

a.     On or about April 30, 2014, LM Ericsson, through certain of its employees and agents, caused the payment of approximately $1,329,162 to Consulting Company C to be improperly recorded in LM Ericsson's consolidated books and records.

94.     Some documents suggest a link between the "Fridge" account and the Company's customers in Indonesia, some of which were state-owned.

**The Scheme in Kuwait**

95.     In or about and between 2011 and 2013, LM Ericsson, through certain of its agents, including Ericsson AB, Employee 3, and Employee 11, made a payment of approximately $450,000 to Consulting Company D, at the request of Sales Agent 5, a representative of Consulting Company D.  The payment was not made in compliance with LM Ericsson's internal accounting controls.

96.     In order to conceal the payment to Consulting Company D, agents of LM Ericsson entered into a sham contract with Consulting Company D and approved a fake invoice for services that were never performed in order to paper over the payment.

97.     Specifically, in or around October 2011, Telecom Company C opened a tender for the modernization of Telecom Company C's radio access network in Kuwait.   In response to the tender, Ericsson AB submitted a bid for the project.

98.     In or around October 2011, Employee 11 was in contact with Sales Agent 5.   Sales Agent 5 provided Employee 11 with inside information, including competitor information, about the Telecom Company C tender.   During this time period, Sales Agent 5 and Consulting Company D did not have any formal agreement with LM Ericsson or Ericsson AB.

99.     On or about December 31, 2012, Telecom Company C awarded the tender to Ericsson AB, a contract valued at approximately $182,442,430.

100.     On or about January 28, 2013, Sales Agent 5 sent a text message to Employee 11, "I have told you in the past many times and I will tell you again that will not put you under pressure or ask you to do impossible things [or] have a fight or an argument with you I have a commitment to my friends in Kuwait which I need to fulfil[l] And will not pay it From pocket.  I need you to find a way out for us and quickly."

101.     On or about November 6, 2013, Sales Agent 5 sent an email to Employee 3, "[Employee 11] was told that I have personally paid my friends in Kuwait the amount of 315000 Dollars and in the process we are not friends any more. . . . [Employee 11] said he will come back with an offer the next day.  Two day later he called and made an offer to settle this matter for a payment of 400 k."

102.   On or about December 12, 2013, an Ericsson employee sent an email attaching a draft "Consultancy Frame Agreement" between Consulting Company D and Ericsson AB's branch office in Qatar.  In the email, the employee wrote, "I have been asked to sort out the mess we got into in Kuwait. . . .  I have constructed the attached agreement. . . . I do not want anyone to think that I had anything to do with this just because I am now cleaning it up!"

103.   In or about December 2013, Consulting Company D and Ericsson AB's branch office in Qatar entered into a Consultancy Frame Agreement dated December 10, 2013 (the "Consultancy Frame Agreement").  The agreement stated that Ericsson AB's branch office in Qatar engaged Consulting Company D to supply consulting services "within the area of marketing and sales support to increase customer satisfaction and enhance Ericsson business in Kuwait from the 1st of January 2010 to 31st of December 2012 with the purpose of winning the LTE business with [Telecom Company C]."  These services were never provided.

104.   The agreement also provided that it replaced a "previously signed agreement between the two parties which, due to reasons beyond the control of both parties, has been lost."  This was false.  There was no previously signed agreement.

105.   On or about December 22, 2013, Consulting Company D issued an invoice to Ericsson AB requesting a payment of $450,000 pursuant to the Consultancy Frame Agreement.  The invoice called for payment on services that were never performed.

106.   In or around December 2013, Ericsson AB's branch office in Qatar transferred approximately $450,000 to Consulting Company D.  Bank records show that the funds were wired through correspondent bank accounts in New York, New York, to Consulting Company D's bank account at a bank in Qatar.

107.    In or around 2013, LM Ericsson, through certain of its agents, caused the $450,000 payment to Consulting Company D to be improperly recorded in LM Ericsson's consolidated books and records.

### LM Ericsson's Willful Failure to Implement and Maintain Sufficient Internal Accounting Controls

108.    During the relevant time period, LM Ericsson, through certain of its employees and agents, knowingly and willfully failed to implement and maintain sufficient internal accounting controls, which facilitated the payment of bribes.

