# Exhibit 57

# FCPA

*A Resource Guide to the* U.S. Foreign Corrupt Practices Act
## Second Edition

By the Criminal Division of the U.S. Department of Justice and
the Enforcement Division of the U.S. Securities and Exchange Commission




# FOREWORD

We are pleased to announce the publication of the Second Edition of *A Resource Guide to the U.S. Foreign Corrupt Practices Act*. The *Guide* was originally published by the Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) in November 2012 to provide companies, practitioners, and the public with detailed information about the statutory requirements of the Foreign Corrupt Practices Act (FCPA) while also providing insight into DOJ and SEC enforcement practices through hypotheticals, examples of enforcement actions and anonymized declinations, and summaries of applicable case law and DOJ opinion releases. Then and now, the *Guide* represents one of the most thorough compilations of information about any criminal statute, and remains relevant to this day.

Although many aspects of the *Guide* continue to hold true today, the last eight years have also brought new cases, new law, and new policies. The Second Edition of the *Guide* reflects these updates, including new case law on the definition of the term "foreign official" under the FCPA, the jurisdictional reach of the FCPA, and the FCPA's foreign written laws affirmative defense. It addresses certain legal standards, including the *mens rea* requirement and statute of limitations for criminal violations of the accounting provisions. It reflects updated data, statistics, and case examples. And it summarizes new policies applicable to the FCPA that have been announced in the DOJ's and SEC's continuing efforts to provide increased transparency, including the DOJ's FCPA Corporate Enforcement Policy, Selection of Monitors in Criminal Division Matters, Coordination of Corporate Resolution Penalties (or Anti-Piling On Policy), and the Criminal Division's Evaluation of Corporate Compliance Programs.

Foreign bribery is a scourge that must be eradicated. It undermines the rule of law, empowers authoritarian rulers, distorts free and fair markets, disadvantages honest and ethical companies, and threatens national security and sustainable development. This updated *Guide* is meant not only to summarize the product of the dedicated and hardworking individuals who combat foreign bribery as part of their work for the U.S. government, but also to help companies, practitioners, and the public—many of whom find themselves on the front lines of this fight—prevent corruption in the first instance. We hope that the *Guide* will continue to be an invaluable resource in those efforts.

**Brian A. Benczkowski**
Assistant Attorney General
Criminal Division
Department of Justice

**Stephanie Avakian & Steven Peikin**
Co-Directors
Division of Enforcement
Securities and Exchange Commission

**July 2020**

## Hypothetical: Facilitating Payments

Company A is a large multinational mining company with operations in Foreign Country, where it recently identified a significant new ore deposit. It has ready buyers for the new ore but has limited capacity to get it to market. In order to increase the size and speed of its ore export, Company A will need to build a new road from its facility to the port that can accommodate larger trucks. Company A retains an agent in Foreign Country to assist it in obtaining the required permits, including an environmental permit, to build the road. The agent informs Company A's vice president for international operations that he plans to make a one-time small cash payment to a clerk in the relevant government office to ensure that the clerk files and stamps the permit applications expeditiously, as the agent has experienced delays of three months when he has not made this "grease" payment. The clerk has no discretion about whether to file and stamp the permit applications once the requisite filing fee has been paid. The vice president authorizes the payment.

A few months later, the agent tells the vice president that he has run into a problem obtaining a necessary environmental permit. It turns out that the planned road construction would adversely impact an environmentally sensitive and protected local wetland. While the problem could be overcome by rerouting the road, such rerouting would cost Company A $1 million more and would slow down construction by six months. It would also increase the transit time for the ore and reduce the number of monthly shipments. The agent tells the vice president that he is good friends with the director of Foreign Country's Department of Natural Resources and that it would only take a modest cash payment to the director and the "problem would go away." The vice president authorizes the payment, and the agent makes it. After receiving the payment, the director issues the permit, and Company A constructs its new road through the wetlands.

### Was the payment to the clerk a violation of the FCPA?

No. Under these circumstances, the payment to the clerk would qualify as a facilitating payment, since it is a one-time, small payment to obtain a routine, non-discretionary governmental service that Company A is entitled to receive (i.e., the stamping and filing of the permit application). However, while the payment may qualify as an exception to the FCPA's anti-bribery provisions, it may violate other laws, both in Foreign Country and elsewhere. In addition, if the payment is not accurately recorded, it could violate the FCPA's books and records provision.

