UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
IN RE TELEFONAKTIEBOLAGET LM                                :
ERICSSON SECURITIES LITIGATION                              :        **DECISION & ORDER**
                                                            :        22-CV-1167 (WFK) (LB)
                                                            :
                                                            :
------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court is a Rule 12(b)(6) motion filed by Telefonaktiebolaget LM Ericsson ("Ericsson" or the "Company") and Börje Ekholm, Carl Mellander, and Xavier Dedullen (collectively, the "Individual Defendants") to dismiss the Amended Class Action Complaint ("CAC"). ECF No. 47. Lead Plaintiff Boston Retirement System ("BRS" or "Lead Plaintiff"), on behalf of a putative class of purchasers of Ericsson's securities, opposes the motion. ECF No. 50. For the reasons below, the Court GRANTS Defendants' motion and DISMISSES the Amended Class Action Complaint with prejudice.

# BACKGROUND

This federal securities class action is brought by a putative class of investors who acquired Ericsson's American Depositary Shares ("ADS") between April 27, 2017 and March 1, 2022. Amended Class Action Complaint ("CAC"), ECF No. 39, ¶ 1. The CAC alleges Defendants made materially false or misleading statements or omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5. The CAC also raises a claim under Section 10(b) and SEC Rule 10b-5(a) and (c) alleging Defendants employed a scheme to defraud investors.[1] Finally, the CAC raises a control-person claim against the Individual Defendants pursuant to Section 20(a) of the Exchange Act.

---

[1] In their motion to dismiss, Defendants do not address Count II of the CAC, which contains Lead Plaintiff's scheme liability claim. Nor does Lead Plaintiff discuss Count II in its opposition to Defendants' motion. Given the parties' silence on Count II, the Court does not address Plaintiff's scheme liability claim.

*The Parties*

Defendant Ericsson is a Swedish multinational communications company "that develops, sells, and manages telecommunications infrastructure including software, hardware, and information technology services." *Id.* ¶ 2. The core of Ericsson's business consists of "implementing telecommunications infrastructure to support mobile broadband across the globe." *Id.* ¶ 69.

Defendants Ekholm, Mellander, and Dedullen each served as Company executives during the class period. Defendant Ekholm has served as Ericsson's CEO since 2017, Defendant Mellander has served as Ericsson's CFO since 2017, and Defendant Dedullen served as Ericsson's Chief Legal Officer between 2018 and March 2022. *Id.* ¶¶ 63-65.

BRS is a "governmental defined benefit pension that administers retirement benefits to all employees of the City of Boston, as well as its autonomous agencies, including: the City of Boston, the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission." *Id.* ¶ 61. BRS "oversees the pensions of more than 34,000 retired and active members" and the current value of its assets under management is $5.4 billion. *Id.* BRS raises the instant claims on behalf of itself and similarly situated investors who acquired Ericsson's ADS within the class period of April 27, 2017 to March 1, 2022. *Id.* ¶ 1.

*Class Period Events*

Ericsson began operating in Iraq following the withdrawal of the United States military in 2011. *Id.* ¶ 3. According to the CAC, the Company established operations in Iraq because the country was "a massively profitable target for growth and expansion." *Id.* In particular, BRS alleges Ericsson "moved swiftly to secure government and mobile provider contracts [in Iraq]

including agreements to construct large scale radio base stations and mobile switch centers—some of the country's largest scale and most profitable projects." *Id.* BRS claims Ericsson's operations in Iraq were extremely successful, purportedly earning $1.9 billion in revenue between 2011 and 2018. *Id.* ¶ 82.

During the same period, the U.S. Department of Justice ("DOJ") and SEC began investigating Ericsson's business practices in developing countries. *Id.* ¶ 6. These investigations culminated on December 6, 2019 when Ericsson pled guilty to violations of the Foreign Corrupt Practices Act ("FCPA") arising from its operations in Djibouti, China, Vietnam, Indonesia, and Kuwait, accepted a $1 billion fine, and entered into a Deferred Prosecution Agreement ("DPA") with DOJ. *Id.* ¶ 28. As part of the DPA, Ericsson admitted to "crimes, illegal business practices, bribes, and corruption" in the aforementioned countries. *Id.* ¶¶ 28, 31. Additionally, and particularly relevant to BRS's instant claims, the DPA required Ericsson to disclose to DOJ any potential FCPA violations in other countries in which it operates, as well as any internal investigations related to possible FCPA violations. *Id.* ¶ 32.

BRS alleges while the Government was investigating Ericsson, the Company engaged law firm Simpson Thacher & Bartlett LLP ("Simpson Thacher") as outside counsel to conduct an internal investigation into Ericsson's business practices in Iraq. *Id.* ¶ 9. Simpson Thacher's purported investigation culminated in a 79-page report dated December 11, 2019—less than one week after Ericsson pled guilty to FCPA violations in Djibouti, China, Vietnam, Indonesia, and Kuwait. [2] *Id.* ¶ 34. According to BRS, the report "established not only rampant corruption and

[2] According to news reports, Simpson Thacher has denied undertaking the Iraq investigation or preparing the report, stating: "The scope of Simpson Thacher's representation did not include preparing Ericsson's investigative report related to Iraq (which the Firm first became aware of in late 2019), or providing any advice concerning the substance of that report or the investigation that led to it." Stewart Bishop, *Ericsson Pleads Guilty and Will Pay $207M Over Botched DPA*, Law360 (March 21, 2023), https://www.law360.com/articles/1588535/ericsson-pleads-guilty-and-will-pay-207m-over-botched-dpa. However, Defendants in the instant case have not disputed BRS's claim that Simpson Thacher prepared the 2019 report.

FCPA violations related to the use of bribes, sham contracts, and kickbacks to secure lucrative telecommunications contracts in Iraq, but also shocking evidence of Ericsson paying a known terrorist organization, the Islamic State of Iraq and Syria ('ISIS'), for access to transportation routes through ISIS territory and in ISIS-held cities." *Id.* ¶ 10. The report also indicated Ericsson's alleged corrupt acts included, *inter alia*, paying bribes to private customers, including Iraq's main mobile carriers, and Iraqi officials to obtain contracts, and carrying out its contracts by paying ISIS to use roadways controlled by the terrorist group. *Id.* ¶¶ 100-02, 108, 111-16.

On February 15, 2022, Ericsson issued a press release addressing its conduct in Iraq after a group of journalists at the International Consortium of Investigative Journalists ("ICIJ") obtained the Company's internal report and sent Ericsson a list of related inquiries. *Id.* ¶¶ 165-68. Shortly thereafter, on March 1, 2022, DOJ determined Ericsson breached the DPA by failing to make subsequent disclosures to DOJ regarding the Company's dealings in Iraq. Defs.' Mem. in Support of Mot. to Dismiss ("Defs.' Mem."), ECF No. 48, at 1.

BRS's instant claims revolve around Ericsson's purported concealment of, and subsequent statements regarding, the company's conduct in Iraq. BRS deems these statements misrepresentations and alleges they artificially inflated Ericsson's share price, and that when the extent of Ericsson's misconduct in Iraq came to light, Ericsson's share price "fell precipitously," thus harming the class of investors BRS represents. *Id.* ¶¶ 272-76.

In particular, BRS alleges Ericsson and the Individual Defendants misled investors regarding (1) the source of Ericsson's growth in the Middle East; (2) the strength of Ericsson's compliance policies and anti-corruption controls; and (3) the resolution of the DOJ and SEC investigations and the risk of future enforcement actions. CAC ¶¶ 193, 205, 207, 209, 215, 220, 222. The Court lays out these alleged misstatements below.