109.    Specifically, certain employees of LM Ericsson, Ericsson AB, and subsidiaries thereof, including Employee 3, Employee 4, Employee 5, Employee 6, and Employee 7, who were responsible for implementing and overseeing a system of reasonable internal accounting controls, were made aware of significant control weaknesses, including actions taken by employees and high-level executives to make improper payments to third party agents, yet knowingly and willfully failed to implement sufficient controls, which facilitated the payment of bribes.

110.    For example, with respect to the conduct in Djibouti, Employee 3, Employee 4, and others, who were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that the third party consultant in Djibouti was engaged in bribery, was being paid pursuant to fake invoices, was being paid pursuant to a sham contract, and was being paid despite not performing the services described in the invoices, and Employee 3, Employee 4, and others willfully failed to implement sufficient accounting controls to prevent transactions from being

improperly executed, and to prevent the Company's assets from being misused, in order to continue the bribery scheme.

111.    With respect to the conduct in Kuwait, Employee 3 and others, who were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that a third party consultant in Kuwait was being paid pursuant to a fake invoice, was being paid pursuant to a sham contract, and was being paid despite not performing the services described in the invoice, and Employee 3 and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and to prevent the Company's assets from being misused.

112.    With respect to the conduct in China, Employee 5, Employee 6, Employee 7, and others, were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that third party agents in China were engaged in providing gifts, travel, and entertainment to employees of state-owned customers, were being paid pursuant to fake invoices, were being paid pursuant to sham contracts, and were being paid despite not performing the services described in the invoices, and Employee 5, Employee 6, Employee 7, and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and the Company's assets from being misused, in order to continue the improper payments.

113.    With respect to the conduct in Vietnam and Indonesia, Employee 5 and others, were in a position to oversee and implement LM Ericsson's internal accounting controls, knew that the Company's internal accounting controls were insufficient to identify that third party agents in those countries were being paid pursuant to fake invoices in order to manage off-the-

books slush funds, were being paid pursuant to sham contracts, were being paid despite not performing the services described in the invoices, and Employee 5 and others willfully failed to implement sufficient accounting controls to prevent transactions from being improperly executed, and to prevent the Company's assets from being misused.

114.    In sum, despite the fact that high-level executives at LM Ericsson knew that the internal accounting controls were inadequate, LM Ericsson, as a result of the conduct of certain of its agents, employees, and high-level executives, nevertheless knowingly and willfully failed to implement sufficient controls, which facilitated the payment of bribes.

115.    The failures to implement internal accounting controls included, but were not limited to, controls relating to: (a) proper documentation and accounting for payments to agents and consultants, including the ultimate recipients of the payments and the reasons for the payments; (b) due diligence for the retention of third party agents and consultants; (c) ensuring due diligence was completed and a fully executed contract was entered with a third party before the third party could begin providing services; (d) ensuring that payments were commensurate with the services to be performed by third parties and that the services paid for were performed; and (e) oversight procedures by personnel at LM Ericsson for third party retention and payment.

### LM Ericsson's Falsified Books and Records

116.    As a result of LM Ericsson's failure to implement effective internal accounting controls, LM Ericsson, through certain of its employees and agents, disguised in its books and records the $2,100,000 in bribe payments to, and for the benefit of, foreign officials in Djibouti.  LM Ericsson, through certain of its employees and agents, also failed to properly record approximately $51,500,000 in payments to third party service providers in China, a subset of which

was used to fund gifts, travel, and entertainment for Chinese foreign officials; the $4,800,000 in payments to a consultant in Vietnam; the $45,000,000 in payments to a consultant in Indonesia, and the $450,000 payment to a consultant in Kuwait.

117.    In connection with these payments, LM Ericsson, through certain of its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered.  The payments were falsely or misleadingly characterized in LM Ericsson's books and records, including as consulting expenses, costs of sale, "external hardware" expenses, "corporate marketing fees," "service fulfillment of contract," or administrative or research and development costs.

118.    With respect to the conduct described above regarding China, approximately $51,500,000 in payments to third party service providers were inaccurately recorded in LM Ericsson's consolidated books and records.

119.    With respect to the conduct described above regarding Vietnam, approximately $4,800,000 in payments to Consulting Company B were inaccurately recorded in LM Ericsson's consolidated books and records.

120.    With respect to the conduct described above regarding Indonesia, approximately $45,000,000 in payments to Consulting Company C were inaccurately recorded in LM Ericsson's consolidated books and records.