### Was the payment to the director a violation of the FCPA?

Yes. The payment to the director of the Department of Natural Resources was in clear violation of the FCPA, since it was designed to corruptly influence a foreign official into improperly approving a permit. The issuance of the environmental permit was a discretionary act, and indeed, Company A should not have received it. Company A, its vice president, and the local agent may all be prosecuted for authorizing and paying the bribe.

## Does the FCPA Apply to Cases of Extortion or Duress?

Situations involving extortion or duress will not give rise to FCPA liability because a payment made in response to true extortionate demands under imminent threat of physical harm cannot be said to have been made with corrupt intent or for the purpose of obtaining or retaining business.[174] In enacting the FCPA, Congress recognized that real-world situations might arise in which a business is compelled to pay an official in order to avoid threats to health and safety. As Congress explained, "a payment to an official to keep an oil rig from being dynamited should not be held to be made with the requisite corrupt purpose."[175]

Mere economic coercion, however, does not amount to extortion. As Congress noted when it enacted the FCPA: "The defense that the payment

was demanded on the part of a government official as a price for gaining entry into a market or to obtain a contract would not suffice since at some point the U.S. company would make a conscious decision whether or not to pay a bribe."[176] The fact that the payment was "first proposed by the recipient … does not alter the corrupt purpose on the part of the person paying the bribe."[177]

This distinction between extortion and economic coercion was recognized by the court in *United States v. Kozeny*. There, the court concluded that although an individual who makes a payment under duress (i.e., upon threat of physical harm) will not be criminally liable under the FCPA,[178] a bribe payor who claims payment was demanded as a price for gaining market entry or obtaining a contract "cannot argue that he lacked the intent to bribe the official because he made the 'conscious decision' to pay the official."[179] While the bribe payor in this situation "could have turned his back and walked away," in the oil rig example, "he could not."[180]

Businesses operating in high-risk environments may face real threats of violence or harm to their employees, and payments made in response to imminent threats to health or safety do not violate the FCPA.[181] If such a situation arises, and to ensure the safety of its employees, companies should immediately contact the appropriate U.S. embassy for assistance.

## Principles of Corporate Liability for Anti–Bribery Violations

General principles of corporate liability apply to the FCPA. Thus, a company is liable when its directors, officers, employees, or agents, acting within the scope of their employment, commit FCPA violations intended, at least in part, to benefit the company.[182] Similarly, just as with any other statute, DOJ and SEC look to principles of parent-subsidiary and successor liability in evaluating corporate liability. As described more fully below, unlike with most other statutes, DOJ has instituted an FCPA Corporate Enforcement Policy that applies to corporate resolutions in the FCPA context.

### Parent–Subsidiary Liability

There are two ways in which a parent company may be liable for bribes paid by its subsidiary.

*First*, a parent may have participated sufficiently in the activity to be directly liable for the conduct—as, for example, when it directed its subsidiary's misconduct or otherwise directly participated in the bribe scheme.

*Second*, a parent may be liable for its subsidiary's conduct under traditional agency principles. The fundamental characteristic of agency is control.[183] Accordingly, DOJ and SEC evaluate the parent's control—including the parent's knowledge and direction of the subsidiary's actions, both generally and in the context of the specific transaction—when evaluating whether a subsidiary is an agent of the parent. Although the formal relationship between the parent and subsidiary is important in this analysis, so are the practical realities of how the parent and subsidiary actually interact.

If an agency relationship exists and the subsidiary is acting within the scope of authority conferred by the parent, a subsidiary's actions and knowledge are imputed to its parent.[184] Moreover, under traditional principles of *respondeat superior*, a company is liable for the acts of its agents, including its employees, undertaken within the scope of their employment and intended, at least in part, to benefit the company.[185] Thus, if an agency relationship exists between a parent and a subsidiary, the parent is liable for bribery committed by the subsidiary's employees. For example, SEC brought an administrative action against a parent for bribes paid by the president of its indirect, wholly owned