A. Alleged Misstatements Concerning the Strength of Ericsson's Business in the Middle East

BRS first alleges Defendants misled investors regarding the source of the Company's growth in the Middle East. *Id.* ¶ 192. According to BRS, Ericsson attributed its growth to "major mobile broadband projects in the Middle East," when, in reality, the success of these projects hinged on "illegal conduct including bid rigging, bribery, and slush fund payments" and "transporting equipment and materials into the country" which itself "was made possible, in part, by making illegal 'protection payments' to ISIS." *Id.* ¶ 193. BRS claims four of Defendants' alleged misstatements fall into in this category, all of which, BRS argues, falsely attribute Ericsson's Middle Eastern growth to factors other than illegal conduct. These statements are:

1. Ericsson's 2016 SEC Form 20-F, which reported the Company's Middle Eastern business results, and stated, "[s]ales increased, primarily in Global Services. In the first half of the year, Network sales growth was mainly driven by some major mobile broadband projects, which were completed in the second half of the year." *Id.* ¶¶ 193-94.

2. An October 20, 2017 earnings call, during which Defendant Ekholm stated, "we actually see growth in Middle East and Africa which is explained by multiple customers in multiple countries. So there are many contributing parts." *Id.* ¶ 201.

3. An April 20, 2018 earnings call, during which Defendant Mellander stated: "[we] see the investments in R&D paying off [in networks] when it comes to the gross margin improvement there. . . . [there is a mix between China coming down] but also strong performance, a good momentum in North America but also Latin America and Middle East." *Id.* ¶ 203.

4.  Ericsson's SEC Form 6-K, filed on October 20, 2017, which stated, "[s]ales in the
    Middle East showed growth despite a continued challenging macroeconomic
    environment." *Id.* ¶ 205.

## B. Alleged Misstatements Concerning Ericsson's Purportedly Robust Anti-Corruption Program

BRS also alleges Defendants misled investors by "touting the purported robustness" of
the Company's compliance and enhanced anti-corruption programs. *Id.* ¶ 207. BRS argues
these programs failed to identify "Ericsson's business in Iraq was sustained by obtaining
contracts through illegal bribes, kickbacks, and bid rigging practices" and that "[Ericsson's]
ability to complete projects depended upon the paid assistance of ISIS for access to key
transportation routes and cities." *Id.* Defendants also allegedly knew Ericsson failed to properly
implement steps to improve its anti-corruption program and that the Company's third-party
"vetting process did not identify the Company's illegal relationships with ISIS." *Id.* Three of
Defendants' alleged misstatements fall into this category.

5.  Ericsson's 2016 SEC Form 20-F referring investors to the Company's 2016 corporate
    governance report, which stated: "to ensure compliance with legal and regulatory
    requirements and the high standards that we set for ourselves, Ericsson has adopted
    internal rules that include" a "Code of Business Ethics"; "Group Steering Documents,
    including Group policies and directives, instructions and business processes for
    approval, control and risk management"; and "[a] Code of Conduct, which applies to
    product development, production, supply and support of Ericsson products and
    services worldwide." *Id.* ¶ 208. The corporate governance report also stated,
    "Ericsson's Code of Business Ethics summarizes fundamental Group policies and
    directives and contains rules to ensure that business is conducted with a strong sense

of integrity," and "[that by requiring employees to acknowledge that they are aware of the principles of the Code of Business Ethics] Ericsson strives to raise awareness throughout its global operations." *Id.* ¶ 209.

6. Ericsson's 2017 SEC Form 20-F/A, the Company's foreign issuer annual report filed on March 27, 2018, which stated, *inter alia*, "Ericsson has a zero tolerance approach to corruption expressed in the Company's Code of Business Ethics"; "[t]he Company has embedded this guiding principle at its highest levels and implemented it throughout its global organization with a set of policies and processes"; and "[t]his includes an anticorruption directive with more detailed guidelines." *Id.* ¶ 211.

7. Ericsson's 2017 SEC Form 20-F, which stated, "[i]n 2017, Ericsson introduced a vetting process that focuses on ethics and compliance. . . . All members of the current Executive Team have been vetted, and all future recruitments to these positions will also go through mandatory vetting. Business Partner Review Boards have been established in all Market Areas to over-see mitigation of the corruption risks in relation to onboarding of new business partners." *Id.* ¶ 213.

C. Statements Concerning Ericsson's Entry into the DPA and the Internal Iraqi Corruption Report

Lastly, BRS alleges Defendants misled investors regarding the purported resolution of DOJ's investigation into the company's business practices. BRS argues Defendants misrepresented the company's compliance with the DPA and the risk of future enforcement actions. In particular, BRS argues "(a) Ericsson knowingly violated the DPA's ongoing disclosure requirements by concealing the known illegal conduct in Iraq; (b) the strength of Ericsson's compliance systems were unchanged because the illegal conduct in Iraq continued to be concealed; and (c) the risks of future government enforcement action for the same misconduct

were not mitigated or reduced in any way." *Id.* ¶ 215.  BRS cites eight alleged misstatements in this category.

8. A December 6, 2019 press release announcing Ericsson had reached a resolution regarding the DOJ's and SEC's FCPA investigations, which stated, *inter alia*, "[t]he resolution marks the end of the FCPA-related investigations into Ericsson and its subsidiaries undertaken by the DOJ and the SEC." *Id.* ¶ 216.

9. The same December 2019 press release, in which Ericsson listed a number of improvements to the Company's ethics and compliance program, including, *inter alia*, "[e]nhancing the internal anti-corruption and compliance related awareness campaigns (including the Company's zero tolerance for corruption)." *Id.* ¶ 220.

10. A December 7, 2019 earnings call in which Defendants Ekholm and Mellander discussed Ericsson's entrance into the DPA, and in which Defendant Ekholm stated, "[t]his settlement puts an end to a long and wide-ranging process. . . . I'm actually glad that we finally reached this day. We're now able to move forward and fully focus on our business and build a stronger company." *Id.* ¶ 222.

11. The same December 7, 2019 earnings call, in which Defendant Dedullen stated, "we are not aware of any other follow-on investigations in any of the other countries," in response to a question asking if "you could give us an update on whether [other investigations in other regions have started] or you've had any kind of discussions with the regulators." *Id.* ¶ 224.

12. The same call, in which Defendant Ekholm stated, "we can continue to do business in the countries we are in, but of course, we need to be compliant. And that's the way I

would conduct the business anyway," in response to a question asking how the DPA's compliance monitoring requirements would affect Ericsson's business. *Id.* ¶ 226.

13. The Company's 2020 SEC Form 20-F, in which Ericsson reported, *inter alia*, its audit and compliance committee "evaluated the effectiveness and appropriateness of Ericsson's anti-bribery and corruption program" and that "[c]ertain cross-process risks are centrally coordinated, such as risks relating to [*inter alia*] . . . anti-bribery and corruption." *Id.* ¶ 228. The 20-F stated Ericsson's FCPA compliance monitor's "main responsibilities include reviewing Ericsson's compliance with the terms of the settlement and evaluating the Company's progress in implementing and operating its enhanced compliance program and accompanying controls as well as providing recommendations for improvements." *Id.* ¶ 229. The Company also disclosed Ericsson was engaging with the monitor "while the Company continues to undertake significant reforms to strengthen its Ethics & Compliance program." *Id.* ¶ 229.