121.    With respect to the conduct described above regarding Kuwait, the payment on or about December 30, 2013 of approximately $450,000 to Consulting Company D was inaccurately recorded in LM Ericsson's consolidated books and records.

A-2-1

# Attachment B

**ATTACHMENT  B**

**<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>**

I, Ronnie Leten, do hereby certify that I am the Chair of the Board of Directors of Telefonaktiebolaget LM Ericsson (or "the Company"), and that the following is an accurate excerpt of certain resolutions unanimously adopted by the Company's Board of Directors

For purposes of the adopted RESOLUTIONS, the following terms have the meanings ascribed below:

"<u>Company</u>" means Telefonaktiebolaget LM Ericson;

"<u>DPA</u>" means the deferred prosecution agreement entered into by the Company and the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of New York (together, referred to as the "<u>Offices</u>" or "<u>DOJ</u>") on 6 December 2019.

"<u>DPA Breach Notices</u>" means notices from the DOJ on 21 October 2021 and on 1 March 2022, in which the DOJ notified the Company and its counsel that DOJ had "determined that Ericsson breached its obligations . . . under the DPA" by, in the first instance, "failing to provide certain documents and factual information" and, in the second instance, failing to sufficiently report a 2019 internal investigation into alleged misconduct in Iraq.

"<u>Guilty Plea Documents</u>" means the DOJ's proposed plea agreement between the Company and the United States of America, by and through the Offices.

NOW, THEREFORE, BE IT:

RESOLVED, that the resolution of the DPA Breach Notices be, and it hereby is, authorized and approved substantially with the terms presented to the Board of Directors;

RESOLVED, that the Chief Financial Officer of the Company [Carl Mellander] and an LM Ericsson employee [Jonas Stringberg], designated by the Chief Executive Officer [Börje Ekholm]

and Chief Legal Officer [Scott Dresser], be, and each hereby is, authorized and instructed to execute and deliver the Guilty Plea Documents substantially with the terms presented to the Board of Directors on behalf of the Company;

RESOLVED, that the Group Head of Litigations and Disputes [Matthew Matule] (or any other individual designated by the Chief Executive Officer and Chief Legal Officer) be, and he hereby is, authorized on behalf of the Company to enter an appearance before the United States District Court for the Southern District of New York and to enter on behalf of the Company the requisite plea of guilty as provided in the Guilty Plea Documents substantially with the terms presented to the Board of Directors;

RESOLVED, that each of the Chief Executive Officer, Chief Financial Officer, and Chief Legal Officer, (or any person designated by them), be, and each of them hereby is, authorized and empowered to take any and all actions in the name of the Company or the Company's subsidiaries, as the case may be, as any of them may deem necessary, appropriate or desirable, to negotiate, execute and complete the resolution of the DPA Breach Notices and the Guilty Plea Documents substantially with the terms presented to the Board of Directors in accordance with these resolutions, and to take any such other decisions and actions as may be necessary, appropriate or desirable in connection therewith, and further, any and all actions taken by such persons in connection with the foregoing, are hereby adopted, ratified, confirmed and approved in all respects as fully as if any such action had been presented for approval and approved prior to such action being taken, subject to such changes as such officers shall approve, and the execution of the Guilty Plea Documents by such officer or officers shall be deemed to constitute conclusive evidence of their approval of such changes.

Date: 02 March 2023 | 08:34:04 CET

By: _____
Ronnie Leten
Chair of Board of Directors
Telefonaktiebolaget LM Ericsson

B-2

# Attachment C

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the  Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, Telefonaktiebolaget LM Ericsson (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption law.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.	The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws. its compliance policies, and its Code of Conduct.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws,"), which shall be memorialized in a written compliance policy or policies.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance policies and Code of Conduct, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company. Such policies and procedures shall address:

    a.      gifts;

    b.      hospitality, entertainment, and expenses;

    c.      customer travel;

    d.      political contributions;

    e.      charitable donations and sponsorships;

    f.      facilitation payments; and

g.      solicitation and extortion.

4.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts.  This system should be designed to provide reasonable assurances that:

a.      transactions are executed in accordance with management's general or specific authorization;

b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

c.      access to assets is permitted only in accordance with management's general or specific authorization; and

d.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance policies and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its Code of Conduct and anti-corruption compliance policies and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance policies and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's Code of Conduct or anti-corruption compliance policies and procedures.