14. A March 26, 2021 earnings call, in which Defendant Ekholm referenced the DPA's independent monitor requirement, stating: "we can simply never allow what happened previously to happen again. . . . we cooperate fully [with government agencies] . . . we have a culture where we have zero tolerance when it comes to corruption and that we comply with all rules fully." *Id.* ¶ 231.

15. A January 25, 2022 earnings call, in which Defendant Ekholm stated, "Ericsson basically failed to provide certain documents and factual information [to DOJ]. I'm sorry to say, but at this point in time, we will have no further information to share. But I will say that we will update the market as soon as we have additional information about the matter and then we will share it, of course." *Id.* ¶ 233.

16. Ericsson's February 15, 2022 press release, in which Ericsson addressed the Company's conduct in Iraq and allegedly "continued to assure investors of its 'transparency' regarding the allegations of corruption in Iraq and its ability to manage compliance risks due to its 'processes in place to manage security risks, covering both employees and subcontractors' and the purported fact that '[t]he company acts upon the findings of any misconduct, through disciplinary actions, process improvements and internal learning.'" *Id.* ¶ 235.

## **LEGAL STANDARDS**

A. Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA")

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must be dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In considering a motion to dismiss, the Court must accept all the non-movant's factual allegations as true and draw all reasonable inferences in the non-movant's favor. *Id.* at 555. However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

A plaintiff alleging securities fraud must also satisfy the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Under Rule 9(b), a plaintiff alleging fraud must "state[] with particularity . . . the circumstances constituting fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). More specifically, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012).

## B. Section 10(b) and Rule 10b-5

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Because the central arguments in this case revolve around the first two elements, the Court addresses the legal standards for both in more detail below.

### i. Material Misrepresentations or Omissions

Two components comprise a misstatement under Section 10(b) and Rule 10b-5: the statement must be both (1) false and (2) material. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (Forrest, J.).

#### 1. Falsity

To be actionable, an alleged misstatement must be false or misleading. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Whether a statement is false or misleading is

"evaluated not only by 'literal truth,' but by context and manner of presentation.'" *Id.* (internal citation omitted). Moreover, a plaintiff must show the alleged "misstatement was false at the time it was made." *Lululemon*, 14 F. Supp. 3d at 571. "A statement believed to be true when made, but later shown to be false, is insufficient." *Id.* "To establish the falsity of an opinion, a plaintiff must plead that (i) 'the speaker did not hold the belief she professed,' (ii) any 'supporting fact[s] she supplied' with her opinion 'were untrue,' or (iii) the speaker omitted facts whose omission makes the statement misleading to a reasonable investor." *In re Citigroup Sec. Litig.*, 20-CV-9132 (LAP), 2023 WL 2632258, at *12 (S.D.N.Y. Mar. 24, 2023) (Preska, J.) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).

    2. <u>Materiality</u>

    As the Second Circuit has described, "[a]n alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" *Singh*, 918 F.3d at 63. To be actionable, such a statement must have "significantly altered the 'total mix' of information made available" in the view of a reasonable investor. *Id.* (internal citation omitted).

    "Certain categories of statements are immaterial as a matter of law, such as 'puffery,' opinions, and forward-looking statements accompanied by adequate cautionary language." *Citigroup*, 2023 WL 2632258, at *11. In the same vein, "'[r]osy predictions,' or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable." *Lululemon*, 14 F. Supp. 3d at 572 (citing *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) ("statements containing simple economic projections, expressions of

optimism, and other puffery are insufficient"), and *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (similar)).

    ii.    <u>Scienter</u>

Second, the PSLRA requires plaintiffs to plead scienter—that is, a defendant's "intention to deceive, manipulate, or defraud"—with particularity. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). To do so, a plaintiff must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (internal citations omitted). To qualify as "strong" under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314.

A plaintiff may prove scienter in one of two ways: by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184-85 (2d Cir. 2014) (internal citation omitted). To show scienter through circumstantial evidence, a plaintiff must allege conduct that, at the least, "is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnet v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). To show scienter in the corporate context, a plaintiff must plead facts raising "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

## DISCUSSION

I.     <u>Failure to Plead Actionable Misrepresentation or Omission</u>

Defendants argue all the alleged misstatements cited in the CAC are unactionable for one or both of the following reasons: the statements were (1) immaterial as a matter of law or (2) not false when made. The Court agrees.

A.  <u>Middle East Growth Statements</u>

Defendants argue the Middle East statements are not actionable because, in the Second Circuit, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *UBS*, 752 F.3d at 184. Further, as the Second Circuit recently explained, "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98-99 (2d Cir. 2021). Accordingly, Defendants argue BRS cannot turn Defendants' general statements about Ericsson's growth in the Middle East into actionable securities fraud claims by pointing to purported corruption in Ericsson's Iraqi operations.

On the other hand, BRS argues while companies do not have a duty to disclose unadjudicated wrongdoing "in certain narrow circumstances," such is not the case here. Rather, BRS argues "when a company puts the source of its financial success at issue, they 'must disclose information concerning the source of its success, including illegal sources.'" Pl.'s Mem. in Opp. at 2 (quoting *In re Veon Ltd. Sec. Litig.*, 2017 WL 4162342, at *5 (S.D.N.Y. Sept. 19, 2017) (Carter, J.)). According to BRS, Defendants placed the source of Ericsson's growth in the Middle East at issue and thereby misled investors by failing to mention the corrupt conduct involved in securing and executing the company's contracts in Iraq. As such, BRS urges this

Court to follow *In re Braskem* and *In re Veon*—two cases from the Southern District of New York—in which both courts held the plaintiffs made out securities fraud claims against defendants who made misleading statements regarding their respective sources of success.

In *Braskem*, the U.S. District Court for the Southern District of New York held the plaintiffs, who purchased stock in a Brazilian petrochemical company, adequately alleged that the defendants' statements about the price of naphtha, a critical raw material input, were misleading. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) (Engelmayer, J.). There, the court found the defendants, "while commenting on naphtha pricing, omitted to reveal the—or at least an—elephant in the room: that the favorable purchase price that Braskem secured was substantially due to its bribery of Petrobras and public officials." *Id.* at 759. The court continued, "Braskem deceptively omitted to list—among the 'variety of factors' that the Form 20–F depicted as the reasons for the naphtha prices Braskem paid Petrobras—a major factor: the bribery scheme that secretly assured that, whatever result the listed factors might otherwise yield, Braskem would emerge paying a below-market price. . . . Braskem's omission from its list of this key factor, the bribery-affected side deal with Petrobras, was a classic half-truth." *Id.* at 759-60.

Similarly, in *Veon*, the U.S. District Court for the Southern District of New York held that certain of the defendant company's statements in its 6-K SEC filings "sufficiently place[d] the reasons for growth in Uzbekistan at issue to make further disclosure necessary." *Veon*, 2017 WL 4162342, at *6. For example, the company asserted its "sales and marketing efforts" in Uzbekistan resulted in increased mobile subscribers and revenues. *Id.* Similarly, the company "attributed its growth in Uzbekistan to particular causes, such as its 'sales and marketing activities, regional 3G network roll-out and data development,' or 'efficient SG&A spending,'

without mentioning" bribes the company made to an Uzbekistani official's family member. *Id.* at \*7. The court, following the reasoning set out in *Braskem*, found the statements actionable. *Id.* ("[T]hese disclosures are in line with those that the district court found actionable in *Braskem*, where the defendant disclosed certain reasons supporting the price it paid for a particular raw material, but did not disclose that the price also was due to a side agreement the company had secured through bribery.").