11.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance policies and procedures.

*Enforcement and Discipline*

12.      The Company will implement mechanisms designed to effectively enforce its Code of Conduct and anti-corruption compliance policies and procedures, including appropriately incentivizing compliance and disciplining violations.

13.      The Company will institute appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's Code of Conduct and anti-corruption compliance policies and procedures by the Company's directors, officers, and

employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, Code of Conduct, and compliance policies and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.     The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.      properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's Code of Conduct and anti-corruption compliance policies and procedures; and

c.      seeking a reciprocal commitment from agents and business partners.

15.     Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of

the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's Code of Conduct or compliance policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.

17.     The Company will ensure that the Company's Code of Conduct and compliance policies and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance policies and procedures regarding anti-corruption laws; and

        b.     where warranted, conduct an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its Code of Conduct and anti-corruption compliance policies and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's

C-7

Code of Conduct and anti-corruption compliance policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

# Attachment D

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Telefonaktiebolaget LM Ericsson (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the Office of the United States Attorney for the Southern District of New York (the "Office") (collectively, "the Department"), are as described below:

1.      The Company retained the Monitor on June 2, 2020 for a period of three years pursuant to the Deferred Prosecution Agreement in United States v. Telefonaktiebolaget LM Ericsson, 1:19-cr-00884-AJN, DE 6, (December 6, 2019 S.D.N.Y.) entered into between the Defendant and the Department on December 6, 2019 (the "DPA").

2.      The Company and the Department agree to extend the term of the monitorship for one year (the "Term of the Monitorship") until June 1, 2024, unless the extension or early termination provision of Paragraph 1 of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

3.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the

"anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

4.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 11-12; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

5.      Any disclosure by the Company to the Monitor concerning corrupt payments, false books and records, and internal accounting control failures shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Department, pursuant to the Agreement.

*Withholding Access*

6.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

7.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Department. Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access. The Department may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the
Company and Review Methodology*

8.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

9.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and potential business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

10.     In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

11.     Pursuant to the mandate under the DPA, the Monitor has conducted three reviews and prepared three reports, which were submitted to the Department.

12.     To carry out the Mandate pursuant to the Agreement, during the Term of the Monitorship, the Monitor shall conduct a supplemental review and prepare a fourth report, as

D-4

described in Paragraphs 14-17 below. With respect to the fourth report, after consultation with the Company and the Department, the Monitor shall prepare the fourth written work plan on or before April 15, 2023, and the Company and the Department shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Department in its sole discretion.

13.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the fourth review shall include such steps as are reasonably necessary to conduct an effective fourth review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Fourth Review*

14.     The fourth review shall consist of two phases. The first phase of the fourth review commenced on January 15, 2023, pursuant to prior agreement between the Department, the Monitor, and the Company. The second phase of the fourth review shall commence no later than thirty (30) calendar days from the date of the date of the Monitor's fourth review work plan (unless otherwise agreed by the Company, the Monitor, and the Department). The Monitor shall issue a written report within two hundred fifteen (215) days of commencing the second phase of the fourth review, setting forth the Monitor's assessment and, if

necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her report with the Company prior to finalizing the report. The Monitor's report need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices. Rather, the report should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to

> Deputy Chief – FCPA Unit
> Deputy Chief – CECP Unit
> Criminal Division, Fraud Section
> U.S. Department of Justice
> 1400 New York Avenue N.W.
> Bond Building, Eleventh Floor
> Washington, D.C. 20005
>
> Chief, Criminal Division
> United States Attorney's Office for the Southern District of New York
> 1 St. Andrew's Plaza
> New York City, NY 10007

After consultation with the Company, the Monitor may extend the time period for issuance of the fourth report for a brief period of time with prior written approval of the Department.

15. Within ninety (90) calendar days after receiving the Monitor's fourth report, the Company shall adopt and implement all recommendations in the report. If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the Department of any such recommendations in writing within twenty (20) calendar days of receiving

the report. The Company need not adopt those recommendations within the ninety (90) calendar days of receiving the report but shall propose in writing to the Monitor and the Department an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

16.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Department. The Department may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

17.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within ninety (90) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Department.