Here, Defendants distinguish their statements from the relevant statements in *Braskem* and *Veon*. Specifically, Defendants argue their statements are "general" and "nothing like the specific statements in the cases on which Plaintiff relies." Defs.' Reply, ECF No. 51, at 3. This Court agrees. Each alleged misstatement in the first category of the CAC refers to "growth" in the "Middle East." *See* CAC ¶¶ 194 – 205 (citing Ericsson's alleged misstatements as (1) "[n]etwork sales growth [in the Middle East] was mainly driven by some major mobile broadband projects;" (2) "we actually see growth in Middle East and Africa which is explained by multiple customers in multiple countries. So there are many contributing parts;" (3) "[we] see the investments in R&D paying off . . . [including] strong performance, a good momentum in North America but also Latin America and Middle East;" and (4) "Sales in the Middle East showed growth despite a continued challenging macroeconomic environment."). The sources of growth mentioned in the alleged misstatements include "some major mobile broadband projects," "multiple customers in multiple countries," "many contributing parts," and "investments in R&D." *See id.* None of these factors, nor the resultant "growth" in the Middle East allegedly touted by Defendants, comes close to the level of specificity characterizing the statements in *Braskem* or *Veon*.

In *Braskem*, the defendants listed a number of factors affecting the price of a specific chemical—the raw material naphtha—including "the market prices of naphtha and other basic petrochemical derivatives, the volatility of the prices of these products in the international markets, the real/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered." *Braskem*, 246 F. Supp. 3d at 746 (S.D.N.Y. 2017). Likewise, in *Veon*, the defendants highlighted the company's success in Uzbekistan and detailed with specificity the factors responsible for its growth there, including "sales and marketing activities, regional 3G network roll-out and data development" and "efficient SG&A spending," while omitting mention of bribes made to the Uzbekistani president's daughter. *Veon*, 2017 WL 4162342, at *6-7.

No such level of specificity exists in Defendants' statements here. Notably, none of Defendants' statements refer to Iraq in particular. Instead, each alleged misstatement refers to growth in a region where Ericsson operated in multiple countries including, but not limited to, Iraq. *See* Defs.' Mem. at 5 (explaining in 2017, Ericsson's combined Middle East and Africa region "comprised 70 countries with more than 4,500 employees"); *id.* at 20 (noting "Iraq was just one of multiple countries" in which Ericsson operated within the Middle East region). As such, Defendants did not put the source of their growth in Iraq in particular at issue—in contrast to the defendants in *Veon*, for example, who "sufficiently place[d] the reasons for growth in Uzbekistan at issue to make further disclosure necessary." *Veon*, 2017 WL 4162342, at *6.

The sources of growth cited in Defendants' statements also lack the specificity necessary for actionability. For instance, sources Defendants identified as contributing to Ericsson's regional growth include "some major mobile broadband projects," "multiple customers in multiple countries," "many contributing parts," and "investments in R&D." CAC ¶¶ 193-205. These are "far too generic to be actionable under the securities laws." *Schiro v. Cemex, S.A.B. de*

*C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019) (Caproni, J.). These reasons for growth are similar to those at issue in *Schiro v. Cemex*, in which the defendant company "attributed the Company's growth [in Colombia] to broad trends and corporate strengths" while omitting any discussion of its ongoing bribery scheme in the country. *Id.* Nevertheless, the court found the defendants' statements—which claimed the company "'continue[d] strengthening [its] footprint with expansion projects' such as [a specific plant] and that the Company's 'solid asset base together with [its] unique portfolio of building solutions, [would] allow [it] to continue promoting growth in [its] markets'"—were too general to trigger a duty to disclose. *Id.*

Defendants' statements here are also similar to those in *International Flavors & Fragrances Inc.*, in which the defendant company allegedly profited from bribes and kickback schemes in Russia and Ukraine. *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 19-CV-7536 (NRB), 2021 WL 1199035, (S.D.N.Y. Mar. 30, 2021) (Buchwald, J.), *aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022), *and aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022). In that case, the company cited "organic growth, acquisitions, and macroeconomic trends" as sources of its success, making no mention of its illicit activities. *Id.* at *17. Nevertheless, the court ruled, since the defendant company had "myriad revenue streams [and sold] products all over the globe," "these types of statements [were] far too generalized and attenuated to implicate defendants' duty to disclose specific payments made . . . to customers in Russia and Ukraine." *Id.* at *18.

Here, too, Defendants' statements are vague and refer only to general trends and strengths, such as "investments in R&D" and "multiple customers in multiple countries." CAC ¶¶ 201, 203. The closest Defendants come to mentioning specific revenue sources is their

reference to "major mobile broadband projects." *Id.* ¶¶ 193-94. However, Defendants do not

mention any specific projects, nor do they even list a particular country in which those projects

are located. Plus, even if Defendants *had* mentioned a specific mobile broadband project, that

would not necessarily trigger a duty to disclose: in *Schiro*, for instance, the defendant company

cited a specific cement plant as an example of its "strengthen[ed] footprint[.]" *Schiro*, 396 F.

Supp. 3d at 297. Still, the court determined the defendant's statements were "far too generic" to

be actionable. *Id.*

Ultimately, the Court finds Defendants' statements here are distinguishable from those in

*Braskem* and *Veon*. These Defendants did not delve into specific details in their recitations of

the sources of Ericsson's growth, nor did they tout growth in Iraq in particular. As such,

Defendants' statements regarding the Company's growth in the Middle East are too general to

require further disclosure, and thus are not materially misleading.

B. Anti-Corruption Policy Statements

Next, Defendants argue alleged misstatements 5 through 7 are immaterial as a matter of

law. They claim these remarks are "general statements about reputation, integrity, and

compliance with ethical norms," and are thus "too general to cause a reasonable investor to rely

on them." Defs.' Mem. at 14; *UBS*, 752 F.3d at 183. BRS, on the other hand, contests this

characterization, arguing Defendants' compliance- and policy-related statements were "detailed

and served as confident assurances that investors relied on." Pl.'s Mem. at 12. Defendants

counter by arguing BRS cannot avoid controlling precedent that consistently finds policy

statements like those made by Defendants to be unactionable. *See* Defs.' Reply at 4.

The Court agrees with Defendants. Alleged misstatements 5 through 7 endorse the

importance of compliance and anti-corruption measures in broad terms. The statements in this

category note the existence of "internal rules" meant to "ensure compliance with legal and regulatory requirements," such as a code of business ethics, group steering documents including group policies and directives, and a code of conduct. CAC ¶ 208. The CAC also cites Defendants' statements that "Ericsson has a zero tolerance approach to corruption expressed in the Company's Code of Business Ethics," that "[t]his includes an anticorruption directive with more detailed guidelines, for example about appropriate levels of gifts and entertainment," and that "[i]n 2017, Ericsson introduced a vetting process that focuses on ethics and compliance." *Id.* ¶¶ 211, 213.

Despite BRS's contentions, these statements are "simple and generic assertions" regarding Ericsson's commitment to regulatory compliance and anti-corruption measures. *See Singh*, 918 F.3d at 64. Defendants' statements regarding the importance of legal and ethical conduct are far from the detailed "assurances of actual compliance" required to trigger further disclosure. *See id.* (contrasting "simple and generic assertions" with "actionable assurances of actual compliance," the latter of which entailed descriptions of "compliance mechanisms in confident detail, including references to 24-hour monitoring teams, specific compliance equipment, and [the defendant company's] clean compliance record").