*Certification of Compliance*
*and Termination of the Monitorship*

18.     At the conclusion of the one hundred and five (105) calendar day period following the issuance of the fourth report, if the Monitor believes that the Company's compliance program is reasonably designed and implemented to detect and prevent violations of the anti-corruption laws and is functioning effectively, the Monitor shall certify the Company's compliance with its compliance obligations under the Agreement. The Monitor shall then submit to the Department a written report ("Certification Report") within thirty (30) calendar days. The Certification Report shall set forth an overview of the Company's remediation efforts to date, including the

implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts. Also at the conclusion of the 105 calendar day period following the issuance of the fourth report, the Company shall certify in writing to the Department, with a copy to the Monitor, that the Company has adopted and implemented all of the Monitor's recommendations in all prior reports, or the agreed-upon alternatives. The Monitor or the Company may extend the time period for issuance of the Certification Report or the Company's certification, respectively, with prior written approval of the Department.

*Monitor's Discovery of Potential or Actual Misconduct*

19. (a) Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- improper payments or anything else of value may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

- the Company may have maintained false books, records or accounts; or

the Company may have failed to implement a system of internal accounting controls that is sufficient to accurately record the Company's transactions.(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Department at any time, and shall report Potential Misconduct to the Department when it requests the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Department and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Department and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct has occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Department. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Department, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Department and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Department or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Department and address the Company's failure to disclose the necessary information in his or her reports.

(e)     Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

20.     The Monitor shall meet with the Department within thirty (30) calendar days after providing the report to the Department to discuss the report, to be followed by a meeting between the Department, the Monitor, and the Company.

21.     At least annually, and more frequently if appropriate, representatives from the Company and the Department will meet to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Department, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

22.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Department determines in its sole discretion that disclosure would be in furtherance of the Department's discharge of its duties and responsibilities or is otherwise required by law.

# Attachment E

**ATTACHMENT E**

**<u>CERTIFICATION</u>**

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention:  Chief of the Fraud Section

        United States Department of Justice
        United States Attorney's Office
        Southern District of New York ("SDNY")
        Attention: United States Attorney for SDNY

Re:     Plea Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 9 of the Plea Agreement ("the Agreement") filed on ____, in the United States District Court for the Southern District of New York, by and between the United States of America and Telefonaktiebolaget LM Ericsson (the "Company"), that undersigned are aware of the Company's compliance obligations under Paragraphs 9 and 10 of the Agreement, and that, based on the undersigned's review and understanding of the Company's anti-corruption compliance program that incorporates relevant internal accounting controls, the Company has implemented an compliance program that meets the requirements set forth in Attachment C to the Agreement.  The undersigned certifies that such compliance program is reasonably designed to detect and prevent violations of the FCPA and other anti-corruption laws throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer of the Company and the Chief Compliance Officer of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation

shall be deemed to have been made in the Southern District of New York. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of New York.

Date: _____       Name (Printed): _____


                                     Name (Signed): _____
                                     Chief Executive Officer
                                     Telefonaktiebolaget LM Ericsson


Date: _____       Name (Printed): _____


                                     Name (Signed): _____
                                     Chief Compliance Officer
                                     Telefonaktiebolaget LM Ericsson

F-2

# Attachment F

**ATTACHMENT F**

**<u>CERTIFICATION</u>**

To:    United States Department of Justice
Criminal Division, Fraud Section
Attention:  Chief of the Fraud Section

United States Department of Justice
United States Attorney's Office
Southern District of New York ("SDNY")
Attention: United States Attorney for SDNY

Re:    Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 13 of the Plea Agreement ("the Agreement") filed on _____, in the United States District Court for the Southern District of New York, by and between the United States of America and Telefonaktiebolaget LM Ericsson (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 13 of the Agreement, and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of New York (collectively, the "Offices") any evidence or allegations of conduct required pursuant to Paragraph 13 of the Agreement, which includes any evidence or allegation of conduct that may constitute a violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirements contained in Paragraph 13 and the representations contained in this certification

E-2

constitute a significant and important component of the Agreement and of the Offices' determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Southern District of New York.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Southern District of New York.

Date: _____        Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Executive Officer
                                     Telefonaktiebolaget LM Ericsson

Date: _____        Name (Printed): _____

                                     Name (Signed): _____
                                     Chief Financial Officer
                                     Telefonaktiebolaget LM Ericsson

E-2