Indeed, as Defendants correctly note, numerous district courts in this Circuit have found general policy- and compliance-related statements, such as those at issue here, to be unactionable. *See, e.g.*, *Citigroup*, 2023 WL 2632258, at *14 (finding unactionable statements including "[Citi's] compliance organization is designed to protect Citi ... by managing adherence to applicable laws [and] regulations" and "Citi's firm-wide Risk Governance Framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm"); *Schiro*, 396 F. Supp. 3d at 298

(finding unactionable statement that company "reject[s] all form of corruption" and "does not tolerate bribery in any form"); *Salim v. Mobile Telesystems PJSC*, 19-CV-1589 (AMD) (RLM), 2021 WL 796088, at *4 (E.D.N.Y. Mar. 1, 2021) (Donnelly, J.), *aff'd*, 21-839-CV, 2022 WL 966903 (2d Cir. Mar. 31, 2022) (finding unactionable defendant's statements which "touted the Company's corporate compliance system, including the Company's commitment to compliance with the FCPA and its zero-tolerance policy towards corruption.").

BRS attempts to clear this hurdle by arguing the context surrounding Defendants' statements makes them actionable. *See* Pl.'s Mem. at 11-12 (citing *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) (Woods, J.) ("It is possible, therefore, that while challenged statements are mere puffery when viewed in isolation, the context in which they were made could lead a reasonable investor to 'rely on them as reflective of the true state of affairs at the [c]ompany.'" (internal citation omitted))). BRS alleges Defendants' statements came against the backdrop of a "highly publicized DOJ and SEC investigation into the Company's corruption in other countries." *See id.* at 12. Accordingly, BRS argues Defendants' policy statements which might otherwise consist of mere puffery were material to Ericsson's investors. *See id.*

This argument fails. The context of the DOJ and SEC investigations does not change the "milquetoast corporate-speak" nature of Defendants' anti-corruption statements. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 513 (S.D.N.Y. 2017) (Oetken, J.) ("If this type of milquetoast corporate-speak [noting the existence of a "global compliance program" and "comprehensive policies and supervisory procedures"] required disclosure of all potential FCPA violations then known to the company, then 'any company that has a compliance program and discloses that program in even the most austere terms would be required, *ipso facto*, to disclose

any possible deviation that came to its attention.'" (internal citation omitted)). In fact, the

Second Circuit recently explained that where a company's previous potential wrongdoing is

already public knowledge—as the "highly publicized" FCPA investigations into Ericsson were at

the time of Defendants' alleged misstatements—investors are even *less* likely to rely on generic

compliance-related statements in making investment decisions. *See Danske Bank A/S*, 11 F.4th

at 104 ("Although Danske averred that it took steps to comply with [anti-money laundering

("AML")] protocols and vaguely recited some AML buzzwords, it claimed no particular acts of

compliance. No reasonable investor—especially one who . . . was well aware of a gigantic AML

scandal at the Estonian Branch—would weigh these generic statements in its investment

calculus.").

Moreover, as Defendants highlight, Defendants went so far as to warn investors perfect

compliance might not be possible. For instance, in the same 2017 20-F Form containing alleged

misstatement 6, Ericsson expressly warned investors "we cannot provide any assurances that

violations [of Ericsson's policies, directives, and Code of Conduct] will not occur" and "[w]e

may fail to comply with our corporate governance standards, which could negatively affect our

business, operating results, financial condition, reputation and brand." Defs.' Mem. Ex. 17, ECF

No. 49-17, at 100. That Ericsson raised the possibility it might fail to comply with its own anti-

corruption policy in the very document describing that policy further undermines the

actionability of Defendants' statements.

Ultimately, Defendants' compliance- and policy-related statements are unactionable both

because of their generality and because Defendants never promised perfect compliance. *See*

*Singh*, 918 F.3d at 64 (finding immaterial defendants' statements that were (1) too general to

provide "assurances of actual compliance" and (2) "suggest[ed] caution (rather than confidence)

regarding the extent of [Defendants'] compliance.").  As such, this Court finds alleged misstatements 5, 6, and 7 unactionable.

C.  <u>Statements Related to FCPA Investigations and Risk of Future Enforcement Actions</u>

Finally, BRS alleges Defendants made nine misstatements relating to Ericsson's entry into the DPA with DOJ, Ericsson's purportedly enhanced post-DPA compliance program, and the risk of additional FCPA investigations.  Each of these alleged misstatements is unactionable for various reasons.  The Court addresses these reasons, and the relevant alleged misstatements, in turn below.

i.      *Alleged Misstatements 8-10 and 12-16*

Most of the alleged misstatements related to the DPA and FCPA investigations are unactionable because Ericsson gave ubiquitous warnings to investors regarding the possibility of future compliance failures and investigations.  These warnings came "both before *and* after [the Company] enter[ed] into the DPA."  Defs.' Reply at 6.  Defendants thus "suggest[ed] caution (rather than confidence) regarding the extent of [Defendants'] compliance" with laws and regulations, including the terms of the DPA.  *Singh*, 918 F.3d at 64.  Considering these explicit warnings, no reasonable investor would have understood Defendants' statements regarding the resolution of the FCPA investigations and improvements to Ericsson's compliance program to contain "assurances of actual compliance."  *See id.*

First, the DPA's very requirements cut against BRS's claim that Defendants misled investors in December 2019 regarding the supposed improvements Ericsson made to its compliance program and the risk that the Company would fail to comply in the future. Defendants' alleged misstatements 8, 9, 10, and 12 occurred soon after Ericsson entered the DPA, which imposed an independent compliance monitorship on Ericsson.  Defs.' Mem. at 17;

CAC, Ex. A, § 4(e).  Since these statements came in the wake of Ericsson's DPA announcement, BRS argues Defendants attempted to frame the DPA as marking the end of the FCPA investigations into Ericsson.  However, by its own terms, the DPA suggested the possibility of future compliance failures.  The Agreement imposed a monitor requirement because the Government determined Ericsson "ha[d] not yet fully implemented or tested its compliance program."  *Id.*  The Agreement described the monitorship's purpose as "reduc[ing] the risk of misconduct"—rather than framing the monitor as a failsafe measure to prevent misconduct— illustrating the prospect Ericsson might continue to violate its compliance requirements.

Further, the DPA included findings that would prevent a reasonable investor from interpreting Defendants' alleged misstatements as "assurances of actual compliance."  *Singh*, 918 F.3d at 64.  For example, the DPA noted "the Company has been enhancing and has committed to *continuing to enhance* its compliance program and internal accounting controls."  CAC, Ex. A, § 4(d) (emphasis added).  That Ericsson needed to "continu[e] to enhance" its compliance efforts indicates the Company's extant compliance framework was insufficient.  *See Singh*, 918 F.3d at 64 ("Cigna's assertion that it 'expect[s] to continue to allocate *significant* resources' to regulatory compliance suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness" (emphasis in original)).

Moreover, Defendants proactively and repeatedly warned investors about the possibility of compliance failures and enforcement penalties.  In fact, Defendants issued some of these warnings in the very same documents containing Defendants' alleged misstatements.  Since Defendants continuously warned investors Ericsson might fail to comply with regulations and could be the target of future investigations, alleged misstatements 8, 9, 10, 12, 13, 14, 15, and

16—which relate to either Ericsson's purportedly enhanced compliance framework or the resolution of the FCPA investigations—were not misleading.

For example, less than three months after Ericsson entered into the DPA, Defendants warned investors in the company's 2019 Form 20-F that "Ericsson may fail or be unable to comply with laws or regulations and could experience penalties and adverse rulings in enforcement or other proceedings" and that "[Ericsson] cannot assure [violations of laws and regulations] do not occur." Defs.' Mem. Ex. 41, ECF No. 49-41, at 102. The 2019 20-F further cautioned "[Ericsson] may be subject to further adverse consequences following our recent resolutions with the United States Department of Justice (DOJ) and the Securities and Exchange Commission (SEC) of the previously disclosed investigations under the FCPA." *Id.* at 103. Ericsson also warned, "there can be no assurance that the remedial measures we have taken [in relation to the DPA] and plan to take in the future will be effective or that there will not be a finding of material weakness in our internal controls." *Id.* at 104.

Ericsson continued to issue similar warnings throughout the rest of the class period. For example, in its 2020 Form 20-F filed on March 25, 2021—which is the source of alleged misstatement 13 and was filed one day before Defendant Ekholm made alleged misstatement 14—Ericsson issued identical warnings to those included in its 2019 Form 20-F. The 2020 Form 20-F noted, "Ericsson may fail or be unable to comply with laws or regulations and could experience penalties and adverse rulings in enforcement or other proceedings," that "we cannot assure that violations [of laws and regulations] do not occur," and that "[w]e may be subject to further adverse consequences following our recent resolutions with [DOJ] and [SEC] of the previously disclosed investigations under the FCPA." Defs.' Mem. Ex. 42, ECF No. 49-42, at 89-90.

Ericsson's 2021 Form 6-K includes similar cautionary language. The Company filed this form on January 25, 2022, less than a month before Ericsson issued its February 15, 2022 press release that addressed the Company's conduct in Iraq and purportedly "assure[d] investors" of its "ability to manage compliance risks." CAC ¶ 235. In the 2021 Form 6-K, Ericsson reiterated the warnings it included in the 2020 Form 20-F, expressly stating the Company might fail to comply with laws and regulations. *See* Defs.' Mem. Ex. 45, ECF No. 49-45, at 57. And once again, Ericsson acknowledged the possibility of "further adverse consequences following the 2019 resolutions" of the DOJ and FCPA investigations. *Id.* at 58. The Company's 2021 6-K further noted potential consequences following "the correspondence received from the DOJ in October 2021, stating that the DOJ has determined that Ericsson breached its obligations under the DPA." *Id.* at 59.

Given the numerous warnings the Company made regarding its possible compliance failures, which it repeatedly disclosed in public filings, the Court finds Defendants' DPA-related statements were not misleading. Defendants' statements pertaining to the resolution of the FCPA investigations and Ericsson's improved compliance efforts were "framed by acknowledgments of the complexity and numerosity of applicable regulations[.]" *See Singh*, 918 F.3d at 64. They reflect Defendants' "uncertainty as to the very possibility of maintaining adequate compliance mechanism[s]." *Id*. *See also Citigroup*, 2023 WL 2632258, at *15 ("The Court's conclusion [that the defendant's statements were not misleading] is buttressed by the repeated and specific cautions that Citigroup provided in its Annual Reports."). In sum, since the Court must assess whether a statement is misleading based on its context—which here includes a steady stream of warnings to investors—the Court finds none of Defendants' statements

regarding Ericsson's post-DPA compliance, the resolution of the FCPA investigations, or the risk of future enforcement actions are actionable.

ii.    *Alleged Misstatement 10*

The Court agrees with Defendants that alleged misstatement 10 is also unactionable because it is a statement of general corporate optimism and is therefore puffery.  Defendants appropriately analogize Defendant Ekholm's statement that "[w]e're now able to move forward and fully focus on our business" to statements courts have found unactionable, including "the distractions that we [had] to overcome earlier this year are now behind us."  *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, 17-CV-3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (Keenan, J.).  *See also In re Nokia Corp. Sec. Litig.*, 19-CV-3509, 2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021) (Carter, J.) ("statements touting the progress of the integration as 'complete' and 'successful' or that the cultural integration 'went beautifully' are 'too general to cause a reasonable investor to rely upon them.'" (internal citation omitted)); *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 145 (D. Conn. 2007) (Dorsey, J.) (statement that a company had put "problems . . . behind us" was found "not actionable as a general statement of optimism"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

iii.    *Alleged Misstatement 11*

Finally, BRS focuses heavily on alleged misstatement 11.  There, during a December 7, 2019 earnings call with research analysts, Defendant Dedullen stated, "[w]e are not aware of any other follow-on investigations in any of the other countries."  CAC ¶ 224.  BRS argues this statement was misleading because Defendant Dedullen made it in response to UBS research analyst David Terrence Mulholland's question regarding the existence of other investigations of which investors should be aware.  *Id.*  BRS claims Mr. Mulholland's question encompassed the

existence of *any* other investigation—including internal investigations—such that Defendant

Dedullen should have disclosed the existence of the Iraq internal investigation.  Pl. Mem. at 14.

In response, Defendants argue Mr. Mulholland's question referred only to *regulatory*

investigations.  It is therefore fatal to BRS's claim, Defendants argue, that "Plaintiff does not

allege that, when Mr. Dedullen made this statement, any regulator had notified Ericsson that it

was investigating its conduct in Iraq."  Defs.' Mem. at 18.

    The Court agrees with Defendants.  Mr. Mulholland's question is best understood as

asking Defendants about regulatory investigations specifically, rather than *any* investigations

generally.  Defendant Dedullen's answer was therefore not false or misleading. Considering Mr.

Mulholland's question in full provides greater support for this interpretation.  It reads: "whenever

we had the last color on this, when you took a provision in Q3, I think it wasn't clear to you then

yet whether *other investigations in other regions* around the same topics might kick off. I just

wondered if you could give us an update on whether anything else has or you've had any kind of

discussions *with the regulators*."  Def. Mem. Ex. 40, ECF No. 49-40, at 6 (emphasis added).  Mr.

Mulholland's follow-up questions make it even clearer the analyst's focus was on regulatory

investigations, as these questions addressed DOJ and SEC investigations, as well as "countries

where you haven't, it seems, faced criminal . . . investigational charges."  *Id.*

    As Defendants argue, BRS "cannot plead falsity by excerpting one snippet without the

context that the question specifically concerned U.S. and non-U.S. 'regulators,' not internal

investigations."  Defs.' Reply at 7.  Contrary to BRS's assertion, it is not "hyper-technical" to

find Defendant Dedullen was referring only to regulatory investigations in making alleged

misstatement 11.  *See* Pl. Mem. at 14.  Rather, this conclusion is required in light of Mr.

Mulholland's question and the follow-up concerning regulatory investigations in particular.

Since Defendant Dedullen was responding to a question about the existence of other *government* investigations, he did not mislead investors in stating Ericsson was unaware of further investigations writ large. To be clear: BRS does not allege that, as of December 7, 2019, any regulator had notified Ericsson of an investigation focused on Iraq. Rather, BRS suggests Mr. Mulholland's targeted inquiry concerning other potential regulatory investigations encapsulated investigations of all sorts, and thus begged a response of similar scope. This is not so. This Court does not embrace BRS's broad reading of Mr. Mulholland's questions and so finds Defendant Dedullen's statement was not contemporaneously false and is therefore unactionable. *See Citigroup*, 2023 WL 2632258, at *12.

## II.  Failure to Plead Scienter

Defendants also move to dismiss BRS's Section 10(b) and Rule 10b-5 claims on the grounds BRS fails to plead Defendants acted with scienter. As previously noted, there are two ways for a plaintiff to prove scienter: (1) by showing Defendants' motive and opportunity, and (2) by demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. BRS makes no attempt to follow the first route of proving scienter, so this Court, like Defendants, addresses only the second. *See* Defs.' Mem. at 19. Defendants argue none of the facts on which BRS relies provide circumstantial evidence of recklessness. *Id.* at 19-23. These are: (1) the importance of Ericsson's business in Iraq; (2) the danger of doing business in Iraq; (3) confidential witness allegations; (4) Ericsson's internal and government investigations and the DPA; and (5) Defendant Ekholm's statements regarding the Iraq investigation. *Id.* (referencing CAC ¶¶ 246-71).

Defendants argue BRS offers only "scattershot theories" of intent, none of which come close to showing Defendants acted with "conscious recklessness—i.e., a state of mind

approximating actual intent, and not merely a heightened form of negligence." *Id.* at 19; *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal citation omitted). Rather, Defendants argue, BRS tries to "obfuscate its clear-cut pleading failure" by bundling together legally insufficient allegations—despite the "'elementary arithmetic' that 'zero plus zero (plus zero plus zero plus zero) cannot equal one.'" Defs.' Mem. at 24 (citing *In re Diebold Nixdorf, Inc., Sec. Litig.*, 19-CV-6180 (LAP), 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) (Preska, J.) (internal citation omitted)).

The Court agrees. Even "assess[ing] all the allegations holistically," as this Court is required to do, *Tellabs*, 551 U.S. at 326, BRS falls short of showing any Individual Defendant acted with conscious recklessness. BRS's allegations do not support a "powerful or cogent" inference that the Individual Defendants "harbored thoughts of fraud." *Citigroup*, 2023 WL 2632258, at *23. Therefore, scienter cannot be imputed to Ericsson. *See id.* The Court addresses each family of facts proffered by BRS in turn below.

A. Importance of Ericsson's Business in Iraq

In the CAC, BRS argues scienter can be inferred from the relative importance of Ericsson's Iraqi operations to the company as a whole. BRS alleges those "operations represented critical growth opportunities given that Iraq was one of the few remaining countries wholly lacking telecommunications infrastructure." CAC ¶ 248. BRS claims the $1.9 billion Ericsson earned from its Iraqi operations between 2011 and 2019 was "imperative to Ericsson's growth at a time when the number of opportunities for establishing telecommunications infrastructure in a developed or developing nation were drying up." *Id.* ¶ 250.

This argument fails for multiple reasons. First, BRS exaggerates the significance of Ericsson's business in Iraq in relation to the Company's global operations. As Defendants

highlight, Ericsson's global revenues during the period at issue, 2011 to 2019, were $265 billion. Defs.' Mem. at 20. The Company's earnings in Iraq constitute a mere .7 percent of that figure. As such, to claim Ericsson's Iraqi operations were "imperative" to the Company's growth strains credulity. Seven tenths of one percent falls well short of the threshold courts have required to find a particular venture within a company to be a core operation. *See, e.g.*, *Hensley v. IEC Elecs. Corp.*, 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (Furman, J.) (finding core operations doctrine inapplicable where subsidiary "contributed only about fifteen percent" to parent's total revenue).

Second, even if this comparatively minimal source of revenue *were* somehow a "core operation" of Ericsson's—which, to be clear, the Court does not so find—the "core operations" theory of scienter "at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (Carter, J.) (internal citation omitted).

B. The Danger of Doing Business in Iraq

BRS also alleges scienter based on the known dangers of conducting business in Iraq "alongside ISIS," which BRS claims "were directly communicated to the highest level officials at Ericsson." CAC ¶ 255. BRS alleges Ericsson management was made aware of the risk of conducting business in Iraq by employees including "Tom Nygren, then vice president and general counsel for Ericsson in the Middle East," and in connection with the kidnapping of Affan Akram, an employee of Ericsson's subcontractor Orbitel, who "contacted Ericsson seeking assistance after he was kidnapped [by ISIS forces]." *Id.* ¶¶ 256-57.

Defendants challenge an inference of scienter based on generalized knowledge about the dangers of operating in Iraq. Though BRS's allegations illustrate those dangers, they do not

serve as circumstantial evidence of recklessness.  While BRS alleges sobering details related to

Ericsson employees' experiences in Iraq, those accounts are insufficient to show Defendants

were consciously reckless in making the alleged misstatements.  In order to rise to the level of

conscious recklessness, the red flags Defendants purportedly ignored "must [have] be[en]

particularized, specific, and together, egregious."  *Int'l Flavors & Fragrances Inc.*, 2021 WL

1199035, at *25 (internal citation omitted).  BRS has not met this standard here.  The Court

agrees with Defendants that BRS's "general allegation[s]" that Ericsson operated in a country

with "reported corruption comes nowhere close to establishing" that Defendants "were

specifically put on notice" of bribery or other misconduct by its employees in that country.

Defs.' Reply at 8 (quoting *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *25).

    C. <u>Confidential Witness Allegations</u>

BRS further alleges scienter can be inferred based on allegations from confidential

witnesses 1 and 2 ("CW 1" and "CW 2," respectively).  CW 1 allegedly confirmed "Ericsson had

a database for contracts, payments, and renewals," which "rolled up to the Central Procurement

Team located in Sweden."  CAC ¶ 253.  CW 2, who reported to former Ericsson official Tarek

Saadi, allegedly "confirmed that Saadi regularly engaged in corrupt practices," that "Ericsson

was not blind to it," and that Saadi reported directly to Defendant Ekholm.  *Id.* ¶¶ 105, 11.

These allegations fail to show scienter.  Confidential witness allegations must "show that

individual defendants actually possessed the knowledge highlighting the falsity of public

statements."  *Marcu v. Cheetah Mobile Inc.*, 18-CV-11184 (JMF), 2020 WL 4016645, at *7

(S.D.N.Y. July 16, 2020) (Furman, J.) (internal citation omitted).  Conclusory allegations that

defendants "were aware" of certain information or "should have had" such information are

insufficient. *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 15-CV-7199 (JMF), 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (Furman, J.).

However, this is precisely what the confidential witnesses allege. CW 1 alleges Ericsson maintained a database of contracts and payments that "rolled up" to the "Central Procurement Team," but as Defendants highlight, CW 1 does not allege the database contained unlawful payments or that an Individual Defendant was on the "Central Procurement Team" or otherwise reviewed the database. Defs.' Mem. at 21. In its opposition, BRS argues that while "Defendants question whether the databases contained unlawful payments, [] that is an inference that must be drawn in Lead Plaintiff's favor at this stage." Pl. Mem. at 20. Even drawing such an inference, CW 1 still does not allege any of the Individual Defendants knew of particular information in the database. CW 1's allegations do not illustrate that the Individual Defendants "actually possessed the knowledge highlighting the falsity of public statements." *See Marcu*, 2020 WL 4016645, at *7. Therefore, they are insufficient to show scienter.

CW 2's allegations similarly fall flat. By claiming Tarek Saadi engaged in corrupt conduct and alleging that Mr. Saadi reported directly to Defendant Ekholm, BRS simply alleges Defendants "should have had" information about Saadi's purported misconduct. *See Prinik*, 2017 WL 3278928, at *3. Even assuming Mr. Saadi *did* report directly to Defendant Ekholm, such a reporting arrangement alone does not establish scienter. *See Fogel v. Wal-Mart de Mexico SAB de CV*, 13-CIV-2282 (KPF), 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (Failla, J.) (declining "invitation" to "speculate that because [the defendant] was responsible for supervising a culpable individual, that individual must have reported to [the defendant] directly, and must have conveyed information that would make [the defendant] at least reckless not to know of the alleged bribery in which that individual was involved"), *aff'd sub nom. Fogel v.*

*Vega*, 759 F. App'x 18 (2d Cir. 2018), *and aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018).  Moreover, as Defendants note, BRS does not allege Mr. Saadi actually informed any Individual Defendant of his alleged corrupt practices.  Accordingly, the Court finds neither CW 1's nor CW 2's allegations raise a strong inference of scienter.

D.  Ericsson's Investigations and DPA

Next, BRS alleges Ericsson's internal investigations, government investigations, and entry into the DPA support a showing of scienter.  CAC ¶¶ 259-68.  BRS argues Ericsson's first internal investigation, the existence of which was disclosed in the company's 2017 Form 20-F, supports scienter: as part of the "enhancements" Ericsson purportedly implemented following this investigation, the company "disclosed a development in its reporting structure" in which the "Chief of Compliance directly reported to the Board."  CAC ¶ 262.  This reporting structure "supports the inference that Defendants knew or were reckless of not knowing of the widespread corrupt and illegal conduct taking place in Iraq."  *Id.*  Though not alleged in the CAC, BRS alleges in its opposition that the "initiation of the DOJ and SEC investigations in 2016" are also indicia of scienter because Defendants "touted compliance reforms and anti-corruption enhancements" despite "knowing [the] results" of these investigations.  Pl. Mem. at 18.

BRS also argues the internal Iraq report completed in 2019 further supports scienter because Defendants "commissioned the Iraqi Corruption Report" and "the Chief Compliance Officer reported directly to the Board of Directors and was responsible for providing updates."  Pl. Mem. at 18-19.  BRS claims, therefore, Defendants "knew of or were reckless in not knowing" the contents of the Iraq report.  CAC ¶ 271.

Finally, BRS alleges Ericsson's entry into the DPA supports scienter because Defendants "were required to be aware" of the "stringent, ongoing obligations to the DOJ" tied to the DPA.

CAC ¶ 264.  Since breaching the DPA "could result in criminal penalties for Defendants, it can be inferred that they were aware of the obligations and any related conduct that could be determined to run afoul of the agreement."  *Id.* ¶ 266.

Defendants, however, argue neither the investigations nor the DPA support an inference of scienter.  The Court agrees.  First, BRS does not allege either Ericsson's first internal investigation or the DOJ and SEC investigations initiated in 2016 focused on conduct in Iraq.  And as Defendants argue, "investigations involving countries *other than Iraq* do not support the inference that the Individual Defendants knew of conduct in Iraq."  Defs.' Reply at 9.

Next, with respect to the Iraq investigation itself, BRS "identifies no specific information that any Individual Defendant learned from the Company's internal investigation in Iraq that rendered their statements false."  *Id.*  This makes BRS's allegation insufficient: BRS has "not identified any specific fact that the Individual Defendants possessed that contradicted their statements at the time they were made," which BRS must do to allege scienter on the basis of "a defendant's knowledge of and/or access to certain facts."  *Citigroup*, 2023 WL 2632258, at *22 (internal citation omitted).  Moreover, the Court agrees with Defendants that "the 2019 internal investigation plainly can have no bearing on scienter for the MEA Business Statements and Policy Statements, which were made in 2017 and 2018."  Defs.' Mem. at 23 (citing *Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *6 (S.D.N.Y. Sept. 19, 2018) (Wood, J.) ("[plaintiff] must identify specific contradictory information . . . available to the defendant at the time" of challenged statements to plead scienter)).

The Court also agrees with Defendants that BRS "has it backwards" regarding the proper inference to draw from Ericsson's internal investigations.  Defs.' Mem. at 22.  Rather than supporting an inference of scienter, "Ericsson's efforts to investigate and remediate

noncompliance" *undermine* such an inference, because "clutching the results of [the] investigation . . . directly contradicts the rationale behind engaging in an internal investigation in the first place: the desire to uncover any improper conduct by" Ericsson's employees. *Id.* (citing *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (Castel, J.)). *See also Salim*, 2021 WL 796088, at *14 ("[T]he fact that [the defendant] commenced an internal investigation tends to undermine any inference of scienter").

Further, Defendants convincingly argue BRS fails in its attempt to use the Board's reporting structure as an indicator of scienter. Defendant Ekholm was the only Individual Defendant to serve on the Board. Defs.' Mem. at 22-23 n.14. However, BRS "alleges no well-pled facts that CEO Ekholm supposedly learned from [the Chief of Compliance's reporting] that rendered any challenged statement false when made." *Id.* Without such a detailed allegation, Defendant Ekholm's board position is insufficient to plead scienter: "[s]cienter cannot be inferred solely from the fact that, due to [a defendant's] board membership or executive managerial position, [he] had access to the company's internal documentation as well as any adverse information." *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 528 (S.D.N.Y. 2020) (Buchwald, J.) (internal citation omitted).

Ericsson's entry into the DPA similarly fails to raise an inference of scienter for any of the Individual Defendants. That the Individual Defendants "held senior executive positions when Ericsson entered into the DPA," Pl.'s Mem. at 19, does not make the DPA an indicator of scienter. As Defendants argue, "general allegations regarding . . . the organizational role of a defendant" are "by themselves . . . insufficient to raise a strong inference of a defendant's scienter." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 467 (S.D.N.Y. 2017) (Koeltl, J.) (internal citation omitted).

E. Defendant Ekholm's Statements About Disclosure

Finally, BRS alleges scienter based on Defendant Ekholm's statement to the press on February 15, 2022 that "[t]he materiality of our findings did not pass our threshold to make a disclosure," and "[t]hat was our judgment when we completed the investigation two years ago." CAC ¶¶ 50, 178; Defs.' Mem. Ex. 51, ECF No. 49-51. BRS argues this statement was an "admission" by Ekholm that "he knew of the illegal conduct in Iraq at least as early as 2019 and affirmatively elected to conceal this material information from investors." CAC ¶ 178. However, the Court finds Defendants' explanation more accurately describes Defendant Ekholm's statement: as "merely explain[ing] the Company's rationale in 2019 for certain disclosure decisions under applicable Swedish investor disclosure laws and rules." Defs.' Reply at 10.

In sum, even viewed holistically, BRS's allegations do not support a strong inference of scienter. As such, BRS's Section 10(b) and Rule 10b-5 claims must also be dismissed for lack of scienter.

III. Loss Causation

A securities fraud plaintiff must also prove loss causation. The loss causation requirement "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

Here, BRS's "failure to adequately plead either scienter or a misstatement or omission is dispositive. Thus, the Court need not reach the issue of loss causation." *Das*, 332 F. Supp. 3d at 817 (S.D.N.Y. 2018) (citing *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 367 (S.D.N.Y. 2015) (Ramos, J.) (collecting cases)). Regardless, "since loss causation is premised

on the assumption that a misstatement or omission concealed something from the market, [BRS] cannot demonstrate loss causation where [it has] failed to establish any such misrepresentation." *Id.* (internal citation omitted).

IV.     Section 20(a) Claim

Finally, BRS asserts a control person claim against the Individual Defendants under Section 20(a) of the Exchange Act. To establish control person liability, the plaintiff must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108 (internal citation omitted). Because BRS has failed to establish a primary violation of Section 10(b), its Section 20(a) claim necessarily fails and must be dismissed. *See Citigroup*, 2023 WL 2632258, at *23.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. The Clerk of Court is directed to terminate the motion at ECF No. 47 and to close this case.

SO ORDERED.

## s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 24, 2023
       Brooklyn, New York

38